FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2020 JUL -6 PM 4: 32

OFFICE OF THE CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

DAVID PITLOR,

      Plaintiff,

v.

TD Ameritrade, Inc.

Charles Schwab and Co., Inc.

Kutak Rock, LLP.

      Defendants.

8:20CV267

**Jury Demand**

**Attachments Begin at Page 88**

## Introduction

1.       TD Ameritrade and Schwab provide brokerages services to millions of retail investors. They claim to be committed to helping their customers, regardless of their knowledge, experience, resources, or lack thereof. In their dealings with Pitlor, however, the Defendants refused to even acknowledge Pitlor's meritorious inquiries and assertions of error. Rather than resolving the disputed matters and remedying damages, they instead conspired to deny wrongdoing and aggressively acted to protect a nefarious, clandestine enterprise that operates in the shadows of their legitimate business affairs.

2.       The Defendants' strategically defended against Pitlor's allegations with deception and false claims; Schwab boldly attributes the source of the error to be Pitlor's having "misinterpreted data

1

viewed online" [1], so too TD Ameritrade portrayed Pitlor to be incompetent in their official responses to regulatory authorities' official inquiries, as well as to this Court.

3.    The Defendants' alter-egos shrewdly rely on the lack of obvious motive. Relentlessly exploitive and abusive conduct targeting their own customers certainly is not aligned with their best interest. Indeed, Pitlor's claims are exceptionally peculiar and, on their face,- improbable, but they are nonetheless firmly grounded in verifiable facts. TD Ameritrade and Schwab's legitimate business enterprises are infected by a rot of unabashed criminality, dishonesty, and recklessness that must be potently deterred because they are either unable or unwilling to police themselves responsibly.

4.    By reducing the prospect of punitive consequences, the Defendants' self-regulatory regime encourage financial institutions to rectify wrongdoing and to avoid unnecessarily protracted disputes. The Defendants have abused this trust and the accommodations afforded to them. Now, firm corrective action is warranted.

## B.    Pitlor's initial inquiries and assertions of error were valid.

5.    When Pitlor initially complained to TD Ameritrade in 2017, he asserted meritorious claims of error. While precise damages were not identified, the discrepancies identified by Pitlor were clear evidence of exploitation and Pitlor genuinely sought TD Ameritrade's assistance to understand what had transpired. TD Ameritrade refused to acknowledge the existence of any errors, generally denied all wrongdoing, closed Pitlor's account, and hired Kutak Rock as outside counsel who promptly insisted that Pitlor cease and desist from any further communications with TD Ameritrade. Soon

---

[1] Schwab's characterization is a deceptive misrepresentation of the truth, and egregiously inflammatory. Schwab deliberately deviated from its accounting procedures, altering the manner by which data was displayed and account balances were calculated. "Misinterpretations" aside, Pitlor's assertions of error have never been contested on their merits, and the analyses herein confirms the validity of his initial complaints. The Defendants general denials of wrongdoing are substantiated only by baseless, defamatory attacks on Pitlor's aptitude and credibility. This recklessly abusive, unjustifiable conduct quintessentially characterizes the nature of the Defendants' invidiously discriminatory animus towards Pitlor's **class of one.**

Pitlor is a Professional Mechanical Engineer Licensed by the State of Nebraska in 2019. He is "clothed" with state authority to assess and validate designs based on scientific principles and numerical analyses. Pitlor's license can be suspended or revoked should he make reckless or deliberate misrepresentations, regardless of whether they are proffered in his official capacity as a professional engineer. The professional accreditations of the Defendants' representatives (in particular, professional traders and attorneys) similarly require personal and professional affairs to be conducted with integrity, yet they recklessly misrepresented the truth with deceptive intent, repeatedly, without regard for their professional obligations.

2

thereafter, Defendant Kutak Rock became unresponsive and proceeded to materially assist TD Ameritrade's unlawfully obstructive conduct thereafter.

6.         Schwab adopted a similar strategy to address Pitlor's complaints in 2018 which were not only meritorious, but also accurately identified the range of total damages, the dates those funds went missing, as well as the key role of sweeps transfers with respect to the erroneous.  Schwab categorically rejected the notion of any errors having occurred and proceeded to close Pitlor's accounts and restrict access to historical data and account records.  Defendant Schwab then enlisted Kutak Rock to represent their legal interests.

## C.     Punitive damages and restitution are warranted

7.         Defendants Charles Schwab and TD Ameritrade are jointly and severally liable for the damages and unjust enrichment relating to the exploitation of Pitlor's Charles Schwab accounts.

8.         The integration of TD Ameritrade and Schwab's Electronic Services constitutes a tying arrangement, uniquely violative- *per se,* for its being undisclosed and for its purely illicit purposes which included the facilitation of money laundering, larceny, and digital trespassing.

9.         The Defendants presumed that their schemes were not able to be solved so long as Pitlor's access to information was sufficiently restricted.  Their escalating series of abusive violations and obstructive behavior in responding to Pitlor's complaints was certainly fueled by this objective.

10.        Now, the Defendants are firmly entrenched, more motivated than ever to avoid addressing Pitlor's allegations.  They are strongly incentivized to avoid acknowledging their nefarious collusion as supposed competitors as well as their egregiously obstructive conduct.

11.        The Defendants have portrayed Pitlor to be a vexatious, incompetent nuisance, just another uninformed *pro se* litigant undeserving of any remedy, but the facts and analysis herein leave no question that is the Defendants are the unreasonable, recklessly irresponsible parties to this dispute.

12.        $10 Million was comingled with the assets in Pitlor's Schwab account with manipulative and exploitative intent.  Pitlor's accounts at TD Ameritrade and Schwab were targeted incessantly; the verifiable damages alone surpass well over $100,000.  Their pretending that those funds do not exist must not be permitted to substitute as a valid claim of ownership.

13.        The Defendants must be held liable for the full scope of their egregious transgressions, otherwise their enterprise will be emboldened to continue the expansion of their brazenly predatory

3

schemes without fear of reprisal. The Defendants compromised their own technological infrastructure to defeat the procedural safeguards of their self-regulatory regime. Left unchecked, the Defendants' reckless audacity poses a dynamic threat of causing future harm, and thus punitive damages and restitution are warranted.

14.        The deprivation of rights, anti-trust, and RICO claims presented herein pertain to Pitlor's "class of one", but the Defendants' conduct represents a broader threat to retail investors and to fair competition considering that the Defendants' merger will integrate approximately 23 million retail brokerage accounts into the combined technological infrastructure of Schwab-TD Ameritrade's "Electronic Services", rendering them susceptible to the same abuses that targeted Pitlor's account, but with significantly reduced prospects of RICO or anti-trust liability. **The truly unprecedented nature of the Defendants' transgressions justifies a price being set high enough to effectively deter repetition of similar conduct going forward.**

# PARTIES

15.        **Plaintiff David Pitlor** David Pitlor is a resident of Omaha, NE. He is a Licensed Professional Mechanical Engineer (P.E.) in the State of Nebraska since 2019. Pitlor resided in Omaha during the time the events described in this complaint transpired.

16.        **Defendant TD Ameritrade., Inc. ("TD Ameritrade")** is a subsidiary of TD Ameritrade Holding Corporation (NASDAQ: AMTD) and provides brokerage and other financial services, currently headquartered in Omaha, NE.

17.        **Defendant Charles Schwab & Co., Inc.** ("Schwab")is a subsidiary of the Charles Schwab Corporation (NYSE: SCHW), a multi-national financial services company headquartered in San Francisco, California.

18.        **Defendant Kutak Rock** is a national law firm based in Omaha Nebraska. Kutak Rock's is a Defendant with respect to Claim #1 only, and as pertains to Predicate Set #9. All other references to the "Defendants" refer to the other Defendants and hereby specifically excludes Kutak Rock.

# JURISDICTION

19.     This court has subject matter jurisdiction over this complaint pursuant to the following:

- **28 U.S.C. § 1331**, as applicable to Claims 1, 4, and 5 **18 U.S.C. § 1964(c).**
- **28 U.S.C. § 1337**, as applicable to Claim 6, brought under **15 U.S.C. § 15**
- **28 U.S.C. § 1343**, as applicable to claims 2 & 3 brought under **42 U.S.C. § 1983** and **42 U.S.C. § 1985**, respectively.

# VENUE

## A.     Generally

20.     David Pitlor is a resident of Omaha, NE within the geographical area  Disitrict of Nebraska, and thus this Court is the proper venue

## B.     This venue is the only Court of competent jurisdiction

21.     Pitlor's TD Ameritrade account was an essential element to the exploitation of the Schwab Account.  In September 2017, TD Ameritrade unilaterally terminated the business relationship along with all contractual commitments and obligations - from that date going forward, Then, in 2018, the closed account was utilized as an unauthorized access device to facilitate various aspects of the wire fraud, bank fraud, and money laundering, as well as fraudulent activities involving access devices.

22.     TD Ameritrade made representations to this Court identifying Pitlor as a former customer with a closed account.  TD Ameritrade's unilateral termination of the business relationship, and their subsequent declarations to this Court, should not be rendered to be without meaning.

23.     This Court has ordered Pitlor to arbitrate his dispute with Charles Schwab, and Pitlor remains committed to arbitrating those claims.  However, adjudicating those claims would undoubtedly have preclusive effect, leaving Pitlor without means to vindicate his complaints against TD Ameritrade with respect to their critical role in the exploitation of Pitlor's Schwab Account.

5

24.    No arbitration agreement exists between Pitlor and Defendant Kutak Rock.

25.    The facts that establish the Defendants' collusive agreement are not obvious.  They were not reasonably available when Pitlor brought his previous actions, and this is attributable to the Defendants' fraudulent concealment and spoliation of evidence.  The Defendants have never engaged on the merits of any of Pitlor's allegations with anything but false claims to substantiate their general denials of wrongdoing.  With respect to these considerations, the statute of limitations and the doctrine of estoppel establishes fair constraints.

# TD AMERITRADE ACCOUNT

## Claim #1:

## Racketeer Influenced and Corrupt Organizations Act (RICO)

## 18 U.S.C. § 1962(c).

**Defendants: TD Ameritrade and Kutak Rock**
**Enterprise:  TD Ameritrade, Gainskeeper Inc., Liveperson.com, unspecified 3rd party "vendors" and "visitors"**

A.    **Defendants TD Ameritrade and Kutak Rock patterns of racketeering activities violated 18 U.S.C.  § 1962(c)**

26.    Defendant TD Ameritrade and Defendant Kutak Rock did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of **18 U.S.C. § 1961**.

27.    The specified unlawful activities were facilitated by the Defendants' regular and repeated use of the facilities and services of the enterprise.  The Defendants had specific intent to engage in the substantive RICO violations, and each committed at least two acts or else aided and abetted such acts.

28.    Pitlor's TD Ameritrade Account was exploited by patterns violations of **18 U.S.C. § 1343** – *Fraud by Wire,*  **18 U.S.C. § 1341** – *Mail Fraud*, and **18 U.S.C. § 1029** - *Fraud and related*

*activity in connection with access devices*. These specified unlawful activities predicated violations of **18 U.S.C. § 1956** - *Laundering of Monetary Instruments*, and moreover constitutes a conspiracy to commit money laundering with unspecified third party "vendors" and "visitors" whom are evidenced to have accessed Pitlor's account via unauthorized or counterfeit access devices.

29.     Instead of honestly addressing the obvious errors asserted by Pitlor, Defendant TD Ameritrade denied all wrongdoing and took asserted action to conceal the evidence. Defendant Kutak Rock then conspired with TD Ameritrade to aggressively defend against meritorious assertions of error via an orchestrated campaign reliant upon deliberate misrepresentations and obstructive conduct designed to prevent revelation of the truth. In so doing, their *Obstruction of Justice* violated **18 U.S.C. 1503** & **18 U.S.C. 1512**.

30.     The patterns of racketeering activity shared the same or similar purposes and results, namely the execution of a scheme that utilized TD Ameritrade's state-of-the-art technological capabilities and infrastructure to manipulate account data, as well as the account structure itself. The "hijacking" of the "Cash Account was achieved by representing all cash value as *Margin Equity*. which was utilized accordingly to assess illegitimate debt balances.

31.     Ultimately, the data manipulations facilitated the execution and concealment of larceny, money laundering, and other exploitative and manipulative activities[2]. The orchestrated efforts to escape liability for wrongdoing included objectively false claims directed at Pitlor, the regulatory authorities, and this Court to conceal the exploitation of Pitlor's account and the damages that occurred.

## B.     Defendant Kutak Rock is culpable for their multiple acts to aid and abet Defendant TD Ameritrade's obstruction of justice.

32.     TD Ameritrade's representatives and attorneys conspired to misrepresent facts and submit false claims to the regulatory authorities to substantiate dishonest denials of wrongdoing.

33.     Defendant Kutak Rock may not have been knowledgeable with respect to the intimate technical aspects of the exploitation, but they were informed enough to subtly misrepresent key facts and obscure the truth with deleterious effect. The clever deceptions enabled TD Ameritrade to avoid

---

[2] Due to the sheer volume of material, the detailed evidence and analysis of those other exploitative and manipulative activities- which were not the proximate cause of significant damages, - *per se*, are not the focus of this complaint. However, Pitlor is prepared to present supplementary evidence and analysis pertaining to those matters, specifically pertaining to the manipulative potential with respect to the exercise of options positions.

7

acknowledging evidence directly indicative of wrongdoing. For having directly aided and abetted Defendant TD Ameritrade's illicit enterprise, Kutak Rock exceeded the threshold of conduct that can plausibly be excused as "zealous advocacy".

34.      Kutak Rock's role extended beyond of provision of legal services to protect the *legitimate rights* of their client; their role was aligned with unlawfully obstructive purposes and objectives, they were well aware of that fact, and they did not hesitate to participate. Kutak Rock submitted false claims to the SEC and this Court that they knew to be untruthful, presented in a manner that purposefully assaulted his competence and character. This strategy was relied upon because the factual merits of Pitlor's complaints were sound and could not be directly confronted.

35.      The Defendants' concerted actions served to further aggravate the damages suffered by Pitlor by injuring the prospect of his receiving relief, and their intent was to ensure that wrongdoing- which they were indeed aware of - would never be remedied.

36.      The specific details and evidence giving rise to Kutak Rock's liability as a Defendant is presented with **Predicate Counts #9A & #9B**.

[The remainder of this page is intentionally left blank]

8

C.    **Defendant TD Ameritrade and other individuals comprise an association-in-fact enterprise that exists separate from the acts of racketeering.**

## I.  GAINSKEEPER, INC.

37.            Defendant TD Ameritrade and *Gainskeeper, Inc.* ("Gainskeeper") are separate, unaffiliated, individual entities, but nonetheless constitute an association-in-fact enterprise. Gainkeeper offers automated cost basis accounting solutions.  TD Ameritrade relies on their services to calculate tax lots and to adjusted cost basis with respect to wash sales.

38.            TD Ameritrade and Gainskeeper's association-in-fact enterprise has legitimate business purposes; it exists independently and without regard to the predicate acts committed in furtherance of the unlawful purposes and objectives of the enterprise.

39.            TD Ameritrade's disclosures[3] state that neither of the companies are responsible for the other's work, but the companies' products and services are codependent in the following manner:

- Gainskeeper relies on trading data provided by TD Ameritrade to calculate *Profits and Losses* for tax lots' accounting, including *Cost Basis Adjustments* for *Disallowed Wash Sale Losses*.

- TD Ameritrade utilizes the data calculated by Gainskeeper for 1099-B Tax Filings reported to the I.R.S. on behalf of its customers as well as general accounting of *Profits and Losses.*

40.            TD Ameritrade's scheme relied on fraud involving *Gainskeeper* to conceal the missing *Margin Equity* and illegitimate debt balances assessed against Pitlor's account.  Erroneously inconsistent data from TD Ameritrade's systems were further exploited via unique contrivances involving records and data generated by *Gainskeeper*, particularly concerning *Disallowed Wash Sale Losses* and the corresponding *Cost Basis Adjustments.*  The net result was a convoluted data set that

---

[3] According to TD Ameritrade's disclosure:

*"GainsKeeper is a registered service mark of GainsKeeper, Inc.  TD Ameritrade and GainsKeeper are separate, unaffiliated companies and are not responsible for one another's products or services."*

concealed value in a manner that "Disallowed" proceeds while appearing to account for all transactions.

41. Errors in Gainskeeper's calculations caused erroneous *Profits and Losses* calculations, as well as faulty data which populates the 1099-B Tax Filings submitted to the I.R.S.

## I. LIVEPERSON.COM

42. TD Ameritrade enabled third party access via fraudulent, hidden account access keys and authentication tokens. *Liveperson.com's* services are documented to have been directly utilized in conjunction with the fraudulent use of access devices to conduct clandestine, undisclosed transactions from segregated account partitions that Pitlor was unable to access, as confirmed by files generated by error reports by the *ThinkorSwim* desktop application on Pitlor's personal computer.

43. According to their website, *Liveperson.com* offers artificial-intelligence powered bots that manage communications, perform custom automated tasks, and collect data pertaining to customer interactions.

44. Liveperson's bots specifically tailored for the financial services industry perform tasks such as "processing payments", "opening credit cards", "checking balances and transfers", and "issuing collections".

45. Moreover, their "conversational commerce" tools enable direct interaction with customers that, when implemented with nefarious intent, are powerful eavesdropping technology.

46. TD Ameritrade presumably utilizes third party software such as Liveperson for legitimate purposes, or otherwise the enterprise managed to interlace Liveperson's services into the fabric of its technological infrastructure so to appear legitimate.

## II. OTHER 3RD PARTIES: "VENDORS" & "VISITORS"

47. Utilizing the services of *Liveperson.com*, TD Ameritrade enabled unauthorized access to Pitlor's account and appears to have trafficked account access devices to facilitate the nefarious activities of third-parties identified as "visitors" and "vendors".

48. TD Ameritrade facilitates access to its data repositories and other services to third party vendors and other partners. For example, TD Ameritrade's business activities include advanced data analytics that presumably, does not exist solely for the purposes of facilitating racketeering activities. However, advanced data modeling and associated activities would have been necessary to

perform the calculations required to design, manage, and execute the scheme that exploited Pitlor's account.

49.. The manner by which TD Ameritrade researches, analyzes, distributes, and facilitates access to its customers' account data for these "visitors" and "vendors" is relevant to the claims herein. It seems that TD Ameritrade facilitated direct access to Pitlor's account, which was hijacked by one or more of these "vendors" or "visitors". Thus, understanding the series of failures that would have had to happen to enable such flagrant abuses would be a relevant course of inquiry with respect to discovery.

50. TD Ameritrade cannot be a visitor or vendor to itself, certainly not as their legitimate corporate entity. Thus, the pattern of racketeering activity involved a third-party individual separate from TD Ameritrade.

## D.    The acts of racketeering were continuous.

51. The conduct began beginning with the activation of Plaintiff's Margin Account on January 21, 2016, contemporaneous with the erroneous timestamps that afflicted the *Transaction History's* through June 2017.

52. The pattern of racketeering conduct continued with respect to TD Ameritrade's integral involvement in the exploitation and sabotage of Pitlor's Schwab account as set forth by other claims *infra*, indicating that a very potent threat that this behavior will continue to be repeated.

## E.    The scheme operated by altering the historical account data to understate *Margin Equity*, concealed via manipulation of the cash balances.

53. The scheme that targeted Pitlor's TD Ameritrade account ####1360 relied upon inaccurate asset valuations and altered transaction sequences to misrepresent cash value and understate *Margin Equity*.

54.. Illegitimate debts are evidenced by the erroneous Margin debts accounting of the Monthly Statements.

55. The Futures Account was also targeted for exploitation. The account structure was awry due to the improper comingling of the Margin Account of the Futures and Brokerage Accounts.

12

Cash value was illegitimately segregated and concealed by improper *Mark-to-Market* adjustments and inaccurate asset valuations which ultimately led to inaccurate Futures Sweeps transactions.

*F.* **The laundering of proceeds generated by the specified unlawful activities was facilitated anomalous transactions that proliferate the historical account data,** *Intra-Account Transfers & Courtesy Credits.*

## I. *Intra-Account Transfers*

56.  *Intra-Account Transfers,* suspicious journal entries appearing as pairs of offsetting transactions for small sums that pollute the historical account data and are inconsistently documented amongst the various records. No documented account activity legitimately corresponds to these seemingly trivial transactions.

57.  While the entries appear as pairs of offsetting transactions in the *ThinkorSwim* Account Records and the Transaction History, the Monthly Statements document the *Intra-Account Transfers* as single transactions that credit those nominal sums to the account.

58.  Analysis of *Intra-Account* transfers confirms that the values involved are essentially "detached" from the accounting and, therefore very likely to represent the transfer of value corresponding to larger discrepancies occurring around the same time- as opposed to the small dollar or cent-valued sums reported.

59.  Documented as "journal entries", their specific purpose was to conceal the source, destination, quantity, and ownership of larger sums targeted for conversion.

## II. *Courtesy Credits*

60.  The historical account balances in the *ThinkorSwim* Account Records were altered via fraudulent transactions, so-called *Courtesy Credits.* These transactions appear to be deposits of negligible sums into the account as the final transaction reported for that day, but there is no justification for these entries, hundreds of which populate the record.

61.  *Courtesy Credits* adjust the *Cash Balance* reported by the *ThinkorSwim* Historical Account Data to match the *Available Cash Balance* reported by the Transaction History, rectifying small cent-valued discrepancies that exist without legitimate explanation.

62.       *Courtesy Credits* are not consistently documented amongst the various account records:

  a. the Transaction History, which is a running log of the *Available Cash Balance*, and which documents all transactions in the account exclusively with respect to that single metric (in addition to date/time), does not report any *Courtesy Credits.*

  b. The Monthly Statements report "*Courtesy Adjustments*" that often do not correspond to and, overall, are far less numerous than the *Courtesy Credits* reported by the *ThinkorSwim* Account Records

.

## G.    The missing cash value was concealed by *Cost Basis Adjustments* corresponding to illegitimate *Disallowed Wash Sale Losses* calculated by Gainskeeper Inc.

63.       The scheme relied on illegitimate *Cost Basis* adjustments to conceal the targeted funds' existence from the *Profit/Loss* accounting, and this was achieved by spoofing Gainskeeper Inc.'s calculations of *Disallowed Wash Sale Losses*- also via manipulated transaction sequences[4].

64.       Because the overstated *Disallowed Wash Sale Losses* never occurred, the funds illegitimately removed are accounted for and thereby effectively concealed from the *Profit/Loss* accounting and 1099-B Tax Filings.

65.       Irregularities with the Tax Filings confirm that the *Gainskeeper* Profit/Loss accounting is an erroneous record that does not accurately correspond to the actual account activity.

## H.    The scheme exploited inaccuracies and inconsistencies amongst the various record formats pertaining to timekeeping.

### I.    Generally

66.       In addition to *Courtesy Credits* and *Intra-Account Transfers*, the historical account data was manipulated to alter transaction sequences and to generate other inconsistencies in the recordkeeping specifically pertaining to timekeeping.  These errors afflicted Transaction History, the

---

[4] The transaction sequences utilized to spoof *Gainkeeper's* accounting were a separate contrivance than those previously described with respect to TD Ameritrade's records.  An example of the contorted transaction data is attached to the TD Ameritrade - *Disallowed Wash Sale Losses* section of this complaint.

*ThinkorSwim* Historical Account Data, and the Trade Confirmation Log, as described in further detail below.

## II.    **Transaction History**

67.    Inaccurate timestamps caused the sequence of transactions to be reported inaccurately by the Transaction History, the log that documents each transaction, the *Available Cash Balance*, and a timestamp indicating the date and time of execution.  All securities transactions were documented with inaccurate timestamps that appear to be forward-shifted by 6-7 hours (depending on daylight savings time) but may also be interpreted as a delay of 17-18 hours.

68.    The inaccurate timestamps were responsible for two unique modes of errantly ordered transaction sequences:

- When the timestamps of after-hours transactions were shifted forward past midnight; Transaction History then erroneously reported these transactions to be the first, rather than the last transactions of the day (as opposed to reporting the transactions with the following day's date)

- Only the securities transactions were afflicted with erroneous timestamps (i.e. Margin Account transactions), but the accurate timestamps corresponding to the cash transactions (such as deposits) caused the sequence of transactions to be reported out of order.

## III.    *ThinkorSwim* **Historical Account Data**

69.    The *ThinkorSwim* Historical Account Data is a comprehensive record of securities and cash transactions, historical balances, and profit/loss figures.  According to the *ThinkorSwim* Historical Account Data, deposits were credited at time 00:00, conflicting with the accurate timestamps reported by *Transaction History* which report those deposits being credited to the account in the evening as the final transaction (or amongst the final transactions) of the day. Thereby, the transactions were inaccurately ordered.

70.    Also, there are discrepancies pertaining to the *ThinkorSwim* transaction reference numbers that indicate the existence "man-in-the-middle" scheme whereby a hidden, undisclosed account secretly front runs all securities transactions, enabling a variety of prospective abuses.

15

### III.    Trade Confirmation Log

71.        The sequence of transactions reported by the Trade Confirmation Log, a separate record of the securities transactions, was rendered to be inaccurate due to selective misrepresentation of certain targeted transactions.

### IV.    *Settlement*

72.        The lack of settlement dates does not factor into the specific analyses presented herein, however it does represent a significant flaw in the recordkeeping that enabled or otherwise aided the documentation of erroneous transaction sequences to be documented, as well as their subsequent abuse.

73.        Settlement is where the "rubber meets the road" with respect to the conversion of cash for securities. Without verification of Settlement, there is no verification of the funds reported to have been exchanged.

74.        Indeed, the fact that Settlement cannot be verified for Pitlor's trades impeaches the credibility of the entire record, not only with respect to the purchase and sale of securities, but separately with respect to the accounting of credits and debts.

Excerpt from:  2016 - *ThinkorSwim* Digital Account Statement

Account Trade History

| Exec Time | Spread | Order ID | Settlement Date | Side | Qty | Pos Effect | Symbol | Exp | Strike | Type | Price | Net Price | Order Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/22/16 07:53:20 | STOCK | 1156125806 | | BUY | +100 | TO OPEN | ERX | | | ETF | 17.11 | 17.11 | LMT |
| 1/22/16 09:59:02 | STOCK | 1156420660 | | SELL | -100 | TO CLOSE | ERX | | | ETF | 17.22 | 17.22 | LMT |
| 1/22/16 13:38:11 | SINGLE | 1156723111 | | BUY | +1 | TO OPEN | GLD | 17 JUN 16 | 103 | CALL | 5.45 | 5.45 | LMT |
| 1/22/16 14:13:51 | VERTICAL | 1156768348 | | SELL | -1 | TO OPEN | GLD | 30 JUN 16 | 100 | PUT | 2.45 | 1.17 | MKT |
| | | | | BUY | +1 | TO OPEN | GLD | 30 JUN 16 | 95 | PUT | 1.28 | CREDIT | |
| 1/22/16 14:23:13 | SINGLE | 1156780076 | | BUY | +5 | TO OPEN | GLD | 31 MAR 16 | 110 | CALL | 1.11 | 1.11 | MKT |
| 1/25/16 14:11:36 | STOCK | 1157648620 | | BUY | +84 | TO OPEN | USLV | | | ETF | 10.54 | 10.54 | MKT |
| 1/25/16 14:13:35 | STOCK | 1157648691 | | BUY | +7 | TO OPEN | USLV | | | ETF | 10.56 | 10.56 | LMT |
| 2/2/16 08:38:50 | SINGLE | 1163183959 | | SELL | -1 | TO CLOSE | GLD | 17 JUN 16 | 103 | CALL | 7.50 | 7.50 | LMT |
| 2/2/16 08:40:15 | SINGLE | 1163188596 | | BUY | +1 | TO CLOSE | GLD | 30 JUN 16 | 100 | PUT | 1.72 | 1.72 | MKT |

16

Excerpt from: 2017 - *ThinkorSwim* Digital Account Statement

Account Trade History

| Exec Time | Spread | Order ID | Settlement Date | Side | Qty | Pos Effect | Symbol | Exp | Strike | Type | Price | Net Price | Order Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/3/17 13:52:47 | SINGLE | 1395613297 | | SELL | -3 | TO CLOSE | GLD | 6 JAN 17 | 111.5 | CALL | .42 | .42 | LMT |
| 1/3/17 13:52:47 | SINGLE | 1395613297 | | SELL | -3 | TO CLOSE | GLD | 6 JAN 17 | 111.5 | CALL | .42 | .42 | LMT |
| 1/3/17 13:55:07 | SINGLE | 1395615957 | | SELL | -2 | TO CLOSE | GLD | 6 JAN 17 | 109.5 | CALL | 1.37 | 1.37 | LMT |
| 1/3/17 13:55:07 | SINGLE | 1395615957 | | SELL | -2 | TO CLOSE | GLD | 6 JAN 17 | 109.5 | CALL | 1.37 | 1.37 | LMT |
| 1/3/17 13:56:25 | SINGLE | 1395617375 | | BUY | +30 | TO OPEN | UUP | 13 JAN 17 | 26.5 | PUT | .11 | .11 | LMT |
| 1/3/17 13:56:25 | SINGLE | 1395617375 | | BUY | +30 | TO OPEN | UUP | 13 JAN 17 | 26.5 | PUT | .11 | .11 | LMT |
| 1/4/17 11:55:11 | SINGLE | 1396366958 | | SELL | -44 | TO CLOSE | USO | 27 JAN 17 | 11 | PUT | .14 | .14 | LMT |
| 1/4/17 11:57:11 | SINGLE | 1396369596 | | BUY | +11 | TO OPEN | UNG | 27 JAN 17 | 9 | CALL | .15 | .15 | LMT |

## Predicate Count #1:

### Defendant: TD Ameritrade

### 18 USC § 1343 – *Fraud by Wire*

75. **On 8/19/2016, cash value totaling $23,665.59 was removed from Pitlor's TD Ameritrade Account ####1360 without registering as a loss.**

76. Coinciding with the removal of *Margin Equity* described above, Options contracts were documented as being removed from the account (again) on ***Thursday***, 8/18/2016, with fresh *ThinkorSwim Transaction Reference Numbers*, but these options positions had already been removed from the account upon their expiration several months earlier on ***Friday***, 5/16/2016.

77. The exploitation of Pitlor's Schwab Account also utilized expired options positions to conceal cash value that was illegitimately removed from the account. [5]

78. The detailed evidence and analysis pertaining to **Predicate Count #1** are presented in the attachment: **TD Ameritrade Predicate Counts #1, #2, & #3.**

---

[5] Worthless options positions in Pitlor's Schwab Account were reported to be active investments by the March Statement (Schwab 2018). The unrealized losses associated with those positions never came to be realized in the Brokerage Statements, and that $45,236.01 directly corresponds to funds demonstrated to be missing from the account. **(SEE March 26th and brokerage statements)**

17

## Predicate Count #2:

### Defendant: TD Ameritrade
### 18 U.S.C. 1956 – *Laundering of monetary instruments*
### (or alternatively, 18 U.S.C. § 1343 – *Fraud by Wire*)

79.        **On 8/30/2018, TD Ameritrade did knowingly conduct financial transactions,** *Intra-Account Transfers,* **affecting interstate commerce, that were designed in whole or in part to conceal and disguise the ownership and control of $23,665.59 concealed via Wire Fraud (as set forth in Predicate #1).**

80.        The laundered funds had been accumulated and segregated via wire fraud primarily targeting Pitlor's Futures Account.  Various contrivances were repetitively employed over the course of several months (as set forth *infra in* **Predicate #3 Wire Fraud***).*

81.        The transaction that converted or transferred $23,665.59 was disguised as a ($.04) debit, reported to be an *Intra-Account Transfer* on 8/30/2016.

82.        The Transaction History lists two offsetting transactions for $.04 and ($.04), both listed to be *Intra-Account Transfers*, but having no net impact to the account balances.

83.        The 2016 - August Statement documents just a single *Intra-Account Transfer* from account ####1360-1 to ####1360-2 which credits $.04 to Pitlor's *Cash Balance*.

84.        But, the offsetting $.04 debit transaction is not documented and thus represents an unaccounted sum that has been removed from the account without being documented by the August Statement.

85.        After the $23,665.59 was removed from the account on 8/19/2016, a $.04 discrepancy between the *Margin Equity* and *Cash Balance* was revealed to exist.  Thereby, the missing $.04 transaction on 8/30/2018 directly relates to the concealed removal of $23,665.59 that occurred previously.

86.        The detailed evidence and analysis pertaining to **Predicate Count #2** are presented in the attachment: **TD Ameritrade Predicate Counts #1, #2, & #3.**

# Predicate Count #3:

## Defendant: TD Ameritrade

## 18 U.S.C. § 1343 – *Fraud by Wire* (multiple counts)

87.        **The $23,665.59 debited on 8/19/2016 was accumulated via patterns of misrepresentations and deceptively erroneous accounting pertaining to the Futures Account.**

88.        The value of Futures positions was systematically misrepresented to enable misappropriation (such as via Futures Sweeps) by relying on the following fraudulent accounting contrivances:

a. Fraudulent *Mark to Market* entries that exist only in the *ThinkorSwim* records lack a *ThinkorSwim Transaction Reference Number*. These transactions adjusted the *Cash Balance* but did not correspond to the accurate value of those Futures positions.

b. Cash set aside to satisfy *Initial Margin Requirements* was defalcated and made to disappear.

c. Erroneous valuations for open futures positions at the end of the day. The inaccurate calculations effected any open futures position at 00:00:00, and the polluted data became realized in the Profits/Loss data, illegitimately.

**d.** The Futures Account's transactional accounting is comingled with the margin of the brokerage account in clear violation of **17 CFR § 1.20**[6], and the futures sweep transactions were unrepresentative of the actual trading activity.

89.        The detailed evidence and analysis pertaining to **Predicate Count #3** are presented in the attachment: **TD Ameritrade Predicate Counts #1, #2, & #3.**

---

[6] "A futures commission merchant must separately account for all futures customer funds and segregate funds as belonging to its futures customers" (CFR § 1.20.a - *Futures customer funds to be segregated and separately accounted for. - General.*)

"The futures commission merchant must reflect in the account that it maintains for each futures customer the net liquidating equity for each such customer." (CFR § 1.20.i *Requirements as to amount*)

19

## Predicate Count #4

### Defendant: TD Ameritrade

### 18 USC § 1343 – *Fraud by Wire* (5 Counts)

### Predicate Count #4-A

90.     The 1/11/2017 - *ThinkorSwim* Historical Account Data reports negative balance, $6,809.53 corresponding to a *Margin Equity* deficit that is not documented as a *Margin (Debt) Balance* by the 2017 - January Statement.

Excerpts from 1/11/2017 - *ThinkorSwim* Historical Account Data.

| | |
|---|---|
| ✔ Cash & Sweep Vehicle | ($6,809.53) ← |
| ❯ Equities | $14,505.00 |
| ❯ Options | $9,289.50 |

| | |
|---|---|
| Net Liquidating Value | $16,984.97 |
| Stock Buying Power | ($22,698.43) |
| Option Buying Power | ($14,499.53) |
| Available Funds For Trading | ($6,809.53) |
| Long Stock Value | $14,505.00 |
| Long Marginable Value | $12,240.00 |
| Short Marginable Value | $0.00 |
| Margin Equity | $5,430.47 ← |
| Equity Percentage | 44.00% |
| Maintenance Requirement | $12,240.00 ← |

91.     The historical balances contain a glaring discrepancy. The *Margin Equity* is $6,809.53 less than the minimum *Margin Equity* required by the *Maintenance Requirement*. This *Margin Equity* deficiency indicates that purchases that are documented to have occurred on 1/11/2017 could not have been occurred due to insufficient funds.

92.     The 2017 January Statement reports no *Margin Debt* existing on 1/11/2017, or the following day, thereby impeaching the legitimacy of the historical account data and the other

20

account records that purport to corroborate that negative value for *Cash and Sweep Vehicle* and *Available Funds For Trading*, ($6,809.53).

### 2017 January Statement (excerpt - page 24)

### TD AMERITRADE CASH INTEREST CREDIT/EXPENSE

| | | TD Ameritrade Cash Interest Credit/Expense | | | | |
|---|---|---|---|---|---|---|
| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
| 01/13/17 | $ (2,512.28) | $ - | 4 | 9.25 | $ 2.58 | $ - |
| 01/17/17 | (15,420.95) | - | 1 | 9.00 | 3.86 | - |
| 01/18/17 | (19,542.08) | - | 1 | 9.00 | 4.89 | - |

page 24 of 25

93.     The *Margin Equity* deficit represents damages attributable to the collection of illegitimate debts that were excluded by the official record.  Additional evidence and analysis confirm that the account records were systematically altered to conceal the removal of those funds.  The detailed analysis[7] corresponding to 1/10/2017 – 1/11/2017 support this claim and presents the evidence and analysis that confirm the following to be true:

- the *ThinkorSwim* Historical Account Data  was fraudulently altered to conceal cash value (as *Margin Equity*), confirmed by screenshot of live account balances from 1/11/2017[8]

- the difference between the stated *Margin Equity*, $5,430.47, and the *(Margin) Maintenance Requirement* $12,240.00, indeed precisely corresponds to damages totaling $6,809.53, the negative cash balance stated by the *ThinkorSwim* Historical Account Data.

- The understated Margin Equity becomes a type of "Disallowed Loss" that conceals value debited via illegitimate debts.

---

[7] The detailed evidence and analysis are presented in the attachment: **TD Ameritrade Predicate Count #4-A.**

[8] 1/10/2017 is one of the few instances whereby live account balances in the TD Ameritrade account were preserved by Pitlor's screenshots.  The live balance data facilitates detailed analysis that precisely calculates damages $6,809.53.

- A debt balance that did not exist is manufactured into existence via selective manipulation of transaction sequences reported by Trade Confirmations Log, after the fact. While securities transactions are involved, the fraud in fact relates to the cash accounting[9].

- *Courtesy Credits* facilitate the means to edit account balances to correspond to the value concealed by the various fraudulent contrivances.

94.    The detailed evidence and analysis are presented in the attachment: **TD Ameritrade Predicate Count #4-A.**

95.    Additional instances exist whereby *Margin Equity* is impossibly understated. Often, the discrepancies are for small amounts, indicative of the scheme skimming smaller slices of value repetitively over time[10].

## Predicate Count #4-B[11]

96.    **Manipulation of historical account data for 1/23/2016 and 1/23/2016 results in damages totaling $137.48**

97.    The exploitation began in January 2016, immediately after the timestamp discrepancy originated, which coincided with the activation of the Margin Account.

98.    As shown by the following excerpts:

---

[9] If sufficient funds exist, then no fictitious debt comes into existence and thus the manipulation of the Trade Confirmation Log's transaction sequences cannot be exploited in this manner. However, when a negative balance that never existed is feigned into existence, it becomes the basis for the well concealed fraud. Thereby, the damages are dependent on manipulations of cash balances, not the purchases and sales transactions, which – in real time, transacted appropriately.

[10] The frequency of anomalous *Courtesy Credit* transactions (often appearing on a daily basis for weeks at a time) supports the conclusion that exploitation of this sort was a constant occurrence transpiring on a nearly daily basis. And, when *Excess Margin Equity* existed, cash value could be skimmed without creating a deficit with respect to the *Maintenance Requirement.*

[11] As the damages pertaining this count involves funds and transactions pertaining to the FDIC insured *Money Market,* this Count is alternatively stated as Bank Fraud in violation of **18 U.S.C.§ 1344,** as may be relevant with respect to the statute of limitations. (The scheme stopped utilizing the *Money Market* accounts after the first few months)

22

a.  the *Margin Equity %* changes from 100% to 98% between Saturday 1/23/2016 and Sunday 1/24/2016.

b.  The manipulations do not result in a negative cash balance, but a *Margin Equity* deficit is nonetheless fabricated into the record due to the *Money Market* transfer. That value is extracted from the Marginable Value of the securities in the account, representing damages totaling $137.48 despite there having been no documented transactions in the account during that time.

**Damages:  $137.48 = $4,718.73 (Maintenance Requirement) (–) $4,581.25 (Margin Equity)**

### Excerpts from *ThinkorSwim* Historical Account Data

| Saturday, 1/23/2016 | | Sunday, 1/24/2016 | |
|---|---|---|---|
| Net Liquidating Value | $6,451.37 | Net Liquidating Value | $6,451.37 |
| Stock Buying Power | $2,503.80 | Stock Buying Power | $2,503.80 |
| Option Buying Power | $751.14 | Option Buying Power | $751.14 |
| Available Funds For Trading | $751.14 | Available Funds For Trading | $751.14 |
| Long Stock Value | $4,662.01 | Long Stock Value | $4,662.01 |
| Long Marginable Value | $4,662.01 | Long Marginable Value | $4,662.01 |
| Short Marginable Value | $0.00 | Short Marginable Value | $0.00 |
| Margin Equity | $5,445.65 | Margin Equity | $4,581.25 |
| Equity Percentage | 100.00% | Equity Percentage | 98.00% |
| Maintenance Requirement | $4,718.73 | Maintenance Requirement | $4,718.73 |
| Money Market Balance | $24.22 | Money Market Balance | $888.62 |
| Total Commissions & Fees YTD | $56.29 | Total Commissions & Fees YTD | $56.29 |

Cash balance at the start of business day 23.01 CST — — — 807.86

Cash balance at the start of business day 24.01 CST — — — 807.86

99.  The change in *Margin Equity* coincides with a *Money Market* purchase of $864.40 which is inconsistently documented by the <u>Transaction History</u> as having occurred on 1/25/2016, despite the *Money Market Balance* having been credited on 1/24/2016 according to the *ThinkorSwim* <u>Historical Account Data.</u>

100.  The previous excerpts from the *ThinkorSwim* <u>Historical Account Data</u> report the *Option Buying Power* $751.14, and the Cash Balance $807.86 for both 1/23/2016 & 1/24/2016. But, there is no *Margin Balance* reported for these days, so the *Option Buying Power* and *Cash &*

23

*Sweep Vehicle* balance should be equal to the *Money Market Balance*, $888.62. Indeed, the discrepancies correspond to the damages calculated above, $137.48.

**Damages[12]: $137.48 = $888.62 (Money Market Balance) (–) $751.14 (Buying Power)**

### 2016 January Statement (excerpt - page 8)

### TD AMERITRADE CASH INTEREST CREDIT/EXPENSE

| | | | TD Ameritrade Cash Interest Credit/Expense | | | |
|---|---|---|---|---|---|---|
| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
| 01/28/16 | $ (171.39) | $ - | 4 | 9.25 | $ 0.18 | $ - |
| Total Interest Income/(Expense) | | | | | $0.18 | $ 0.00 |

| | | Insured Deposit Account Interest Credited | | | | |
|---|---|---|---|---|---|---|
| Begin Date | Balance | Number of Days | Interest Rate | Interest Accrued | MTD Accrued | MTD PAID |
| 01/12/16 | $ 6,001.09 | 7 | 0.0100 | $ 0.01 | $ 0.01 | $ - |
| 01/19/16 | 2,595.11 | 1 | 0.0100 | - | 0.01 | - |
| 01/20/16 | 4,415.08 | 1 | 0.0100 | - | 0.01 | - |
| 01/21/16 | 2,026.12 | 1 | 0.0100 | - | 0.01 | - |
| 01/22/16 | 24.22 | 3 | 0.0100 | - | 0.01 | - |
| 01/25/16 | 888.62 | 1 | 0.0100 | - | 0.01 | - |
| 01/27/16 | 64.31 | 1 | 0.0100 | - | 0.01 | 0.01 |
| Total Interest Income | | | | | | $0.01 |

### Excerpt from 2016 – Transaction History

| | | | |
|---|---|---|---|
| 01/25/2016 00:00:01 | MONEY MARKET PURCHASE (MMDA1) | 0.00 | 783.84 |
| 01/25/2016 00:00:01 | MONEY MARKET PURCHASE | -864.40 | -80.76 |
| 01/25/2016 21:11:38 | Bought 84 USLV @ 10.54 | -895.35 | -976.11 |
| 01/25/2016 21:13:35 | Bought 7 USLV @ 10.56 | -83.91 | -1,060.02 |
| 01/26/2016 02:31:38 | MONEY MARKET REDEMPTION | 872.75 | -187.27 |
| 01/26/2016 02:31:41 | MONEY MARKET REDEMPTION (MMDA1) | 0.00 | -187.27 |
| 01/27/2016 00:00:01 | MONEY MARKET PURCHASE (MMDA1) | 0.00 | -187.27 |
| 01/27/2016 00:00:01 | MONEY MARKET PURCHASE | -48.44 | -235.71 |
| 01/28/2016 00:00:01 | MONEY MARKET REDEMPTION (MMDA1) | 0.00 | -235.71 |
| 01/28/2016 00:00:01 | MONEY MARKET REDEMPTION | 64.31 | -171.40 |
| 01/28/2016 00:00:01 | OFF-CYCLE INTEREST (MMDA1) | 0.01 | -171.39 |

- Also note the inexplicable Money Market transactions for $0.00.
- The inexplicable discrepancies call into question the validity and accuracy of this record such that it cannot be trusted.

# Predicate Count #4-C

101.    **On 2/21/2017, an undocumented negative cash balance of ($1,088.60) exists along with Margin Equity deficit of $76.98.**

102.    On 2/21/2017, the historical data reports *Margin Equity* to be $9,027.76, but the *Maintenance Requirement,* $9,104.74. The difference is only $76.98, but more significant discrepancies also exist pertaining to the cash accounting and the *Margin Balances*.

103.    As shown by the excerpts below, a negative balance is reported for the *Cash & Sweep Vehicle, ($1088.60)* that is not listed as a *Margin Balance* by the <u>2017 – February Statement</u>

<u>Excerpts from 2/21/2017 - *ThinkorSwim* Historical Account Data</u>.



| | $9,933.76 |
|---|---|
| Stock Buying Pow·· | ($256.53) |
| Option Buying Po ver | $10,076.96) |
| Available Funds F···· g | ($76.96) |
| Long Stock Value | $10,116.36 |
| Long Marginable · · | $10,116.36 |
| Short Marginable ···· | $0.00 |
| Margin Equity | $9,027.76 |
| ·········· | 89.00% |
| M·········iret··· | $9,104.72 |
| ············· | $0.00 |
| ············· | $6,699.97 |
| ⌄ ···h & weep ····· | ($1,088.60) |

<u>2017 Feburary Statement (excerpt - page 19)</u>

## TD AMERITRADE CASH INTEREST CREDIT/EXPENSE

Statement for Account # 788-801360
02/01/17 - 02/28/17

| TD Ameritrade Cash Interest Credit/Expense | | | | | | |
|---|---|---|---|---|---|---|
| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
| 02/23/17 | (8,837.16) | - | 1 | 9.25 | 2.27 | - |
| 02/24/17 | (7,998.03) | - | 3 | 9.25 | 6.17 | - |
| 02/28/17 | (997.67) | - | 1 | 9.25 | 0.26 | - |
| Total Interest Income/(Expense) | | | | | $11.49 | $0.01 |

104.    The negative cash balance ($1088.60) is not represented, nor does the historical data corroborate the *Margin Balances* that *are* reported. The excerpts from the *ThinkorSwim Digital Account Statement* confirm several significant discrepancies:

a. The "*Cash Balance at the start of business day..*" figures do not correspond to the *Margin Balances* reported by the "*Cash Interest Credit/Expense*" section of the February Statement.

b. The *Courtesy Credit* transactions (denoted as "ADJ" as adjustments) were entered into the record on a later date as evidenced by the sequence of the *ThinkorSwim Transaction Reference Numbers* ("REF #"). [The red arrows highlight the *Courtesy Credit* for 2/27, Ref# 1434**883**275 was entered into the record after the securities transactions on 2/28, Ref# 1434**670**140].

### Excerpt from *2017 - ThinkorSwim Digital Account Statement*

| DATE | TIME | TYPE | REF # | DESCRIPTION | Misc Fees | Commissions | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 2/15/2017 | 0:00:00 | EFN | 1426733606 | CLIENT REQUESTED ELECTRONIC FUNDING RECEIPT (FUNDS NOW) | | | 10,000.00 | 10,006.38 |
| 2/15/2017 | 18:46:02 | TRD | 1426736974 | tAndroid BOT +940 JNUG @11.75 | | -9.99 | -11,045.00 | -1,048.61 |
| 2/16/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 16.02 CST | | | | -1,048.61 |
| 2/16/2017 | 11:42:12 | TRD | 1427477074 | tAndroid BOT +918 JNUG @12.09469 | | -9.99 | -11,102.93 | -1,088.63 |
| 2/16/2017 | 23:59:59 | ADJ | 1428549649 | Courtesy Credit | | | 0.03 | -1,088.60 |
| 2/17/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 17.02 CST | | | | -1,088.60 |
| 2/22/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 22.02 CST | | | | -1,088.60 |
| 2/22/2017 | 23:59:59 | ADJ | 1431687114 | Courtesy Credit | | | $0.15 | $38.11 |
| 2/23/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 23.02 CST | | | | $38.11 |
| 2/23/2017 | 23:59:59 | ADJ | 1432985678 | Courtesy Credit | | | $0.02 | $877.24 |
| 2/24/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 24.02 CST | | | | $877.24 |
| 2/24/2017 | 23:59:59 | ADJ | 1434035047 | Courtesy Credit | | | $0.20 | $134.33 |
| 2/25/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 25.02 CST | | | | $134.33 |
| 2/27/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 27.02 CST | | | | $134.33 |
| 2/27/2017 | 23:59:59 | ADJ | 1434883275 | Courtesy Credit | | | $0.15 | $4.30 |
| 2/28/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 28.02 CST | | | | $4.30 |
| 2/28/2017 | 8:59:48 | TRD | 1434670140 | SOLD -8 UVXY 100 (Weeklys) 3 MAR 17 24 CALL @.53 CBOE | -0.21 | -15.99 | 424 | 400.62 |
| 2/28/2017 | 9:00:38 | TRD | 1434672318 | SOLD -10 UVXY 100 (Weeklys) 3 MAR 17 23 CALL @.70 BATS | -0.27 | -17.49 | 700 | 1,082.86 |

Note: The above excerpt was edited to exclude most of the security transactions so to more efficiently highlight the relevant data, specifically the *Cash Balances*, *Courtesy Credits*, and *Transaction Ref #'s*

105.    Because the live data is not available for direct comparison, the precise calculation of damages is uncertain. The unique damages corresponding to this count is estimated to be the value of the unreported negative cash balance ($1,088.60).

106.    The other discrepancies, including the Margin Debt Balance ($8,837.16) may correspond to the accumulation of previously concealed funds, but it also seems to correspond to funds that have been targeted for theft, indicating that the entirety of Pitlor's $10,000.00 deposit was the true target (See previous excerpt - green arrow). In this manner, the scheme shares similarity to a check kiting scheme, but with 21st century technological enhancements and several additional facets that introduce additional layers of complexity.

$$\$10,000.00 \sim = \sim \$9,925.76 = \$1088.60 + \$8,837.16$$

## Predicate Count #4-D

107.        **On 3/02/2017, an undocumented negative cash balance of ($1,106.69) exists along with *Margin Equity* deficit of $22.46.**

108.        On 3/02/2017, The *ThinkorSwim* Historical Account Data reports a *Margin Equity* value of $9,735.63 and a *Maintenance Requirement* of $9,758.09.  The difference is only $22.46, but more significant discrepancies exist pertaining to the cash accounting and *Margin Balances*.

109.        Because the live data is not available for direct comparison, the precise calculation of damages is uncertain.  The unique damages corresponding to this count are estimated to be the value of the unreported negative cash balance ($1,106.69).

Excerpts from 3/01/2017 - *ThinkorSwim* Historical Account Data

| | |
|---|---|
| Net Liquidating Value | $14,616.32 |
| Stock Buying Power | ($74.87) |
| Option Buying Power | ($10,022.46) |
| Available Funds For Trading | ($22.46) |
| Long Stock Value | $10,842.32 |
| Long Marginable Value | $10,842.32 |
| Short Marginable Value | $0.00 |
| Margin Equity | $9,735.63 |
| Equity Percentage | 90.00% |
| Maintenance Requirement | $9,758.09 |
| Money Market Balance | $0.00 |
| Total Commissions & Fees YTD | $8,315.14 |
| ∨ Cash & Sweep Vehicle | ($1,106.69) |

27

<u>2017 March Statement (excerpt - page 26)</u>

### TD AMERITRADE CASH INTEREST CREDIT/EXPENSE

| TD Ameritrade Cash Interest Credit/Expense | | | | | | |
|---|---|---|---|---|---|---|
| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
| 03/01/17 | $ (977.68) | $ - | 1 | 9.25 | $ 0.25 | $ - |
| 03/03/17 | - | 10,022.74 | 3 | 0.01 | - | 0.01 |
| 03/07/17 | (1,907.79) | - | 1 | 9.25 | 0.49 | - |
| 03/08/17 | (1,087.70) | - | 1 | 9.25 | 0.28 | - |
| 03/09/17 | (5,995.37) | - | 1 | 9.25 | 1.54 | - |
| 03/10/17 | (8,276.55) | - | 3 | 9.25 | 6.38 | - |
| 03/13/17 | (2,459.78) | - | 1 | 9.25 | 0.63 | - |
| 03/23/17 | (4,895.33) | - | 1 | 9.25 | 1.26 | - |
| 03/24/17 | (11,633.97) | - | 3 | 9.00 | 8.73 | - |
| 03/27/17 | (9,970.64) | - | 1 | 9.25 | 2.56 | - |
| 03/28/17 | (16,800.79) | - | 1 | 9.00 | 4.20 | - |
| 03/29/17 | (8,486.75) | - | 1 | 9.25 | 2.18 | - |
| **Total Interest Income/(Expense)** | | | | | **$28.50** | **$0.01** |

### Excerpts from *2017 - ThinkorSwim Digital Account Statement*

| DATE | TIME | TYPE | REF # | DESCRIPTION | Misc Fees | Commissions | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 3/27/2017 | 23:59:59 | ADJ | 1455757852 | Courtesy Credit | | | $0.10 | $3.24 |
| 3/28/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 28.03 CST | | | | $3.24 |
| 3/28/2017 | 0:00:00 | DOI | 1455213537 | SUBSTITUTE PAYMENT~JNUG | | | $17.87 | $21.11 |
| 3/29/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 29.03 CST | | | | $21.11 |
| 3/29/2017 | 23:59:59 | ADJ | 1457683724 | Courtesy Credit | | | $0.07 | $30.63 |
| 3/30/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 30.03 CST | | | | $30.63 |
| 3/31/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 31.03 CST | | | | $30.63 |

Note: The above excerpt was edited to exclude most of the security transactions so to more efficiently highlight the relevant data, specifically the *Cash Balances*, *Courtesy Credits*, and *Transaction Ref #'s*

## Predicate Count #4-E

110.    On 6/21/2017, the historical account data reports a *Margin Equity* deficit and negative cash balance of $23,384.74.  Further discrepancies exist pertaining to the *Margin Balances* reported by the <u>2017- June Statement.</u>

111.    On 6/21/2017, The *Margin Equity* is $38,110.26 but the *Maintenance Requirement* is $61,495.00.  The deficiency is $23,384.74, precisely corresponding to the negative balance for the *Cash and Sweep Vehicle.*

Excerpts from 6/21/2017 - *ThinkorSwim* Historical Account Data

| | |
|---|---|
| Net Liquidating Value | $38,422.26 |
| Stock Buying Power | ($77,949.13) |
| Option Buying Power | ($23,384.74) |
| Available Funds For Trading | ($23,384.74) |
| Long Stock Value | $61,495.00 |
| Long Marginable Value | $61,495.00 |
| Short Marginable Value | $0.00 |
| Margin Equity | $38,110.26 |
| Equity Percentage | 62.00% |
| Maintenance Requirement | $61,495.00 |
| Money Market Balance | $0.00 |
| Total Commissions & Fees YTD | $14,372.30 |
| ˅ Cash & Sweep Vehicle | ($23,384.74) |

2017 June Statement (excerpt - page 14)

TD AMERITRADE CASH INTEREST CREDIT/EXPENSE

| | TD Ameritrade Cash Interest Credit/Expense | | | | | |
|---|---|---|---|---|---|---|
| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
| 06/05/17 | $ (4,218.75) | $ - | 1 | 9.25 | $ 1.08 | $ - |
| 06/06/17 | (3,015.70) | - | 1 | 9.25 | 0.77 | - |
| 06/07/17 | (2,995.71) | - | 1 | 9.25 | 0.77 | - |
| 06/16/17 | - | 40,020.29 | 5 | 0.01 | - | 0.05 |
| 06/21/17 | (60,190.82) | - | 1 | 7.75 | 12.96 | - |
| 06/22/17 | (57,444.62) | - | 1 | 7.75 | 12.37 | - |
| 06/23/17 | (55,223.40) | - | 3 | 7.75 | 35.67 | - |
| 06/26/17 | (61,236.04) | - | 1 | 7.75 | 13.18 | - |
| 06/27/17 | (10,750.42) | - | 1 | 9.00 | 2.69 | - |
| Total Interest Income/(Expense) | | | | | $79.49 | $0.05 |

29

### Excerpts from *2017 - ThinkorSwim Digital Account Statement*

| Date | Time | Type | Ref # | Description | | | | |
|---|---|---|---|---|---|---|---|---|
| 6/20/2017 | 11:28:32 | TRD | 1516646519 | tAndroid BOT +39 UVXY 100 (Weeklys) 23 JUN 17 11.5 CALL @.14 | -$0.92 | -$36.20 | -$546.00 | $40,009.14 |
| 6/20/2017 | 11:30:05 | TRD | 1516647795 | tAndroid BOT +6,625 UVXY @10.0599 | | ($6.95) | ($66,646.84) | ($26,644.65) |
| 6/20/2017 | 23:59:59 | ADJ | 1517971268 | Courtesy Credit | | | $0.22 | ($26,644.43) |
| 6/21/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 21.06 CST | | | | ($26,644.43) |
| 6/21/2017 | 17:18:58 | TRD | 1518279253 | tAndroid SOLD -94 JNUG @17.90 | ($0.04) | | $1,682.60 | ($23,384.74) |
| 6/21/2017 | 23:59:59 | ADJ | 1519131667 | Courtesy Credit | | | $0.01 | ($23,384.73) |
| 6/22/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 22.06 CST | | | | ($23,384.73) |
| 6/22/2017 | 14:08:32 | TRD | 1519223456 | tAndroid BOT +25 JNUG 100 (Weeklys) 30 JUN 17 19.5 CALL @.75 | ($0.59) | ($25.70) | ($1,875.00) | ($1,478.24) |
| 6/22/2017 | 23:59:59 | ADJ | 1520225274 | Courtesy Credit | | | $0.16 | ($1,478.08) |
| 6/23/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 23.06 CST | | | | ($1,478.08) |
| 6/23/2017 | 11:05:14 | TRD | 1520088654 | tAndroid SOLD -440 JNUG @19.63 | ($0.19) | ($6.95) | $8,637.20 | $7,151.98 |
| 6/23/2017 | 23:59:59 | ADJ | 1521460756 | Courtesy Credit | | | $0.19 | $9.00 |
| 6/24/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 24.06 CST | | | | $9.00 |
| 6/25/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 25.06 CST | | | | $9.00 |
| 6/26/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 26.06 CST | | | | $9.00 |
| 6/27/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 27.06 CST | | | | $9.00 |
| 6/27/2017 | 23:59:21 | ADJ | 1523285812 | Courtesy Credit | | | $0.12 | $8.21 |
| 6/28/2017 | 0:00:00 | BAL | | Cash balance at the start of business day 28.06 CST | | | | $8.21 |
| 6/28/2017 | 8:31:16 | TRD | 1522966259 | tAndroid SOLD -15 JNUG 100 (Weeklys) 30 JUN 17 20 CALL @.35 IS | ($0.38) | ($18.20) | $525.00 | $514.63 |
| 6/28/2017 | 23:59:59 | ADJ | 1524362890 | Courtesy Credit | | | $0.09 | $9.88 |

Note: The above excerpt was edited to exclude most of the security transactions so to more efficiently highlight the relevant data, specifically the *Cash Balances*, *Courtesy Credits*, and *Transaction Ref #'s*

112.    The purchase of 6625 shares of UVXY would not have been able to be executed unless sufficient funds were available. This, plus the inflated *Margin Balance* that does not correspond with the historical data, indicates the existence of funds previously segregated and concealed from Pitlor (as *Funds Available to Borrow*) that were utilized to perpetrate further theft via illegitimate, unreported debt balances.

113.    Because the live data is not available for direct comparison, the precise calculation of damages is uncertain. The unique damages corresponding to this count are estimated to be the value of the unreported negative cash balance, ($23,384.74).

114.    Additional discrepancies exist pertaining to the cash accounting and *Margin Balances* reported by the official record.

115.    The transaction data offers further evidence that balances cannot possibly correspond to the live data. The 6/20/2017 purchase of UVXY resulted in a negative cash balance of ($26,644.65). The following day, there is a total *Margin Balance* of ($60,190.82) reported by the **2016 - June Statement.**

116.    For 6/26/2017, a *Margin Balance* is reported of $61,236.04 despite a positive cash balance being reported by the *ThinkorSwim Digital Account Statement.*

30

117.        Also, the Trade Confirmations Log reports an inaccurate order of transaction execution during the relevant time span corresponding to the negative cash balance and *Margin Equity* deficiency.

   a. On 6/20/2017, the final transaction is reported to be the sale of 300 shares of UVXY for total proceeds of $3,004.98.

   b. On 6/21/2017, the final transaction is reported to be the sale of 1194 shares of JNUG for total proceeds of $21,365.18.

118.        The Transaction History (and the other records) report the the final transaction of 6/20/2017 to be the purchase of 6625 shares of UVXY, and the final transaction of 6/21/2017 to be the purchase of 2950 shares of UVXY.

119.        The erroneous accounting results in a total of $24,370.16 that was prospectively not available to contribute to the Margin Equity of prior purchases due to inaccurate sequence reported by the Trade Confirmations Log.  Compare to *Margin Equity* deficiency of $23,384.74.

$$\$24{,}370.16 = \$21{,}365.18 + \$3{,}004.98$$

### Excerpt from 2017 – Transaction History

| | | | |
|---|---|---|---|
| 06/20/2017 12:28:32 | Bought 39 UVXY Jun 23 2017 11.5 Call @ 0.14 | -583.12 | 40,009.36 |
| 06/20/2017 12:30:05 | Bought 6625 UVXY @ 10.0599 | -66,653.79 | -26,644.43 |
| 06/21/2017 16:54:07 | Sold 3300 UVXY @ 9.92 | 32,728.34 | 6,083.91 |
| 06/21/2017 16:55:10 | Bought 1194 JNUG @ 17.93 | -21,415.37 | -15,331.46 |
| 06/21/2017 18:05:59 | Sold 1194 JNUG @ 17.9 | 21,365.18 | 6,033.72 |
| 06/21/2017 18:06:47 | Bought 2950 UVXY @ 9.97 | -29,418.45 | -23,384.73 |
| 06/22/2017 10:23:57 | Sold 6275 UVXY @ 9.8301 | 61,675.59 | 38,290.86 |

### Excerpt from 2017 – Trade Confirmations Log

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 06/20/2017 | 17036108862 | Bought | UVXY | 6,625 | 10.0599 | 66,646.84 | 6.95 | 66,653.79 |
| 06/20/2017 | 17036767442 | Sold | UVXY | 300 | 10.04 | 3,012.00 | 6.95 | 3,004.98 |
| 06/21/2017 | 17043923173 | Sold | UVXY | 3,300 | 9.92 | 32,736.00 | 6.95 | 32,728.34 |
| 06/21/2017 | 17043924224 | Bought | JNUG | 1,194 | 17.93 | 21,408.42 | 6.95 | 21,415.37 |
| 06/21/2017 | 17043985582 | Bought | UVXY | 2,950 | 9.97 | 29,411.50 | 6.95 | 29,418.45 |
| 06/21/2017 | 17043996145 | Sold | JNUG | 1,194 | 17.90 | 21,372.60 | 6.95 | 21,365.18 |
| 06/22/2017 | 17050131054 | Sold | UVXY | 6,275 | 9.8301 | 61,683.88 | 6.95 | 61,675.59 |

120.        As demonstrated by several examples in the attachment **TD Ameritrade Account – Predicate #5**, erroneous *Cost Basis Adjustments* correspond to non-existent *Disallowed Wash Sale Losses* that were calculated by *Gainskeeper*.

121.        Legitimate *Disallowed Wash Sale Losses* are accounted for by increasing the *Adjusted Cost Basis* of subsequent transactions.  No loss is reported corresponding to the first transaction, but the loss is carried forward by increasing the *Cost Basis* of the other transaction.  When an illegitimate *Disallowed Wash Sale Loss* is reported, the increased *Cost Basis* does not correspond to any actual loss.  Yet, that value is literally "disallowed" from being factored into the accounting as a loss, and thereby represents a cash loss suffered by Pitlor that resulted from larceny, not legitimate trading losses.

122.        The following example pertains to the illegitimate *Disallowed Wash Sale Losses* and *Cost Basis Adjustments* pertaining to LOMLF transactions on 4/29/2016 that serves to conceal cash value totaling $277.19.

### Excerpt from 2016 – 1099-B Tax Filing

**SHORT TERM TRANSACTIONS FOR COVERED TAX LOTS [Ordinary gains or losses are identified in the Additional information column]** *(Lines 2 & 5)*
Report on Form 8949, Part I with Box A checked. Basis is provided to the IRS. *(Line 3)*
"Gain or loss (-)" is NOT reported to the IRS.

1a- Description of property/CUSIP/Symbol

| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | 1b- Date acquired | 1e- Cost or other basis | 1f- Accrued mkt disc (D) & 1g- Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z) | Additional informatior |
|---|---|---|---|---|---|---|---|
| LION ONE METALS LTD ORD / CUSIP: 536216104 / Symbol: LOMLF | | | | | | | |
| 05/20/16 | 3,000.000 | 1,356.27 | 04/29/16 | 1,949.72 | | -593.45 | Sale |
| 05/20/16 | 2,500.000 | 1,129.16 | 04/29/16 | 1,406.35 | 277.19 W | 0.00 | Sale |
| | Security total: | 2,485.43 | | 3,356.07 | 277.19 W | -593.45 | |

### Excerpt from 2016 – Trade Confirmations Log

| Date | Transaction | Action (Buy, Sell) | Symbol | Quantity | Price | Principal Amount | Commission/Fee | Net Amount |
|---|---|---|---|---|---|---|---|---|
| 04/29/2016 | 14906567897 | Bought | LOMLF | 1,700 | 0.552 | 938.40 | 9.99 | 948.39 |
| 04/29/2016 | 14906568022 | Bought | LOMLF | 500 | 0.56 | 280.00 | 9.99 | 289.99 |
| 04/29/2016 | 14906568030 | Bought | LOMLF | 3,000 | 0.5599 | 1,679.70 | 0.00 | 1,679.70 |
| 04/29/2016 | 14906568033 | Bought | LOMLF | 300 | 0.536 | 160.80 | 0.00 | 160.80 |

123.        All shares were purchased on 4/29/2016 then sold on 5/20/16.  No *Wash Sale* occurred.

124.        Because no wash sale occurred, it is impossible for any shares to have been sold at a loss and later repurchased.  Clearly, there is no possibility for the $277.19 *Disallowed Wash Sale Loss* or corresponding *Cost Basis Adjustment* to be legitimate.

125.        The total cost of all purchases is $3078.88, as per the Trade Confirmation Log. The total *Proceeds* are $2,485.43.  The total actual loss is $593.45.

$$\$593.45 = \$3078.88 \ (\text{-}) \ \$2,485.43$$

126.        However, the according to the 1099-B Tax Filing -2016, *Adjusted Cost Basis* is $3,356.07, due to the $277.19 *Disallowed Wash Sale Loss.* The **1099-B Tax Filing** data thus depicts a total cash loss of $870.64 due to the illegitimate adjustment.

$$\$870.64 = \$3,356.07 \ (\text{-}) \ \$2,485.43$$

127.        Thereby, the fraudulent adjustment conceals $277.19 that has been removed. Quite literally, it becomes a **Disallowed Loss.** The money was removed from the account, but it does not count as a loss and is not otherwise accounted for by the official record.

$$\$277.19 = \$870.64 \ (\text{-}) \ \$593.45$$

# Predicate Counts #6

## Defendant: TD Ameritrade

### 18 U.S.C. § 1343 – *Fraud by Wire* (5 Counts)

**A.        Manipulations of the September 2016 account data constitute multiple wire fraud violations, including improper documentation of wash sale proceeds totaling $65,969.86.**

128.        The exploitation of Pitlor's TD Ameritrade account in September 2016 incorporates all of the fraudulent contrivances previously presented, however the quantity of transactions, particularly wash sales, adds additional dimensions of complexity to the analysis.

129.        The raw data is provided in the attachment **TD Ameritrade Account: September 2016 Data**; the scheme relies on the inconsistencies between the record formats. Multiple wash sales occurred over the course September 2016 involving shares of JNUG and JDST. The *Gainskeeper* data and obscures the accounting by reporting share lots in quantities that do not

33

accurately correspond to the trades as they occurred, further complicated by the lack of consistency compared to and amongst the TD Ameritrade records.

130. Pitlor is prepared to present additional analysis that untangles the convoluted web of account data presented in the attachment. The focus of this analysis, however, is to prove damages in the most efficient manner possible.

## Count #6-A

B. Data manipulations cause there to be *Disallowed Wash Sale Proceeds,* concealing damages totaling_$20,249.93.

131. The purchase date of 9/9/2016 for 877 shares of JNUG documented 2016 Wash

### Excerpt from 2016 – Wash Sale Tax Lot Accounting

| Close Date | Rec type | Open Date | Security | Shares Sold | Proceeds | Cost | Code | Gain/Loss Adjustment | ST/LT | Box | Gain/Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/08/2016 | | 09/08/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 400 | 9,425.80 | 9,415.49 | | | ST | boxA | 10.31 |
| 09/08/2016 | | 09/08/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 1,800 | 42,407.08 | 42,369.71 | | | ST | boxA | 37.37 |
| 09/08/2016 | | 09/08/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 1,100 | 25,893.44 | 25,892.60 | | | ST | boxA | 0.84 |
| 09/08/2016 | | 09/08/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 3,700 | 85,165.85 | 85,146.99 | | | ST | boxA | 18.86 |
| 09/08/2016 | | 09/08/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 800 | 13,819.71 | 13,801.02 | | | ST | boxA | 18.69 |
| 09/08/2016 | | 09/08/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 400 | 9,215.80 | 9,200.68 | | | ST | boxA | 15.12 |
| 09/08/2016 | | 09/08/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 2,700 | 62,179.64 | 62,104.59 | | | ST | boxA | 75.05 |
| 09/09/2016 | | 09/08/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 2,623 | 57,694.75 | 60,572.56 | W | 2,877.81 | ST | boxA | 0.00 |
| 09/09/2016 | | 09/09/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 877 | 18,713.14 | 18,340.13 | | | ST | boxA | 373.01 |
| 09/09/2016 | | VARIOUS | DIREXION DAILY JUNIOR GOLD (JNUG) | 2,623 | 55,968.74 | 58,681.01 | W | 2,712.27 | ST | boxA | 0.00 |
| 09/09/2016 | | 09/09/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 3,500 | 64,252.11 | 76,515.91 | W | 12,263.80 | ST | boxA | 0.00 |
| 09/09/2016 | | 09/09/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 4,000 | 74,068.80 | 87,169.74 | W | 13,100.94 | ST | boxA | 0.00 |
| 09/09/2016 | | 09/09/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 2,700 | 51,045.90 | 58,521.87 | W | 7,475.97 | ST | boxA | 0.00 |
| 09/09/2016 | | 09/09/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 450 | 8,504.81 | 9,743.83 | W | 1,239.02 | ST | boxA | 0.00 |
| 09/09/2016 | | 09/09/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 850 | 16,056.15 | 19,301.54 | W | 3,245.39 | ST | boxA | 0.00 |
| 09/09/2016 | | 09/09/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 740 | 16,277.05 | 15,965.84 | | | ST | boxA | 311.21 |
| 09/09/2016 | | 09/09/2016 | DIREXION DAILY JUNIOR GOLD (JNUG) | 137 | 3,002.57 | 2,908.70 | | | ST | boxA | 93.87 |

132. 3500 shares were purchased on 9/8, and the sale of those shares occurred in two lots, one for 877 shares, and the other for 2623. The Transaction History (confirmed by *ThinkorSwim* Historical Account Data) accurately reports the sale of those 877 JNUG shares as the first transactions of 9/9/2016. (red arrow identifies the final trade on 9/8/2016).

---

[13] The Wash Sale Tax Accounting is a separate record than the 1099-B Tax Filing. The data tends to correspond, but there are subtle discrepancies pertaining to the organization of the tax lots, documentation of *Disallowed Wash Sale Losses*, and the corresponding *Adjusted Cost Basis*. The precise nature of the discrepancies is beyond the immediate scope of the complaint, but it is relevant to point out that discrepancies amongst the various records populated with Gainskeeper data (Wash Sale Tax Accounting, Tax Accounting without Wash Sales, 1099-B Tax Filing) contain subtle discrepancies that conceal "disallowed proceeds" that masquerade as *Disallowed Wash Sale Losses*.

34

Excerpt from 2016 – Transaction History

| Date/Time ▲ | Description | Amount | Net Cash Balance |
|---|---|---|---|
| 09/08/2016 23:53:57 | Bought 3500 JNUG @ 23.09 | -80,824.99 | 24.14 |
| 09/09/2016 14:28:29 | Sold 740 JNUG @ 22.01 | 16,277.05 | 16,301.19 |
| 09/09/2016 14:29:11 | Sold 137 JNUG @ 21.99 | 3,002.57 | 19,303.76 |
| 09/09/2016 14:30:00 | Sold 2623 JNUG @ 22 | 57,694.75 | 76,998.51 |

133.     The purchase price for the 3500 shares purchase on 9/8 was $23.09 per share. There is no discrepancy; this price is reported by the Transaction History, Trade Confirmations Log, and the *ThinkorSwim* Historical Account Data.  The deceptive accounting[14] is confirmed by the following:

- According to the 2016 Wash Sale Tax Accounting, the 877 Shares were purchased for $18,340.13, which equates to $20.91 per share.
- $20.91 was the price paid for the 3500 shares subsequently purchased on 9/9/2016.

134.     There is an additional discrepancy pertaining to those 877 shares.  The Trade Confirmation Log erroneously reports those sales as the final trades on 9/9/2018.  The sale prices and share lots confirm that those shares indeed correspond to the first transactions on 9/9.  (red arrow confirms that next reported transaction is dated 9/12/2016, thus the preceding transactions are the final trades on 9/9)

Excerpt from 2016 – Trade Confirmations Log

| Date ▲ | Transaction | Action (Buy, Sell) | Symbol | Quantity | Price | Principal Amount | Commission/Fee | Net Amount |
|---|---|---|---|---|---|---|---|---|
| 09/09/2016 | 15529811140 | Sold | JNUG | 740 | 22.01 | 16,287.40 | 9.99 | 16,277.05 |
| 09/09/2016 | 15529811142 | Sold | JNUG | 137 | 21.99 | 3,012.63 | 9.99 | 3,002.57 |
| 09/12/2016 | 15536111032 | Sold | JNUG | 4,425 | 18.60 | 82,305.00 | 9.99 | 82,293.22 |

---

[14] *Gainskeeper's* accounting of trade lots (erroneously) differs from TD Ameritrade's accounting, and there is additional inconsistency amongst the *Gainskeeper* records' accounting.  The JNUG Position History (included in the attachment: **TD Ameritrade September 2016**)  in fact has no documentation of any lots of 877 shares purchased for $23.09, and the Tax Lot accounting is something other than FIFO (First-In First-Out).

135.        Proceeds from that sale of 877 shares, $19,279.62, was thus not available to contribute to the *Margin Equity* for the preceding purchases that occurred that day.  A negative cash balance exists of ($8,061.58), but there is no *Margin Equity* deficit.  The fraud was properly calibrated so the missing funds appear to be a valid *Margin Balance*, consistent with the interpretation that *Margin Buying Power* was utilized to finance the final purchase, thus resulting in a negative cash balance.  However, there is no *Margin Balance* for ($8,061.58) reported by the September 2016 statement for 9/9.  In fact, a *Credit Balance* is reported, evidence that the *Cash Account* was essentially "hijacked", effectively segregated from Pitlor, but inextricably comingled and able to access the equity in the Margin account.

## Excerpt from 2016 September Statement

## TD AMERITRADE CASH INTEREST CREDIT/EXPENSE

| TD Ameritrade Cash Interest Credit/Expense | | | | | | |
|---|---|---|---|---|---|---|
| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
| 09/08/16 | $ - | $ 80,060 77 | 1 | 0.01 | $ - | $ 0.02 |
| 09/09/16 | - | 75,926 71 | 3 | 0 01 | - | 0 06 |
| 09/12/16 | - | 77 664 29 | 1 | 0 01 | - | 0 02 |
| 09/14/16 | (13,656 30) | - | 1 | 9 00 | 3 41 | - |
| 09/15/16 | (10,227 08) | - | 1 | 9 00 | 2 56 | - |
| 09/16/16 | (38,349.42) | - | 3 | 8 75 | 27 96 | - |
| 09/19/16 | (58,804 23) | - | 1 | 7 75 | 12 66 | - |
| 09/20/16 | (20,747 01) | - | 1 | 9.00 | 5.19 | - |
| Total Interest Income/(Expense) | | | | | 351.78 | $0.10 |

## Excerpt from 9/09/2016 - *ThinkorSwim Historical Account Data*

### Historical Data - Negative Cash Balance ($8,061.21)

**2016 – September Statement:** 9/9: Credit Balance of $75.926.71    9/12: $77,664.29



## Counts #6-B, 6-C, & 6-D

**C.**    **Data manipulations cause additional *Disallowed Wash Sale Proceeds,* concealing damages totaling $46,690.24.**

136.    On 9/13/2016, there are three additional sales erroneously reported to be the final transactions of the day. The total value of the misrepresented proceeds is $46,690.24.

$$\$46,690.24 = \$14,340.93 + \$4,989.90 + \$27,359.41$$

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 09/13/2016 | 15543370467 | Sold | JNUG | 697 | 20.59 | 14,351.23 | 9.99 | 14,340.93 |
| 09/13/2016 | 15543370515 | Sold | JNUG | 250 | 20.00 | 5,000.00 | 9.99 | 4,989.90 |
| 09/13/2016 | 15543370537 | Sold | JDST | 1,150 | 23.80 | 27,370.00 | 9.99 | 27,359.41 |
| 09/14/2016 | 15547352503 | Sold | JNUG Sep 16 2016 20.25 Call | 50 | 1.00 | 5,000.00 | 47.49 | 4,951.22 |

137.    In addition to the $19,279.62 misrepresented on 9/9/2016, the total proceeds inaccurately reported is $65,969.86.

$$\$65,969.86 = \$19,279.62 + \$46,690.24$$

37

138.         Pitlor does not believe $65,969.86 represents unique damages suffered in September 2016, but it likely does represent the concealment of other "Disallowed Losses" suffered in 2016, including the $23,665.59 removed from the account on 8/19.

# Counts #6-E

D.    **Uniquely altered transaction sequences data reveals the mechanics of the *Disallowed Wash Sale Loss* Scheme**

139.         Pitlor retrieved this and other similar files from his computer, generated by the *ThinkorSwim desktop application. The "messaging" system is used to transmit trade data corresponding to his account ####1360.    There are several discrepancies.*

  a. The order of the messages is awry.  The blue arrows highlight the messages that are out of sequence.

  b. While the trade data indeed corresponds to Pitlor's account activity, it is not only out of sequence, but multiple days' trades are merged together.

140.         The errant timestamps have been exploited so to selectively report certain transactions on different days.  By matching up similar share lots on different days, the Gain/Loss accounting can be convoluted with extreme effect.  It appears that this is precisely what occurred with Pitlor's account, and the net effect was to register what appear to be legitimately calculated (or nearly accurate) *Disallowed Wash Sale Losses*, but by jumbling the data, what becomes disallowed are proceeds are gains.  This is precisely what is documented to have occurred, and is likely responsible for phenomenon of Margin Equity deficits.

141.         Because this artifice is separate from any of the other record formats, it does not create flaws or discrepancies amongst those records.  In this manner, the account data can be resequenced according to precisely calculated arrays that, in tandem with *Courtesy Credits* than facilitate editing of "yesterday's" balances, theft can occur in a perniciously concealed manner.

38

Excerpt from *ThinkorSwim* data file:

ACCOUNTCODE="788801360"/>
<MESSAGE_188 TYPE="ORDER_FILLED_SELL" DATE="1473430923110" UNREAD="false" PRIORITY="10" BODY="FILLED tAndroid SELL -3,500 JDST STP 23.63 [TO CLOSE]" ACCOUNTCODE="788801360"/>
<MESSAGE_189 TYPE="ORDER_FILLED_BUY" DATE="1473430954443" UNREAD="false" PRIORITY="10" BODY="tAndroid BOT +200 JDST @23.75 ARCA" ACCOUNTCODE="788801360"/>
<MESSAGE_19 TYPE="ORDER_FILLED_SELL" DATE="1473349543246" UNREAD="false" PRIORITY="10" BODY="FILLED tAndroid (Replacing #1304952412) SELL -3,300 JNUG STP 23.60 [TO CLOSE]" ACCOUNTCODE="788801360"/>
<MESSAGE_190 TYPE="ORDER_FILLED_BUY" DATE="1473430954443" UNREAD="false" PRIORITY="10" BODY="tAndroid BOT +200 JDST @23.75 ARCA" ACCOUNTCODE="788801360"/>
<MESSAGE_191 TYPE="ORDER_FILLED_BUY" DATE="1473430954443" UNREAD="false" PRIORITY="10" BODY="tAndroid BOT +2,000 JDST @23.75 ARCA" ACCOUNTCODE="788801360"/>
<MESSAGE_192 TYPE="ORDER_FILLED_BUY" DATE="1473430954708" UNREAD="false" PRIORITY="10" BODY="tAndroid BOT +200 JDST @23.75 ARCA" ACCOUNTCODE="788801360"/>
<MESSAGE_193 TYPE="ORDER_FILLED_BUY" DATE="1473430954708" UNREAD="false" PRIORITY="10" BODY="tAndroid BOT +100 JDST @23.75 ARCA" ACCOUNTCODE="788801360"/>
<MESSAGE_194 TYPE="ORDER_FILLED_BUY" DATE="1473430955317" UNREAD="false" PRIORITY="10" BODY="tAndroid BOT +800 JDST @23.75 ARCA" ACCOUNTCODE="788801360"/>
<MESSAGE_195 TYPE="ORDER_FILLED_BUY" DATE="1473430955325" UNREAD="false" PRIORITY="10" BODY="FILLED tAndroid BUY +3,500 JDST @23.75 LMT ARCA [TO OPEN]" ACCOUNTCODE="788801360"/>
<MESSAGE_196 TYPE="ORDER_NOT_FILLED" DATE="1473431933751" UNREAD="false" PRIORITY="10" BODY="REJECTED: StopPx is already triggered tAndroid SELL -3,500 JDST STP 24.10 [TO CLOSE]" ACCOUNTCODE="788801360"/>
<MESSAGE_197 TYPE="ORDER_FILLED_SELL" DATE="1473431971312" UNREAD="false" PRIORITY="10" BODY="tAndroid SOLD -3,500 JDST @23.962" ACCOUNTCODE="788801360"/>
<MESSAGE_198 TYPE="ORDER_FILLED_SELL" DATE="1473431971322" UNREAD="false" PRIORITY="10" BODY="FILLED tAndroid SELL -3,500 JDST STP 24.00 [TO CLOSE]" ACCOUNTCODE="788801360"/>
<MESSAGE_199 TYPE="ORDER_FILLED_BUY" DATE="1473432016164" UNREAD="false" PRIORITY="10" BODY="tAndroid BOT +1,500 JNUG @21.00 EDGX" ACCOUNTCODE="788801360"/>
<MESSAGE_2 TYPE="ORDER_FILLED_SELL" DATE="1473349142967" UNREAD="false" PRIORITY="10" BODY="FILLED tAndroid SELL -3,500 JDST STP 21.45 [TO CLOSE]" ACCOUNTCODE="788801360"/>
<MESSAGE_20 TYPE="ORDER_FILLED_BUY" DATE="1473349613174" UNREAD="false" PRIORITY="10" BODY="tAndroid BOT +2,900 JDST @21.5892" ACCOUNTCODE="788801360"/>
<MESSAGE_200 TYPE="ORDER_FILLED_BUY" DATE="1473432016164" UNREAD="false" PRIORITY="10" BODY="tAndroid BOT +2,000 JNUG @21.00 EDGX" ACCOUNTCODE="788801360"/>

Convert epoch to human-readable date and

| 1473432016164 | Timestamp to Human date | [batch convert] |

Supports Unix timestamps in seconds, milliseconds, microseconds and n.

Assuming that this timestamp is in **milliseconds**:

**GMT**         : Friday, September 9, 2016 2:40:16.164 PM
**Your time zone** : Friday, September 9, 2016 9:40:16.164 AM GMT-05:00
**Relative**    : 4 years ago

Convert epoch to human-readable date and vice v

| 1473349613174 | Timestamp to Human date | [batch convert] |

Supports Unix timestamps in seconds, milliseconds, microseconds and nanosecon

Assuming that this timestamp is in **milliseconds**:

**GMT**         : Thursday, September 8, 2016 3:46:53.174 PM
**Your time zone** : Thursday, September 8, 2016 10:46:53.174 AM GMT-05:00 DST
**Relative**    : 4 years ago

39

# Predicate Count #7

## Defendant: TD Ameritrade

## 18 U.S.C. § 1956 – *Laundering of Monetary Instruments*

142.        Anomalous *Journal Entries* and *Intra-Account Transfers* in September 2016 are evidence of money laundering executed via a transaction pattern similar to the money laundering that occurred in August 2016 as set forth in Predicate Count #2.

## 9/15/2016 – Transaction History

Miscellaneous Journal Entry: $.35 Credit (corresponds to $.04 Cash Balance vs. Margin Equity discrepancy that was revealed upon the removal of $23,665.59)

| | | | |
|---|---|---|---|
| 09/15/2016 14:36:29 | Bought 70 GLD Sep 23 2016 127.0 Call @ 0.64 | -4,544.14 | -4,607.68 |
| 09/15/2016 15:08:29 | MISCELLANEOUS JOURNAL ENTRY | 0.35 | -4,607.33 |
| 09/15/2016 15:53:09 | Sold 150 JNUG @ 19.1048 | 2,855.67 | -1,751.66 |

## 9/16/2016 – Transaction History

Offsetting pair of Intra-Account Transfers:  Debit/Credit Entries  ($.35) / $.35.  (Corresponds to offsetting $.04 entries at the end of August 2016).

| | | | |
|---|---|---|---|
| 09/15/2016 20:49:59 | Bought 40 UVXY Sep 16 2016 23.0 Call @ 0.61 | -2,480.93 | 283.06 |
| 09/16/2016 10:58:06 | INTRA-ACCOUNT TRANSFER | -0.35 | 282.71 |
| 09/16/2016 10:58:06 | INTRA-ACCOUNT TRANSFER | 0.35 | 283.06 |
| 09/16/2016 14:36:05 | Bought 45 JNUG Sep 16 2016 18.5 Call @ 0.5 | -2,294.80 | -2,011.74 |

## Excerpt from 2016 - September Statement (page 19)

A single $.35 credit transaction is reported.  The $.35 debit is not documented, indicating the records having been manipulated to conceal the true value of that debit. (Similarly, the $.04 debit transaction is not documented by the **2016 – August Statement** which only reports one *Intra Account Transfer*, the $.04 credit)

Statement for Account # 788-801360
09/01/16 - 09/30/16

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Account Activity** | | | | |
| Trade Date | Settle Date | Acct Type | Transaction/ Cash Activity* | | Description | Symbol/ CUSIP | Quantity | Price | Amount | Balance |
| 09/16/16 | 09/16/16 | Margin | Journal - Other | | TRANSFER 788801360-1 TO 788801360-2 | - | - | 0.00 | 0.35 | (38,349.42) |

# Predicate Count #8

## Defendant: TD Ameritrade

## 18 U.S.C. § 1029 - *Fraud and related activity involving access devices*

143.    The following excerpt from an error report generated by the *ThinkorSwim* desktop application of Pitlor's computer evidences unauthorized access and activity in Pitlor's account.

144.    The timestamp refers to 3/23/2017 at 1:39:20 AM.  Pitlor has never purchased a Mutual Fund nor was he able to able to access any account features pertaining to "vendors".  [

```
},
"account" : "788801360",
"company" : "AMER",
"segment" : "ADVNCED",
"cddomain" : "A000000020147057",
"usergroup" : "ACCT",
"accesslevel" : "ACCT",
"authorized" : "Y",
"acl" : "TTQ2M1NSG1G2G3G4G5DRBPG6G7DTSDG8MAGBSPQSOSGKH1XBH2GRH3H4H5ESH6TEF7TFF8RFXNXOTOPND8E2E4E6E8F2D4D6D2",
"appid" : "-r-AppServer16A-",
"source" : "WEB",
"timestamp" : "1490251160495",
"token" : "0d35b3afac0ab606b4a7f32d7ba2444910a80f68",
"accountActivityToken" : "a4cf7383e469ef60a4daaedcca0d679558f7cd598d09f9d8acc60951f17e64fe7"
}
});
tdaStreamer.streamOn(true);
});},1);
});
</script>
<script>
require(["dojo/domReady!"], function() {
setTimeout(function() {
require([ "ent/utils/Megahover"],function(megahover){
megahover.links = {
chart: '/grid/p/site#r=jPage/https://research.ameritrade.com/grid/wwws/research/stocks/charts?c_name=invest_VENDOR',
alert:"/grid/p/site#r=jPage/cgi-bin/apps/u/Alerts",
mfBuyNav: 'tradeMutualFundsBuy',
mfSellNav: 'tradeMutualFundsSell',
mfExchangeNav: 'tradeMutualFundsExchange',
mfBuyLink: "/grid/p/site#r=jPage/cgi-bin/apps/u/EnhancedMutualFundBuy",
mfSellLink: "/grid/p/site#r=jPage/cgi-bin/apps/u/EnhancedMutualFundSell",
mfExchangeLink : "/cgi-bin/apps/u/EnhancedMutualExchSwap",
//optnExerciseLink : "/grid/m/__orders/optionOrder",
optnExerciseLink : "/grid/p/site#r=optionOrder",
legacyOptnExerciseLink : "/cgi-bin/apps/u/JaguarEnhancedOptionTrade"
`
```

145.    In the following excerpt, the following anomalies exist and are highlighted accordingly:

- Visitor ID, session key, transaction token, and other identifying data available.  TD Ameritrade has control over this information and should be able to identify the nature of this activity.
- Cobrowse = True (indicates someone accessing the account session remotely)
- Sales.Liveperson.net:  On the following line, a visitor identification number and session key are stated.

- Then an additional identifiers are stated, followed by invest.ameritrade.com with visitorStatus=INSITE_STATUS
- Visitor Active: Id= lpScriptId509 (indicates a "visitor" to the account)
- Session Duration, Transaction Token, and authToken imply that access occurred for a certain amount of time. The encrypted Authtoken is indeed an access device according to **18 USC § 1029.**

```
</script>
<script charset="UTF-8" src="./January 2017 irreg_files/tag.js.download"></script><script charset="UTF-8" id="_lpTagScriptId_o" src="./January 2017 irreg_files/jsonp"></script><script charset="iso-8859-1" src="./January 2017 irreg_files/mTag.js.download"></script><script charset="UTF-8" src="./January 2017 irreg_files/saved_resource"></script><script type="text/javascript" charset="UTF-8" src="./January 2017 irreg_files/saved_resource(1)"></script><style type="text/css"></style><style type="text/css"></style><link rel="stylesheet" type="text/css" href="./January 2017 irreg_files/$Z2xIZmlqcHFyYg2.css"><link rel="stylesheet" type="text/css" href="./January 2017 irreg_files/$ZWpucWxrYA2.css"><script type="text/javascript" charset="ISO-8859-1" src="https://sales.liveperson.net/bc/38974897/?
&amp;visitor=1147102328232031&amp;msessionkey=205293295533170010&amp;siteContainer=Secondary1&amp;site=38974897&amp;cmd=mTagInPage&amp;lpCallId=509653194894-862424242240&amp;protV=20&amp;lpjson=1&amp;page=https
%3A//invest.ameritrade.com/grid/p/site&amp;id=699964311&amp;javaSupport=false&amp;visitorStatus=INSITE_STATUS&amp;activePlugin=none&amp;cobrowse=true&amp;pageWindowName=gridMainWindowinvest&amp;PV%21visitorActive=1" id="lpScriptId509653194894-862424242240"></script></head>
<body style="visibility: visible;" class="claro tda grid-main streaming">
<noscript>
&lt;style type="text/css"&gt;
#container-site,#container-dock,#container-tray{display:none;}
#noscript-frame{width:100%;position:absolute;height:100%;border:o none; margin:o; padding:o;}
body{margin:o;padding:o;}
noscript{display:block;}
&lt;/style&gt;
&lt;iframe id='noscript-frame' src="/grid/p/javascriptDisabled"&gt;&lt;/iframe&gt;
</noscript>
<div id="container-left" class="container-left-fixed slide-to-center">
<div id="container-site" data-dojo-type="retail/layout/DockPage" data-dojo-mixins="retail/module/Video/_DialogLauncherMixin" data-dojo-props="device:&#39;Web&#39;, streaming:false, dnd:true, pageType:&#39;site&#39;, , sessionDuration:&#39;3300&#39;, transactionToken:&#39;-5716843949113562593&#39;, authToken: { token: &#39;YA4+D2V81AbCUci
+oWmYDTgF9bindh8SZPtN6sjtzc1QebDDBooaUGFUyVrnJkzXkgFP3OG2cFxVP7F4DBH8DiEdI
+CoCtrTHa2qWWBWoEgy5SmFeKmO/LDVqt9QW9rdpO49xqk/pK8n2f9417EsJaLodGkaSXhUlC5YCdOxrDnFkda/zgvzkya3JNol2mVsJol8maXU/OK5XPXxzAvOr1Osaq+o3qgo3/NAJvuEbfULzNII3Cud8BuW
+5+C7AeByO1rPrQwAs5dHaK/2UpC3L+p
+a3LISCs8lcFreOho2wjrS8RDdooYOSbYbsX1F9jtut4diSA5jpxqLu9GaQOOfFbD1Xco/vrQGJl9kNvgaV5v31GualURdLiEKfnuxCK/WBVJmKQM/q66okF2I2ORksO3yt1lSoqrD
+r48kEGgPZHQHttT5IexQklITsTVr2AzmWoWApwEi+2AVy
+Blpw4GoMx9+GkbkDz2Dy3PvqaJNySd53hvnICsoNXU8Uw4d1zGd100MQuG4LYrgoVi/JHHvlIb6N6R5s/DjojbhrktZy8s8/zPMFPOIM/AnTQKQwoMrSgdEF13KIRRaWKdJ
+g7242olbL4oVvRqIuIreo1J4xwkssotzjeCR/RxJm9sdbOFKFj66ExusRPjYo7QVJmfInSkYzTrhY6lgJ9u1uOGRiGmzThJeU8eZCx3W
+QxOhOW9Y3cTdo55+arrDIZsmQAeNMpcJ4oVjysDmWEFH3qRfaJ7RrgW2qngqtBqqwxdxPIAlh/98lOXsxk7mIV
+DhXg2XofCCMTw22pme2ROuglGCh5VxUMNjucrXCIQfs8t2mjrZ99cWOLmmWYZMcsWIXM4DY3q203A1l2Pw1mqzqCPLRGYluvU5YR4HZLha5aAy96fOn5ZpGunzQ2h2Hn8UYK6HbWXrPEgS7jYUIo5tL4N2
8rMESL9B1PO7fQ/aseB1wxM2aTvoq9Cvf9EO2o1+aocu+s1tZg7z1S84S6IHbngs4Wf2ZdwP34cV9rcADiJkDkf7nqXMx77+VVbVzLUudVcgXKIu212FD3x19z9sWBHDJACbCooB75E&#39;, expiration:
&#39;3299&#39;, }, showDock: true, pageReloadFlag: false " lang="en-US" widgetid="container-site">
<!--HEADER-->
<!-- START DEFAULT-LAYER REGION -->
<div data-dojo-type="core/layout/Region" data-dojo-props="" class="header-container" id="tda_layout_Region_o" lang="en-US" widgetid="tda_layout_Region_o">
<!-- DEFAULT-LAYER REGION LAYOUT -->
```

146.     In the following excerpt, The crucial consideration is that Pitlor only had one account with TD Ameritrade. He did not have access to any additional accounts other than 78801360, which was accessed via the *ThinkorSwim* platform using the login "dpne2008." However, the following evidence supports the conclusion that indeed separate accounts were being maintained but hidden from Pitlor.

- An "Account Switcher Container" and "Account Switcher" is, and why Pitlor's account number and login name are involved in whatever activity is going on
- "accountSwitchercontainer" which appears to identify the nature of the activity:

- Note that '&quot' clutters the information but in fact is simply equivalent to a double quotation mark: "
- **The accountsMap lists both Pitlor's account number 78801360, as well as Pitlor's login name used to access *ThinkorSwim*, dpne2008**
- **The selected_account "788801360"**
- **The "active account is stated to be "dpne2008"**
- **Input type = "hidden"** followed by **name = "accountSwitcher"** is understandable in plain English.
- **The "aria-hidden" pertains to account 78801360.** Aria-hidden = true: Indicates that this section of the document and its children are hidden from the rendered view. Essentially, the activity is designed to occur in the background without ever being displayed.

```
<li id="accountSwitcherContainer">
<span class="accountSwitcherText">Account:</span>
<div id="accountSwitcherSelectBox" data-dojo-type="retail/module/Account/AccountSwitcher" data-dojo-props="uuid:&quot;A2b32ab1d-0add-4546-8045-b38b3279f2e3&quot;,
link_acocunt_url:&quot;/grid/p/site#r=jPage/cgi-bin/apps/u/AccountManagement&quot;,selected_account:&quot;788801360&quot;,
accountsMap:{&quot;788801360&quot;:&quot;dpne2008&quot;,
isChanged : &quot;yes&quot;,
&quot;active&quot;:&quot;788801360&quot;},
tradePermissionChanged : false
" lang="en-US" widgetid="accountSwitcherSelectBox" class="module"> <div class="messagingModule"></div>
<table class="dijit dijitReset dijitInline dijitLeft dijitSelect dijitValidationTextBox dijitDownArrowButton dijitSelectFixedWidth dijitValidationTextBoxFixedWidth" data-dojo-attach-
point="_buttonNode,tableNode,focusNode,_popupStateNode" cellspacing="0" cellpadding="0" role="listbox" aria-haspopup="true" tabindex="0" lang="en-US" id="accountSwitcherSelect"
widgetid="accountSwitcherSelect" aria-expanded="false" style="user-select: none; width: 207px;" aria-invalid="false"><tbody role="presentation"><tr role="presentation"><td class="dijitReset dijitStretch
dijitButtonContents" role="presentation"><div class="dijitReset dijitInputField dijitButtonText" data-dojo-attach-point="containerNode,textDirNode" role="presentation"><span role="option" class="dijitReset
dijitInline dijitSelectLabel dijitValidationTextBoxLabel "><span class="activeAccount"></span>dpne2008</span></div><div class="dijitReset dijitValidationContainer"><input class="dijitReset dijitInputField
dijitValidationIcon dijitValidationInner" value="&#935;" type="text" tabindex="-1" readonly="readonly" role="presentation"></div><input type="hidden" name="accountSwitcher" data-dojo-attach-
point="valueNode" value="788801360" aria-hidden="true"></td><td class="dijitReset dijitRight dijitButtonNode dijitArrowButton dijitDownArrowButton dijitArrowButtonContainer" data-dojo-attach-
point="titleNode" role="presentation"><input class="dijitReset dijitInputField dijitArrowButtonInner" value="&#9660;" type="text" tabindex="-1" readonly="readonly"
role="presentation"></td></tr></tbody></table>
</div>
```

147.    The next excerpt is particularly suspicious, and directly evidences activity pertaining to bank accounts, transfers, and the display being set to none. Certainly, evidence like this existing on Plaintiff's computer suggests that his computer is essentially being controlled by a remote proxy that is instructing transactions to be executed on Pitlor's computer and transferring funds out.

148.    In tandem with Courtesy Credits and other fraudulent edits to the account data, this unauthorized access fits in with the other evidence, that Pitlor's account was secretly connected to other accounts, or otherwise partitioned to allow this sort of exploitation.

Note the relevant activity:

*Portfolio Deposits External Transfers (display: none). Connect Accounts – Bank Connections…*

```
<div role="list" class="menu-column">
<div class="subpages">
<div class="sectionTitle">
<a href="https://invest.ameritrade.com/grid/p/site#r=transfers">Deposits &amp; Transfers</a>
</div>
<ul class="subpages" data-menu="L3-SUB">
<li id="transfersOverview">
<a href="https://invest.ameritrade.com/grid/p/site#r=transfers">Overview</a>
</li>
<li id="portfolioDepositsCashTransfers">
<a href="https://invest.ameritrade.com/grid/p/site#r=jPage/cgi-bin/apps/u/CreateBankTransaction">Cash Transfers</a>
</li>
<li id="portfolioDepositsExternalTransfers">
<a href="https://invest.ameritrade.com/grid/p/site#r=externalTransfer">Transfer from Another Company<style> #mainnav #portfolioDepositsExternalTransfers {display: none;} </style></a>
</li>
<li id="transfersActivity">
<a href="https://invest.ameritrade.com/grid/p/site#r=transfersActivity">Activity</a>
</li>
<li id="connectAccounts">
<a href="https://invest.ameritrade.com/grid/p/site#r=connectAccounts">Account/Bank Connections</a>
</li>
<li id="portfolioDepositsOtherTransfers">
<a href="https://invest.ameritrade.com/grid/p/site#r=jPage/cgi-bin/apps/u/ExternalTransfer">Other Transfers</a>
</li>
```

149.    Mutual Funds have unique features with regard to how the transactions are settled, and was utilized as the means to remove money from the Schwab Account, and as the following excerpt suggests, this was also a preferred means of laundering funds from the TD Ameritrade Account as well.

150.    In the following excerpt, Pitlor's account number is listed. The timestamp refers to 3/23/2017 at 1:39:20 AM. Pitlor purchased ETFs, but never any Mutual Funds.

```
},
"account" : "788801360",
"company" : "AMER",
"segment" : "ADVNCED",
"cddomain" : "A000000020147057",
"usergroup" : "ACCT",
"accesslevel" : "ACCT",
"authorized" : "Y",
"acl" : "TTQ2M1NSG1G2G3G4G5DRBPG6G7DTSDG8MAGBSPQSOSGKH1XBH2GRH3H4H5ESH6TEF7TFF8RFXNXOTOPND8E2E4E6E8F2D4D6D2",
"appid" : "-r-AppServer16A-",
"source" : "WEB",
"timestamp" : "1490251160495",
"token" : "0d35b3afac0ab606b4a7f32d7ba2444910a80f68",
"accountActivityToken" : "a4cf7383e469ef60a4daaedcca0d679558f7cd598d09f9d8acc60951f17e64fe7"
}
});
tdaStreamer.streamOn(true);
});}, 1);
});
</script>
<script>
require(["dojo/domReady!"], function() {
setTimeout(function() {
require([ "ent/utils/Megahover"],function(megahover){
megahover.links = {
chart: '/grid/p/site#r=jPage/https://research.ameritrade.com/grid/wwws/research/stocks/charts?c_name=invest_VENDOR',
alert:"/grid/p/site#r=jPage/cgi-bin/apps/u/Alerts",
mfBuyNav: 'tradeMutualFundsBuy',
mfSellNav: 'tradeMutualFundsSell',
mfExchangeNav: 'tradeMutualFundsExchange',
mfBuyLink: "/grid/p/site#r=jPage/cgi-bin/apps/u/EnhancedMutualFundBuy",
mfSellLink: "/grid/p/site#r=jPage/cgi-bin/apps/u/EnhancedMutualFundSell",
mfExchangeLink : "/cgi-bin/apps/u/EnhancedMutualExchSwap",
//optnExerciseLink : "/grid/m/__orders/optionOrder",
optnExerciseLink : "/grid/p/site#r=optionOrder",
legacyOptnExerciseLink : "/cgi-bin/apps/u/JaguarEnhancedOptionTrade"
```

# Predicate Counts #9

## Defendants: TD Ameritrade and Kutak Rock

### 18 U.S.C. § 1512(b)-3 (2 Counts)

### 18 U.S.C. § 1503 (1 Count)

## A.    Background

151.    In July 2017, Pitlor submitted a complaint to TD Ameritrade in July 2017 which detailed several discrepancies, including erroneous timestamps and other asymmetries amongst the various account records. Such irregularities are commonly accepted to be "red flags" for fraud that, while standing alone do not constitute proof of wrongdoing or damages, are indeed suspicious such to require a proper explanation as to how the errors and inconsistencies were in fact innocuous.

152.    TD Ameritrade Senior Legal Counsel "Amanda", Presidential Ambassor "Brian", and TD Clearing Representative "John" participated in the teleconference with Pitlor. Rather than providing any explanation for the obvious errors, TD Ameritrade representatives refused to acknowledge the existence of any discrepancies in this account data. Instead they claimed the following:

    a.  Pitlor's claims were investigated and conclusively determined to be without merit.

    b.  All account transactions were reviewed and confirmed to have been executed properly and complied with all applicable laws and regulations.

    c.  Pitlor's assertions of error were invalid, attributable to his lack of knowledge concerning TD Ameritrade's standard operating practices and documentation procedures.

153.    Pitlor expressed his dissatisfaction regarding TD Ameritrade's orchestrated strategy predicated on dishonesty and avoidance. TD Ameritrade responded by hiring Kutak Rock as outside counsel and informed Pitlor that his account would be closed.

154.    Kutak Rock proceeded to issue a cease and desist request to Pitlor, instructing him to direct all further communications to Kutak Rock.

## Predicate Count #9-A (2 counts)

B.        Defendant Kutak Rock and TD Ameritrade conspired to engage in misleading conduct toward (1) the SEC and (2) FINRA with specific intent to hinder or prevent the communication of information relating to the commission of a Federal offense, in violation of 18 U.S.C. § 1512(b)-3.

155.        In responses to Pitlor's formal complaints to FINRA and the SEC, Kutak Rock composed deceptive responses submitted to those authorities on behalf of TD Ameritrade. Kutak Rock was fully aware that their responses relied upon false claims that shrewdly mischaracterized the factual content of Pitlor's complaint. Kutak Rock knew that:

   a. TD Ameritrade had adamantly refused to acknowledge Pitlor's meritorious assertions, and

   b. Pitlor's unsatisfied inquiries[15] concerned verifiable inaccuracies and inconsistencies that existed in the account records.

156.        Despite their knowledge of certain discrepancies in the records, particularly with respect to timestamps, Kutak Rock's response to the SEC stated the following:

> *"TD Ameritrade has spot-checked certain transactions within your account, and has not located any discrepancies with regard to timestamps or any improper reporting of transactions."*

> Kutak Rock's 10/17/2017 "Response to SEC Investor Complaint"
>
> (on behalf of TD Ameritrade)

157.        The timestamp discrepancy affected *every* securities trade in the account. Kutak Rock was well aware of this fact; Pitlor discussed the matter with them directly, upon their

---

[15] During the 9/8/2017 phone conversation, Kutak Rock directly inquired to Pitlor as to his interpretation of the timestamp discrepancy. Pitlor expressed his uncertainty and redirected the inquiry to Kutak Rock. Attorney Thomas D. pledged to respond after speaking to "affirmational" persons at TD Ameritrade. In a genuine effort to assist that inquiry, Pitlor provided a written explanation describing how erroneous timestamps could be abused in conjunction with undisclosed accounts for exploitative purposes. The only response Pitlor received was another general denial of all alleged wrongdoing on behalf of TD Ameritrade. It also includes Kutak Rock's declaration that *"TD Ameritrade has acted in accordance with all applicable laws, rules, and regulations in connection with the transactions in your account."*

46

inquiry in fact.  It is the key contrivance that enabled erroneous transaction sequences to be exploited as well as the manipulative cash accounting to be conducted.  Kutak Rock knew, or should have known, that it simply was not possible for TD Ameritrade to have spot checked any transaction and found there to be no error.

## Predicate Count #9-B

C.    **Kutak Rock conspired with TD Ameritrade to corruptly influence the outcome of 8:17-cv-00359 in violation of <u>18 U.S.C. § 1503</u>.**

158.        In their *Brief in Support of Motion to Dismiss*, the Defendants claimed to have diligently attempted to ascertain Pitlor's claims.

> **"Defendants have made their best effort to ascertain and identify the various allegations and theories of recovery being asserted by Plaintiff."**
>
> <u>Excerpt from: 8-17-cv-00359 Doc No. 24 at 2 - Footnote 4)</u>

159.        "Claim #4" pertaining to TD Ameritrade's violations of <u>17 CFR 240.17a-3</u> was not ambiguously stated, but the Defendants were unable to directly refute the claim because of the obvious errors and inconsistencies in the account data, so the Defendants chose the path of deception, repeatedly mischaracterizing "Claim #4" as something else entirely.

   a.  The Defendants fail to correctly identify "Claim #4" on both attempts:

> **"Plaintiff's 'Third' and 'Fourth' Claims assert a violation of SEC Rules 10b-5 and 10b-3, 17 C.F.R. § 240.10b-5 (2017) and 17 C.F.R. § 240.10b-3 (2017), respectively."**
>
> <u>Excerpt from: 8-17-cv-00359 Doc No. 24 at 13</u>

47

b.  The Defendants then go on to claim that:

" Plaintiff's failure to allege any statements by TD Ameritrade or Kutak Rock induced him to purchase or sell any securities is fundamentally fatal to his Third and Fourth Claims. "

Excerpt from: 8-17-cv-00359 Doc No. 24 at 13

160.    But **17 CFR § 240.17a-3** does not exclusively pertain to securities fraud.  In fact, it relates to consistency and completeness of account records that TD Ameritrade most certainly cannot make claim to with regard to Pitlor's account #####1360.

161.    **17 CFR § 240.17a-3** specifically requires an itemized daily record of "all receipts and disbursements of cash and all other debits and credits". (*See* first paragraph of 17 CFR § 240.17a-3)  The analysis presented in this complaint confirms with absolute certainty that TD Ameritrade's records do *not* properly document all of the "disbursements" or "debits".  They are simply unable to make such a claim without overtly committing perjury, so they decided on a more subtle means of deception, but to the same effect.

162.    Also, none of the trades were reported to have settled in TD Ameritrade Account ####1360.  Ultimately, it does not require a very deep dive into the records to notice that "something is wrong."  *That* was the essence of Pitlor's initial complaint to TD Ameritrade, and TD Ameritrade brazenly flouted their duties they are trusted to uphold in good faith.  Such is the essence of the self-regulatory regime.

163.    Moreover, Pitlor remains flustered by their having had no reservations whatsoever to engage in deception directed at the Court by way of underhanded attacks focused on Pitlor's competence.  They assault his ability to assert an error based on objective facts.

"Plaintiff generally recounts what he perceives as several accounting anomalies associated with TD Ameritrade's records and user-interface that pertain to, among other things, timestamps for various trades, credit and adjustment entries, alleged transfer anomalies, and purported tax-reporting issues."

Excerpt from: 8-17-cv-00359 Doc No. 24 at 3

48

164.    The facts clearly demonstrate there to be no legitimate basis for any other perception to be drawn; their abusive conduct cannot be justified as zealous advocacy. Neither TD Ameritrade or Kutak Rock are able to assert that, upon examination of the account records, that the error was attributable Pitlor's "perception."

# SCHWAB ACCOUNT

## A.    Upon its inception, Pitlor's Schwab Account was immediately targeted for exploitation.

165.    On 2/27/2018, Pitlor's first trades in Schwab account ####5612 were targeted by a scheme indistinguishable to that which targeted his TD Ameritrade Account in 2016-2017. Botched implementation of this scheme, however, triggered a transfer of $9,999,999.00 into Pitlor's account due to the perpetrators' failure to properly regard a special *Margin Requirement*.[16]

166.    Spoofing Schwab's accounting systems resulted in a cash deficiency that, while fabricated into existence, was automatically satisfied by Schwab's systems by transferring funds from an undisclosed account that, apparently[17], was linked to Pitlor.

167.    That deposit addressed the cash deficiency, but it was also proof of nearly $10 Million dollars having been comingled with the assets in Pitlor's newly opened account, *prohibitum malum*. Schwab then froze the account under false pretenses and adamantly refused to acknowledge that the transfer occurred.

## B.    TD Ameritrade assisted and participated in the exploitation of Pitlor's Schwab Account.

---

[16] The Electronically Traded Fund ("ETF") TVIX, which tracks volatility, is a marginable security that contributes to *Margin Equity*, but with a unique caveat: Purchases of TVIX must be made with 100% cash, and the shares cannot be used as collateral for subsequent loans or purchases until after being maintained for 30 days. Because the transaction sequence was altered, the illogical consequence was there being "insufficient" funds for the TVIX purchase itself (the paradoxical outcome illustrates the essence of the Defendants' erroneous accounting scheme).

[17] The Defendants possess and exclusively control the information that explains the precise nature and origin of the $9,999,999.00 deposit to Pitlor's Schwab Account ####5612 on 2/28/2018.

168.         TD Ameritrade collaborated with Schwab and assisted with the concealment and removal of the $9,999,999.00 deposit. Their conspiratorial agreement was established either immediately upon Pitlor's opening a Schwab account[18] or shortly thereafter, precipitated by that errant $9,999,999.00 deposit. Analysis confirms that the $3.51 held in Pitlor's TD Ameritrade account was swapped with the $10,000,005.87 *Cash on Hold* that existed in the Schwab Account on 3/06/2018, which was then taken back and stolen so to ultimately represent unique damages of $3.51 (as was essential in concealing the additional $6.87 that was converted along with the $9,999,999.00 deposit). TD Ameritrade not only participated in the concealment and removal of the $9,999,999.00 deposit but also assisted with the scheme to sabotage Pitlor's Schwab Account thereafter.

169.         TD Ameritrade's tortious interference is documented to have begun on 3/1/2018, the morning after the $9,999,999.00 deposit, and continued incessantly throughout the life of the Schwab account. Crash logs generated by the Schwab and TD Ameritrade applications on Pitlor's devices evidence TD Ameritrade's direct involvement with the development and debugging of code associated with the Schwab's Mobile Application, including tasks specifically pertaining to Pitlor's account balances, manipulation of timestamps, and account activity records.

## C.         The exploitation of Pitlor's Schwab Account exhibited features of the scheme used by the TD Ameritrade's enterprise, but it exhibited unique features that made it more potent and pernicious.

170.         Schwab's official record and historical data contain significantly fewer discrepancies than the scheme that targeted the TD Ameritrade account and, overall, proof of damages relies of systematic analysis that boils down to "all or none". Either all of the damages occurred as alleged, or none occurred. According to the official record, no damages occurred, and thus impeaching its authenticity and validity are paramount to Pitlor's claims.

171.         The exploitation, theft, and money laundering integrally relied upon freezing Pitlor's account to prevent the movement of cash. This was achieved by unlawful restricting

---

[18] The first trades in Pitlor's Schwab account were targeted, and *Margin Equity* was understated $1048.69 occurred on the first day. This is plausibly explained by the existence of a broader, predatory anti-trust enterprise whereby Schwab and TD Ameritrade collaborated to target specific customers, especially former customers that were switching brokerages. Upon information and belief, Pitlor's account was identified as a desirable target for exploitation due to his trading patterns, specifically the frequent transactions involving volatile investments, such as out-of-the-money options contracts nearing expiration.

Pitlor's account activity and altering accounting procedures under the color of **12 CFR § 220**, thereby depriving his right to equal protection with respect to not only **12 CFR § 220**, but also the Customer Protection Rule (Exchange Act Rule **17 CFR § 240.15c3-3**).

D.       **Analysis of live data captured by screenshots facilitates precise calculations of damages, derived with precision that accounts for every penny.**

172.              Demonstrative proof that damages occurred is not a simple task.  There are no "shortcuts" (as might be an apt description of the *Margin Equity* deficiencies that exist in the TD Ameritrade account's historical data and the illegitimate Margin Balances documented by the Monthly Statements).  Nevertheless, Pitlor's proofs are considerably more thorough with respect to the Schwab Account because of the extensive live data preserved by Pitlor's screenshots.  The analysis precisely accounts for every penny of alleged damaged.

173.              After the $9,999,999.00 Cash on Hold, Pitlor snapped screenshots to preserve live data that seemed anomalous or erroneous.  Without those screenshots, the damages could never be precisely calculated or proven, and evidence of Schwab's having manipulated their accounting systems simply would be extremely limited.

174.              The scheme is unraveled via analysis of those critical discrepancies that were omitted or edited out from the official record.  Analysis of the historical records and live screenshots reveals data omissions and inconsistencies that are only reconciled by invalidating the official record, and moreover, to conclude it to be a meticulously crafted fabrication.

175.              The mathematical puzzle that is Pitlor's Schwab Account data, and the complexity of the analysis required to prove the damages, are testament to the Defendants having leveraged their technological resources into an overwhelming advantage to defeat the regulatory and statutory framework that are supposed to prevent these abuses from being possible.

E.       **Schwab representatives deliberately deceived and misinformed Pitlor.**

176.              Recorded phone calls and written correspondences between Pitlor and multiple Schwab representatives confirm that authoritative figures (such as Derivatives Managers,

51

Resolution Specialists, and Managing Director of Corporate Counsel) coordinated their efforts to deflect Pitlor's inquiries and deny his access to information.

177.            Pitlor's notified Schwab of the errors with good-faithed inquiries seeking resolution of the disputed matters, first regarding the $9,999,999.00 errant deposit on 2/28/2018 and then again during the final week of March during and after the further exploitation that resulted in the theft of $82,864.25.   In April, Pitlor shared several screenshots documenting certain discrepancies indicative cash value was missing from the account.

178.            Schwab refused to acknowledge any errors and rejected Pitlor's assertions with unsubstantiated general denials of wrongdoing and false claims regarding Schwab's accounting procedures, contractual terms, and enforcement of account restrictions.

179.            Rather than remedying the clear errors, Schwab responded to Pitlor's ensuing inquiries by abruptly closing Pitlor's accounts -without notice, and permanently prohibiting Pitlor's access to account data thereafter.   First, Futures Account ####6617 was closed without notice on 3/28/2018.   Then, Pitlor's access to Schwab One Account ####5612 was permanently restricted on 4/27/2018, several days earlier than the 5/2/2018 date that had been previously specified by Schwab.[19]

180.            The Defendants conflagrated conflict rather than remedying clear error.   The missing cash and erroneous records are not the product of honest mistakes, nor can it conceivably be attributed to larceny committed by a rogue employee or few.   This was an elaborate scheme that utilized the full breadth of the Defendants' array of technological, financial, and human resources, including attorneys, computer programmers, and professional traders, and both Schwab and TD Ameritrade are culpable.

181.            The Defendants eliminated the evidence from the historical data required to prove the theft and exploitation that occurred.   With brazen disregard for the truth, Schwab has previously denied all wrongdoing to this Court.   However, the live account data preserved by Pitlor's screenshots leave no doubt regarding the veracity of the claims herein.

---

[19] Schwab sent Pitlor two written notifications specifying that the account closure would take place on 5/2/2018.   In addition to prohibiting Pitlor's access to account data, the Charles Schwab Corporation programmed its telephones to refuse Pitlor's calls.  Clearly, Schwab intended to refuse Pitlor access to any information provided by Schwab representatives, particularly those who did not participate in the scheme.

# Claim #2:

## 42 U.S.C. § 1983 - *Civil Action for deprivation of rights*
## Defendant: Schwab

A.    **Schwab deprived Pitlor's rights by enforcing illegitimate account restrictions under the color of 12 CFR § 220 – *Credit by Brokers and Dealers (Regulation T)***

182.    Schwab wielded their authority and powerful position to enforce illegitimate restrictions on Pitlor's account, with dishonesty and invidious animus, under the color of **12 CFR § 220 ("Reg T").**

183.    The exploitation of Pitlor's Schwab Accounts was facilitated via enforcement of bogus *"Settled Cash Up Front"* and *"Pattern Day Trader"*[20] restrictions. The Defendants relied on their lawful authority to establish legitimacy in their actions that was not just clearly erroneous, but genuinely predatory and singling Pitlor out for unfair treatment.

184.    Neither the *"Settled Cash Up Front"* nor the *"Pattern Day Trader"* restrictions were enforced in accordance with the statute. Instead, Schwab fraudulently enforced its own brand of the law to achieve the nefarious objectives of their RICO enterprise and anti-trust violative partnership with TD Ameritrade.

185.    Schwab deviated from established accounting protocols under the auspices of the "90 Day Freeze[21]", the terms of which are set forth by **12 CFR § 220.8(c).**

186.    On 2/28/2018, under the auspices of **Reg T**, Defendant Schwab restricted Pitlor's account with a *Settled Cash Up Front* restriction for a "free ride[22]" settlement violation. Phone

---

[20] Information available via the SEC and FINRA websites confirm that the "Pattern Day Trader" rules and restrictions pertain to the rules set forth with respect to **Reg T** .

[21] *"Settled Cash Up Front"* is the term used to refers to the restriction enforced under the color of **12 CFR § 220.8(c).** *Cash Account - 90 Day freeze.* For clarity and consistency, Pitlor adopts that nomenclature for the purposes of this complaint.

[22] A free ride violation occurs when an investor sells stock purchased with unsettled funds (i.e. if the purchase and sale occur prior to paying for it, and without sufficient excess Margin Equity or Margin Buying Power). Pitlor used cash freshly deposited into the account to finance the transactions in question.

53

call recordings clearly document multiple Schwab representatives' explanations and affirmations that the supposed "free ride" violation involved the purchase and sale of TVIX, an electronically traded fund ("ETF"), on 2/27/2018. The TVIX purchases were the first transactions in the account after Pitlor's initial deposit. The total purchase cost was less than the value of that initial deposit. No free ride occurred; none is documented by the record. If any violation occurred[23], then the Defendants erred. No other plausible explanations exist.

187.          Despite Pitlor's objections based on the aforesaid facts, Schwab altered their accounting procedures- supposedly for the purpose of segregating unsettled cash while it was unavailable to contribute to *Buying Power*, under the auspices of the *Settled Cash Up Front* restriction. The illegitimately imposed restriction was the means to justify Schwab's deviating from their established accounting procedures. The Defendants' scheme relied on erroneous calculations of cash, buying power, and account values, as well as altering how that data was displayed, to precisely misrepresent and conceal cash value.

188.          On numerous occasions, Pitlor's *Cash and Cash Investments Total* displayed a negative cash balance at the end of the day. Had the *Settled Cash Up Front* restriction been enforced in the manner prescribed by the **Reg T**, those negative balances could not have existed. The official record reports no other transactions (i.e. fees, withdrawals) that could conceivably justify a negative cash balance while the *Settled Cash Up Front* restriction was in effect.

189.          Furthermore, there are two written communications from Schwab confirming that Pitlor's account was restricted, under the color of the law, because of the settlement violation pertaining:

- The notification of the Settled Cash Up Front restriction; the excerpt below confirms that Schwab claimed that: *"in accordance with securities industry regulations, we are required to restrict trading in your account to the funds you have available."*
- The correspondence from Schwab Resolution Specialist, Stacey F., who not only affirms that a Free Ride Violation was responsible for the Settled Cash Up Front Restriction, but goes on to insist that the account was reviewed, particularly pertaining to sweeps

---

[23] *See* analysis of account activity for 2/27 & 2/28 pertaining to *Disallowed Wash Sale Losses* in the attachment: Key Values. The evidence confirms that Schwab manipulated the transaction sequences with respect to the cash accounting, perpetrated in the same manner that targeted Pitlor:s TD Ameritrade Account, and this is was resulted in the settlement violation, as well as the cash deficit which triggered the automatic deposit of secretively comingled funds.

transactions, and insisted that no errors occurred, and that "cash movement is working as designed."

190.    Initially, the objective was to conceal the removal of $10,000,005.87 from *Cash on Hold* on 3/6/2018, but the erroneous accounting continued to be utilized thereafter, exploiting Pitlor's account to steal $82,864.25 which was converted via *Mutual Funds* purchases.

---

## Important Account Information
1 message

**Charles Schwab & Co., Inc.** <online.service@schwab.com>                Wed, Feb 28, 2018 at 8:01 AM
Reply-To: online.service@schwab.com
To: PITLOR@gmail.com



Important Account Information

February 28, 2018 | your account ending. 612

# We're required to limit your trading to funds you currently have available

Because our records show that the trade(s) you placed on 02/27/2018 were not settled in accordance with securities industry regulations, we are required to restrict trading in your account to the funds you have available. This restriction will stay in place for at least 90 calendar days.

191.    The *90 Day Freeze* was claimed to have been lifted from Pitlor's account on 3/28/2018 (after 30 days), but no such discretionary authority is prescribed by the **Reg T,** further evidence of Schwab's having enforced their own brand of the law.  Despite the restriction supposedly being removed, Pitlor was not permitted to utilize *Funds Available to Borrow* (Margin Loans) to finance investments.  Nor did the aberrant accounting normalize.  Instead, the changes to Pitlor's account were (1) the abrupt, unannounced closure of Pitlor's account and (2) the elimination of the *Bank Sweep Feature* as Pitlor's *Cash Features* option.

B.        **Schwab's failure to properly enforce a *Settled Cash Up-Front* restriction is well documented. Negative *Cash Balances*, *Margin Calls*, and Unreported *Balances Subject to Interest* further reveal the convoluted accounting scheme.**

192.        Pitlor's account ended the day with negative balances for *Cash and Cash Investments Total* on 3/6, 3/19, 3/20, 3/27, and 3/28.

193.        In addition to Margin Calls issued against Brokerage Account ####5612 on 3/21 for $23, and on 3/27 for $38980, a Futures Margin call was also issued on 3/27 for $3404.57 – but it refers to account ####5612 rather than the Futures Account ####6617.

194.        Then next morning, Pitlor received an urgent notice informing Pitlor that funds were due totaling ($38,986), a negative sum that essentially canceled the Margin Call from the previous day plus an additional ($6) funds 'owed' (indicating a net credit). This was done as the enterprise retooled their pattern of racketeering activities to more effectively conceal the damages.

195.        On 3/28/2018, Pitlor's account ended the day with *Funds Due* totaling $10,982. The debt existed due to the approximately $80 thousand dollars that had been converted and removed from the account over the previous several days. No *Margin Call* was issued.

196.        *Balances Subject to Interest* that were displayed in the live data were omitted from the historical data and the official record.

- **3/21 – *Balance Subject to Interest*: $29.54**
- **4/13 – *Balance Subject to Interest*: $11.61**

197.        In other instances, negative cash balances corresponding to Margin debt were not reported in the record either, such as the ($90,737.88) on 3/27/2018.

C.        **Borrowed Funds were utilized to execute the concealed removal of cash value; the account records were altered to eliminate evidence of *Funds Available to Borrow* having been utilized**

198.        Despite specifically forbidding the use of Borrowed Funds for investments, Schwab's undisclosed utilization of *Borrowed Funds* was essential in the concealment funds converted via *Mutual Funds Buying Power.*

199.        Screenshots taken the afternoon of 3/26/2018 document the seemingly impossible instance whereby *Funds Available – To Trade: Cash + Borrowing* is a reported with a value, $0,

56

that is impossibly *less* than the value of *Cash Investments* stated alone, $51,698.63.  This necessarily implies a negative value for *"Funds Available to Borrow."*[24]

200.     Also, comparison between the live end-of-day balances and the historical balances for 3/23/2018 clearly documents the historical data was edited to conceal the $28,396 stated as *Funds Available to Borrow* in the live data.

| 3/26/2018 Screenshot @ 15:18 | | 3/26/2018 Screenshot @ 15:19 | |
| --- | --- | --- | --- |
| Schwab Mobile App | | Schwab Mobile App | |
| **Account Value** | | $81,265.21 | |
| Day Change | | +$3,254.97 (3.43%) | |
| Futures Total Equity | -$16,973.20 | | |
| Initial Margin Requirement | $38,280.00 | Margin Details | |
| Futures Buying Power | -$3,554.57 | | |
| | | Margin Equity | $23,355.97 |
| | | Equity Percent | 100.00% |
| Funds Available | | Trade Date Balance | $51,752.91 |
| | | Balance Subject to Interest | $74,642.25 |
| To Trade | | MTD Interest Owed | $54.28 |
| Cash Investments | $51,698.63 | | |
| Settled Funds | $51,698.63 | | |
| Cash + Borrowing | $0.00 | Margin Buying Power | |
| SMA | $23,356.00 | | |
| Day Trade Buying Power | $14,216.00 | Marginable Securities | |
| To Withdraw | | Equities | $0.00 |
| | | Mutual Funds | $0.00 |
| Cash Investments | $0.00 | Short Selling | $0.00 |
| Cash on Hold | $54.28 | Non-Marginable Securities | |
| Cash + Borrowing | $0.00 | Equities | $0.00 |
| | | Mutual Funds | $51,698.63 |
| Margin Details & Buying Power | | Penny Stocks | $0.00 |
| | | Fixed Income | |
| Disclosures & Footnotes | | Treasuries Maturing in 10+ yrs | $0.00 |
| | | Government Agencies | $0.00 |
| Brokerage Products: Not FDIC Insured · No Bank Guarantee · May Lose Value | | Municipal Bonds | $0.00 |
| | | Non-convertible Corporates | $0.00 |

201.     The screenshot on the left implies *"Funds Available to Borrow"* to have a negative value, ($51,698.63).  On the right, *Mutual Funds Buying Power* is set precisely to that discrepant value, $51,698.63, while all other categories of *Margin Buying Power* were set to zero due to an illegitimate *Pattern Day Trader* restriction.

---

[24] Logically, it is consistent to interpret the implied negative value for *"Funds Available to Borrow"* as a measure of "Funds that are Owed [to Pitlor]."

**D.        The proceeds of larceny were converted while Pitlor's account was frozen under the auspices of illegitimate *Pattern Day Trader* restrictions.**

202.        Purchases and withdrawals were prohibited due to clearly invalid restrictions claimed to be *"Pattern Day Trader"* restrictions enforced under the color of **Reg T,** on 3/26, 3/27, and 3/28.

203.        The *"Pattern Day Trader"* restriction is specified to apply to accounts with net value under $25,000.00, and it is not a complete prohibition on trading.  However, Schwab utilized the *"Pattern Day Trader"* restriction to completely restrict Pitlor's account- from both trading ***and withdrawals***, despite Pitlor's account value exceeding the $25,000 threshold.

204.        Schwab's illegitimately imposed *"Pattern Day Trader"* restrictions ensured that Pitlor would not disturb the precisely calibrated cash balances targeted for conversion.

205.        Even according to the altered historical account values which omits the value of the Futures Account and the funds previously converted, there was no legitimate justification for any such restrictions being imposed.[25]

## Historical Account Value

Account 2043-5612

| ▼ Date | Account Value |
| --- | --- |
| Wednesday, March 28, 2018 | $33,928.92 |
| Tuesday, March 27, 2018 | $38,419.53 |
| Monday, March 26, 2018 | $98,238.41 |

---

[25] The Defendants concealed their actions by temporarily releasing the hold on Pitlor's account 3/27/2018 and 3/28/2018.  However, phone call recordings from 3/26 and 3/28 firmly support Pitlor's factual claims pertaining to Schwab's identifying the nature of Pitlor's account freeze on those days to be attributable to the *Pattern Day Trader* restriction.

E.        **Schwab's targeted Pitlor for unfair treatment with invidiously discriminatory animus**

206.        Several Schwab representatives informed Pitlor that special "coding" had been applied to enforce *"Settled Cash Up Front"* and *"Pattern Day Trader"* restrictions.

207.        Other representatives referred to notes in the account, but were unable to elaborate or share because, presumably, these notes were instructions to not engage with Pitlor and to instead transfer to specific representatives that were "in the know" concerning the abnormal accounting. The front-line Schwab representatives quickly transferred Pitlor to more senior representatives rather than addressing Pitlor's inquiries; Pitlor was frequently required to wait on hold until these representatives were available.

208.        The enterprise's finely tuned racket was conducted by Senior Schwab representatives such as tenured representatives in the Margin Department, professional traders, derivatives managers, Resolution Specialists with the Client Advocacy Team, and Schwab's Managing Director of Corporate Legal Counsel. These communications are documented by phone call audio recordings and written correspondences that are smoking gun evidence of the deliberate acts of deception, misrepresentation, and blatant lies.

209.        Pitlor's "class of one" was singled out for unfair treatment by Schwab who, clothed with governmental authority, inequitably administered **12 CFR § 220.** There was no error; it was done with specific intent to harm Pitlor, to distract him, and ultimately to execute a scheme that was designed to discredit him. Had Schwab's unfair treatment of Pitlor been motivated by "economics" alone, then the exploitation would not have continued after having successful laundered $10,000,000.00 that had been unlawfully comingled (i.e. giving Pitlor possession of those funds). There was no rational basis for Schwab to treat Pitlor in this manner.[26]

210.        The larceny ultimately totaled $83,095.11, but it would have been significantly less had Pitlor's successful trading not rapidly accumulated funds. The extent of the data manipulations and other specified unlawful activities required to accomplish that theft further

---

[26] *See* Village of Willowbrook v. Olech. **528 U.S. 562** (2000)

supports the notion that the Defendants were motivated by the prospect of Pitlor suffering financial loss, as opposed to their further unjust enrichment.

## F.    Pitlor's rights to equal protection established by the 14th Amendment were substantially deprived.

211.    Pitlor was deprived of his rights to equal protection of laws in clear violation of the 14th Amendment of the Constitution.  But for these statutes having being deliberately violated, Pitlor would not have suffered the damages that occurred.

212.    **12 CFR § 220** ("**Reg T**") "imposes, among other obligations, initial margin requirements and payment rules on securities transactions" and also is explicitly states "its principle purpose is to regulate the extension of credit by brokers and dealers."

213.    The illegitimate restrictions pertaining to *Funds Available to Borrow* facilitated abuses that enabled undocumented conversion transactions to be concealed from the official record, as such was the precise objective.

214.    Pitlor was deprived of his rights of equal protection with respect to the following provisions set forth by **12 CFR § 220.3:**

> **12 CFR 220.3** – **General Provisions**
>
> **(a) *Records.* The creditor shall maintain a record for each account showing the full details of all transactions.**
>
> **(b) *Separation of accounts* -**
>
> **(1) *In general.* The requirements of one account may not be met by considering items in any other account. If withdrawals of cash or securities are permitted under this part, written entries shall be made when cash or securities are used for purposes of meeting requirements in another account.**

215.    The defendants conspired to egregiously violate the statutory requirements pertaining **17 CFR § 240.15(c)3-3** *Customer protection – reserves and custody of securities.*  Schwab exploited an exception that specifically exempts financial institutions from critical requirements, codified by subsection **(j)** *Treatment of free credit balances*.  The following excerpts are applicable to Pitlor's claims with respect to the unreported transfers as well as the sweeps transactions:

**Excerpt from 17 CFR § 240.15(c)3-3(2)(j) (bold added for emphasis):**

60

**(1) A broker or dealer must not accept or use any free credit balance carried for the account of any customer of the broker or dealer unless such broker or dealer has established adequate procedures pursuant to which each customer for whom a free credit balance is carried will be given or sent, together with or as part of the customer's statement of account, whenever sent but not less frequently than once every three months, a written statement informing the customer of the amount due to the customer by the broker or dealer on the date of the statement, and that the funds are payable on demand of the customer.**
**(2) A broker or dealer must not convert, invest, or transfer to another account or institution, credit balances held in a customer's account except as provided in paragraphs (j)(2)(i) and (ii) of this section.**

216.        The exception to the above requirements explicitly identifies Sweeps transfers, as stated by the following except from the Customer Protection Rule:

### Excerpt from 17 CFR § 240.15(c)3-3(2)(j)(2)(ii)

**"A broker or dealer is permitted to transfer free credit balances held in a customer's securities account to a product in its Sweep Program or to transfer a customer's interest in one product in a Sweep Program to another product in a Sweep Program..."**

217.        Notably, the above exception is qualified by the requirement that the broker or dealer provide an account statement, as per **17 CFR § 240.15(c)3-3(2)(j)(1)**. Schwab never provided a statement for account ####6617 and refuses to acknowledge its ever having been associated with Pitlor's Schwab One Account ####5612. The statements for account ####5612 were physically altered to prevent *Bank Sweep Feature* data and *Transfers* from being reported.

218.        Direct evidence establishes proof that transfers involving the *Bank Sweep Feature* and Futures Account ####6617 were the essential elements of the digital sleight-of-hand that concealed not only the $9,999,999.00 but also the majority of those additional funds, proceeds of theft totaling $82,864.25, that were converted during the final week of March 2018.

219.        Schwab retroactively edited historical data to remove all evidence of Pitlor's ever having an ownership interest in the Margin Account that was identified as Pitlor's Futures Account ####6617, as well as its association with account ####5612.

# CLAIM #3:

## 42 U.S.C. § 1985(3) – *Conspiracy to interfere with civil rights*
## Defendants: Schwab and TD Ameritrade

### A. TD Ameritrade and Schwab conspired to "go in disguise" to deprive Pitlor's rights

220.     In response to Pitlor's inquiries regarding the anomalies in the account data, multiple Schwab representatives referred to "special coding" pertaining to the enforcement of the *Settled Cash Up Front* restriction, but no further details were given. Extensive evidence indicates this "special coding" in fact refers to Schwab and TD Ameritrade's having altered their systems to enable integration of their respective platforms, specifically to alter and misrepresent Pitlor's account balances for exploitative purposes.

221.     As described previously with respect to Schwab's violation of **42 U.S.C. 1983**, the wire fraud and money laundering critically relied on those bogus restrictions imposed under the color of **Reg T.**

222.     The Defendants' mobile applications installed on Pitlor's Samsung Smartphone were manipulated to facilitate TD Ameritrade's unauthorized access to Pitlor's Schwab Account data, thereby enabling TD Ameritrade's tortious interference. The Defendants spoofed their own systems and infiltrated Pitlor's devices by incessantly and deliberately crashing their mobile applications. A fabricated version of Pitlor's Schwab Account history was continuously "debugged" in existence.[27]

223.     Quite literally, the Defendants conspired to "go in disguise on the premises" of Pitlor's digital property. The Defendants established nefarious, hidden data communication links through which the Schwab and TD Ameritrade mobile applications were able to manipulate the raw Schwab account data and edit into the record a fraudulently reconstructed version of account activity.

224.     Detailed excerpts from crash logs generated by the Defendants' applications on Pitlor's furnish explicit evidence of the digital trespassing which, in addition to the direct manipulation of Schwab account data, established unauthorized remote access to Pitlor's Smartphone to control secure memory partitions (Samsung's "KNOX"), data access permissions (via Secure

---

[27] The evidence analysis pertaining to these claims are presented in **Predicate Count #18.**

62

Linux "SeLinux"), data processing and conversions (Hardware Abstraction layer), and over-the-air signal transmissions (via Radio Interface Layer). They used steganography to conceal encrypted, sensitive data in what appear to be innocuous, ubiquitous picture or sound files.

## B.    The Defendants were motivated by invidiously discriminatory animus to target Pitlor's "Class of One".

225.    The Defendants' invidiously discriminatory animus is established by the fact that, after having first succeeded to repatriate the $10,000,005.87 that was unlawfully comingled with the assets in Pitlor's account, *prohibitum malum*, the Defendants then continued to utilize the same contrivances to steal *"only"* $83,089.05 from Pitlor. They were motivated to **distract** and ultimately, to **discredit** Pitlor by forcing him into a new dispute.

226.    Pitlor's closed TD Ameritrade account ####1360 was utilized as an unauthorized access device. By integrating their systems, they were able to alter transaction data and manipulate the cash accounting with near perfection. The Defendants scheme was designed and executed in a manner to ensure that, with their combined resources and clout, they would be certain to emerge victorious by proving Pitlor to have *"misinterpreted information viewed online."*

227.    Indeed, the official record appears to be "flawless" at face value, and the apparent validity holds up even under moderate scrutiny. Even the errors in Schwab's Brokerage Statements can be plausibly argued to be innocuous oversights that do not reflect there having been any actual damages. Certainly, without Pitlor's screenshots of live data, there would be no means by which to prove damages. Nevertheless, even with the live data, proof of damages that decisively impeaches the official record is a laborious endeavor.

228.    On 4/23/2018, just days after receiving a favorable judgement in **8:17-cv-00359, Pitlor v. TD Ameritrade et al. (2017)**, TD Ameritrade reactivated Pitlor's defunct account for the purposes of facilitating additional money laundering and specified unlawful activities relating to the concealment of the Defendants' scheme. While TD Ameritrade involvement with the exploitation of the Schwab account began no later than 3/1/2018, the favorable ruling emboldened TD Ameritrade to possess and conceal the laundered funds associated with Futures Account ####6617 while Schwab disposed of Pitlor's legal complaint. In the days thereafter, Schwab's Managing Director of Legal Counsel deliberately hastened and instigated that dispute with obnoxiously provocative and abusive conduct.

229.    Schwab prematurely cut off Pitlor's access to account records on 4/27/2018, several days prior to the account closure date that had been specified, 5/2/2018. The Defendants concluded that, notwithstanding the errors Pitlor had identified, their scheme was impenetrable so long as Pitlor's access to information was sufficiently disadvantaged.

230.    Pitlor's "class of one" was targeted because he represented a threat to the enterprise. He clearly expressed his intent- as well as some modicum of competence that might succeed to unravel and decipher the scheme that TD Ameritrade was keen to protect. The rapid evolution of his claims certainly motivated TD Ameritrade to instigate further conflict with Pitlor via the Schwab account for the purposes of distracting him from focusing on the TD Ameritrade account. Schwab was independently motivated to distract and discredit Pitlor with respect to the $9,999,999.00 deposit that occurred on 2/28.

231.    The Defendants desired to deprive Pitlor's rights so to strike him down, so that he could not enjoy the equality of rights or be protected by federal law. Pitlor was indeed deprived of an array of rights and protections, all of which were enabled by the fraudulent imposition of account restrictions which were enforced under the color of **Reg T**.

232.    An essential element of the Defendants conspiracy is to avoid every having to address Pitlor's claims on their merits. They have refused to address, let alone attack the merits of the errors asserted. Instead, they assault Pitlor's character, demeanor, and competence, constructing a facade that enables avoidance. They execute the strategy in a refined, seemingly well-practiced manner. The Defendants have continued their gaslighting campaign, endeavoring to depict Pitlor as the unreasonable party to these disputes when the facts prove, without question, the Defendants flagrant dishonesty is indicative of their reckless disregard for the law and common decency as they seek to subdue the truth. Their rely on an apparent lack of motive to assault Pitlor's credibility.

233.    The Defendants' conspired to accomplish their objectives by deliberately harming Pitlor. Their discrimination was not a private matter; their nefarious schemes relied upon depriving his rights under the color of the law.

# Claim #4

## 18 U.S.C. § 1962 - RICO (c)

### Defendants TD Ameritrade and Schwab

### Enterprise:  TD Ameritrade, Schwab, Facebook, Amazon, Kutak Rock

A.      **The Defendants' clandestine partnership establishes a RICO enterprise on its own accord, as well as a continuation and expansion of the enterprise which targeted Pitlor's TD Ameritrade Account.**

234.      Defendants TD Ameritrade and Charles Schwab's association-in-fact enterprise renders them each to be jointly and severally liable for the racketeering activity that targeted Pitlor's Schwab Accounts.  The Defendants integrated their electronic services in a clandestine manner to facilitate unauthorized access to Pitlor's Schwab Accounts.

235.      The Defendants' devised and implemented a scheme to obtain money by means of false and fraudulent pretenses and representations through a pattern of racketeering activities, but the illicit enterprise existed for other purposes distinguishable from the exploitation of the Schwab account.

236.      The first transactions in the Schwab Account on 2/27/2018 were exploited to understate *Margin Equity* in a manner indistinguishable from the scheme that relentlessly targeted TD Ameritrade account in 2016-2017.

237.      Schwab's decision to exploit Pitlor's Schwab account upon its inception is infers that the supposed competitors illegally shared data about customers' trading patterns and proclivities. Unless it is to be presumed that Schwab similarly targets all new customers' accounts and comingles $9,999,999.00 with their assets in their normal course of business, it must be concluded that an enterprise existed that involved the illicit exchange of information for the purposes of targeting certain customers for exploitation, such as those customers whose accounts were closed by the "competing" firm and thereby likely candidates to open a new brokerage account.

238.      As previously set forth in **Claim #2** and **Claim #3**, the Defendants were motivated to distract and discredit Pitlor's focus on the enterprise's scheme that targeted his TD Ameritrade Account, as well as the errant $9,999,999.00 deposit that occurred on 2/28/2018.  While the genesis

65

of Schwab and TD Ameritrade's cooperation with respect to Pitlor's account is not entirely clear, there is no doubt that (1) Pitlor's Schwab account was targeted from day one, on 2/27/2018, and (2) TD Ameritrade's digital intrusions began no later than 3/1/2018, immediately after the errant $9,999,999.00 deposit was credited to Pitlor's Schwab Account ####5612 on 2/28/2018.

239. Pitlor's TD Ameritrade Account ####1360 was utilized to assist the concealment and laundering of the errant deposit, as well as the proceeds of larceny generated by the Defendants' enhanced scheme implemented thereafter, thereby representing an expansion and continuation of the enterprise that targeted Pitlor as a TD Ameritrade client in 2016-2017.

240. The prospect that somehow Schwab was involved in the exploitation of Pitlor's TD Ameritrade account- while perhaps a reasonable inquiry- is not supported by any direct evidence. Thus, it is beyond the scope of this complaint and not alleged herein.

## B.     The pattern of racketeering and specified unlawful activities pertains to the laundering of monetary instruments.

241. The scheme was executed via transmissions by means of wire, specifically involving the Defendants' desktop and mobile trading platforms, constituting a pattern of predicate acts in violation of **18 U.S.C. § 1343 - Fraud by Wire.**

242. The targeted funds were segregated in the FDIC insured deposit accounts that comprise Schwab's *Bank Sweep Feature*, constituting a pattern of predicate acts in violation of **18 U.S.C. § 1344 – Bank Fraud.**

243. Unauthorized access devices facilitated intrusion into Pitlor's Schwab Account as well as his electronic devices, constituting a pattern of predicate acts in violation of **18 U.S.C. § 1029 – Fraud and related activity in connection with access devices.**

    a. The unauthorized access facilitated the conversion transactions.

    b. The Defendants modified their mobile applications to secretly access, alter, and exchange data on Pitlor's devices.

    c. Pitlor's inactive, supposedly closed TD Ameritrade Account ####1360 was instrumentally utilized in the Defendants' larceny, laundering, and concealment thereof.

244. The conversion transactions and fund transfers involving the proceeds of specified unlawful activities were excluded from the official record and edited out of the historical data,

specifically to conceal the source and ownership of that cash value, constituting a pattern of predicate acts in violation of **18 U.S.C. § 1956 – Laundering of Monetary Instruments.**

    a. The Monthly Brokerage Statements were altered so to omit specific data pertaining to the *Bank Sweep Feature* as well as *Transaction Details* pertaining to *Transfers*, constituting additional predicates pertaining to **18 U.S.C. § 1343 - Fraud by Wire,** or alternatively mail fraud in violation of **18 U.S.C. § 1341 – Frauds and swindles.**

    b. The proceeds of larceny were converted via *Mutual Funds* purchases, thereby giving rise to Pitlor's reinvestment injury.

    c. Schwab obtained Pitlor's driver's license under false pretenses (the ID used by Pitlor to open the Schwab account had expired), as was necessary to establish funds transfer capabilities, constituting a predicate act in violation of **18 U.S.C. § 1028A – Aggravated identity theft.**

## C. The Defendants' enterprise includes Facebook and Amazon

245.    The Defendants pattern of racketeering activities integrally utilized Facebook and Amazon's electronic services. Facebook and Amazon each appear in the crash reports generated by the Defendants' mobile applications on Pitlor's devices. The entries correspond to processes[28] that were critical to the Defendants nefarious, clandestine intra-process communications that facilitated the data manipulations.

    a. Critical intra-process communications, including the transmission of encrypted, hidden messages were facilitated by Facebook. Facebook and TD Ameritrade have a lawful business arrangement (an association-in-fact enterprise) whereby transactions in TD Ameritrade accounts are able to be executed via the Facebook messenger.

    b. Manipulation of timekeeping (i.e. switching timestamp broadcast receiver) involved computing services hosted by Amazon.

246.    TD Ameritrade and Facebook's legitimate association-in-fact enterprise enables trades to be performed via the Facebook messenger. Indeed, the crash logs generated by TD Ameritrade's

---

[28] For example, *Process ID #1621* was responsible for the crash of the Schwab Mobile Application on 2/28/2018, the day of the errant $9,999,999.00 deposit. The crash reports for 2/28/2018 and 3/1/2018 contain log entries pertaining to Schwab, TD Ameritrade, Facebook, and Amazon, all of which are identified as corresponding to *Process ID #1621.*

*ThinkorSwim* mobile applications contains log entries pertaining to Facebook's "Orca" (the messenger application) active on the processes utilized to transmit clandestine data.

247.        While Facebook and Amazon were negligent with respect to their systems being exploited to facilitate critical fraudulent contrivances, there is no evidence indicative of their direct knowledge of conspiracy to launder funds from Pitlor's accounts.  Without evidence of their conscious participation, there can be no fraudulent intent and thus, at this time neither Facebook or Amazon are named as a Defendant to the claims set forth in this complaint.

# D. Predicate Counts

## Predicate Count #10A (1 Count)

Defendant Schwab

**18 U.S.C. § 1956** *Laundering of Monetary* **Instruments**

3/6/2018: $10,000,005.87 from *Cash on Hold*

## Predicate Count #10B (4 Counts)

Defendant Schwab

**18 U.S.C. § 1956** *Laundering of Monetary Instruments*

Conversions via Mutual Fund Purchases/Mutual Funds Buying Power

(1) 3/23/2018: $2,481.61

(2) 3/26/2018: $51,698.63

(3) 3/27/2018: $27,218.88

(4) 3/28/2018: $1,465.13

## Predicate Count #10C (1 General Count)

Defendants TD Ameritrade and Schwab

**18 U.S.C. § 1956(h)** *Conspiracy to Launder Monetary Instruments*

The conspiracy utilizes contrivances pertaining to Bank Sweep Feature, Schwab Futures Account ####6617, TD Ameritrade's Electronic Services (and Pitlor's TD Ameritrade Account ####1360 and its Futures Account XXXX561)

| Damages correspond to the Futures Account | |
|---|---|
| $13,768.61 | *Sweep to Futures* (3/23) |
| $51,698.63 | *Sweep to Futures* (3/27) |
| $10,982.00 | Funds Due (3/28) |
| $3,404.57 | **Futures Margin Call excluded from *Sweep to Futures* (3/27)** |
| $2,702.27 | *Disallowed Wash Sale Losses,* all of which shown to be invalid. (March data) |
| $224.80 | Conversion Fees [1 Wire x $25 + 4 x $49.95] (3/6, 3/23, 3/26, 3/27, 3/28) |
| $54.28 | Interest Paid to Schwab (total) |
| $29.54 | *Balance Subject to Interest* not reported [$29.54 = $22.67 + $6.87] (3/22) |
| $2.29 | Discrepancy: $10,982 *Funds Due* and actual negative cash balance $10,979.71 (3/28) |
| $0.77 | Interest (supposed to have) credited the Account (3/15) |
| ($3.51) | TD Ameritrade Account Balance Swapped for $10,000,005.87 (3/6) |
| $82,864.25 | **Total Funds Converted via *Mutual Funds Buying Power*** |
| Note: | The highlighted cells corresponds to funds concealed by final data manipulations captured by screenshots of live data on 4/13 representing unique damages of $309. |

| $309 - Fees and other discrepancies accounted for by final adjustments in April | |
|---|---|
| $224.80 | **Conversion Fees [1 Wire x $25 + 4 x $49.95] (3/6, 3/23, 3/26, 3/27, 3/28)** |
| $54.28 | Interest Paid to Schwab (total) |
| $29.54 | *Balance Subject to Interest* not reported [$29.54 = $22.67 + $6.87] (3/22) |
| $2.29 | Discrepancy: $10,982 *Funds Due* and actual negative cash balance $10,979.71 (3/28) |
| $0.77 | Interest (supposed to have) credited the Account (3/15) |
| ($3.51) | TD Ameritrade Account Balance Swapped for $10,000,005.87 (3/6) |
| $1.00 | Anomalous SMA Value (3/8) |
| ($0.17) | Stray cash discrepancy contained with end-of-month anomalies ($3736.**17**) |
| $309 | **TOTAL Concealed via April Adjustments [$309 = $734 - $425]** |
| Note: $.83 = $1 (-) $.17. This is precisely equal to the sum of the cent-valued discrepancies $.83 = $.46 (3/19) + $.26 (3/22) + $.06 (3/28) + $.03 (3/23 - 3/26) + $.02 (3/6) | |

## #10-D (1 Count)

### 18 U.S.C. 1028(a)(7), - *Identity Theft*

### Defendant Schwab

## Predicate Count #11 (2 Counts)

Defendant Schwab

### 18 U.S.C. § 1341, *Frauds and Swindles* (Mail Fraud)

Schwab Brokerage Statements were physically altered to conceal cash value and transactions.

(1) **February Statement** – to prevent reporting of cash balances and *Bank Sweep*
*transactions/balances*

(2) **March Statement** – to conceal "Transfers" section to prevent reporting of that
transaction data.

## Predicate Count #12: (6 Counts #12A - #12F)

Defendant Charles Schwab

### 18 U.S.C. § 1343. *Fraud by Wire*

### [Or alternatively, 18 U.S.C. § 1341, *Frauds and Swindles* (Mail Fraud)]

One count for each of the following six erroneous values:

| Brokerage Report Discrepancies[29] | Short Sales Total Proceeds | Transactions Total Purchases | Gain/Loss Cost Basis Discrepancy | Investments Sold[30] |
|---|---|---|---|---|
| March | $52,425.82 | $3092.84 | ($45,236.01) | $5795.11 |
| April | $21,751.53 | - | $16,870.41 | ($5795.11) |

$$\$83{,}089.05 = \$82{,}864.25 + \$224.80 =$$

$$\$45{,}236.01 + \$16{,}870.41 + \$10{,}982 + \$3433.57 + \$5795.11 + \$600 + \$104.85 + \$54.28 + \$7.16 +$$
$$\$4.45 + \$2.29\ (\text{-})\ (\$1 + \$.06 + \$.02)$$

---

[29] Negative values indicate an "understatement" or "omission." Positive values pertain to overstated values or, in the case of *Short Sales,* the total amount affected by the errant record keeping.

[30] The discrepancy pertaining to $5795.11 in the March Statement was retroactively manifested due to the inaccurate *Realized Gain or (Loss)* data reported by the April Statement, and thus is considered a single count.

# Predicate Count #13

Defendant Charles Schwab

### 18 U.S.C. § 1343. *Fraud by Wire* (3 Count)

Damages were concealed in the live data by understating losses.  One count for each of the three erroneously understated "*Day Change*" values.

| Illegitimate, Unreported "Disallowed Losses" | Amount | Corresponds to: |
|---|---|---|
| *Day Change* - 3/26/2018 | $23,143.13 | 3/26 - *Sweep from Futures* $23,355.97 |
| *Day Change* - 3/28/2018 | $43,408.18 | 3/28 - *Sweep from Futures* $42,080.00 |
| *Day Change* - 3/29/2018 | $12,868.28 | 3/29 - *Sweep from Futures* $12,499.41 |
| SUBTOTAL 1 | $79,419.59 | Sum of Day Change Discrepancies |
| *Margin Calls* | $3,439.57 | $23 – 3/21/2018 $3,404.57 – 3/27/2018 (Futures), $12 – 4/03/2018 |
| 3/27 – Cash Discrepancy | $4.45 | Discrepancy in end-of-Day Negative Cash Balance $90,733.43 vs. $90,737.88 |
| 3-28 – Cash Balance | .64 | Stray Cash Balance |
| TOTAL | $82864.25 | Mutual Funds Buying Power |

# Predicate #14 (2 Counts)

Defendants: TD Ameritrade and Charles Schwab

### 18 U.S.C. § 1344 - *Bank Fraud*

### [Or alternatively, 18 U.S.C. § 1343 - *Fraud by Wire*]

1. $51,753.55, the balance of the Bank Sweep Feature reported to have swept to Brokerage Account ####5612 on 3/28/2018, was specifically targeted to be concealed and converted.

2. The same contrivances were utilized to conceal and transfer $10,000,005.87 from *Cash on Hold* on 3/6/2018.

71

| Bank Fraud concealed the funds converted via Mutual Funds Buying Power | |
|---|---|
| $51,698.63 | *Sweep to Futures* transferred via *Bank Sweep Feature* (3/27) |
| $28,396.94 | *Bank Sweep Feature* balance (3/26) |
| $2,702.27 | *Disallowed Wash Sale Losses* (March) |
| $54.28 | Interest Fee paid to Schwab (March) |
| $4.45 | *Margin Equity discrepancy* [Live vs. Historical data] (3/27) [$4.45 = $3.51 + $.94 = $3.51 + $1 (-) $.06]* |
| $6.87 | *Cash on Hold* converted along with $9,999,999.00 (3/6) |
| $0.77 | Interest Credited to account via *Bank Sweep Feature* (3/16) - contributes to total damages |
| $0.06 | Unjustified discrepancy between *Settled Cash* and *Cash Investments Total* (3/28)* |
| ($0.02) | Refunded at liquidation (as separate sum via separate check) - relates to $3.51 + $3.38 (-) $6.87= $.02 |
| **$82,864.25** | **Total Funds Converted via *Mutual Funds Buying Power*** |

Note that the $4.45 is the sum of values that includes ($.06), then $.06 appears as a separate discrepancy the following day, which serves to cancel out that previous discrepancy. This example illustrates how the scheme also operated similarly to precisely match larger sums.

# Predicate #15 (2 Counts)

Defendants: TD Ameritrade and Charles Schwab

## 18 U.S.C. § 1343 - Fraud by Wire

## (Alternatively, 18 U.S.C. § 1348 - Securities Fraud)

The two counts correspond to the two *Short Sales* that transacted on 3/23/2018 that were instead reported to be *Investment Purchases*. Proceeds totaling $16,439.68 were instead recorded as an expenditure.

| | Description of Discrepancy |
|---|---|
| **$16,439.68** | Proceeds of *Short Sales* not reported |
| **$16,439.68** | Proceeds of *Short Sales* instead reported as *Cost Basis* |
| **($406.50)** | Cost Basis of closing transactions for *Short Sales* deducts from total damages |
| **$5,795.11** | Errant transactional accounting of *Investment Sold by March and April Statements* |
| **$28,396.94** | Concealed via various contrivances 3/27/2018 |
| **$14,223.46** | Concealed Margin Equity on 3/23/2018 |
| **$1,886.00** | Manipulation of end-of-month account value on 3/30/2018 |
| **$104.85** | Discrepancy between live vs. historical account value for 3/21/2018 |
| **($11.61)** | Unreported *Balance Subject to Interest* – April |
| **($6.87)** | *represents "refund" of Cash on Hold* converted with $9,999,999.00 on 3/6/2018 |
| **$3.51** | TD Ameritrade account balance. Initially, this value was credited to the account as it was swapped with the $10,000,005.87 *Cash on Hold.* While the $6.87 was made to seem as if it had never been stolen, the $3.51 discrepancy remains. |
| **$82,864.25** | **Total funds converted via *Mutual Funds Buying Power*** |

# Predicate Count #16 (7 Counts #16A - #16G)

Defendants: TD Ameritrade and Charles Schwab

## 18 U.S.C. § 1343 - *Fraud by Wire*

## Count #16-A

$23,489.95 was concealed via manipulation of the *Trade Date Balance* and erroneous accounting of *Sweep to Futures* transfer as a loss to Brokerage Account ####5612.

## Count #16-B

On 3/23/2018, Margin Equity totaling $14,223.46 was concealed via alteration of the historical account balances.

## Count #16-C

The altered historical balance data on 3/23/2018 was altered to caused the account value to be understated by $23,141.13 compared to the value reported by the live data.

## Count #16-D

The *Sweep to Futures* transfer reported by the March Statement, $51,698.63, is understated by $3,404.57, the value of the Futures Margin Call received on 3/27/2018.  The actual amount *Swept to Futures* was $55,103.20.

## Count #16-E

Illegitimate Funds Due $10982.00 corresponding to negative cash balance of $10,979.71.

## Count #16-F

Discrepancies precisely equate to $2481.61, the value converted via Mutual Funds Buying Power on 3/23/2018.

## Count #16-G

Futures Buying Power was utilized to debit Pitlor's account even after its supposed closure.

## Count #16-H

Pitlor's $75,000.00 withdrawal was an amount specifically targeted for theft.

73

**$82,864.25 = $75000 + $3404.57 + $3404.57 + $1048.69 + $3.38 + $4.45 (-) $1.41**

**$82,864.25 = $74,594.84. + 3092.84 + 3404.57 + 1768 + 4.45 + 2.29 + $.77 (-) $3.51**

# Predicate #17 (3 Counts)

Defendant Charles Schwab

### 18 U.S.C. § 1343 - *Fraud by Wire*

### Schwab Spreadsheet Transaction Data

# Count #17-A

Illegitimate *Disallowed Wash Sale Losses* concealed damages totaling $2,702.27

# Count #17-B

The <u>Schwab Transaction Spreadsheet Data</u> was manipulated to conceal profits totaling $76,431.65.

| Funds Concealed via Manipulation of **Schwab Spreadsheet Transaction Data** (March) | |
|---|---|
| $29,256.75 | Account Value as of 3/1/2018 (*Bank Sweep* balance - excluding the $9,999,999.00 deposit) |
| $16,439.68 | *Short Sale* proceeds reported as *Investments Purchased* (UVXY Options Contracts - 3/23) |
| $16,439.68 | Overstated Cost of Investments Purchased (b/c Short Sale proceeds reported as Investments Purchased) |
| $10,979.71 | Negative Cash Balance (3/28) |
| $3,433.57 | Total value debited by Margin Calls (March/April) |
| ($118.00) | Unique damages not represented by spreadsheet data- end of March adjustments (corresponds to fees) |
| $0.26 | [$1 + $.03 - $.77] Discrepancy between *Settled Funds* and *Cash Investments Total* (3/22) |
| **$76,431.65** | **GAINS FOR TRANSACTIONS EXCLUDED FROM <u>SCHWAB SPREADSHEET TRANSACTION DATA</u> (March)** |

# Count #17-C

In addition to the $76,431.65, there are additional damages totaling $6,657.40 corresponding to an array of anomalies corresponding to the March data.

74

| Total Value of Discrepancies Not Represented by Schwab Spreadsheet Transaction Data (March) | |
|---|---|
| $3,092.84 | Overstated cost of *Investments Purchased* (March Statement) |
| $2,702.27 | Illegitimate *Disallowed Wash Sale Losses* (March Statement and Schwab Transaction Spreadsheet) |
| $600.00 | Discrepnacy historical balances vs. *Assets by Investor of* Schwab Performance Report (3/23) |
| $118.00 | Unique damages - end of March adjustments (corresponds to fees) |
| $104.85 | Discrepancy between end-of-day Historical vs. Live Balances (3/20) |
| $22.67 | Negative Cash Balance - end-of-day 3/19 |
| $6.87 | Cash on Hold converted on 3/6 along with $9,999,999.00 ($10,000,005.87 = $9,999,999 + $6.87) |
| **$4.45** | Discrepancy between Historical vs. Live Balances (3/27) **[$4.45 + $.06 -$ 1.00 = $3.51 ]** |
| $3.38 | Negative Cash Balance - end-of-day 3/6 |
| $2.29 | Discrepancy between negative cash balance and *Funds Due* (3/28) |
| $0.77 | Interest Credited to Account (3/16) |
| $0.03 | Combination of various discrepancies (3/23) & difference of SMA vs. Margin Equity (3/26) |
| ($0.02) | Returned to Pitlor at Liquidation (offsets difference corresponding to $3.51 + $3.38 (-) $6.87= $.02 |
| ($1.00) | Anomalous SMA Value (3/8) |
| **$6,657.40** | **Total of Discrepancies Not Represented by Schwab Spreadsheet Transaction Data (March)** |

# Predicate Count #18

Defendants: TD Ameritrade and Charles Schwab

### 18 U.S.C § 1029.
*Fraud and related activity in connection with access devices*

The Defendants' enterprise abused the permissions granted to the Schwab and TD Ameritrade applications to facilitate clandestine access to Pitlor's accounts, and his electronic devices, via unauthorized access devices, including TD Ameritrade Account ####1360 which, as a closed account, is an unauthorized access device.

# Claim #5

## 18 U.S.C. § 1962a

## Defendants TD Ameritrade and Schwab

### A. Undisclosed Mutual Fund Purchases caused Pitlor to suffer reinvestment injury.

248.        Distinct injury was caused by the reinvestment of proceeds from the Defendants pattern of racketeering activities. The proceeds of larceny were converted via Mutual Fund Purchases and financed the fees associated with those transactions.

249.        Those investments purchases were the final act to a series of artifices that concealed and segregated proceeds of larceny to be converted via Mutual Funds' purchases. The analysis presented with this complaint provides detailed explanations and examples of the scheme that is summarized as followed:

   a. Cash value was concealed via (1) manipulation of the *Trade Date Balance* in conjunction with (2) misrepresentations involving *Margin Equity* (and the SMA), the Futures Account, and *Bank Sweep Feature,* and (3) synchronization of various other synchronized contrivances that concealed cash value by prevented it from contributing to *Account Value* and *Buying Power* displayed by the live data. Then, (4) the historical account balances were altered to coincide with the alternate version of account history that excludes that value, corresponding to (4) targeted funds primarily involving deposits and transferred into the account, including sweeps transfers amongst the Brokerage Account, the Futures Account and the *Bank Sweep Feature.*

   b. Due to Schwab's enforcement of the *Settled Cash Up Front* restriction, imposed illegitimately under the color of **Reg T**, funds segregated as *Funds Available to Borrow* were inaccessible by Pitlor.

   c. Via undisclosed loan transactions collateralized by the assets in Pitlor's account, *Settled Cash* was generated, allowing it to be a placeholder for those funds targeted to be converted.

   d. Pitlor's screenshots document $82,864.25 having been segregated and converted as *Mutual Funds Buying Power.*

**B.      The Mutual Fund Purchase transactions are confirmed by the derivations of damages precise accounting for the fees**

250.      The analyses herein confirms that, in addition to the $10,000,005.87 transferred out of the account on 3/6/2018, and the $82,864.25 was converted via Mutual Fund Purchases later in March 2018, fees were assessed for each conversion transaction, representing additional damages totaling $224.80.

   a. a $25.00 fee was charged in conjunction with the $10,000,005.87 that debited Pitlor's account on 3/6/2018.

   b. Four transaction fees were assessed, each for $49.95, corresponding to the four days whereby *Mutual Funds Buying Power* was populated with value while all other buying power was set to $0. (3/23, 3/26, 3/27, and 3/28 of 2018). While three such instances occurred on 3/27, Mutual Fund transactions occur only once per day and, accordingly, only one fee was assessed.

   c. Multiple derivations precisely account for $224.80, the total cost of those fees.

   **$224.80 = $25 (3/6) + $49.95 (3/23) + $49.95 (3/26) + $49.95 (3/27) + $49.95 (3/28)**

251.      While there was some variation with respect to how the various contrivances were implemented to conceal and segregate cash value, the direct cause of injury resulted from the conversion of those funds via *Mutual Funds Buying Power.* Therefore, Pitlor suffered "investment injuries" distinguishable from the pattern of racketeering activities, and the Defendants thereby violated RICO (a).

# Claim #6: Anti-Trust (2 Counts)

## 15 U.S.C. § 1

## Defendants TD Ameritrade and Schwab

### Claim 6-A

**A.      The Defendants' conspiratorial agreement to exploit Pitlor's Schwab Accounts constitutes a *per se* anti-trust violation for the horizontal naked**

**restraint of trade that specifically intended to harm Pitlor's ability to freely and fairly participate, in violation of Section 1 of the Sherman Act.**

252.    Direct evidence of the Defendants' agreement is established **Predicate Count #18 – 18 U.S.C. § 1029**.  The evidence and analysis pertain to the following:

- The Defendants' secretive data transmissions and use of unauthorized or counterfeit access devices are evidenced by the crash logs generated by the TD Ameritrade and Schwab Mobile Applications on Pitlor's devices.
- Other anomalies pertaining to Pitlor's supposedly closed TD Ameritrade account, such as activation of the Futures Account, which is consistent with the alleged utilization of Futures Account Buying Power being the mechanism through which funds were debited from Pitlor's Schwab Brokerage Account ####5612.
- $3.51, the closing balance of Pitlor's TD Ameritrade Account ####1360, inextricably figures into all derivations of damages suffered by Pitlor's Schwab Accounts.

253.    The Crash Logs of the Schwab Mobile App and TD Ameritrade's *ThinkorSwim* application evidence TD Ameritrade's tortious interference with Pitlor's Schwab Account, whereby Schwab and TD Ameritrade developed and debugged code to perpetrate the data manipulations, funds transfers, and concealment thereof.

254.    The Defendants utilized advanced data processing and communications techniques to enable clandestine inter-process communications (IPC) to facilitate data transfers and sharing between the Defendants' mobile apps.

255.    TD Ameritrade's accessed and transmitted data on processes pertaining to Schwab account data, including transaction records, tasks pertaining to "fragments" and other data strings specifically corresponding to live and historical balances.

256.    In addition to the extensive evidence of TD Ameritrade's tortious interposing, the nefarious nature of TD Ameritrade's involvement is confirmed by the of debug ("/D") and verbose ("/V") entries that frequently correspond to TD Ameritrade throughout the crash logs.  Android

78

specifically instructs their use to be limited to **application development** and should never be compiled in the final production version of the app.

> **"You should never compile verbose logs into your app, except during development. Debug logs are compiled in but stripped at runtime, while error, warning, and info logs are always kept."**

Source: Android Studio User Guide – Debug your app – Write and view logs

https://developer.android.com/studio/debug/am-logcat

257.    Debugging allows "breakpoints" and "watchpoints" to be added that, among an array of other capabilities, permits specific variables to be inspected, evaluated, and changed by the developer:

> **"Android Studio supports several types of breakpoints that trigger different debugging actions. The most common type is a line breakpoint that pauses the execution of your app at a specified line of code. While paused, you can examine variables, evaluate expressions, then continue execution line by line to determine the causes of runtime errors."**

Source: Android Studio User Guide – Debug your app – Overview

https://developer.android.com/studio/debug

## Claim 5-B

**B.      The nature of the Defendants' conspiracy constitutes an anti-competitive tying arrangement, a *per se* violation of Section 1 of the Sherman Act**

258.    Schwab conditioned their provision of services upon the requirement that Pitlor's account activity be processed in conjunction with and integrally involving TD Ameritrade and their electronic services.  This condition was never disclosed to Pitlor and was secretly enforced.

259.    As the Defendants have substantial market power over the tying product (Schwab's Brokerage Services), their concerted action is *per se* illegal, particularly for the existence of the tied product (TD Ameritrade's Electronic Services) being undisclosed and serving the explicit purpose of facilitating specified unlawful activities pertaining to money laundering and other patterns of racketeering activities.

260.    The particularly egregious circumstances require the presumption of anticompetitive conduct, as is evident by the unfairness that resulted from their lawlessness. TD Ameritrade and Schwab deliberately set out to stifle Pitlor's ability to participate in the market space where they possess enormous clout.

261.    The Defendants resorted to outright sabotage of his Schwab account in order further the goals and objectives of their illicit racketeering enterprise without any regard for the harm inflicted or the prospective consequences for their actions, as demonstrated by the following facts:

a. Pitlor's TD Ameritrade account was configured specifically for the purposes of exploitation. The timestamps for the Margin Account transactions were altered at TD Ameritrade to enable retroactive editing of account balances to conceal cash value.

b. After continuous exploitation and theft over the course of 18 months, Pitlor presented clear evidence of the erroneous recordkeeping corresponding the scheme that targeted his account.

c. TD Ameritrade refused to acknowledge, let alone remedy those obvious errors. Instead, TD Ameritrade unilaterally decided to terminate its business relationship with Pitlor in September 2017. They further instructed Pitlor to never attempt to do business with TD Ameritrade again, and Kutak Rock issued a cease and desist request on their behalf.

d. TD Ameritrade made declarations to this Court affirming that, indeed, Pitlor's account had been closed in **8:17-cv-00359 Pitlor v. TD Ameritrade et al.** (2017). While Pitlor was restricted from trading, the account remained accessible through the *ThinkorSwim* platform.

e. Pitlor has never stopped receiving monthly brokerage statements for account ####1360[31].

f. The Defendants agreed to utilize TD Ameritrade's electronic services to secretly process Schwab account data, and Pitlor's defunct TD Ameritrade Account ####1360 was directly utilized. Pitlor was not notified of the arrangement, but indeed Pitlor's Schwab account

---

[31] On 1/23/2020, Pitlor inquired to TD Ameritrade and received affirmation that indeed TD Ameritrade considers his account to have been closed in 2017.

activity is evidenced to have been accessed, interacted with, and manipulated by TD Ameritrade.

g.  TD Ameritrade's involvement was instrumental in facilitating the money laundering and theft from Pitlor's account, even after the errant $9,999,999.00 was successfully removed from the account, resulting in direct damages totaling $83,095.11.

h.  The Defendants combined efforts escalated the potency of their schemes.  By secretly integrating their Electronic Services, the enterprise more effectively concealed discrepancies representative of the wrongdoing, as is evident by the comparisons to the exploitation of the TD Ameritrade account which, by comparison, produced significantly more errors in the historical account data and the official records.

## The significance of $3.51

**12/11/2019 Screenshot at 15:08**
**TD Ameritrade *ThinkorSwim* Mobile App**

**Balances**
-----1360

| | |
|---|---|
| Cash & Sweep Vehicle | $3.51 |
| Cash Balance | $0.00 |
| Equity Percentage | 100.00% |
| Long Marginable Value | $0.00 |
| Long Stock Value | $0.00 |
| Maintenance Requirement | $0.00 |
| Margin Balance | $3.51 |
| Margin Equity | $3.51 |
| Money Market Balance | $0.00 |
| Net Liquidating Value | $3.51 |
| Option Buying Power | $3.51 |
| Short Balance | $0.00 |
| Short Marginable Value | $0.00 |
| Stock Buying Power | $3.51 |
| Total Commissions & Fees YTD | $0.00 |
| Futures Commissions & Fees YTD | $0.00 |
| Futures Account | TDACX561 |
| Day Trades Left | 3 |

262.     Rather than transferring funds via traditional means, the evidence may be interpreted as Defendants having instead manipulated the digital infrastructure of Pitlor's accounts so that the balances in the Schwab account could be assigned to the TD Ameritrade account, and vice-versa. By digitally reconfiguring the TD Ameritrade account to be accessible via Schwab's platforms-the Defendants avoided transaction reporting requirements.

263.     $3.51 uniquely factors into all of the derivations of damages; it contributes as unique damages when the fees are accounted for (which incorporates the April Data and the 4/13 *Balance Subject to Interest $11.61*), otherwise it tends to be reflected as a credit to the account. Ultimately, indicating that the $3.51 which was initially credited to the account was then removed from the account twice.

264.     While the subsequent analyses commonly refer to the $3.51 having been swapped into the account at the time of the $10,000,005.87 *Cash on Hold* was removed, there is uncertainty as to whether that $3.51 had been in Pitlor's Schwab Account, or if it was being prepared to "Swap in" to that account. In terms of the analysis, it does not matter when it occurred because ultimately, $3.51 was removed from the account twice so to represent unique damages of $3.51. $3.51 had a specific purpose, and it was precisely choreographed to be concealed amongst other discrepancies, while aiding the concealment of others, summarized as follows:

- $3.51 was significant in the concealment of $3.38, both of which combined to conceal $6.87.
$$\mathbf{\$3.38 + \$3.51 = \$6.87 + \$.02}$$
- Indeed, a $.02 discrepancy tends to persist throughout the derivations of damages.
- The unique damages of $3.51 was concealed as $4.45.
**$4.45 = $3.51 + $1 - $.06 = $3.51 + $.94** and all of those constituent sums correspond to unique discrepancies..
- $4.45 was ultimately combined with a $7.16 discrepancy and concealed as an unreported *Balance Subject to Interest,* $11.61 in the closing days of the account.
- That final *Balance Subject to Interest,* which was not reported by the <u>April Statement,</u> accounts for it three times.
**$11.61 = $3.51 + $3.51 + $3.51 + $1 + $.06 + $.02**
- .The third $3.51 in fact corresponds to the concealment of $3.38 paired with a $.13 discrepancy:
$$\mathbf{\$3.51 = \$3.38 + \$.13 = \$3.38 + \$.77 \ (\text{-}) \ \$.64,}$$

265.     The above calculation represents the fact there was more than one $.13 discrepancy, which in fact corresponded to a separate discrepancy of $.26 = $.13 + $.13.

266.     The historical records were edited as the data was being generated, and then was "cleansed" to retroactively portray a version of account activity favorable to the Defendants liking, so by no means

82

are the relationships between the discrepancies constrained by the forward passage of time. Indeed, the records contain logical inconsistencies and "dualities" that enable multiple interpretations[32]. That, standing alone, is evidence of there existing "issues" with Schwab's records.

267.    From no later than the moment Futures Account ####6617 was deleted, the Defendants planned for Schwab to rely on those alternate "interpretations" to counter-attack Pitlor's allegations, in the appropriately controlled setting, with a more "thorough" analysis, firmly supported by the official record based on doctored historical data, that demonstrates Pitlor's one-off observations to be unsupported, and at best representative of innocuous imperfections that are not indicative of damages. The completeness of Pitlor's analysis eliminates that possibility.

268.    Indeed, the objective of the subsequent analyses is not to merely identify errors and inconsistencies. Damages must be quantified with unassailable PROOF. That proof, achieved with precision that accounts for every penny, necessarily requires $3.51 to be uniquely figured into the calculations. Indeed, even the intermediate values require $3.51 to be precisely accounted for in order to accurately calculate the totals:

$1.43 = $.66 + $.46 + $.26 + $.03 + $.02

**$4.45** = **$3.51** + $1 -$.06

$6.87 = **$3.51** + $3.38 - $.02

$7.16 = $2.29 + $3.38 + $1.43 + $.06 = $6.87 + $.26 + $.03

**$11.61** = $7.16 + **$4.45**

$104.85 = $54.28 + $29.54 + **$11.61**  $6.87 + $2.29 + $.26

$118 = $104.85 + **$11.61** + $2.29 + $.02 - $.77

$1465.13 = $1048.69 + $357.75 + $54.28 + **$4.45** + $.02 - $.06

**$1768** = $1048.69 + $600 +$104.85 + $6.87 + **$3.51** + $3.38 + $1.3 + $.06 -$.64 (−) $.02

**$2702.27** = $1048.69 + $575 + $600 + $357.75 + $54.28 + $29.54 + $22.67 + $3.38 + $7.16 + **$4.45** - $.64

---

[32] The existence of multiple viable interpretations is likely attributable to the interposing account data associated with those secretly comingled accounts or partitions that were concealed from and never directly accessible by Pitlor (i.e. $3.51).

**$3618** = $1048.69 + $600 + $575 + $494.54 + $309 + $224.80 + $118 + $104.85….

+ $54.28 + $50 + $29.54 + $7.16 + **$3.51** + .06 - $1.43

**$10,982.00** = $3,404.57 + $2,702.27 + $3,092.84 + $1768 + $6.89 + **$4.45**…

+ $2.29 + $.77 -$.06 - $.02

**$10,979.71** = $3092.84 + $2702.27 + $1768 + $1048.69 + $600 + $575…

+ $494.54 $309 + $118 + $104.85 + $54.28 + $50 + $29.54 + $22.67…

+ **$3.51** + $3.38 + $1.41 + $1 + $.66 + $.06 + $.03 - $.02

## THE SIGNIFICANCE OF MATCHING AND NEARLY MATCHING SUMS

| |
|---|
| $10,982.00 |
| $10,979.71 |
| $23,355.97 |
| $23,355.97 |
| $3,404.57 |
| $3,404.57 |
| $2,702.27 |
| $2,702.27 |
| $1,048.69 |
| $1,048.69 |
| $54.28 |
| $54.28 |
| ($3.51) |
| ($0.77) |
| $0.06 |
| $83,089.05 |

269.    The multiplicity of valid calculations which not only compute numerically, but also make sense logically, ensures that values are properly accounted for without being "double counted." Then again, "double counting", or the existence of "matching and nearly matching values" also precisely describes the nature of the scheme.

**$83,089.05 = $82,864.25 (Mutual Funds Buying Power) + $224.80 (Total Fees)**

270.    It is noteworthy to point out the extremely miniscule odds that a coincidence can explain the fact that, as presented in Claim #1, **Predicate Count 4-A**, damages totaling $6,809.53 are proven.  In the adjacent list, note that **$3,404.57 x 2 = $6809.14.**

271.    **$3,404.57** was the arbitrary value of the Futures Margin Call received the morning of 3/27/2018 after Pitlor's account was frozen due to bogus *Pattern Day Trader* violation.

272.    Any benefit of the doubt that may remain is resoundingly squashed by the following excerpts.  Each was taken on 3/23/2018 within moments of each other.   Note how the change in cash value is $40 for most of the fields.  Except, *Funds Available - to Trade: Cash & Cash Investments* is frozen with a value of $6,809.76.

84



273.    There are other "synchronicities" between damages, disallowed wash amounts, and the like that are simply beyond the scope of this complaint, and ultimately distract from the analysis that directly proves the alleged damages using only the Schwab data, with that single exception, $3.51.

274.    Pitlor surmises that the TD Ameritrade account, which was rigged to commit relentless larceny, was essentially "replayed" in the Schwab account. Predicate 18 pertaining to the abuse of access devices firmly supports this notion.

275.    There are other compelling "coincidences" that simply cannot possibly be by chance. Pitlor believes this to relate to a phenomenon called "representation error", specifically pertaining to the fraction 1/10 and how computers are unable to accurately calculate that precise value, but due to the sheer volume of this complaint- this speculative tangent of the analysis will be abruptly halted. This complaint focuses on that which is certain and those claims that can be objectively proven, today.

# DAMAGES

### CLAIM #1

276.      The damages resulting from the exploitation of the TD Ameritrade account is estimated according to the total value concealed via misrepresentation of Margin Equity.  To avoid double counting, a conservative estimate figures the following:

2016: $65,969.86 – (Predicate Counts #6)

2017: $6,809.53 + $137.48 + $76.98 + $22.46 (Predicate Counts# 4)

Total Direct Losses are no less than: $73,016.31

TD Ameritrade is liable for 3X damages, $219,048.93

Kutak Rock is also liable for that amount: $219,048.93

### CLAIMS 2 THROUGH 6

The direct damages are $83,089.05.

The unjust enrichment is $10,000,005.87

1.      Pitlor suffered significant harm due to Schwab and TD Ameritrade's invidiously discriminatory animus.  He is due restitution.  How much was it worth to TD Ameritrade and Schwab?  What was the true market value of that $83,095.11 from their perspective?  Certainly, it was no less than $10,000,005.87, *quantum valebat.*

2.      Their anti-trust violative enterprise operated by depriving Pitlor's rights under the color of the law, and financial gain must be ruled out as a motive for the theft that transpired after successfully laundering those funds.

TD Ameritrade and Schwab are jointly and severally liable for $10,083,094.90 x 3 = $30,249,284.80

# PRAYER FOR RELIEF

Wherefore,

277.    It is not known how much more "right" Pitlor would have had to have been in order to avoid this protracted dispute.  It appears there is no threshold that Pitlor can attain to convinced the Defendants to admit wrongdoing and remediating the harm that was done?!

Wherefore,

278.    the thoroughness of the evidence and analysis presented herein by no means can be presumed to be overkill- it is an absolute necessity.  Pitlor has always desired fair engagement on the merits of his claims, and that is what the Defendants have staunchly denied.

Wherefore,

279.    The Defendants animus has been directed at not only Pitlor, but the law itself.  The Defendants have proven themselves to be untrustworthy, and as partners their capabilities are enhanced,

This is the rare occasion where the full extent of punitive restitution is necessary.

| | | | | | 43,165.00 | Wire Transfer Fee | 25.00 |
|---|---|---|---|---|---|---|---|
| | | | | | 43,182.00 | Mutual Fund Transaction Fee | 49.95 |
| | | | 3.51 | | 43,185.00 | Mutual Fund Transaction Fee | 49.95 |
| 1,463.83 | | | 1.00 | | 43,186.00 | Mutual Fund Transaction Fee | 49.95 |
| 3,618.00 | 0.17 | 3,618.17 | (0.06) | | 43,187.00 | Mutual Fund Transaction Fee | 49.95 |
| 2,481.61 | | 118.00 | 104.85 | 4.45 | (3.51) | 1.00 | 0.03 | (0.02) | 224.80 |
| 1,768.00 | | 3,736.17 | | | | | | | |
| 1,048.69 | | | | | | | | | |
| 600.00 | | | 3.51 | | | | | | |
| 104.85 | | | 1.00 | | | | | | |
| 1.00 | | | (0.06) | | | | | | |
| 0.02 | | 7.16 | 4.45 | 11.61 | | | | | |
| (7.16) | | 0.03 | | | | | | | |
| (3.51) | | (3.51) | | | | | | | |
| (0.03) | | (3.51) | | | | | 22.67 | | (3.51) |
| | 600.00 | 309.00 | 0.17 | 0.03 | (54.28) | (0.02) | 17,725.31 | 6.87 | 3.38 | 0.06 | | | 10,982.00 |
| | | | | | | | 8,245.23 | 2,702.27 | 29.54 | 3.51 | (0.66) | (0.17) | (0.03) | 0.02 | 10,979.71 |
| 29,256.75 | 3.38 | (28,000.00) | (6.87) | (3.51) | (1.41) | 1,248.34 | | | | | | | | |
| | | | | | | 1,048.69 | 1,465.13 | 118.00 | 54.28 | 7.16 | 6.89 | 2.29 | (0.17) | 2,702.27 |
| | | | | | | 118.00 | | | | | | | | |
| | 1,048.69 | 575.00 | 494.54 | 250.00 | 104.85 | 6.87 | 1.00 | 0.66 | 2,481.61 | | | | |
| | 25.00 | | | | | 3.51 | | | | | | | |
| | 600.00 | | | | | 1.00 | | | 103,505.22 | 3/23 - Cash + Borrowing Funds Avail. to Trade |
| | | | | | | 0.02 | | | 0.06 | |
| | | | | | | (0.03) | | | (0.66) | |
| | | | | | | 28,396.94 | 23,355.97 | 51,752.91 | 103,505.82 | |
| | | | | | | | | (54.28) | | |
| | | | | | | | | 51,698.63 | 38,980.52 | 54.28 | 4.45 | 90,737.88 |

| | | | | | | (9,308.65) |
| | | | | | | (29.54) |
Direct relation to $3.51 - TD AMERITRADE ACCOUNT | | | | | | (0.26) |
BANK SWEEP VALUE | | | | | | (0.03) |
MUTUAL FUNDS BUYING POWER & FEES | | | | | | 0.02 |
| | | | | | | 1.00 |

| Date | 3/23 | 3/26 | 3/27 | 3/27 | 3/27 | 3/28 | |
|---|---|---|---|---|---|---|---|
| utual Fund Buying Power Conversio | 2,481.61 | 51,698.63 | 17,725.31 | 1,248.34 | 8,245.23 | 1,465.13 | 82,864.25 |
| | | | | | 28,000.00 | | |
| | | 6.87 | 0.02 | 6.89 | | | |
| | | | | 1.00 | | | |
| | 3.51 | 3.38 | (6.87) | 0.02 | | | |
| | | | | 29,256.25 | | | |

| The table is comprised of unique discrepant values, but the relationships demonstrate the "lack of uniqueness" or, as defined by mathematics, a "linear dependance" amongst the discrepant values. This indicates that the errant values are not random, but instead have been meticulous designed. In this case, it contributes to the proof of the Defendants' scheme to misrepresent, conceal, and deceive so to facilitate larceny and money laundering. | Discrepant Values | 27-Feb Understated Margin Equity | 28-Mar Funds Due Caused by deficit from conversions | 30-Mar Neg. Futures Buying Power | 23-Mar Misc. Discrepancies Converted Mutual Funds Buying Power | 30-Mar End Month Adjustment |
|---|---|---|---|---|---|---|
| | | $1,048.69 | $10,982.00 | $3,618.00 | $2,481.61 | $1,768.00 |
| March Statement Overstated Investments Purchased | $3,092.84 | - | $3,092.84 | - | - | - |
| Disallowed Wash Sale Losses | $2,702.27 | - | $2,702.27 | - | - | - |
| End-of-March Adjustment Corresponding to error of $1886 (expired options contracts held open) | $1,768.00 | - | $1,768.00 | - | - | - |
| Cash Balance Reported by March Statement | $1,463.83 | - | - | - | - | - |
| 2/27 - Understated Margin Equity | $1,048.69 | - | $1,048.69 | $1,048.69 | $1,048.69 | $1,048.69 |
| 3/23 - Discrepancy between stated account value and sum of asset values | $600.00 | - | $600.00 | $600.00 | - | $600.00 |
| 3/6 - Discrepancy between asset values and account value | $575.00 | - | $575.00 | $575.00 | $575.00 | - |
| 2/27 - Disallowed Wash Sale Loss | $494.54 | $494.54 | $494.54 | $494.54 | $494.54 | - |
| 4/13 - adjustment prior to account liquidation | $309.00 | - | - | $309.00 | - | - |
| 3/18 - Losses assessed due to expired options contracts being held open | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | - |
| 3/23 - end-of-day asset value discrepancy between live and historical data | $220.00 | $220.00 | $220.00 | $220.00 | - | - |
| End-of-March Adjustment Corresponding to error of $1886 (expired options contracts held open) | $118.00 | - | - | - | - | - |
| 3/21 - Discrepancy between live and historical Account Value | $104.85 | $104.85 | $104.85 | $104.85 | $104.85 | $104.85 |
| Balance Subject to Interest not reported by official record | $29.54 | ($29.54) | $29.54 | - | - | - |
| Margin Call due to negative cash balance | $23.00 | - | $23.00 | - | - | - |
| Negative Cash Balance | $22.67 | - | $22.67 | - | - | - |
| Margin Call due to negative cash balance | $12.00 | - | $12.00 | - | - | - |
| Balance Subject to Interest not reported by official record $11.61 = $7.16 + $4.45 | $11.61 | - | $11.61 | - | - | - |
| 3/23 - Cash Discrepancy between live and historical values for Margin Equity / Cash Investments total | $7.16 | - | $7.16 | $7.16 | - | $7.16 |
| Sum of $1.61 + $1.38 | $6.89 | - | $6.89 | - | - | - |
| 3/6 -Cash on Hold converted with $10,000,005.87 | $6.87 | - | $6.87 | - | $6.87 | - |
| 3/27 - Cash Discrepancy | $4.45 | $4.45 | $4.45 | $4.45 | - | $4.45 |
| Value remaining in Plaintiffs TD Ameritrade Account ####1390 | $3.51 | - | $3.51 | $3.51 | - | $3.51 |
| 3/6 - Negative Cash Balance | $3.38 | $3.38 | $3.38 | - | - | - |
| 3/28 - Undisclosed adjustment added to Funds Due | $2.29 | - | $2.29 | - | - | - |
| 3/8/2018 Anomalous SMA balance | $1.00 | $1.00 | - | $1.00 | $1.00 | - |
| Difference between 3/22 Excess Margin Equity and value transferred to Bank Sweep Feature on 3/23 | $0.66 | - | - | - | $0.66 | ($0.66) |
| 3/28 - Anomalous Cash Discrepancy | $0.06 | $0.06 | $0.06 | - | - | - |
| Net Credit to Account Due to Offsetting Margin Calls on 3/27 and 3/28, $38,980 and ($38,986) | ($6.00) | - | ($6.00) | - | - | - |
| Total Interest Credited to Account in March and April | ($1.43) | - | ($1.43) | - | - | - |
| 3/31 Stray balance - difference of Funds Due $3618 and $3736 vs. Negative Futures Buying Power $3618.17 and $3736.17 after Futures Account had already been closed | ($0.17) | - | ($0.17) | ($0.17) | - | - |
| 3/26 - Discrepancy between SMA and Margin Equity | ($0.03) | ($0.03) | - | ($0.03) | - | - |
| Anomalous Value returned via separate check (from different account) at liquidation | ($0.02) | ($0.02) | ($0.02) | - | - | - |
| | $12,874.46 | $1,048.69 | $10,982.00 | $3,618.00 | $2,481.61 | $1,768.00 |
| Compare to Understated Loss 3/29/2018 | $12,868.28 | | | | | |

| The connection between the individual errant sums, the understated losses from 3/29/2018, and the missing proceeds (doubled because it was assessed as an assett purchase), is further evidence of the enterprise's dangerous potential. The Defendants rely on the complexity to conceal their wrongdoing and to substantiate insincere general denials of wrongdoing. Allow their strategy to succeed would set a dangerous precedent, particularly as 12 Million TD Ameritrade Accounts will soon be integrated into Schwab and TD Ameritrade's combined technological platforms and accounting systems. | | |
|---|---|---|
| Grand Total | | $32,772.76 |
| 3/21 Live vs. Historical | | $104.85 |
| Interest Credited | | $1.43 |
| 3/22 - Cash Discrepancy | | $0.26 |
| 3/28 - Cash Discrepancy | | $0.06 |
| Missing Proceeds Due to Short Sale Reported as Investment Purchase | $16,439.68 | $16,439.68 | $32,879.36 |

| KEY VALUES | | | |
|---|---|---|---|
| 3/2 | $494.54 | Disallowed Wash Sale Loss | 3-2 Realized Gain/Loss record |
| MARCH | $2,702.27 | Total Disallowed Wash Sale Losses | Schwab Spreadsheet Transaction Data |
| 2/27 | $1,048.69 | Understated Margin Equity | 2/27 & 2/28 Historical Balance Data |
| 3/6 | $575.00 | discrepancy in value of Options Investments | Screenshot |
| 3/2 | $10,000,005.87 | Cash on Hold | Screenshot 3/2 - Historical Balance Data |
| 2/28 | $9,999,999.00 | Cash on Hold - Deposit | 2/28 - Deposit Confirmation |
| 3/6 | ($3.38) | Negative Cash and Cash Investments - Total | Screenshot |
| 2/28 | $6.87 | Cash on Hold - Margin Loan Interest Fee | 2/28 - Historical Balance Data / March Statement |
| 3/8 | $1.00 | Anomalous SMA value | 3/8 - Live Account Balances (pre-market) |
| 3/15 | $0.77 | Interest Credited to Bank Sweep, refunded, recredited, stolen | Screenshot / March Statement |
| 3/18 | $50.00 | Value of expired options possessing value - Cash Discrepancy | Screenshot |
| 3/19 | ($22.67) | Negative Cash and Cash Investments - Total | Screenshot (3/20, 3/21) |
| 3/22 | $29.54 | Balance Subject to Interest (unreported) | Screenshot |
| 3/20 | $0.33 | Futures Buying Power discrepancy ($29.87) | Screenshot |
| 3/21 | $0.46 | Cash Investments, $20.92 vs. Settled Funds, $20.46 | Screenshot |
| 3/22 | $0.13 | Cash Available, $127.17 vs. Bank Sweep deposit, $127.04 | Screenshot / March Statement |
| 3/21 | $104.85 | Live vs. Historical Account Value Discrepancy | Screenshot / Historical Personal Value Log |
| 3/22 | $0.66 | Margin Equity $14,054.26 vs. Bank Sweep deposit, $14,053.60 | Screenshot / March Statement |
| 3/22 | $0.26 | Cash Investments, $14,174.43 vs. Settled Funds, $14,174.17 | Screenshot |
| 3/22 | $14,054.00 | Undisclosed utilization of Borrowed Funds ( to match the SMA Balance) | Screenshot |
| 3/22 | $14,181.30 | Manipulated Trade Date Balance | Screenshot |
| 3/22 | $127.04 | Bank Sweep value concealed by Borrowed Funds | Screenshot |
| 3/22 | $25.00 | Cash Discrepancy representing conversion fee from 3/6/2018 | 3/22 - Balance Data vs. Screenshot |
| 3/23 | $13,768.61 | Sweep to Futures registers as loss to Brokerage Account | Screenshot |
| 3/23 | $412.03 | Trade Date Balance (before opening bell) | Screenshot |
| 3/23 | ($9,308.65) | Trade Date Balance (after opening bell) | Screenshot |
| 3/23 | $23,489.95 | Sum of $.66 + $13,768.61 + $412.03 + $9308.65 | CALCULATED |
| 3/23 | $14,223.46 | Concealed Margin Equity | 3/23 Live vs. Historical Balance Data |
| 3/23 | $600.00 | Account Value Discrepancy | 3/24 - Asset Holdings by Investor vs. Historical Balance |
| 3/23 | $28,396.00 | Borrowed Funds omitted from Historical Data | 3/23 - Live Balances |
| 3/23 | $0.03 | Consolidation of other Discrepancies $.69 - $.66 | 3/23 - Calculated |
| 3/23 | $7.16 | Cash Discrepancy | 3/23 vs. 3/26- Historical Balance Data |
| 3/23 | $74,642.25 | Balance Subject to Interest | 3/23 - Historical Balances |
| 3/23 | $23,143.13 | Discrepancy Live vs. Historical Account Value | 3/23 - Live & 3/23 - Historical Balance Data |
| 3/26 | Various | Direct Evidence of Manipulated Account Values on 3/26/2018 | Screenshot |
| 3/27 | $16,922.62 | Cash Value in Futures Account Unaccounted for | Screenshot |
| 27-Mar | (90,737.88) | Negative Margin Equity | 3/27- Historical Data & Screenshot |
| 3/27 | $55,907.59 | Value of Futures Account excluded from historical Account Value | Screenshot |
| 3/27 | $4.45 | Discrepancy live vs. historical Margin Equity | Screenshot vs. 3/27 -Historical Balance Data |
| 3/27 | $34,867.11 | Borrowed Funds Available to Withdraw | Screenshot |
| 3/28 | ($10,979.71) | Negative Margin Equity / Cash Balance | Screenshot |
| 3/28 | $10,982.00 | Funds Due | Screenshot |
| | $0.64 | Stray Cash Balance | Schwab Portfolio Checkup - Assett Allocation |
| 3/28 | $2.29 | Difference between Neg. Cash Balance vs. Funds Due | Screenshot |
| 3/29 | $1.30 | $1465.13 (3/28 Mutual Fund BP) (-) $1463.83 (end day balance) | CALCULATED - Discrepancy |
| 3/31 | $1,768.00 | End of Month Adjustment to total Account Value | Screenshot |
| 3/31 | $118.00 | Unique Damages Corresponding to End of Month Adjustments | CALCULATED ($118 = $3736 (-) $3618 = $1886 (-) $1768) |
| MARCH | $1,886.00 | Value of Expired Options reported as active Investment positions | March Statement |
| 3/31 | $0.17 | Difference between Neg. Futures Buying Power vs. Funds Due | Screenshot |
| 3/31 | $3,618.00 | Funds Due | Screenshot |
| 3/30 | $3,736.00 | Funds Due | Screenshot |
| 4/13/2018 | $11.61 | Balance Subject to Interest (unreported) | Screenshot |
| 4/13/2018 | $309.00 | Unique damages corresponding to Neg. Futures Buying Power / SMA | Screenshot |
| APRIL | $0.02 | Interest Credited (based on phony balance data) | April Statement |
| 2017 | $3.51 | TD Ameritrade####1360 Remaining Balance | Statements / Screenshots |

# ATTACHMENT: TD AMERITRADE PREDICATE COUNTS #1 & #2 & #3

## Predicate Count #1

### 18 USC § 1343 – *Fraud by Wire*

**A.    $23,665.55 accumulated as *Margin Equity* was excluded from *Net Liquidating Value* on 8/18/2016 and was withdrawn on 8/19/2016**

280.    The following data corresponds to the *ThinkorSwim* Historical Account Data for 8/18/2016 & 8/19/2016 (Excerpts are presented on following page).  The relevant figures from this data is summarized as follows:

| Account Balances | 8/18/2016 | 8/19/2016 |
|---|---|---|
| Net Liquidating Value | $1997.51 | 1948.26 |
| Cash and Sweep Vehicle | $1760.01 | $1760.76 |
| Options | $237.50 | $187.50 |
| Options Buying Power | $1,760.01 | $1760.76 |
| Stock Buying Power | $7502.76 | $1760.76 |
| Margin Equity | $25,427.06 | $1760.72 |
| Profits and Losses | ($17,285.38) | ($17335.38) |

281.    On 8/18/2016 The *Net Liquidating Value* is equal to the sum of values stated for *Cash and Sweep Vehicle* and the *Options,* but the *Margin Equity,* **$25,427.06,** is erroneously excluded.

*Net Liquidating Value = Cash and Sweep Vehicle + Options*

**$1997.51 = $1760.01 + $237.50        (8/18/2016 )**

**Margin Equity $25,427.06 does not factor into stated *Net Liquidating Value.***

282.    On 8/19/2016, the *Margin Equity* was stated to be **$1760,72,** indicating that *Margin Equity* totaling **$23,666.34** had been removed.  It also implies that the $25,427.06 *Margin Equity* on 8/18/2018 included the *Cash and Sweep Vehicle* balance, $1760.72.

**$23,666.34 = $25,427.06 - $1760.72**

91

283.    The *Cash and Sweep Vehicle* increased in value by $.75 between 8/18/2016 and 8/19/2016.

$$\$.75 = \$1760.76 - \$1760.71$$

284.    Thus, the total net value removed from the account was:

$$\$23,665.59 = \$23,666.34 - \$.75$$

285.    Neither the *Net Liquidating Value* nor the *Profits and Losses* accounting were impacted by the removal of the *Margin Equity*, $23,666.34.

286.    The *Options Buying Power* and *Cash and Sweep Vehicle*, stated to be $1760.76, each anomalously increased in value by $0.75. As shown by the table below, that $.75 does contribute to the *Net Liquidating Value* but is not accounted for by the *Profits and Losses*.

**Figure: 8/18 vs. 8/19 Changes in Value of Account Assets**

| 8/18 – 8/19 Comparisons | Value of Options Assets | Net Liquidating Value | Profits and Losses |
|---|---|---|---|
| 8/18 | 237.50 | 1997.51 | ($17,285.38) |
| 8/19 | 187.50 | 1948.26 | ($17,335.38) |
| Difference | ($50.00) | ($49.25) | ($50.00) |

## Excerpt from 8/18/2016 *ThinkorSwim* Historical Account Data



## Excerpt: 8/19/2016 *ThinkorSwim* Historical Data



**B. Coinciding with the clandestine withdrawal of *Margin Equity*, expired options contracts inexplicably reappear in the account.**

93

287.    In addition to the vanishing *Margin Equity*, the *Thinkorswim* Historical Account Data for 8/18/2016 contains another significant discrepancy. Twenty-four entries inexplicable entries appear, all purporting to be *"Removal of option due to expiration…"*, as shown on the following page. This is clearly an erroneous fabrication, for the following reasons:

    a. those Options contracts in fact already expired, in May 2016, three months prior

    b. 8/18/2016 was a Thursday and the options contracts for those underlying securities expire on Fridays,

    c. The positions were not shown to have existed in Pitlor's account on the previous day, or any other day since the original expiration.

    d. The account records for May 2016 do show many of these positions existing, but several do not precisely coincide with the reported account holdings.

    e. There is no *Trade Date* listed for these transactions, which is left blank. Only the 8/18/2016 execution date is stated.

    f. These entries are not corroborated by corresponding transactions in any of the other record formats.

## Excerpt from  8/18/2016 *ThinkorSwim Historical Account*

| Trade D… | Exec Da… | Exec Ti… | Type | Ref # | Description | Misc Fees | Commissio… | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 8/18/16 | 8/18/16 | 00:00:00 | BAL | -- | Cash balance at the start of business day 18.08 CST | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292708788 | REMOVAL OF OPTION DUE TO EXPIRATION -228.0 GDXJ 100 20 MAY 16 37 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292708895 | REMOVAL OF OPTION DUE TO EXPIRATION -28.0 GDXJ 100 20 MAY 16 37.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292709218 | REMOVAL OF OPTION DUE TO EXPIRATION -30.0 GDXJ 100 20 MAY 16 38 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292709232 | REMOVAL OF OPTION DUE TO EXPIRATION -22.0 GDXJ 100 20 MAY 16 39.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292710135 | REMOVAL OF OPTION DUE TO EXPIRATION -150.0 GLD 100 20 MAY 16 120 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292710152 | REMOVAL OF OPTION DUE TO EXPIRATION -100.0 GLD 100 20 MAY 16 120.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292710157 | REMOVAL OF OPTION DUE TO EXPIRATION -205.0 GLD 100 20 MAY 16 121 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292710191 | REMOVAL OF OPTION DUE TO EXPIRATION -107.0 GLD 100 20 MAY 16 121.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292710303 | REMOVAL OF OPTION DUE TO EXPIRATION -70.0 GLD 100 20 MAY 16 122 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292710334 | REMOVAL OF OPTION DUE TO EXPIRATION -53.0 GLD 100 20 MAY 16 123 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292710348 | REMOVAL OF OPTION DUE TO EXPIRATION -40.0 GLD 100 20 MAY 16 123.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292710392 | REMOVAL OF OPTION DUE TO EXPIRATION -40.0 GLD 100 20 MAY 16 122.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292720842 | REMOVAL OF OPTION DUE TO EXPIRATION 228.0 GDXJ 100 20 MAY 16 37 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292720845 | REMOVAL OF OPTION DUE TO EXPIRATION 28.0 GDXJ 100 20 MAY 16 37.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292720847 | REMOVAL OF OPTION DUE TO EXPIRATION 30.0 GDXJ 100 20 MAY 16 38 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292720851 | REMOVAL OF OPTION DUE TO EXPIRATION 22.0 GDXJ 100 20 MAY 16 39.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292721735 | REMOVAL OF OPTION DUE TO EXPIRATION 100.0 GLD 100 20 MAY 16 120.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292721740 | REMOVAL OF OPTION DUE TO EXPIRATION 205.0 GLD 100 20 MAY 16 121 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292721768 | REMOVAL OF OPTION DUE TO EXPIRATION 107.0 GLD 100 20 MAY 16 121.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292721783 | REMOVAL OF OPTION DUE TO EXPIRATION 70.0 GLD 100 20 MAY 16 122 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292721812 | REMOVAL OF OPTION DUE TO EXPIRATION 150.0 GLD 100 20 MAY 16 120 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292721817 | REMOVAL OF OPTION DUE TO EXPIRATION 40.0 GLD 100 20 MAY 16 122.5 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292721829 | REMOVAL OF OPTION DUE TO EXPIRATION 53.0 GLD 100 20 MAY 16 123 CALL | -- | -- | -- | 1,760.76 |
| | 8/18/16 | 00:00:00 | RAD | 1292721844 | REMOVAL OF OPTION DUE TO EXPIRATION 40.0 GLD 100 20 MAY 16 123.5 CALL | -- | -- | -- | 1,760.76 |

Order History

Excerpt: 5/22/2016 *ThinkorSwim* Historical Data

Statement for account 788801360 ()    from 5/22/16 to 5/22/16    Show by symbol: [      ▾] 

**Cash & Sweep Vehicle    $3,311.47    Transactions: All**

| Trade D... | Exec Da... | Exec Ti... | Type | Ref # | Description | Misc Fees | Commissio... | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 5/22/16 | 5/22/16 | 00:00:00 | BAL | -- | Cash balance at the start of business day 22.05 CST | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:15:03 | RAD | 1235293724 | REMOVAL OF OPTION DUE TO EXPIRATION -70.0 GLD 100 20 MAY 16 122 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:16:21 | RAD | 1235294916 | REMOVAL OF OPTION DUE TO EXPIRATION -28.0 GDXJ 100 20 MAY 16 37.5 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:18:04 | RAD | 1235296162 | REMOVAL OF OPTION DUE TO EXPIRATION -40.0 GLD 100 20 MAY 16 123.5 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:24:26 | RAD | 1235301509 | REMOVAL OF OPTION DUE TO EXPIRATION -30.0 GDXJ 100 20 MAY 16 38 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:25:42 | RAD | 1235302702 | REMOVAL OF OPTION DUE TO EXPIRATION -22.0 GDXJ 100 20 MAY 16 39.5 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:27:48 | RAD | 1235304742 | REMOVAL OF OPTION DUE TO EXPIRATION -25.0 TRQ 100 20 MAY 16 3 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:31:05 | RAD | 1235308131 | REMOVAL OF OPTION DUE TO EXPIRATION -50.0 SLV 100 20 MAY 16 16.5 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:31:41 | RAD | 1235308685 | REMOVAL OF OPTION DUE TO EXPIRATION -228.0 GDXJ 100 20 MAY 16 37 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:32:36 | RAD | 1235309753 | REMOVAL OF OPTION DUE TO EXPIRATION -150.0 GLD 100 20 MAY 16 120 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:33:45 | RAD | 1235310940 | REMOVAL OF OPTION DUE TO EXPIRATION -100.0 GLD 100 20 MAY 16 120.5 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:35:01 | RAD | 1235312479 | REMOVAL OF OPTION DUE TO EXPIRATION -175.0 SLV 100 20 MAY 16 16 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:40:24 | RAD | 1235318499 | REMOVAL OF OPTION DUE TO EXPIRATION -25.0 PPP 100 20 MAY 16 2.5 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:41:59 | RAD | 1235320406 | REMOVAL OF OPTION DUE TO EXPIRATION -205.0 GLD 100 20 MAY 16 121 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:46:35 | RAD | 1235325681 | REMOVAL OF OPTION DUE TO EXPIRATION -14.0 MEOH 100 20 MAY 16 32.5 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:48:44 | RAD | 1235328317 | REMOVAL OF OPTION DUE TO EXPIRATION -107.0 GLD 100 20 MAY 16 121.5 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:54:25 | RAD | 1235334422 | REMOVAL OF OPTION DUE TO EXPIRATION -40.0 GLD 100 20 MAY 16 122.5 CALL | -- | -- | -- | 3,311.47 |
| | 5/22/16 | 22:54:25 | RAD | 1235334434 | REMOVAL OF OPTION DUE TO EXPIRATION -53.0 GLD 100 20 MAY 16 123 CALL | -- | -- | -- | 3,311.47 |

> Order History: 0 working, 0 filled, 1 canceled

> Trade History                                            Show average fill prices

> Options    $2,207.00

> Profits and Losses    ($4,941.01)    by Symbol

**Account Summary**

| | |
|---|---|
| Net Liquidating Value | $5,518.47 |
| Stock Buying Power | $9,869.20 |
| Option Buying Power | $3,311.47 |
| Available Funds For Trading | $3,311.47 |
| Long Stock Value | $0.00 |

288.    Note how the positions stated on 8/19/2019 generally correspond to, but do not precisely match the entries from 5/22/2016. The 8/19/2019 entries contain several duplicates, including positions that are opposite than those originally listed (in the 5/22/2016 records, the positions are all stated with negative quantity, but the 8/19/2016 records contain entries with post positive and negative entries

## Predicate Count #2

### 18 U.S.C. 1956 – *Laundering of monetary instruments*

### (or alternatively, 18 U.S.C. § 1343 – *Fraud by Wire*)

C.    **The transaction that transferred $23,665.59 was disguised as a ($.04) debit reported as an *Intra-Account Transfer* on 8/30/2016 that was omitted from the 2016 – August Statement.**

289.    The $.04 discrepancy between Margin Equity $1760.72 and *Cash and Sweep Vehicle* $1760.76 on 8/19/2016 (red arrows in excerpt above) directly corresponds to

95

discrepancies pertaining to suspicious journal entries, *Intra Account Transfers* for $.04 and ($.04) on 8/30/2016.

290.     The $.04 cent discrepancy is "rectified" at the end of the month via inexplicable *Intra-Account Transfers* that are inconsistently documented amongst the various record formats[33], illustrated as follows:

    a.   The Transaction History lists two offsetting transactions for $.04 and ($.04), both listed to be *Intra-Account Transfers*, but having no net impact to the account balances.

### Excerpt from 2016 Transaction History

| Date/Time ▲ | Description | Amount | Net Cash Balance |
|---|---|---|---|
| 08/22/2016 00:00:01 | REMOVAL OF OPTION DUE TO EXPIRATION (ARTX Aug 19 2016 5.0 Call) | 0.00 | 1,760.76 |
| 08/30/2016 09:07:11 | INTRA-ACCOUNT TRANSFER | -0.04 | 1,760.72 |
| 08/30/2016 09:07:11 | INTRA-ACCOUNT TRANSFER | 0.04 | 1,760.76 |

    b.   The 2016 - August Statement documents just a single *Intra-Account Transfer* from account ####1360-1 to ####1360-2 which credits $.04 to Pitlor's *Cash Balance*. But, the offsetting $.04 debit transaction is not documented and thus represents an unaccounted sum that has been removed from the account without being documented by the August Statement.

**Statement for Account # 788-801360**
08/01/16 - 08/31/16

| | | | | | Account Activity | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Trade Date | Settle Date | Acct Type | Transaction/ Cash Activity* | | Description | Symbol/ CUSIP | Quantity | Price | Amount | Balance |
| 08/30/16 | 08/30/16 | Margin | Journal - Other | | TRANSFER 788801360-1 TO 788801360-2 | - | - | 0.00 | 0 04 | 1,760 76 |

---

[33] "Any financial transaction that doesn't make sense - either common or business...", is a red-flag for fraud.
"Discrepancies between bank deposits and postings" is a red-flag for fraud.
"No supporting documentation for adjusting entries..." is a "fraud danger signal."
State of New York – Office of the State Comptroller "Red Flags for Fraud"

291.        The $.04 debit reported by the Transaction History is not documented by the 2016
- August Statement. The ($.04) reported by the Transaction History cannot be validated because
(1) it is missing from the August Statement, but (2) the *Cash Balances* reported by the records are
the same, $1760.76.

292.        The missing $.04 debit could in fact represent any other value and the August
Statement would appear no different. Thus, it must be concluded that the $.04 debit in fact
represents the *Margin Equity* $23,665.59 that was concealed and removed from the account
between 8/18/2016 and 8/19/2016.

293.        Another discrepancy further invalidates the accounting. The *ThinkorSwim* Digital
Account Statement also lists two offsetting transactions for $.04 and ($.04), but the *Cash
Balances* ($1760.84 & $1760.88) do not correspond with the values stated by the other record
formats ($1760.72 vs. $1760.76).  This unexplained contradiction further impeaches the integrity
of the record.

*Excerpt from ThinkorSwim Digital Account Statement*

| Cash Balance | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DATE | TIME | TYPE | REF # | DESCRIPTION Misc Fees | Commissions & Fees | AMOUNT | | BALANCE |
| 8/30/2016 | 0:00:00 | BAL | | Cash balance at the start of business day 30.08 CST | | | | 1,760.88 |
| 8/30/2016 | 0:00:00 | JRN | 1298933287 | INTRA-ACCOUNT TRANSFER | | | -0.04 | 1,760.84 |
| 8/30/2016 | 0:00:00 | JRN | 1298933288 | INTRA-ACCOUNT TRANSFER | | | 0.04 | 1,760.88 |
| 8/31/2016 | 0:00:00 | BAL | | Cash balance at the start of business day 31.08 CST | | | | 1,760.88 |

# Predicate Count #3

**D.    The $23,665.59 debited on 8/19/2016 was accumulated via patterns of
misrepresentations and deceptively erroneous accounting pertaining to the
Futures Account.**

294.        Pitlor's Futures Account was exploited via a systematic pattern of various
fraudulent accounting contrivances involving the following:

   a.  Fraudulent *Mark to Market* entries that exist only in the *ThinkorSwim* records and lack a
       *ThinkorSwim Transaction Reference Number*.

97

b. Erroneous valuations for open futures positions at the end of the day. The inaccurate calculations effected any open futures position at 00:00:00, and the polluted data became realized in the Profits/Loss data, illegitimately.

c. Defalcation of cash set aside to satisfy *Initial Margin Requirements*.

295.    TD Ameritrade did not properly separate and segregate the futures account funds in accordance with **17 CFR § 1.20**[34].

a. While Futures positions are permitted to be held in a securities margin account, a separate Futures Account had been established specifically for those purposes.

b. Sweeps transactions between the Brokerage Account and the Futures Account purported to represent the segregation of those funds used for Futures trading, and thus the comingling of the Margin of the Brokerage and Futures Account facilitated various abuses- including theft of the Initial Margin set aside as collateral for Futures positions.

c. The Futures Account thus existed as a segregated account utilized generally for purposes of misrepresentation and exploitation, and as a conduit through which to conceal, aggregate, and launder funds.

296.    The deception pertaining to the accounts' structure was exploited to execute clearly erroneous sweeps transactions. The damages do not correspond to the Futures Account transactions, but rather TD Ameritrade's cash accounting.

a. The July 2016 Statement only references Futures Account TDACX561 a single time with respect to a Futures Sweep transaction.

b. All other Futures Sweep transactions that are documented via generic entries "Sweep to Futures" and "Sweep from Futures".

c. The Futures Sweeps reported by the Monthly Statements confirm that the Futures Sweeps transactions correspond to erroneous, inconsistent accounting.

---

[34] "A futures commission merchant must separately account for all futures customer funds and segregate funds as belonging to its futures customers" (CFR § 1.20.a - *Futures customer funds to be segregated and separately accounted for. - General.*)

"The futures commission merchant must reflect in the account that it maintains for each futures customer the net liquidating equity for each such customer." (CFR § 1.20.i *Requirements as to amount*)

d. The inconsistent recordkeeping is indicative of the Futures Account having been "hijacked" and segregated from Pitlor's account ####1360, thereby facilitating the theft and concealment thereof.

e. Similar contrivances were utilized to segregate and conceal funds utilizing Pitlor's Schwab Futures Account ####6617.

297. As shown on the following page's excerpt from the *ThinkorSwim* Digital Account Statement for 5/4/2016, there are no entries of trades of other futures account activity listed under *"Futures Statements."*

a. However, under the data for the Forex Account, a separate cash balance is shown, nearly corresponding to the brokerage account balance, despite there being no transactions entries.

b. Erroneous Futures Sweep transactions chipped away at Pitlor's *Margin Equity*, sometimes with small bites of only a few dollars, and other times concealing the *Initial Margin* Equity for open positions for over $6,000.

xcerpt from 5/04/2016 *ThinkorSwim* Digital Account Statement: **(Futures and Forex)**

| 5/4/2016 | | 23:58:00 ADJ | 1.22E+09 | Courtesy Credit | | | | 0.05 | -1,351.80 |
| | | | | TOTAL | | ($358.80) | ($1,567.44) ######### | | ($1,351.80) |

tures Statements

| de Date | Exec Date | | Exec Time Type | Ref # | Description | | Misc Fees | Commission Amount | | Balance |
|---|---|---|---|---|---|---|---|---|---|---|

rex Statements

| | Date | | Time | Type | Ref # | Description | | Commissions | Amount | Amount(USD) | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 4/29/2016 | 0:00:00 | BAL | -- | Cash balance at the start of the business day 29.04 CST | | -- | -- | -- | $0.00 |
| | | 4/30/2016 | 0:00:00 | BAL | -- | Cash balance at the start of the business day 30.04 CST | | -- | -- | -- | $0.00 |
| | | 5/1/2016 | 0:00:00 | BAL | -- | Cash balance at the start of the business day 01.05 CST | | -- | -- | -- | $0.00 |
| | | 5/2/2016 | 0:00:00 | BAL | -- | Cash balance at the start of the business day 02.05 CST | | -- | -- | -- | $0.00 |
| | | 5/3/2016 | 0:00:00 | BAL | -- | Cash balance at the start of the business day 03.05 CST | | -- | -- | -- | $0.00 |
| | | 5/4/2016 | 0:00:00 | BAL | -- | Cash balance at the start of the business day 04.05 CST | | -- | -- | -- | $0.00 |

tal Cash ($1,351.95)

298.        Rather than being displayed under *Futures Statements*, Pitlor's Futures trades (blue arrows in excerpt below) were instead reported amongst the transactions posted to the Brokerage account.

Excerpt from 5/04/2016 *ThinkorSwim* Digital Account Statement

| DATE | TIME | TYPE | REF # | DESCRIPTION |
|---|---|---|---|---|
| 5/3/2016 | 13:46:00 | TRD | | 1223208480 tAndroid SOLD -1 /GCM6 @1288.00 |
| 5/3/2016 | 13:46:43 | TRD | | 1223210310 tAndroid BOT +2,000 TSRMF @.4295 |
| 5/3/2016 | 13:46:43 | TRD | | 1223210310 tAndroid BOT +10,000 TSRMF @.4295 |
| 5/3/2016 | 13:50:07 | TRD | | 1223213150 tAndroid BOT +1 /YGM6 @1289.3001555 |
| 5/3/2016 | 14:56:29 | TRD | | 1223301620 tAndroid SOLD -1 /YGM6 @1289.60 |
| 5/3/2016 | 14:59:58 | TRD | | 1223309071 tAndroid BOT +10 GDXJ 100 (Weeklys) 3 JUN 16 41.5 CALL @ |
| 5/3/2016 | 16:00:00 | ADJ | | /GCM6 mark to market at 1291.80 official settlement price |
| 5/3/2016 | 23:58:00 | ADJ | | 1223721491 Courtesy Credit |
| 5/4/2016 | 0:00:00 | BAL | | Cash balance at the start of business day 04.05 CST |
| 5/4/2016 | 0:00:00 | EFN | | 1223736522 CLIENT REQUESTED ELECTRONIC FUNDING DISBURSEMENT |
| 5/4/2016 | 0:00:00 | JRN | | 1224051478 FOREIGN SECURITY FEE |
| 5/4/2016 | 4:43:35 | TRD | | 1223374043 tAndroid SOLD -2 /GCM6 @1278.20 |
| 5/4/2016 | 9:21:55 | TRD | | 1223739483 tAndroid BOT +60 JNUG @143.64 EDGX |
| 5/4/2016 | 9:23:32 | TRD | | 1223742098 tAndroid SOLD -5 SIL 100 15 JUL 16 31 CALL @4.10 |

299.        None of the *Mark to Market* adjustments associated with open futures positions are assigned *TOS Reference Numbers*, as highlighted (Red Arrow) in the above excerpt by the entry on 5/3/2016 @ 16:00:00.

300.        By contrast, throughout the entirety of Pitlor's account records, all transactions that change the account value or asset holdings in the account are assigned *ThinkorSwim Reference Numbers ("TOS Ref #")*. As shown below, offsetting *Mark to the Market*[35] transactions occurring on 4/4/2016 were indeed assigned *TOS Ref #'s*.

---

[35] Offsetting Mark to the Market record entries are separate anomaly. Another such instance is analyzed in this complaint and shown to be associated with causation of $221 in damages on 1/11/2017.

Excerpt from: *ThinkorSwim* Digital Account Statement

| DATE | TIME | TYPE | REF # | DESCRIPTION | Misc Fees | Commissions & Fees | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 4/4/2016 | 0:00:00 | BAL | | Cash balance at the start of business day 04.04 CST | | | | -2,030.19 |
| 4/4/2016 | 0:00:00 | JRN | 1204032681 | MARK TO THE MARKET | | | -111.4 | -2,141.59 |
| 4/4/2016 | 0:00:00 | JRN | 1204032803 | MARK TO THE MARKET | | | 111.4 | -2,030.19 |
| 4/5/2016 | 0:00:00 | BAL | | Cash balance at the start of business day 05.04 CST | | | | -2,030.19 |

301.    And unlike the "mark to market" transactions associated with the futures position, those *Mark to the Market* transactions documented to have occurred on 4/4/2016 were also included in the Transaction History.

Excerpt from: Transaction History

| Date/Time ▲ | Description | | Amount | |
|---|---|---|---|---|
| 04/04/2016 22:31:12 | MARK TO THE MARKET | | 111.40 | -2,030.19 |
| 04/04/2016 22:31:12 | MARK TO THE MARKET | | -111.40 | -2,030.19 |

## E. Inaccurate valuations of Futures contracts and fraudulent *Mark to Market* entries enabled

302.    Inaccurate *Official Settlement Prices* were reported for open Futures positions, realized to the account via *Mark to Market* entries, thereby facilitating erroneous accounting of cash equity as well as illegitimate sweeps of funds to the futures account.

303.    For example, on 6/30/2016 a "mark to market" adjustment deducts $675.00 from the cash balance.

Excerpt from: *ThinkorSwim* Digital Account Statement

| DATE | TIME | TYPE | REF # | DESCRIPTION | Misc Fees | Commissions | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 6/30/2016 | 15:15:00 | ADJ | | /VXN6 mark to market at 16.975 official settlement price | | | -675 | 6,402.36 |

304.    The actual price at settlement time was 17.15, as confirmed by market data provided by Kibot.com data, but the "official settlement price" is stated to be 16.75, resulting in a deduction of $675.00.

**KIBOT MARKET DATA for /VXN6 – Volatility Futures Contract**

**DATE,        TIME,        OPEN, HIGH, LOW, CLOSE, QUANTITY**

101

| | | |
|---|---|---|
| 06/30/2016, | 16:56, | 17.15,  17.15,  17.15,  17.15,        11 |
| 06/30/2016, | 17:03, | 17.2,    17.2,    17.2,    17.2,           1 |

305.	The purchase price was $17.20, thus the actual adjustment would have been ($50). (Tick size is 0.05 VIX points = $50)

306.	Even had the "official settlement price" been accurate, and further presuming that the mark to market procedures were legitimate practices, still the deduction of $675.00 is incorrect.  A change of .40 VIX points translates to $400.00.

307.	A total of 50 such entries exist in the records between 4/28/2016 and 8/15/2016, the timespan encompassing all futures trades, and none of these purported "mark to market" adjustments are designated by a *ThinkorSwim Transaction Identification Number*.

308.	Nor are the "mark to market" adjustments documented in the Transaction History, which purports to accurately represent the accounting of Pitlor's *Net Cash Balance*, as shown by the excerpt below.

| Date/Time ▲ | Description | Amount | Net Cash Balance |
|---|---|---|---|
| 05/02/2016 21:02:48 | Sold 2000 ASM @ 1.39 | 2,769.94 | 2,093.87 |
| 05/03/2016 13:29:20 | Bought 70 JNUG @ 176.8 | -12,385.99 | -10,292.12 |
| 05/03/2016 14:50:23 | Bought 10 GLD May 6 2016 125.0 Call @ 0.54 | -557.73 | -10,849.85 |
| 05/03/2016 15:00:23 | Bought 10 GLD May 6 2016 124.5 Call @ 0.58 | -597.73 | -11,447.58 |
| 05/03/2016 15:12:18 | Sold 150 JNUG @ 161.6147 | 24,231.69 | 12,784.11 |
| 05/03/2016 16:48:00 | FOREIGN SECURITY FEE | -15.00 | 12,769.11 |
| 05/03/2016 19:34:56 | Bought 5 GLD May 20 2016 125.5 Call @ 0.89 | -458.86 | 12,310.25 |
| 05/03/2016 19:46:43 | Bought 12000 TSRMF @ 0.4295 | -5,163.99 | 7,146.26 |
| 05/03/2016 20:59:58 | Bought 10 GDXJ Jun 3 2016 41.5 Call @ 0.83 | -847.73 | 6,298.53 |
| 05/04/2016 10:20:14 | CLIENT REQUESTED ELECTRONIC FUNDING DISBURSEMENT (FUNDS NOW) | -5,000.00 | 1,298.53 |

Excerpt from Transaction History

## F.  Defalcation via disappearance of *Initial Margin Requirement*

309.	Additional damages result from the disappearance of cash value set-aside as *Initial Margin Requirement,* the collateral required to be posted to open a Futures positions.

310.    On 6/28/2016, The *Margin Requirement* for the /VXN 16 contract was $6215.00, but the *Margin Requirement* is stated to be zero despite the position clearly being open in the account[36]. This value was omitted from the *Net Liquidating Value* for 6/28/2016.

311.    **Note the following:**
    a. **/YGQ16 poistion is open with Margin Req. accurately stated.**
    b. **/VXN16 Position is open, but Margin Req. is stated to be $0.00**

Excerpt from 8/19/2016 *ThinkorSwim* Historical Data

| Symbol | Description | | SPC | Exp | Qty | Trade Price | Close Price | | P/L Day | P/L Open |
|---|---|---|---|---|---|---|---|---|---|---|
| /VXN16 | CBOE Volatility Index (VIX) Futures | | 1/1000 | JUL 16 | +1 | 20.40 | 18.875 | | $0.00 | ($1,525.... |
| /YGQ16 | Mini Gold Futures - ICUS - Aug16 | | 1/32.15 | AUG 16 | +1 | 1315.4998 | 1317.9 | | $0.00 | $77.17 |
| | OVERALL TOTALS | | | | | | | | $0.00 | ($1,447.... |

Options $3,819.50

Futures $0.00

Profits and Losses ($5,649.06) by Symbol

| Symbol | Description | P/L Open | P/L % | P/L Day | P/L YTD | P/L Diff | Margin Req | Close Value | Account Code | Account Name |
|---|---|---|---|---|---|---|---|---|---|---|
| /6BU16 | British Pound Futures,Sep-2016,ETH | $0.00 | 0.00% | $0.00 | $12.50 | $0.00 | $0.00 | $0.00 | | |
| /6CU16 | Canadian Dollar Futures,Sep-2016,E... | $0.00 | 0.00% | $0.00 | ($30.00) | $0.00 | $0.00 | $0.00 | | |
| /CLM26 | Light Sweet Crude Oil Futures,Jun-20... | $0.00 | 0.00% | $0.00 | $80.00 | $0.00 | $0.00 | $0.00 | | |
| /CLN26 | Light Sweet Crude Oil Futures,Jul-20... | $0.00 | 0.00% | $0.00 | ($30.00) | $0.00 | $0.00 | $0.00 | | |
| /CLQ26 | Light Sweet Crude Oil Futures,Aug-2... | $0.00 | 0.00% | $0.00 | ($80.00) | $0.00 | $0.00 | $0.00 | | |
| /DXM16 | US Dollar Index Futures - NYCC - Jun16 | $0.00 | 0.00% | $0.00 | $130.00 | $0.00 | $0.00 | $0.00 | | |
| /DXU16 | US Dollar Index Futures - NYCC - Sep... | $0.00 | 0.00% | $0.00 | $225.00 | $0.00 | $0.00 | $0.00 | | |
| /GCM16 | Gold Futures,Jun-2016, ETH | $0.00 | 0.00% | $0.00 | ($8,780.00) | $0.00 | $0.00 | $0.00 | | |
| /GCQ16 | Gold Futures,Aug-2016, ETH | $0.00 | 0.00% | $0.00 | $270.00 | $0.00 | $0.00 | $0.00 | | |
| /HGN16 | Copper Futures,Jul-2016, ETH | $0.00 | 0.00% | $0.00 | ($287.50) | $0.00 | $0.00 | $0.00 | | |
| /HGU16 | Copper Futures,Sep-2016, ETH | $0.00 | 0.00% | $0.00 | ($50.00) | $0.00 | $0.00 | $0.00 | | |
| /NQM16 | E-mini Nasdaq 100 Index Futures,Ju... | $0.00 | 0.00% | $0.00 | $50.00 | $0.00 | $0.00 | $0.00 | | |
| /PLN16 | Platinum Futures,Jul-2016, ETH | $0.00 | 0.00% | $0.00 | ($135.00) | $0.00 | $0.00 | $0.00 | | |
| /QMM16 | NYMEX miNY Light Sweet Crude Oil ... | $0.00 | 0.00% | $0.00 | ($50.00) | $0.00 | $0.00 | $0.00 | | |
| /SIN16 | Silver Futures,Jul-2016, ETH | $0.00 | 0.00% | $0.00 | $900.00 | $0.00 | $0.00 | $0.00 | | |
| /SIU16 | Silver Futures,Sep-2016, ETH | $0.00 | 0.00% | $0.00 | ($50.00) | $0.00 | $0.00 | $0.00 | | |
| /VXM16 | CBOE Volatility Index (VIX) Futures | $0.00 | 0.00% | $0.00 | $300.00 | $0.00 | $0.00 | $0.00 | | |
| /VXN16 | CBOE Volatility Index (VIX) Futures | ($1,525.00) | -7.48% | $0.00 | ($3,425.00) | $0.00 | $0.00 | $18,875.00 | | |
| /YGM16 | Mini Gold Futures - ICUS - Jun16 | $0.00 | 0.00% | $0.00 | $903.39 | $0.00 | $0.00 | $0.00 | | |
| /YGQ16 | Mini Gold Futures - ICUS - Aug16 | $77.17 | +0.18% | $0.00 | ($659.11) | $0.00 | $1,778.00 | $42,370.49 | | |
| /YIN16 | 1.000 oz Mini Silver Futures - ICUS - ... | $0.00 | 0.00% | $0.00 | ($969.00) | $0.00 | $0.00 | $0.00 | | |

## G. Losses accrue due to erroneous and illegitimate Futures sweeps transactions

312.    The Futures Sweeps Transactions are documented only in the *Transaction History*. The *ThinkorSwim* records contain no documentation of these transactions because, as previously

---

[36]    There are other instances of this same fraudulent contrivance being utilized. For example, on 7/22/2016, Margin Requirement is omitted for an open futures contract of /SIU16.

expained, Pitlor's transactions did not occur in a separate futures account, but instead were reported along with the securities transactions in the Brokerage Account.

313. While the sweeps transactions most certainly transferred funds, the amounts often did not correspond to the Futures Account activity. The perpetrators of the fraud, who controlled the Cash Account, thus had direct access to Futures Account funds.

314. The following excerpt from the July Brokerage Statement contains various anomalies. On 7/8/2017, there are two transactions purporting to transfer funds to the Futures Account *Sweep to Futures* and the *Transfer to Futures Account TDACX561* transfer precisely the amount that had been swept to the Brokerage, $1359.00, and the proceeds of a sale of securities, $671.81 respectively.

315. The transfers to the futures account correspond to the cash balances in the brokerage account instead of futures account activity, a certain indication of their fraudulent nature.

| Trade Date | Settle Date | Acct Type | Transaction/ Cash Activity* | Description | Symbol/ CUSIP | Quantity | Price | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 07/05/16 | 07/05/16 | Margin | Delivered - Other | PROSHARES UVXY Jul 01 16 22.5 C EXPIRATION | - | 6- | 0.00 | - | 817.32 |
| 07/06/16 | 07/06/16 | Margin | Journal - Other | Sweep to Futures | - | - | 0.00 | (817.28) | 0.04 |
| 07/06/16 | 07/06/16 | Margin | Journal - Other | Sweep to Brokerage | - | | 0.00 | 1,359.00 | 1,359.04 |
| 07/08/16 | 07/08/16 | Margin | Journal - Other | Sweep to Futures | - | | 0.00 | (1,359.00) | 0.04 |
| 07/08/16 | 07/08/16 | Margin | Journal - Other | Transfer to Futures account: TDACX561 | - | | 0.00 | (671.81) | (671.77) |
| 07/08/16 | 07/11/16 | Margin | Sell - Securities Sold | VANECK VECTORS GDXJ Jul 15 16 50.0 C TO CLOSE Commission/Fee 15.99 Regulatory Fee 0.20 | - | 8- | 0.86 | 671.81 | 0.04 |

316. Note how the "Transfer to Futures Account: TDACX561" documents the transfer of funds to a different account, TDACX561[37], compared to the preceding *Sweep to Futures* and *Sweep to Brokerage* transactions which do not identify any external account.

317. By contrast, the *Transaction History* does not contain any mention of Futures Account TDACX561 and instead uniformly reports all transfers as occurring to or from the generally stated "Futures Account."

---

[37] Futures Account TDACX561 is significant with respect to TD Ameritrade's involvement with respect to the conspiracy to launder funds from the Schwab Account.

| 07/01/2016 16:29:52 | Sold 13 GDXJ Jul 1 2016 44.0 Call @ 0.5 | 629.94 | 817.28 |
| 07/05/2016 00:00:01 | REMOVAL OF OPTION DUE TO EXPIRATION (UVXY Jul 1 2016 22.5 Call) | 0.00 | 817.28 |
| 07/06/2016 00:00:01 | TRANSFER TO FUTURES ACCOUNT | -817.28 | -0.00 |
| 07/06/2016 20:56:19 | TRANSFER FROM FUTURES ACCOUNT | 1,359.00 | 1,359.00 |
| 07/08/2016 00:00:01 | TRANSFER TO FUTURES ACCOUNT | -1,359.00 | -0.00 |
| 07/08/2016 15:51:17 | TRANSFER TO FUTURES ACCOUNT | -671.81 | -671.81 |
| 07/08/2016 19:06:05 | Sold 8 GDXJ Jul 15 2016 50.0 Call @ 0.86 | 671.81 | -0.00 |

## H. Funds are also concealed via erroneous profit/loss accounting due to inaccurate end-of-day valuations of Futures positions.

318.    The erroneous timestamps of the Transaction History appear to correlate to the erroneous end-of-day calculations of *Profit/Loss* of open futures positions held in the account.

a.  The forward shifted time-basis is calibrated such the end-of-day trading, 17:00:00 CDT, becomes represented as 00:00:00 hours.

b.  Thereby, the price that is stated as the daily settlement price utilized in the "Mark-To-Market" calculation is also used as the "closing price" to calculate the profit/loss for positions that remain open at 00:00:00, information which is used to calculate the daily profit/loss figures.

319.    The following *Thinkorswim* data for 4/28 documents Pitlor's first futures trades.

| | Date | Time | Type | Number | Description | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 4/28/16 | 15:10:01 | TRD | 1219925921 | tAndroid SOLD -6 JNUG @151.00 | -0.02 | -- | 906.00 | 9,263.69 |
| | 4/28/16 | 15:11:19 | TRD | 1219927518 | tAndroid BOT +1 /YGM6 @1269.80 | -0.51 | -2.25 | -- | 9,260.93 |
| | 4/28/16 | 15:11:42 | TRD | 1219927556 | tAndroid BOT +1 /YGM6 @1269.7001555 | -0.51 | -2.25 | -- | 9,258.17 |
| | 4/28/16 | 15:12:33 | TRD | 1219925921 | tAndroid SOLD -30 JNUG @151.00 | -0.10 | -- | 4,530.00 | 13,788.07 |
| | 4/28/16 | 15:13:03 | TRD | 1219928154 | tAndroid BOT +1 /YGM6 @1270.00 | -0.51 | -2.25 | -- | 13,785.31 |
| | 4/28/16 | 15:15:00 | TRD | 1219925018 | tAndroid SOLD -500 ASM @1.43 | -0.02 | -9.99 | 715.00 | 14,490.30 |
| | 4/28/16 | 15:15:00 | TRD | 1219925018 | tAndroid SOLD -100 ASM @1.43 | -0.01 | -- | 143.00 | 14,633.29 |
| | 4/28/16 | 15:15:57 | TRD | 1219930820 | tAndroid BOT +1 /YGM6 @1270.6998445 | -0.51 | -2.25 | -- | 14,630.53 |
| | 4/28/16 | 15:18:47 | TRD | 1219932217 | tAndroid SOLD -1 /GCM6 @1269.20 | -1.46 | -2.25 | 30.00 | 14,656.82 |
| | 4/28/16 | 15:19:41 | TRD | 1219932236 | tAndroid BOT +1 /GCM6 @1269.20 | -1.46 | -2.25 | -- | 14,653.11 |
| | 4/28/16 | 15:22:32 | TRD | 1219933452 | tAndroid SOLD -4 /YGM6 @1270.10 | -2.04 | -9.00 | 6.44 | 14,648.51 |
| | 4/28/16 | 15:23:27 | TRD | 1219933489 | tAndroid BOT +1 /GCM6 @1269.50 | -1.46 | -2.25 | -- | 14,644.80 |
| | 4/28/16 | 15:26:00 | TRD | 1219934851 | tAndroid BOT +1 /YGM6 @1269.8998445 | -0.51 | -2.25 | -- | 14,642.04 |
| | 4/28/16 | 15:32:21 | TRD | 1219937439 | tAndroid SOLD -1 /YGM6 @1269.60 | -0.51 | -2.25 | -9.64 | 14,629.64 |
| | 4/28/16 | 16:00:00 | ADJ | -- | /GCM16:XCEC mark to market at 1266.40 official settlement price | -- | -- | -590.00 | 14,039.64 |
| | 4/28/16 | 23:58:00 | ADJ | 1220410845 | Courtesy Credit | -- | -- | 0.11 | 14,039.75 |
| 4/29/16 | 4/28/16 | 17:05:00 | TRD | 1219956169 | tAndroid SOLD -1 /GCM6 @1268.00 | -1.46 | -2.25 | 160.00 | 14,196.04 |
| | 4/28/16 | 17:05:00 | TRD | 1219956169 | tAndroid SOLD -1 /GCM6 @1268.00 | -1.46 | -2.25 | 160.00 | 14,352.33 |
| | 4/28/16 | 17:05:49 | TRD | 1219956197 | tAndroid BOT +1 /GCM6 @1268.10 | -1.46 | -2.25 | -- | 14,348.62 |
| | 4/28/16 | 17:05:49 | TRD | 1219956197 | tAndroid BOT +1 /GCM6 @1268.10 | -1.46 | -2.25 | -- | 14,344.91 |
| | 4/28/16 | 17:08:48 | TRD | 1219956776 | tAndroid SOLD -1 /GCM6 @1267.50 | -1.46 | -2.25 | -60.00 | 14,281.20 |
| | 4/28/16 | 17:08:48 | TRD | 1219956776 | tAndroid SOLD -1 /GCM6 @1267.50 | -1.46 | -2.25 | -60.00 | 14,217.49 |
| | 4/28/16 | 17:09:34 | TRD | 1219957321 | tAndroid BOT +1 /GCM6 @1267.80 | -1.46 | -2.25 | -- | 14,213.78 |
| | 4/28/16 | 17:09:34 | TRD | 1219957321 | tAndroid BOT +1 /GCM6 @1267.80 | -1.46 | -2.25 | -- | 14,210.07 |
| | 4/28/16 | 17:28:35 | TRD | 1219959037 | tAndroid SOLD -2 /GCM6 @1268.00 | -2.92 | -4.50 | 40.00 | 14,242.65 |
| | 4/28/16 | 17:28:53 | TRD | 1219959743 | tAndroid BOT +1 /GCM6 @1268.20 | -1.46 | -2.25 | -- | 14,238.94 |
| | 4/28/16 | 17:28:53 | TRD | 1219959743 | tAndroid BOT +1 /GCM6 @1268.20 | -1.46 | -2.25 | -- | 14,235.23 |
| | 4/28/16 | 17:56:19 | TRD | 1219962273 | tAndroid SOLD -1 /GCM6 @1267.80 | -1.46 | -2.25 | -40.00 | 14,191.52 |
| | 4/28/16 | 17:56:19 | TRD | 1219962273 | tAndroid SOLD -1 /GCM6 @1267.80 | -1.46 | -2.25 | -40.00 | 14,147.81 |
| | 4/28/16 | 17:57:57 | TRD | 1219962657 | tAndroid BOT +1 /GCM6 @1268.00 | -1.46 | -2.25 | -- | 14,144.10 |
| | 4/28/16 | 17:57:57 | TRD | 1219962657 | tAndroid BOT +1 /GCM6 @1268.00 | -1.46 | -2.25 | -- | 14,140.39 |
| | 4/28/16 | 18:35:57 | TRD | 1219962664 | tAndroid SOLD -1 /GCM6 @1267.20 | -1.46 | -2.25 | -80.00 | 14,056.68 |

320.    The unrealized loss of the open futures positions is recognized via the "mark to market" adjustment corresponding to the "official settlement price" of the futures contract at 16:00:00 CDT on 4/28/2016, but erroneously debits $590 instead of the correct adjustment amount of $250.00, explained as follows:

    a.  Pitlor's account holds 2 /GCM16 Gold Futures Contracts that are marked to the stated settlement price of 1266.40 .

    b.  But, according to historical futures price data accessed via Kibot.com, the actual value of the contract at the settlement time was 1268.1 (at 17:00:00 EDT in the Kibot records), and therefore the total adjustment should have only been $250.00. (2 contracts x 12.5 tics = 25 tics @ $10/tic).

Raw Historical Price Data for /GCM16:

| Date | time | Open $ | High $ | Low $ | Close $ | Volume |
|---|---|---|---|---|---|---|
| 04/28/2016 | 16:59 | 1268.4 | 1268.4 | 1268 | 1268.1 | 31 |

**Source: Kibot.com**

321.    A more drastic discrepancy involves the *Profit/Loss* calculations for the two open positions at the end of the natural day on 4/28/2016.

| ⌄ Futures | ($1,293.90) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Symbol | Description | SPC | Exp | Qty | Trade Price | Close Price | P/L Day | P/L Open ⚙ |
| /YGM16 | Mini Gold Futures - ICUS - Jun16 | 1/32.15 | JUN 16 | +4 | 1278.475 | 1266.4 | ($1,613.90) | ($1,552 84) |
| /GCM16 | Gold Futures,Jun-2016, ETH | 1/100 | JUN 16 | -1 | 1277 20 | 1266 4 | $320 00 | ($1 080 00) |
| | OVERALL TOTALS | | | | | | ($1,293 90) | ($2 632 84) |

a. The Closing Price corresponds to the erroneously understated settlement price of 1266.4 reported at 16:00:00 CDT.

b. On 4/28/2016 the actual price at 23:59:59 was 1276.7 according to Kibot historical pricing data for the /GCM16 gold futures contract. Thus, the "P/L Open" loss of **($1080.00)** from the *Thinkorswim* data above, accurately stated, should be a loss of only **($50.00).**

c. The other open position, 4 contracts - YGM16 (mini-gold futures) erroneously states a loss of **($1552.84)** that in fact should actually be **($189.68),** based upon Kibot historical price data stating a price of 1277.00 for the mini-gold futures contract price at 23:54:59 on 4/28.

d. Cumulatively, the open positions' actual losses of **($239.68)**[38] were instead stated to be **($2632.84)**.

Actual Losses in Open Positions: ($189.68) + ($50.00)  = **($239.68)**
Stated Losses in Open Positions:  ($1080) + ($1552.84) = **($2632.84)**

322.    The Futures trades executed on 4/28 actually yielded a gross profit of $840.00.  Instead, a total loss of ($1293.90) is documented as having occurred.  Thereby, this discrepancy facilitates the concealed removal of significant value from the account, equal to the difference between the actual profit and the stated loss, $2133.90.

$$\$840 - (\$1293.90) = \$840 + \$1293.9 = \$2133.90$$

323.    The gross profit of $840.00, less the ($385.75) in commissions (which is not included in the Thinkorswim profit/loss figures), Pitlor's Futures Account activity actually yielded a net profit of $454.25.

---

[38] While perhaps no more than a coincidence, it is still noteworthy to point out that the *Mark to Market* adjustment's overstatement of losses, $240, is precisely equal to the actual losses accrued in the span between the adjustment until the logging of profit/loss for the day, $240.

$$\$840 - \$385.75 = \$454.25$$

324.    The *Margin Requirement* for the open positions is $13,614.00.  But the futures sweep that occurs at 00:00:01 on 4/29/2016 is only for $10,505.65.

| | | | |
|---|---|---|---|
| 04/29/2016  00:00:01 | TRANSFER TO FUTURES ACCOUNT | -10,505.65 | 4,139.77 |

325.    After factoring in the actual realized profit from the 4/28/2018 Futures trades of $454.25, the Futures account is underfunded by a total of $2654.10 with respect to the Margin Requirement of $13,614.00.

**Underfunding of Account: $13,614 – 10,505.65 + 454.25 = $2654.10.**

326.    This "underfunded" situation is only possible because, in fact, the futures trading activity is not segregated in the Futures Account.

327.    In summary, the daily profit and loss calculations are incessantly inaccurate, the futures sweep transactions are unrepresentative of the actual trading activity, and the array of fraudulent artifices were utilized to accumulate the *Margin Equity* that was eventually laundered from the account on 8/19/2016.  (See Damages Count 1 & 2).

# Attachment: TD Ameritrade Account

# Corresponds to Predicate Count #4-A

## Defendant: TD Ameritrade

# 18 USC § 1343 – *Fraud by Wire*

**CONTENTS:**

I.    Understated *Margin Equity* resulted in damages totaling $6809 on
      on 1/10/2017 & 1/11/2017_____

II.   Courtesy Credits_____

III.  Additional damages are indicated by erroneous Profit/Loss data displayed
      Live on 1/12/2017_____

IV.   Erroneous transaction sequences reveal the significance of the
      shifted timestamps in the Transaction History_____

V.    Erroneous transaction sequence corresponding to all deposits_____

**I.  UNDERSTATED MARGIN EQUITY RESULTED
IN DAMAGES TOTALING $6809.53 ON 1/10/2017 & 1/11/2017**

328.        On 1/10/2017 & 1/11/2017, *Margin Equity* totaling $6,809.33 was removed from the Pitlor's TD Ameritrade Account #####1360.

329.        The *Maintenance Requirement*[39] at the end of the day on 1/11/2017 was stated to be $12,240.00.  As identified in the excerpt below, the *Margin Equity* in the account is $5,430.47. Thus, a total discrepancy of $6809.53 exists precisely equal to the negative balance of *Available Funds For Trading* stated to be ($6,809.53).

### Excerpt from 1-11-2017 *ThinkorSwim* Historical Data

| | |
|---|---|
| Net Liquidating Value | $16,984.97 |
| Stock Buying Power | ($22,698.43) |
| Option Buying Power | ($14,499.53) |
| ➡ Available Funds For Trading | ($6,809.53) |
| Long Stock Value | $14,505.00 |
| Long Marginable Value | $12,240.00 |
| Short Marginable Value | $0.00 |
| → Margin Equity | $5,430.47 |
| Equity Percentage | 44.00% |
| → Maintenance Requirement | $12,240.00 |

330.        The *Margin Requirement* for UVXY is stated to be 100% of the position's end-of-day value, $12,240.00[40].  Therefore, the purchase transaction would not have been executed unless adequate funds were available at the time of purchase, $12,699.80 (cost of purchase) + $9,99 (commission).

331.        Further supporting the above, the *Margin Balances* reported by the January 2017 Monthly Statement reports Margin Balances that simply did not exist, as shown by the excerpt on the following page.  Moreover, the erroneous Margin balances made to exist via inaccurate transaction sequences, such as the ($6809.53) shown above, is not documented, thus its viability as a debt balance is potently refuted.

Excerpt from **January Brokerage Statement**:

---

[39] The *Maintenance Requirement* represents the minimum *Margin Equity* required to exist in the account
[40] KIBOT.com's data records confirm that the end-of-day *Marginable Value* of the 2000 UVXY shares should be no less than $12,300.00, representing a $60 discrepancy.  To avoid unnecessary complexity, this analysis presumes TD Ameritrade's valuation to be accurate.  Specific damages pertaining to the inaccurate valuation of account assets is presented in other counts.

| TD Ameritrade Cash Interest Credit/Expense | | | | | | |
|---|---|---|---|---|---|---|
| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
| 01/13/17 | $ (2,512.28) | $ - | 4 | 9.25 | $ 2.58 | $ - |
| 01/17/17 | (15,420.95) | - | 1 | 9.00 | 3.86 | - |
| 01/18/17 | (19,542.08) | - | 1 | 9.00 | 4.89 | - |

page 24 of 25

Statement for Account # 788-801360
01/01/17 - 01/31/17

| TD Ameritrade Cash Interest Credit/Expense | | | | | | |
|---|---|---|---|---|---|---|
| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
| 01/23/17 | (745.44) | - | 1 | 9.25 | 0.10 | - |
| Total Interest Income/(Expense) | | | | | $11.52 | $ 0.00 |

332.     As the following analysis shows, the deficit in Pitlor's account is not explained by an improper extension of credit, but instead is attributable to a series of fraudulent contrivances specifically designed to conceal the theft of value from the *Margin Equity*.

333.     The $6,809.53 deficit can be precisely accounted for by the following summation, described further below:

$$\$6809.53 = \$4042.80 + \$2988.03 + (\$221.30)$$

**(A): $4042.80**

> *Margin Equity* discrepancy between live balances captured via screenshot for the evening of 1/10/2019 compared to the *ThinkorSwim* Historical Data.

**(B): $2,988.03**

> *Margin Equity* missing due to the inaccurate sequence of orders as stated by the *Trade Confirmation Log* on 1/11/2019.

**(C): ($221.30)**

> Offsetting "Mark to the Market" journal entries for +/- $221.30 transferred funds held in the *Short Account* which thus reduced the overall deficit represented in the end-of day *Margin Equity*. The atypical accounting and documentation of transactions pertaining to value held in the *Short Account* is indicative of unlawful comingling of assets.

111

## A. **$4042.80**

334.    A *Margin Equity* discrepancy totaling $4042.80 is revealed by comparing the of the account balances displayed live on the *ThinkorSwim* Mobile App at 18:29:37 on 1/10/2017 to the 1/10/2017 - *ThinkorSwim* Historical Data.

335.    This is one of the few instances whereby Pitlor's screenshots captured live account balances, and the analysis is thereby quite straightforward to prove that the historical data was altered to conceal the illegitimate removal of cash value.



336.    The total difference in the stated *Margin Equity* values above is $4582.37. After accounting for the (presumed) valid *Margin Balance* of ($529.58) and a *Commission Fee*[41] for ($9.99), the total discrepancy is calculated to be $4042.80, as presented in the table below.

| 1/10/2017 - MARGIN EQUITY DISCREPANCY | $ TOTAL |
|---|---|
| Screenshot Data (previous page on left) | $7,516.10 |
| Historical Data   (previous page on right) | $2,933.73 |

---

[41] After the 18:29:37 screenshot, another purchase occurred at 18:35:03 , but as stated above, the *Margin Balance* was already negative, ($529.58). The value of the securities purchased did not change between the time of purchase and the end of after-hours trading (7PM Central time) and thus the only impact to *Margin Equity* was a legitimate ($9.99) deduction for the commission.

| | |
|---|---|
| Difference | $4582.37 |
| Margin Balance* (left) | ($529.58) |
| Valid commission (*ThinkorSwim* Historical Data) | ($9.99) |
| Total Discrepancy - Margin Account Value | $4042.80 |

*The $529.58 Margin Debt is presumed to be valid

## B. $2988.33

337.    The Trade Confirmation Log reports an inaccurate sequence of transaction execution for three sales that occurred at the *start* of the day on 1/11/2017. These transactions are erroneously stated to be the *final* trades of the day, as confirmed by their *Trade Confirmation Numbers* and presented in the figure on the following page.

338.    The erroneous transaction sequence resulted in understatement of *Margin Equity* by $2988.03.

339.    The 11-digit *Trade Confirmation Numbers* reported by the Trade Confirmation Log are a separate trade identification number than the 10-digit *ThinkorSwim Transaction Reference Number* ("TOS Transaction Ref. #") documented by *ThinkorSwim* Historical Data. Both the *Trade Confirmation Numbers* and the *TOS Transaction Ref* # are sequential record of transactions.

340.    The subtle misrepresentations pertaining to the sequence of transactions facilitated the understatement of *Margin Equity.*

341.    concealment of these funds was achieved by altering account balances via a separate fraudulent contrivance to alter account balances in the historical data via so-called *Courtesy Credit* adjustments.

### Figure:  1/11/2017 - Inaccurate Trade Confirmation Sequence

| Trade Confirmation Number | *ThinkorSwim TOS Transaction Ref #* | *ThinkorSwim Timestamp* | Transaction History Timestamp | Trade Symbol | Quantity | Net Cost or Proceeds |
|---|---|---|---|---|---|---|
| 16207223465 | 1400769613 | 08:42:02 | 15:42:02 | UVXY | 2000 | ($12,709.79) |
| 16207766247 | 1401112473 | 11:45:09 | 18:45:09 | GORO | 265 | $1415.68 |
| 16207772473 | 1401120314 | 11:48:09 | 18:48:09 | RIC | 300 | ($2280.81)* |

113

| 16208728930 | 1400733263 | 08:30:00 | 15:30:00 | GORO | 350 | $1844.97 |
| 16208728934 | 1400734227 | 08:30:03 | 15:30:03 | PPP | 500 | $392.50 |
| 16208728940 | 1400741380 | 08:32:34 | 15:32:34 | PPP | 950 | $750.56** |

*Actual final trade on 1/11/2017 (confirmed by 1/11/2017 *ThinkorSwim* Historical Data)
**Final trade on 1/11/2017 according to Trade Confirmation Log.

342.     According to their *Trade Confirmation Numbers*, three sales transactions are reported to have occurred after the purchase of 2000 shares of UVXY.

    a.  $1844.97 proceeds from the sale of 350 shares of GORO.

    b.  $392.50 and $750.56 proceeds from sales of 500 and 950 shares of PPP, respectively.

343.     But, those three sales in fact occurred at the start of the day, prior to the UVXY purchase.  The apparent late-arrival of these funds (according to Trade Confirmations Log) is responsible for understatement of *Margin Equity* by $2,933.08 in the *ThinkorSwim Historical Data,* which reported the trades in the correct sequence.

344.     The sales transactions ultimately were credited to the account, the $2988.03 of value is not included in the *Margin Equity* and thus has effectively disappeared due to the incorrect sequence of transactions:

- In the correct sequence, the proceeds from these sales would have contributed to the *Margin Equity* of the UVXY position.
- Instead, the funds merely reduce the net negative cash balance but do not contribute towards *Margin Equity*.
- *Profit/Loss* is not impacted, but funds are indeed missing as confirmed by the *Net Liquidating Value-* which corresponds to the errantly stated values *Margin Equity* and *Cash Balances.*

345.     The above demonstrates that *Margin Equity* can be removed without being registered as a loss by the *ThinkorSwim* Historical Data.

346.     A separate contrivance concealed the funds via illegitimate cost basis adjustments by generating fictitious *Disallowed Wash Sale Losses* via manipulation of *Gainskeeper* Records.

## C. ($221.30)

114

347.     On 1/11/2017, offsetting journal entries for +/- $221.30 and -$221.30, identified as *Mark to the Market* transactions, are inconsistently represented in the account records and appears to correspond to the transfer of funds pertaining to the exercise of SLV options[42].

348.     As these funds were held in the *Short Account* as a cash balance, a *Mark to the Market* is improper and should not be necessary to necessitate an entry in the Transaction History or *ThinkorSwim* Historical Data to reflect the value in the *Available Cash Balances.* Various additional discrepancies exist in the documentation of these transactions.

349.     The *Mark to the Market* transactions are equal and offsetting, and thus apparently have no impact on the account balances. This is a hallmark red-flag for fraudulent accounting activity. Moreover, they are documented inconsistently amongst the different record formats.

350.     In the 1/11/2017 - *ThinkorSwim* Historical Data:
   a.   the transactions are stated as the first transactions of the day.
   b.   The debit occurs first, then the credit
   c.   The *TOS Reference Numbers* confirm the transactions to have been reported in the incorrect sequence. The *Mark to the Market* entries have *Ref #'s* starting with 1401… clearly should follow the first trades of the day which have *Ref #'s* beginning with 1400.

351.     In the Transaction History:
   a.   these transactions are stated as the final transactions of the day.
   b.   The credit occurs first, then the debit
   c.   But, the transactions do not change the account values, indicating that the entries are misrepresented in the records.

---

[42] The Transaction History documents this exercise to have been executed in an "erroneous" manner. However, every other options exercise at expiration proceeded in precisely the same manner, indicating it was not a mistake but instead a symptom (or feature) of the scheme. Many hundreds of thousands of dollars, on multiple occasions, appeared to have been converted in Pitlor's account in this manner whereby (1) Options positions were exercised and then reversed and re-executed for no apparent reason. While the transactions are shown to have been reversed, the funds may have been sent elsewhere. Then, the exercise and liquidation transactions were re-executed. On multiple occasions, several hundreds of thousands of dollars appeared to have been converted in this fashion, thereby also plausibly explaining TD and Schwab's enterprise. According to this iteration of the enterprise, Pitlor was unwittingly an individual constituent of the enterprise.    More information in Timestamps

Excerpt from 1/11/2017 – ThinkorSwim Historical Data:

| Exec Time | Type | Ref # | Description | Fees | Amount | Balance |
|---|---|---|---|---|---|---|
| from 1/11/17 to 1/11/17 | Show by symbol: | | | | | |
| Transactions: All | | | | | | |
| 00:00:00 | BAL | -- | Cash balance at the start of business day | -- | -- | -3,486.25 |
| 00:00:00 | JRN | 1401466655 | MARK TO THE MARKET | -- | -221.30 | -3,707.55 |
| 00:00:00 | JRN | 1401466709 | MARK TO THE MARKET | -- | 221.30 | -3,486.25 |
| 08:18:14 | TRD | 1400725202 | tAndroid SOLD -990 AUY @3.15 | -9.99 | 3,118.50 | -377.81 |
| 08:30:00 | TRD | 1400733263 | tAndroid SOLD -350 GORO @5.30 | -9.99 | 1,855.00 | 1,467.15 |

Excerpt from 2017 – Transaction History:

| ate/Time ▲ | Description | Amount | Net Cash Balance |
|---|---|---|---|
| 1/11/2017 15:42:02 | Bought 2000 UVXY @ 6.3499 | -12,709.79 | -5,944.27 |
| 1/11/2017 18:45:09 | Sold 265 GORO @ 5.38 | 1,415.68 | -4,528.59 |
| 1/11/2017 18:48:09 | Bought 300 RIC @ 7.5694 | -2,280 81 | -6,809.40 |
| 1/11/2017 21:38:54 | MARK TO THE MARKET | 221.30 | -6,809.40 |
| 1/11/2017 21:38:54 | MARK TO THE MARKET | -221.30 | -6,809.40 |

352.    According to their *TOS Reference Numbers* in the *ThinkorSwim* Historical Data, the debit occurred first, then the credit. The offsetting *Mark to the Market* journal entries documents the removal of this value from the account on 1/11/2018, and their being simultaneously replaced by the settlement of those funds in the *Short Account*[43].

---

[43] This exploitation of Pitlor's Schwab Account was exploited via similar contrivances to conceal value totaling $28,396, equal to unsettled funds held as *Margin Equity* on 3/22/2018 & 3/23/2018.

116

a. First occurred the debit ($221.30), leaving behind a Margin Debt, followed the credit for $221.30 which nullified and thereby conceals the illegitimate debt

b. This explains why the values do not change in the *Transaction History*. The misrepresentation is concealing the fact the funds were indeed removed from the account.

c. While no additional debt is created, cash assets worth $221.30 is lost.

353.    These offsetting entries represents theft of funds totaling $221.30. As such, the $221.30 must be an illegitimate *Disallowed Loss* according the mathematical equality.

$$\$6809.53 = \$4042.80 + \$2988.03 + (\$221.30)$$

354.    The $221.30 may be included in the $6809.53, or the total damages could be $7030.83 instead of $6809.53, but despite this uncertainty, there is no doubt that at least $6809.53 is missing from *Margin Equity.*

355.    The anomalous accounting for the transfer of assets held in the *Short Account* supports the broader claims pertaining to the TD Ameritrade and Schwab's RICO and/or anti-trust enterprises involving illicit comingling of assets with customer accounts. **(SEE TIMESTAMPS/INTERMINGLING)**

## II. COURTESY CREDITS

356.    Historical account balances are confirmed to have been manipulated via transactions identified as a *Courtesy Credit* adjustments. *Courtesy Credits* appear in the *ThinkorSwim* Historical Data for 1/09, 1/10, 1/11, and 1/12 (and every other day in January 2017 when trades occurred in Plaintiff's account).

357.    These *Courtesy Credits*, identified as "adjustment" transactions, were utilized to edit the previous day's account data, appearing to reconcile the small discrepancies (typically only a few cents) between the Transaction History and the *ThinkorSwim* Historical records, independent records of the *Available Cash Balance.* but it is not plausible to presume that legitimate discrepancies existed which required the records to be edited daily.

117

**Excerpts from *ThinkorSwim Historical Data* (1/10, 1/11, and 1/12):**

| Exec Date | Exec Time | Type | Ref # | Description |
|---|---|---|---|---|
| 1/10/17 | 08:48:44 | TRD | 1399903349 | tAndroid BOT +400 PPP @.82538 |
| 1/10/17 | 08:48:44 | TRD | 1399903349 | tAndroid BOT +400 PPP @.82538 |
| 1/10/17 | 18:29:15 | TRD | 1400499814 | tAndroid BOT +615 GORO @5.38 |
| 1/10/17 | 18:35:03 | TRD | 1400499899 | tAndroid BOT +990 AUY @3.20 |
| 1/10/17 | 23:59:59 | ADJ | 1401181086 | Courtesy Credit |
| 1/11/17 | 11:45:09 | TRD | 1401112473 | tAndroid SOLD -265 GORO @5.38 ARCA |
| 1/11/17 | 11:48:09 | TRD | 1401120314 | tAndroid BOT +300 RIC @7.5694 |
| 1/11/17 | 23:59:59 | ADJ | 1402072942 | Courtesy Credit |
| 1/12/17 | 09:55:43 | TRD | 1401952814 | tAndroid SOLD -1 FXY 100 20 JAN 17 83.5 CALL @1.35 BATS |
| 1/12/17 | 09:55:51 | TRD | 1401952814 | tAndroid SOLD -3 FXY 100 20 JAN 17 83.5 CALL @1.35 BATS |
| 1/12/17 | 09:59:01 | TRD | 1401958084 | tAndroid BOT +288 AKG @3.735 |
| 1/12/17 | 23:59:59 | ADJ | 1402938941 | Courtesy Credit |

358. The *Courtesy Credits* altered the account activity and were entered into the record for the previous day, and thereby a plausible mechanism existed by which the Margin Equity could be understated.

359. The other account records contain inconsistent or non-existent documentation *Courtesy Credits*. For example, the *Monthly Brokerage Statements* only report a few of the *Courtesy Credit* entries, often not corresponding to the *ThinkorSwim Historical Data*.

## III. ADDITIONAL DAMAGES INDICATED BY ERRONEOUS PROFIT/LOSS DATA DISPLAYED LIVE ON 1/12/2017

360. The botched reverse-split distribution that was supposed to have occurred on 1/12/2017 exposed what really going on "under the hood", namely that the enterprise unlawfully intermingled assets and debts as the means to conceal the accumulation and removal of funds from Pitlor's account.

361. On 1/12/2017, along with the failure to deliver the UVXY options contracts after the reverse-split, the stated Profit/Loss for UVXY is awry. A screenshot taken at 16:05 displays the *P/L Day* (Profit or Loss for the day) for all UVXY positions as a profit of $7,683.92, and total *P/L Day* for the entire account to be $8,926.16, despite total Equity stated as $8,794.73.

362. But the single transaction for shares of UVXY that occurred sold 400 Shares of UVXY for $12,556.04 to liquidate the position purchased the previous day for $12,699.80, in fact

realizing a total loss of ($143.76). The Options positions show a P/L Day loss of ($252.00), but the positions were never delivered to the account and show a quantity of zero.

**1/12/2017 Screenshot @ 16:05**
(*ThinkorSwim* Mobile App)



The UVXY position correctly shows a quantity of zero because the shares were sold.

But the Options positions were never delivered to the account and also show a quantity of zero.

P/L Day (UVXY): $7,935.92

P/L Day (entire account): $8926.16

Equity: $8,794.73

363.    While the 1/12/2017 - *Thinkorswim* Historical Record appears to have been cleansed, there still exist several anomalies:

    a.  Overstatement of the *P/L Day* and *P/L Open* values for UVXY positions cause the overstatement of Profit/Loss for account.

    b.  The Margin Accounting is also awry. The *Maintenance Requirement* is stated to be $18,741.82, but cumulative totals of the Margin Requirements for the marginable positions held in the account only sums to a total of $8,595, the Margin Equity is stated to be $8,863.73, representing a total deficit of minimum *Margin Equity* required to be held in the account $9878.09

364.    The above discrepancies support the conclusion that TD Ameritrade manipulated their systems to facilitate concealment of illegitimate withdrawals of *Margin Equity*. The botched

reverse-split distribution caused the scheme to go awry and precipitated the display of account balances that, under normal circumstances, were neither displayed to Pitlor nor factored into the *Profit/Loss* calculations. The failure to deliver those reverse-split positions revealed those funds previously concealed, registering as anomalous profits.

365.    As presented *supra*, Margin Equity was understated by $6,809.40 on 1/10/2017 – 1/11/2017, and thus the anomalously overstated *P/L Day* for 1/12/2017 revealed that these funds indeed existed in the account at the time the 2000 UVXY shares were purchased on 1/11/2017. The 1/12/2017 screenshots indicate total damages of $9878.09.

## IV.  ERRONEOUS TRANSACTION SEQUENCES REVEAL THE SIGNIFICANCE OF THE SHIFTED TIMESTAMPS IN THE TRANSACTION HISTORY

366.    The Transaction History reports an erroneous transaction sequence for 1/10/2017 & 1/11/2017, but different from Trade Confirmation Log discrepancies causing damages. In this case, the erroneous timestamps reported by the Transaction History created temporary discrepancies in the cash accounting between it and the *ThinkorSwim* Historical Data.

367.    On 1/09/2017, The Transaction History erroneously reports that purchase of 1210 of UVXY occurred at 01:29:22, but the accurate timestamp is 18:29:22[44]. While the timestamp appears to be forward shifted, in fact the Transaction History documents the transaction as occurring on 1/9/2017, before all other transactions which occurred that day, despite their all having preceded the UVXY purchase.

368.    The final transactions of 1/10/2017, purchases of 615 shares of GORO and 990 of AUY, which occurred at 18:29:15 and 18:35:03, respectively, are afflicted with the same inaccuracy in the *Transaction History*.

369.    So, while the *Transaction History* appears to report transactions with "forward-shifted" timestamps, this evidence suggests "backward shifting" or a more complex contrivance altogether.

---

[44] 18:29:22 (CST) corresponds to the timestamp of the UVXY purchase reported by the *ThinkorSwim* Historical data; the transaction sequence is corroborated by the Trade Confirmation Log. Also, due to the limited hours of extended trading sessions, no purchases would have been possible at 01:29:22.

370.    The Transaction History's calculates the *Available Cash Balance* according to an erroneous sequence whereby the first transaction of the day is in fact the transaction that occurred last. final transaction of the day is instead transaction occurring as the first transaction of the day.

371.    Purchases during the final hours of the extended trading sessions were pushed through time 00:00 but were still documented as transactions for the correct day.  While irregularities and inconsistencies of this nature perhaps enabled opportunities for exploitation, extensive analysis has failed to identify any unique damages.  This species of discrepancy is representative of an unintended "side-effect" of the data manipulations that permit the resequencing of transactions.

372.    This reveals key characteristics of the timestamp manipulation contrivance, namely that the account history can be reconstructed the following day according to desired transaction sequence.

    a.    The entirety of the Transaction History was shifted not forward by 5-6 hours, but backward by 18-19 hours, yet still reported on the correct day.

    b.    Thereby, today's account activity could be recorded ***tomorrow*** in the Transaction History, facilitating manipulation and editing of *Available Cash Balance* corresponding to an inaccurate transaction sequence, and

    c.    Via *Courtesy Credits,* yesterday's *ThinkorSwim* Historical Data is able to be edited and altered "today" simultaneous to the entry of the erroneous data into the Transaction History.

373.    The faulty configuration and accounting of Pitlor's Charles Schwab account exhibited similar features that (1) transaction sequences were consistently reconstructed according to a fraudulent depiction of account activity and (2) transactions were inconsistently reported on different dates, especially pertaining to Margin loans.

## V.  ERRONEOUS TRANSACTION SEQUENCE CORRESPONDING TO ALL DEPOSITS

374.    On 1/09/2017 and 1/10/2017, all deposits to the account are inaccurately stated due to timestamp discrepancies in both the *ThinkorSwim* Historical Data and the Transaction History.

375.    In the *ThinkorSwim* Historical data, all deposits are represented as having credited the account at 00:00:00, as the first transactions of the day.  The *TOS Transaction Ref #s* confirm that deposit entries reflect the account being credited prematurely.  Early recognition of funds is a hallmark red flag indicative of fraud.

376.    The *Transaction History* lists the accurate time for the deposits, but the securities transactions are stated with inaccurate timestamps.

377.    The resulting erroneous transaction sequence causes the *Available Cash Balances* to be unrepresentative of the actual account balances in both the *ThinkorSwim* Historical Data and the Transaction History, due to erroneous sequences of transaction execution activity

378.    This pattern of misrepresentation is consistent for all deposits to the account.

# <u>Attachment: TD Ameritrade Account</u>
# <u>Illegitimate Disallowed Wash Sale Losses</u>

# <u>Corresponds to Predicate Count #5</u>

Defendant: TD Ameritrade

# <u>18 USC § 1343</u> – *Fraud by Wire*

## General Description

379.        By increasing the *Cost Basis* reported by the <u>1099-B Tax Filing</u>, the missing funds are literally "disallowed" from being factored into the accounting of *Profits and Losses*, yet in truth represents a cash loss suffered by Pitlor that resulted from larceny, not legitimate trading losses.

380.        Several examples are presented to demonstrate the crucial role of this particular contrivance with respect to Defendant TD Ameritrade's pattern of racketeering activity:

     a.  April 2016 - LOMLF

     b.  PPP on 1/11/XX

     c.  GDXJ on 5/XX/XX

     d.  GLD May 6th 2016

### a. An illegitimate *Disallowed Wash Sale Loss* pertaining to LOMLF transactions on 4/29/2016 conceals $277.19.

381.        The following example pertains to the illegitimate *Disallowed Wash Sale Losses* and *Cost Basis Adjustments* pertaining to LOMLF transactions on 4/29/2016 that serves to conceal cash value totaling $277.19.

**SHORT TERM TRANSACTIONS FOR COVERED TAX LOTS [Ordinary gains or losses are identified in the Additional Information column]** *(Lines 2 & 5)*
Report on Form 8949, Part I with Box A checked. Basis is provided to the IRS. *(Line 3)*
"Gain or loss (-)" is NOT reported to the IRS.

1a- Description of property/CUSIP/Symbol

| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | 1b- Date acquired | 1e- Cost or other basis | 1f- Accrued mkt disc (D) & 1g- Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z) | Additional Information |
|---|---|---|---|---|---|---|---|
| LION ONE METALS LTD ORD / CUSIP: 536216104 / Symbol  LOMLF | | | | | | | |
| 05/20/16 | 3,000.000 | 1,356.27 | 04/29/16 | 1,949.72 | | -593.45 | Sale |
| 05/20/16 | 2,500.000 | 1,129.16 | 04/29/16 | 1,406.35 | 277.19 W | 0.00 | Sale |
| | Security total: | 2,485.43 | | 3,356.07 | 277.19 W | -593.45 | |

**Excerpt from 1099-B Tax Filing - 2016**

| Date | Transaction | Action (Buy, Sell) | Symbol | Quantity | Price | Principal Amount | Commission/Fee | Net Amount |
|---|---|---|---|---|---|---|---|---|
| 04/29/2016 | 14906567897 | Bought | LOMLF | 1,700 | 0.552 | 938.40 | 9.99 | 948.39 |
| 04/29/2016 | 14906568022 | Bought | LOMLF | 500 | 0.56 | 280.00 | 9.99 | 289.99 |
| 04/29/2016 | 14906568030 | Bought | LOMLF | 3,000 | 0.5599 | 1,679.70 | 0.00 | 1.679.70 |
| 04/29/2016 | 14906568033 | Bought | LOMLF | 300 | 0.536 | 160.80 | 0.00 | 160.80 |

**Excerpt from Trade Confirmation Log**

382.     All shares were purchased on 4/29/2016 then sold on 5/20/16.  No *Wash Sale* occurred.

383.     Because no wash sale occurred, it is impossible for any shares to have been sold at a loss and later repurchased.  Clearly, there is no possibility for the $277.19 *Disallowed Wash Sale Loss* or corresponding *Cost Basis Adjustment* to be legitimate.

384.     The total cost of all purchases is $3078.88, as per the Trade Confirmation Log. The total *Proceeds* are $2,485.43.  The total actual loss is $593.45.

$$\$593.45 = \$3078.88 \,(\text{-})\, \$2,485.43$$

385.     However, the according to the 1099-B Tax Filing -2016, *Adjusted Cost Basis* is $3,356.07, due to the $277.19 *Disallowed Wash Sale Loss.*   The **1099-B Tax Filing** data thus depicts a total cash loss of $870.64 due to the illegitimate adjustment.

$$\$870.64 = \$3,356.07 \,(\text{-})\, \$2,485.43$$

386.     Thereby, the fraudulent adjustment conceals $277.19 that has been removed. Quite literally, it becomes a **Disallowed Loss.**  The money was removed from the account, but it does not count as a loss and is not otherwise accounted for by the official record.

$$\$277.19 = \$870.64 \,(\text{-})\, \$593.45$$

**B.     An Illegitimate *Disallowed Wash Sale Loss* corresponding to PPP transactions in January 2017 conceals $48.36.**

126

387.        The transactions of shares of PPP, purchased on 1/10/2017 and sold on 1/11/2017 provide a simple example of an erroneous *Disallowed Wash Sale Loss* and illegitimate *Cost Basis Adjustment* which conceals $48.36. While $48.36 represents relatively minor damages, this example is critical in demonstrating that the *Disallowed Wash Sale Losses* are separate contrivances that **conceal** losses; they do not correspond to the direct causation of losses. The damages totaling $6,809.57 corresponding to 1/11/2017 indeed relate to other fraudulent artifices.

388.        The data from the 1099-B TD Ameritrade Tax Filing – 2017 reports a *Wash Sale Disallowed Loss* and a corresponding adjustment to the *Cost Basis* for $48.36.

| TD Ameritrade Clearing, Inc. | | | | | | Account | 788801360 |
|---|---|---|---|---|---|---|---|
| **Proceeds from Broker and Barter Exchange Transactions** | | | | | | | |
| 2017  1099-B* OMB No. 1545-0715 | | | (continued) | | | 02/08/2018 | |

SHORT TERM TRANSACTIONS FOR COVERED TAX LOTS [Ordinary gains or losses are identified in the Additional information column] *(Lines 2 & 3)*
report on Form 8949, Part I with Box A checked. Basis is provided to the IRS. *(Line 3)*
Gain or loss (-)" is NOT reported to the IRS.

| 1a- Description of property/CUSIP/Symbol | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | 1b- Date acquired | 1e- Cost or other basis | 1f- Accrued mkt disc (D) & 1g- Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z) | Additional Information |
| PRIMERO MINING CORP COM / CUSIP: 74164W106 / Symbol: PPPMF | | | | | | | |
| 1/11/17 | 1,450.000 | 1,143.06 | Various | 1,248.99 | ... | -105.93 | Total of 2 transactions |
| 1/11/17 | 4,235.000 | 3,360.58 | 01/10/17 | 3,504.49 | 48.36 W | -95.55 | Sale |
| | Security total: | 4,503.64 | | 4,753.48 | 48.36 W | -201.48 | |

<u>Excerpt from 1099-B Tax Filing - 2017</u>

389.        The 1099-B tax filing accurately reports a total loss of $201.48, but contains the following errors:

    a.  A fictitious *Disallowed Wash Sale Loss* for $48.36 is reported.

    b.  As a result, the Cost Basis is overstated by $48.36. Purchases that only cost $4705.12 are instead reported to have cost $4,753.48.

    c.  The *Date Acquired* is stated to be *Various* despite all purchases having occurred on 1/10/2017. This error is repeated throughout both the TD Ameritrade and Schwab 1099-B tax filings and correlates with the concealment.

390.        No *Disallowed Wash Sale Loss* occurred. Certainly, a loss occurred but all shares were purchased on 1/10/2017 and then sold on 1/11/2017, as confirmed by the following excerpt from the *Transaction History:*

| 01/10/2017 15:47:23 | Bought 1900 PPP @ 0.8216 | -1,571.07 | -3,352.20 |
| 01/10/2017 15:48:44 | Bought 3785 PPP @ 0.8254 | -3,134.05 | -6,486.25 |
| 01/10/2017 19:15:38 | CLIENT REQUESTED ELECTRONIC FUNDING RECEIPT (FUNDS NOW) | 3,000.00 | -3,486.25 |
| 01/11/2017 15:18:14 | Sold 990 AUY @ 3.15 | 3,108.44 | -377.81 |
| 01/11/2017 15:30:00 | Sold 350 GORO @ 5.3 | 1,844.97 | 1,467.16 |
| 01/11/2017 15:30:03 | Sold 500 PPP @ 0.805 | 392.50 | 1,859.66 |
| 01/11/2017 15:32:34 | Sold 950 PPP @ 0.8006 | 750.56 | 2,610.22 |
| 01/11/2017 15:32:53 | Sold 4235 PPP @ 0.7959 | 3,360.58 | 5,970.80 |

**Excerpt from 2017 – Transaction History**

391.        According to all transaction records (*Transaction History, Trade Confirmations, ThinkorSwim, Monthly Brokerage Statement, Tax Documents*):

| | |
|---|---|
| Total Cost of 'PPP' Purchases on 1/10/2017 | $4705.12 |
| Total Proceeds of 'PPP' Sales on 1/11/2017 | $4503.64 |
| **NET LOSS** | **$201.48** |

392.        The *Disallowed Wash Sale Loss* of $48.36 thus conceals an illegitimate loss to the account. The is significant because, unless $48.56 is removed from the account (without being documented as a loss) then the stated *Profit/Loss* will be overstated according to the *Adjusted Cost Basis* as pertains to the account as a whole, and no such discrepancy exists. Thus, the existence of this erroneous *Disallowed Wash Sale Losses* implies that funds totaling $48.56 to have been withdrawn from the account without being registered as a loss.

## C.        Illegitimate *Disallowed Wash Sale Losses* corresponding to GDXJ transactions on 5/20/2017 conceal $307.78

393.        The Gainskeeper data contains an illegitimate *Cost Basis Adjustments* of $307.78 of corresponding to a *Disallowed Wash Sale Loss* that did not occur.

| Security ▾ | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Adj gain ($) | Adj gain (%) | Term |
|---|---|---|---|---|---|---|---|---|---|

128



| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| VANECK VECTORS JUNIOR GOLD | | 5,458 | -- | 177,466.14 | --- | 177,205.11 | -261.03 | -0.15 | Short-term |
| | Sell.FIFO | 193 | 05/31/17 | 6,025.66 | 06/01/17 | 6,033.82 | 8.16 | 0.14 | Short-term |
| | Sell FIFO | 2,020 | 06/16/17 | 66,565.95 | 06/19/17 | 66,308.40 | -257.55 | -0.39 | Short-term |
| | Wash Sale Adj | [2,020] | 06/20/17 | -257.55 | 06/19/17 | -- | 257.55 | -- | Short-term |
| | Sell.FIFO | 1,020 | 06/20/17 | 33,419.60 | 06/20/17 | 32,920.49 | -499.11 | -1.49 | Short-term |
| | Sell.FIFO | 596 | 06/20/17 | 19,175.13 | 06/20/17 | 19,235.90 | 60.77 | 0.32 | Short-term |
| | Wash Sale Adj | [629] | 06/20/17 | -307.78 | 06/20/17 | -- | 307.78 | -- | Short-term |
| | Sell FIFO | 1,629 | 06/20/17 | 52,845.13 | 06/20/17 | 52,708.50 | -138.63 | -0.26 | Short-term |

**Excerpt from 2017 Gainskeeper Data - GDXJ**

394.　　　　The 6/16 purchase and 6/19 sale of 2020 shares resulted in a loss of $257.55, and thus the repurchase of 2020 shares are subject to cost basis adjustment due to the *Disallowed Wash Sale Losses.* Indeed, the *Gainskeeper* Data reflects an accurate cost basis adjustment distributed over the repurchase 2020 shares.

395.　　　　However, the *Gainskeeper* Data above also documents an anomalous, illegitimate *Cost Basis Adjustment* of $307.78 pertaining to a fictitious *Disallowed Wash Sale Loss* corresponding to 629 shares.

396.　　　　The transaction records confirm that it is not possible for a *Disallowed Wash Sale Loss* corresponding to those 629 shares to be valid, as confirmed by analysis of the trade data as shown in the following excerpt of the Transaction History :

| | | | |
|---|---|---|---|
| 06/16/2017 21:56:56 | Bought 2020 GDXJ @ 32.95 | -66,565.95 | -59,607.70 |
| 06/19/2017 00:00:01 | REMOVAL OF OPTION DUE TO EXPIRATION (SLV Jun 16 2017 17.5 Call) | 0.00 | -59,607.70 |
| 06/19/2017 00:00:01 | REMOVAL OF OPTION DUE TO EXPIRATION (GLD Jun 16 2017 125.5 Call) | 0.00 | -59,607.70 |
| 06/19/2017 00:00:01 | REMOVAL OF OPTION DUE TO EXPIRATION (GLD Jun 16 2017 126.0 Call) | 0.00 | -59,607.70 |
| 06/19/2017 11:04:58 | Sold 2020 GDXJ @ 32.8301 | 66,308.40 | 6,700.70 |
| 06/19/2017 11:05:39 | Bought 6050 VIXY @ 10.505 | -63,562.20 | -56,861.50 |
| 06/20/2017 08:28:39 | Sold 3050 VIXY @ 10.55 | 32,169.85 | -24,691.65 |
| 06/20/2017 08:29:18 | Bought 1020 GDXJ @ 32.63 | -33,289.55 | -57,981.20 |
| 06/20/2017 09:05:55 | INTRA-ACCOUNT TRANSFER | -0.01 | -57,981.21 |
| 06/20/2017 09:05:55 | INTRA-ACCOUNT TRANSFER | 0.01 | -57,981.20 |
| 06/20/2017 10:02:34 | Sold 3250 UVXY @ 9.8701 | 32,070.18 | -25,911.02 |
| 06/20/2017 10:02:59 | Sold 3000 VIXY @ 10.6701 | 32,002.65 | 6,091.63 |
| 06/20/2017 10:03:57 | Bought 2225 GDXJ @ 32.1699 | -71,584.98 | -65,493.35 |
| 06/20/2017 11:07:13 | Sold 1616 GDXJ @ 32.28 | 52,156.39 | -13,336.96 |
| 06/20/2017 11:09:22 | Bought 3100 UVXY @ 9.78 | -30,324.95 | -43,661.91 |
| 06/20/2017 11:36:29 | Sold 1629 GDXJ @ 32.3601 | 52,706.50 | 9,044.59 |

397.    First, it is relevant to note that the inconsistency between the various documents introduces additional complexity into the analysis that renders the errors to be more difficult to identify and explain.

    a. The sequence of the transactions as reported by the 1099-B is awry. The sale of 1,629 shares was the final GDXJ transaction, but the 1099-B reports the sale of 1616 shares to be the last. The illegitimate *Cost Basis Adjustment* corresponds to these transactions.

    b. The lots reported by Gainskeeper do not correspond to the information reported by the 1099-B. Gainskeeper breaks apart the lot of 1616 into multiple transactions. This helps to conceal the illegitimate *Cost Basis Adjustments*.

398.    Because no subsequent repurchase ever occurred with respect those lots of 1616 and 1620 shares of GDXY shares sold on 6/20/2017, the $307.78 increase to the *Cost Basis* as reported by *Gainskeeper* is not offset by any actual differed loss.

130

399.    As shown below, the 1099-B Tax Filing for 2017 submitted to the I.R.S. by TD Ameritrade includes this invalid *Disallowed Wash Sale Loss* of $307.78:

**SHORT TERM TRANSACTIONS FOR COVERED TAX LOTS [Ordinary gains or losses are identified in the Additional information column]** *(Lines 2 & 3)*
Report on Form 8949, Part I with Box A checked. Basis is provided to the IRS. *(Line 3)*
"Gain or loss (-)" is NOT reported to the IRS.

1a- Description of property/CUSIP/Symbol

| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | 1b- Date acquired | 1e- Cost or other basis | 1f- Accrued mkt disc (D) & 1g- Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z) | Additional Information |
|---|---|---|---|---|---|---|---|
| VANECK VECTORS JR GOLD MINERS E ETF / CUSIP: 92189F791 / Symbol: GDXJ | | | | | | | |
| 06/01/17 | 193.000 | 8,033.82 | 05/31/17 | 6,025.66 | ... | 8.16 | Sale |
| 06/19/17 | 2,020.000 | 66,308.40 | 06/16/17 | 66,565.95 | 257.55  W | 0.00 | Sale |
| 06/20/17 | 1,629.000 | 52,706.50 | 06/20/17 | 52,845.13 | ... | -138.63 | Sale |
| 06/20/17 | 1,616.000 | 52,156.39 | 06/20/17 | 52,594.73 | →307.78  W | -130.56 | Sale |
| Security total: | | 177,205.11 | | 178,031.47 | 565.33  W | -261.03 | |

Excerpt from 1099-B Tax Filing - 2017
Invalid *Disallowed Wash Sale Loss* - *$307.78*

400.    The *Cost Basis Adjustment* of $307.78 is unwarranted and illegitimate. While the reported loss for the security, **($281.03),** is indeed accurate, the erroneous *Disallowed Wash Sale Loss* in fact conceals the illegitimate removal of $307.78 from the account.

401.    Additional evidence is presented in the analysis of 2016 JNUG *Disallowed Wash Sale Losses* that confirms that indeed the sequence of transactions was manipulated to generate these erroneous *Cost Basis Adjustments* corresponding to fictitious *Disallowed Wash Sale Losses*.

D.    **An illegitimate *Disallowed Wash Sale Loss* corresponding to GLD May 6 2016 Options transactions on 5/20/2017 conceals $626.11.**

402.    The following example illustrates how options trades were also targeted. The data was manipulated and inconsistently reported with completely illegitimate *Cost Basis Adjustments*, concealing unreported losses of $626.11.

403.    The *Date Acquired* is stated to be *Various* despite all purchase and sale transactions occurring on the same day, 5/6/2016. This fits the pattern of the previous examples whereby the position is reported to have been acquired inaccurately. This ambiguous designation corresponds to illegitimate *Cost Basis Adjustments*.

**SHORT TERM TRANSACTIONS FOR NONCOVERED TAX LOTS [Ordinary gains or losses are identified in the Additional information column]** *(Line 3)*
Report on Form 8949, Part I with Box B checked. Basis is NOT provided to the IRS. *(Line 3)*
"Date acquired," "Cost or other basis," "Accrued market discount," "Wash sale loss disallowed" and "Gain or loss (-)" are NOT reported to the IRS

**1a- Description of property/CUSIP/Symbol**

| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | Date acquired | Cost or other basis | Accrued mkt disc (D) & Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z) | Additional information |
|---|---|---|---|---|---|---|---|
| | | SPDR GOLD TR GOLD SHS GLD May 06 2016 124.0 Call / CUSIP: / Symbol: GLD 05/06/16 C 124.000 | | | | | |
| 05/06/16 | 18.000 | 228.07 | 05/06/16 | 330.58 | ... | -102.51 | Option sale |
| 05/06/16 | 100.000 | 986.09 | Various | 1,826.77 | 626.11 W | -214.57 | Total of 4 transactions |
| | Security total: | 1,214.16 | | 2,157.35 | 626.11 W | -317.08 | |

404.    The total loss as stated in the tax filing is ($317.08). The $626.11 *Disallowed Wash Sale Loss* corresponds to the final lot. Even without laboring through the calculations for the individual transactions, the invalidity of the disallowed loss amount can be directly inferred by the fact that the $626.11 *Disallowed Wash Sale Loss* improperly adjusts the *Cost Basis* corresponding to its purchase, not a repurchase of shares.

405.    Thus, it is impossible for there to be an actual loss of $626.11 that has been legitimately differed.

406.    Appropriately, the cost basis of the second transaction could be adjusted by $102.51. But this is not the case. The entirety of the $626.11 *Cost Basis Adjustment* is illegitimate because all losses are properly realized by the *Gain or Loss* column.

| | Trade Confirmations | Tax Documents (errant Wash Sale Accounting) | Proper Wash Sale Accounting (According to data as reported by 1099-B) |
|---|---|---|---|
| Cost Basis | $1531.24 | $2157.35 | 1633.75 |
| Proceeds | $1214.16 | $1214.16 | $1214.16 |
| Wash Sale Disallowed | N/A | $626.11 | $102.51 |
| Transaction Gain/Loss | $317.08 | $943.19 | $419.59 |
| Realized Gain/Loss | $317.08 | $317.08 | $317.08 |
| | | | |

407.    As the transaction records below show, there are several round-trip transactions and several potential *Disallowed Wash Sale Losses.* But, the *Gain/Loss* data reports only two lots, and as explained above, the entire $626.11 of the *Cost Basis Adjustments* are illegitimate.

| Date | Transaction | Action (Buy, Sell) | Symbol | Quantity | Price | Principal Amount | Commission/Fee | Net Amount |
|---|---|---|---|---|---|---|---|---|
| 05/06/2016 | 14950590077 | Bought | GLD May 06 2016 124.0 Call | 25 | 0.09 | 225.00 | 28.74 | 254.33 |
| 05/06/2016 | 14950809761 | Sold | GLD May 06 2016 124.0 Call | 13 | 0.14 | 182.00 | 19.74 | 161.94 |
| 05/06/2016 | 14951052172 | Bought | GLD May 06 2016 124.0 Call | 30 | 0.13 | 390.00 | 32.49 | 423.20 |
| 05/06/2016 | 14951058791 | Sold | GLD May 06 2016 124.0 Call | 21 | 0.12 | 252.00 | 25.74 | 225.75 |
| 05/06/2016 | 14951059133 | Bought | GLD May 06 2016 124.0 Call | 25 | 0.13 | 325.00 | 28.74 | 354.33 |
| 05/06/2016 | 14951124954 | Sold | GLD May 06 2016 124.0 Call | 46 | 0.14 | 644.00 | 44.49 | 598.40 |
| 05/06/2016 | 14951138273 | Bought | GLD May 06 2016 124.0 Call | 18 | 0.15 | 270.00 | 23.49 | 293.92 |
| 05/06/2016 | 14951147475 | Sold | GLD May 06 2016 124.0 Call | 18 | 0.14 | 252.00 | 23.49 | 228.07 |
| 05/06/2016 | 14951164815 | Bought | GLD May 06 2016 124.0 Call | 20 | 0.09 | 180.00 | 24.99 | 205.46 |

# Predicate Count #10 (1 Counts)

## #10-A (1 Count)

## #10-B (4 Counts)

### 18 U.S.C. § 1956. *Laundering of monetary instruments*

Defendant Schwab

133

## #10C (5 Counts)

### *Conspiracy to Launder Monetary Instruments*

*Defendants TD Ameritrade and Schwab*

## #10-D (1 Count)

### 18 U.S.C. 1028(a)(7), - *Identity Theft*

Defendant Schwab

| $VALUE | DATE | Description of Conversion |
|---|---|---|
| $10,000,005.87 | 2/28/2018 | Transfer of $9,999,999.00 |
| | | plus (+) $6.87 |
| | 3/6/2018 | equals = $10,000,005.87 *Cash on Hold* |
| $2,481.61 | 3/23/2018 | Mutual Funds Buying Power |
| $51,698.63 | 3/26/2018 | Mutual Funds Buying Power |
| $17,725.31 | 3/27/2018 | Mutual Funds Buying Power |
| $8,245.23 | 3/27/2018 | Mutual Funds Buying Power |
| $1,248.34 | 3/27/2018 | Mutual Funds Buying Power |
| $1,465.13 | 3/28/2018 | Mutual Funds Buying Power |
| **$10,082,870.12** | | **Money Laundering** |

## A. General description of money laundering and specified unlawful activities.

408.　　　　　　　Schwab conducted financial transactions which in fact involved the proceeds of specified unlawful activity, in violation of **18 U.S.C § 1956.**  Schwab did so with full knowledge that the transactions were designed in whole or in part, to conceal or disguise the source, the ownership, or the control of funds which in fact involved the proceeds of specified unlawful activity.

409.　　　　　　　The specified unlawful activity pertained to the segregation and concealment of *Margin Equity* and cash value from Schwab Account ####5612, predicated by the Defendants' patterns of violations of **18 U.S.C § 1343**, **18 U.S.C. § 1344**, and **18 U.S.C. § 1029.**

134

410.       The five counts correspond to the $10,000,005.87 transferred on 3/6/2018, and four additional counts for each day that Mutual Funds Purchases occurred (Mutual Funds only transact one time each day at end-of-day settlement).

411.       By prohibiting Pitlor's purchases and withdrawals with bogus *Pattern Day Trader* restrictions, and further by restricting his access to *Borrowed Funds*, Schwab ensured that Pitlor would be unable to interfere with the illicit segregation of assets and conversion transactions.

412.       Sweeps transactions between the Futures and Brokerage accounts, as well as the transfers involving the *Bank Sweep Feature*, were integral to the targeted funds' segregation, concealment, and ultimately, their conversion. The synchronization of fraudulent contrivances involving the Futures Account and the *Bank Sweep Feature* was an essential element to the scheme.

413.       The account structure was reconfigured to misrepresent values and buying power with respect to Futures Account ####6617. This was specifically achieved by excluding the value of the Futures Account from the *Cash and Cash Investments Total* and subsequently resulted in errantly stated account balances.

414.       The official record was altered to misrepresent and omit transaction data pertaining to sweeps transactions to the Futures Account and the *Bank Sweep Feature* which ultimately enabled the laundering of $10,000,005.87 from the *Cash on Hold* of Pitlor's account ####5612 that was executed via an unreported[45] transfer on 3/6/2018. In conjunction with additional artifices which manipulated the Gain/Loss and cash accounting, funds totaling $82,864.25 were stolen from Pitlor via transactions utilizing *Mutual Funds Buying Power*.

415.       Mutual Funds have unique features that make them an attractive tool for money launderers, such as the liquidity offered by same day settlement.

416.       **12 CFR § 220.118** specifically permits Mutual Fund Purchases to be made from a "special cash account" using **unsettled** funds in accordance with **12 CFR § 220.4(c.)(3)**. This is particularly relevant considering the illegitimate *Settled Cash Up Front* restriction, the Mutual Funds Buying Power (in Brokerage Account ####5612) and its corresponding to Futures Buying Power.

417.       The scheme targeted funds transferred to, and the cash balances existing within, the *Bank Sweep Feature*, the interest-bearing FDIC insured deposit accounts linked to the Schwab One Brokerage Account. One derivation presented below specifically demonstrates how the value

---

[45] The <u>March Statement</u> was altered to exclude the section "Transfers". (See XXXXXXXX)

$28,396.94 was targeted twice.  The scheme specifically targeted this sum because of its similarity to $28,000.00, Pitlor's initial deposit on 2/27/2018.

**EQ-10.1: $82,864.25 = $28,396.94 + $28,396.94 + $23,355.97 + $2702.27 +$4.45 + $3.51 + $3.38 + $.79**

**EQ-10.1(a):   $.79 = ($.46 + $.26 + $.26 + $.03 (-) $.02).**

**EQ-10.1(b)     $.79 = $.77 + $.02**

**EQ-10.2: $82,864.25 = $28,396.94 + $28,000 + $23,355.97 + $3092.84 + $7.16 + $4.45 + $3.51 + $3.38**

418.         The *Bank Sweep Feature* was "detached" from Pitlor's Schwab One Account ####5612.  Indeed, $28,396.94 and $23,355.97 are sums that existed in and transferred to, respectively, the *Bank Sweep Feature*.  Their sum, $51,752.91, less the $54.28 MTD Interest Owed at the time, equals the amount **reported** as the *Sweep To Futures* on 3/27 **(EQ-1.4).**

**EQ-10.3: $51,752.91 = $23,355.97 + $28,396.94 (3/27/2018 - Bank Sweep Feature Balance)**
**EQ-10.4: $51,698.63 = $51,752.91 (-) $54.28     (3/27/2018 – Sweep to Futures)**

419.         The Defendants' enterprise abused certain rules pertaining to the transfer of assets and accounts, particularly as set forth by **12 CFR § 220**[46] with respect to Pitlor's Futures Account ####6617.  Thereby, funds transferred to the Futures Account ####6617 were not necessarily required to be immediately "converted" in the traditional sense.

---

[46] 12 CFR § 220.4(b)(7) - Margin account. Transfer of accounts:

(i) A margin account that is transferred from one creditor to another may be treated as if it had been maintained by the transferee from the date of its origin, if the transferee accepts, in good faith, a signed statement of the transferor (or, if that is not practicable, of the customer), that any margin call issued under this part has been satisfied.

(ii) A margin account that is transferred from one customer to another as part of a transaction, not undertaken to avoid the requirements of this part, may be treated as if it had been maintained for the transferee from the date of its origin, if the creditor accepts in good faith and keeps with the transferee account a signed statement of the transferor describing the circumstances for the transfer.

136

a.  Funds were transferred to and concealed in Futures Account ####6617, and account data was edited so to exclude that value from the *Total Accounts Value.*

b.  Then, Pitlor's association with those accounts was revoked via maneuvers that, had they not been for the specific purpose of avoiding the statutory requirements[47], would have been compliant with **12 CFR § 220.4(b)(7) - *Margin account. Transfer of accounts.***

c.  Further manipulations altered the historical data, "cleansing" Pitlor's Brokerage Account of any documented association with Futures Account ####6617.

d.  Even after its "closure", value continued to be debited from Brokerage Account ####5612 via negatively valued *Futures Buying Power*.

420.    Futures Account ####6617 was retroactively disassociated with Pitlor's Brokerage Account ####5612, effectively dispossessing Pitlor of ownership rights to any assets held in the account ####6617, as well as the ability to access account data that documented the existence of those funds that had been concealed and converted.

421.    The account data was altered upon the "closure" of Futures Account ####6617, which occurred without notice on 3/28/2018. No correspondence or documentation was received thereafter to confirm the closure. Crucially, Pitlor was also abruptly restricted from accessing any data pertaining to Futures Account ####6617.

422.    Various end-of-month adjustments documented by Pitlor's screenshots confirm that account values were altered to feign consistency between the official record and the historical account data.

423.    The money laundering scheme required the official record to be altered. Indeed, there is abundant evidentiary support presented in **Predicate Counts #11**:

a.  The February Statement was hastily altered to omit critical data pertaining to cash balances, including the *Bank Sweep Feature.*

b.  The March Statement was craftily altered to omit the subsection "*Transfers*" from the "*Transaction Details*" section and also contains irregularity with respect to the *Bank Sweep Feature.*

---

[47] As contained in the above excerpts, the account transfers must **"not [be] undertaken to avoid the requirements of this part..."** in order to be **"treated as if it had been maintained for the transferee from the date of its origin."**

c. Schwab never provided any periodic statement specifically identifying the Margin Account ####6617 as the Futures Account associated with Pitlor's Schwab One Brokerage Account ####5612.

424. The live data also was also manipulated so to conceal the existence of value segregated within Futures Account ####6617. The screenshots below identify several of the artifices utilized to conceal and misrepresent the account values.



- **Left Screenshot (3/4/2018)**: the "Account Summary" displays the *Personal Value* on 3/4/2018. (Futures Account ####6617 is not displayed because it was not opened until 3/5/2018.)

- **Middle Screenshot (Red arrows) (3/8/2018)**: After the $10,000,005.87 was removed from *Cash on Hold* on 3/6/2018, the *Personal Value* is stated to be zero, (1) the value of Futures Account ####6617 was not reported, and (2) the value stated for Brokerage Account ####5612 is accompanied by an asterisk which refers to the note: *"This account value does not contribute to the Personal Value chart...."* (*See* Schwab Mobile App Screenshots on middle and right)

138

- **Right Screenshot (3/18/2018):** As the scheme carried on for the express purposes of sabotage and theft, the "Total [Accounts Value]" data field was omitted altogether. (The Blue Arrows identify the "Total" data field in middle screenshot and the empty space where it should appear in the right screenshot.)

- **All:** Superscripts indicate that data was altered specifically pertaining to account values. (Green arrows)

# Count #10-A

## B. $10,000,005.87 was laundered from *Cash on Hold* on 3/6/2018.

425.        The illicit conversion of assets began with the $10,000,005.87 *Cash on Hold* on 3/6/2018, but the same contrivances were utilized to commit larceny thereafter.

426.        On 2/28/2018, a $9,999,999.00 transfer into Pitlor's Schwab account ####5612 occurred due to an error[48] which exposed these funds to have been secretly comingled with the assets in Pitlor's newly opened account for exploitative purposes. Comingling assets in this manner is *prohibitum malum* by the *Customer Protection Rule*, **17 CFR § 240.15(c)3-3.**

427.        Schwab refused to acknowledge that (1) any transfer had deposited funds in Pitlor's account on 2/28/2018, and (2) further, repeatedly denied that *Cash on Hold* represented cash value that existed in the account. Schwab's intent to disguise and conceal the source, location, ownership, and control of those funds[49].

428.        Despite Pitlor's having received written confirmation of the 2/28/2018 transfer, Schwab representatives consistently claimed during phone conversations that (1) no deposit or transfer occurred and (2) no corrective action was needed and none occurred.

    a.   On 3/30/2018, Stacy F. with Schwab's Client Advocacy Team sent Pitlor a written correspondence reasserting the claim proffered by various representatives' claim that

---

[48] The error pertained to Schwab's faulty execution of the same scheme that was utilized to prey on Pitlor's TD Ameritrade Account. Detailed explanation is presented with the analysis of 2/27 & 2/28 and *Disallowed Wash Sale Losses*

[49] **18 U.S.C. § 1956** sets forth that money laundering is committed when a person "conducts a financial transaction… knowing that the transaction is designed in whole or in part- to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity… or to avoid a transaction reporting requirement under State or Federal Law…"

that the "large" *Cash on Hold* amount was consistent with Schwab's standard procedures for new accounts, and that the purpose was to prevent funds from leaving the account[50].

b.  But, *Cash on Hold* is specifically defined by Schwab to be a *Credit Balance*, payable on demand, and therefore the requirements of **17 CFR § 240.15(c)3-3** necessarily apply. Moreover, there is nothing in Schwab's disclosures that remotely support the claim that $9,999,999.00 displayed as *Cash on Hold* is consistent with Schwab's standard procedures.

c.  The truth continued to be flagrantly misrepresented, with reckless disregard for the truth, including by Schwab's Managing Director of Corporate Counsel, Garret W, as documented by recorded phone conversations where similar misrepresentations were made claiming that *Cash on Hold* does not indicate the existence of cash value held in the account.

429.        As documented by the screenshots presented on the following page, During the morning of 3/6/2018, *Cash on Hold* was stated to be $10,000,005.87. Negatively valued *Futures Buying Power* was utilized to conceal the conversion the $9,999,999.00 along with that additional $6.87, a total of $10,000,005.87.

430.        Also, the *Futures Buying Power*, ($9,970,749.12) corresponds to a debit of $10,000,005.87 being assessed against Brokerage Account ####5612. The *(Brokerage) Account Value*, stated to be $29,256.75, is cash value held in the *Bank Sweep Feature.*

**EQ-10.5 [Negative Futures Buying Power]: ($9,970,749.12) = $29,256.75 (-) $10,000,005.87**

---

[50] See 3/30/2018 correspondence received from Schwab's Client Advocacy Team.



- **Left Screenshot (3/6/2018):** The Schwab Mobile App's display has been altered to prevent the display of the Futures Buying Power; that data field was whited out to conceal that value. *Cash on Hold* is stated to be $10,000,005.87.

- **Middle Screenshot (3/6/2018):** (1) (blue arrows) - Futures Buying Power was not prevented from being displayed by the Schwab Streetsmart App, but the Streetsmart App "greyed out" so to conceal the "Total Futures [value]" data field. (2) (red arrows) - The Futures Account data is contradictorily stated to be account ####5612. This comingling may be responsible for the misrepresentation and erroneous accounting pertaining to *Cash & Cash Investments, Futures Buying Power,* and *(Brokerage) Account Value*.

- **Right Screenshot (3/4/2018):** Details pertaining to the *Bank Sweep Feature* were inaccessible during the time the $9,999,999.00 deposit existed as *Cash on Hold*.

141

<center>

### Count #10-B

### 18 U.S.C. § 1956

### 4 Counts corresponding to Mutual Funds Purchases on
### 3/23, 3/26, 3/27, & 3/28

</center>

**C.**     **$82,864.25 was converted via unreported *Mutual Funds* purchases.**

431.         While the conversions transactions were concealed from both the live data and the official record, the conversion of $82,864.25 was documented as *Mutual Funds Buying Power* that existed while Pitlor was restricted[51] from executing purchases or withdrawals.

432.         On 3/23, 3/26, 3/27, 3/28, four conversions occurred whereby the enterprise converted $82,864.25 which had been segregated as *Mutual Funds Buying Power*[52], corresponding the six total transfers via Futures Buying Power. (Mutual Fund transactions occur at settlement, only once per day).

433.         Every derivation of damages presented herein this complaint distinctly accounts for $3.51, the value that existed in Pitlor's TD Ameritrade Account ####1360.

434.     .        Several of the derivations, precisely accounts for the fees charged for the five conversion transactions. The total $224.80 corresponds to the $49.95 charged on each of the four days when funds were segregated Mutual Funds Buying Power, and $25 transfer fee (account transfer or wire transfer) assessed for the conversion of the *Cash on Hold* on 3/6/2018.

<center>

**EQ10.6: $224.80 = $25 + ($49.95 x 4)**

</center>

435.         Schwab is an underwriter and sponsor of Mutual Funds, and thereby the Charles Schwab Corporation can convert free credit balances into different monetary instruments, and then back again- without the involvement of any other financial institution.

---

[51] On 3/23, Pitlor overcame the restriction by executing *Short Sales* which generated *Settled Cash*. However, the following week Pitlor was restricted from all activity with a more restrictive prohibition that froze all trading activity under the auspices of a "Pattern Day Trader" restriction.

[52] *Mutual Funds Buying Power* is a stated in the Schwab account balances as a category of *Margin Buying Power*.

436.        *Mutual Funds Buying Power* was populated with the cash value that was subsequently converted while Pitlor's account was restricted.  All other *Margin Buying Power* being inexplicably set to zero under the guise of an utterly non-sensical[53] "Pattern Day Trader" restrictions that were repeatedly claimed to have been in effect.

437.        The screenshots on the following two pages confirm that *Mutual Funds Buying Power* coincided with the illicit conversion of cash value from Pitlor's Brokerage Account ####5612, and those precise sums were simultaneously stated to be Futures Buying Power or otherwise relating to *Borrowed Funds*.

---

[53] The Pattern Day Trader restriction froze all account activity, and was imposed despite Pitlor's account balance having been well above the $25,000 threshold.

### 3/23 Screenshot @ 08:54
**$2481.71 Mutual Funds Buying Power**

| | |
|---|---|
| Equity Percent | -100.00% |
| Trade Date Balance | -$9,308.65 |
| Balance Subject to Interest | $0.00 |
| MTD Interest Owed | $6.87 |

Margin Buying Power

Marginable Securities

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $2,481.61 |
| Short Selling | $0.00 |

Non-Marginable Securities

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $0.00 |
| Penny Stocks | $0.00 |

Fixed Income

| | |
|---|---|
| Treasuries Maturing in 10+ yrs | $0.00 |
| Government Agencies | $0.00 |
| Municipal Bonds | $0.00 |
| Non-convertible Corporates | $0.00 |
| Convertible Corporates | $0.00 |

Options

| | |
|---|---|
| Long (cleared funds) | $0.00 |
| Short (minimum equity required) | $0.00 |

### 3/26 Screenshot @ 17:27
**$51698.63 Mutual Funds Buying Power**

| | |
|---|---|
| Equity Percent | 100.00% |
| Trade Date Balance | $51,752.91 |
| Balance Subject to Interest | $74,642.25 |
| MTD Interest Owed | $54.28 |

Margin Buying Power

Marginable Securities

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $0.00 |
| Short Selling | $0.00 |

Non-Marginable Securities

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $51,698.63 |
| Penny Stocks | $0.00 |

Fixed Income

| | |
|---|---|
| Treasuries Maturing in 10+ yrs | $0.00 |
| Government Agencies | $0.00 |
| Municipal Bonds | $0.00 |
| Non-convertible Corporates | $0.00 |
| Convertible Corporates | $0.00 |

Options

| | |
|---|---|
| Long (cleared funds) | $0.00 |
| Short (minimum equity required) | $0.00 |

### 3/27 Screenshot @ 15:13
**$17725.31 Mutual Funds Buying Power**

| | |
|---|---|
| Account Value | $95,394.09 |
| Day Change | -$59,604.43 (-60.67%) |

Margin Details

| | |
|---|---|
| Margin Equity | -$90,733.43 |
| Equity Percent | -100.00% |
| Trade Date Balance | -$38,980.52 |
| Balance Subject to Interest | $0.00 |
| MTD Interest Owed | $54.28 |

Margin Buying Power

Marginable Securities

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $17,725.31 |
| Short Selling | $0.00 |

Non-Marginable Securities

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $0.00 |
| Penny Stocks | $0.00 |

Fixed Income

| | |
|---|---|
| Treasuries Maturing in 10+ yrs | $0.00 |
| Government Agencies | $0.00 |
| Municipal Bonds | $0.00 |
| Non-convertible Corporates | $0.00 |

### 3/23 Screenshot @ 08:58
**$2481.71 Futures Buying Power**



| | |
|---|---|
| **Futures Account 20435612** | |
| Futures Account Value | $11,797.13 |
| Futures Total Equity | $11,797.13 |
| Total Futures | |
| Futures Gain/Loss | $0.00 |
| Futures Options | $0.00 |
| Futures Cash | $11,797.13 |
| Requirements & Buying Power | |
| Buying Power | $2,481.61 |
| Futures Requirements | $0.00 |
| Initial Margin | $0.00 |
| Maintenance | $0.00 |
| Disclosures & Footnotes | > |

### 3/26 Screenshot @ 17:27
**$51,698.63 Implied Negative Value for Funds Available to Borrow**

| | |
|---|---|
| Futures Account Value | -$17,843.20 |
| Futures Total Equity | -$17,843.20 |
| Initial Margin Requirement | $38,280.00 |
| Futures Buying Power | -$4,424.57 |

Funds Available

To Trade

| | |
|---|---|
| Cash Investments | $51,698.63 |
| Settled Funds | $51,698.63 |
| Cash + Borrowing | $0.00 |
| SMA | $23,356.00 |
| Day Trade Buying Power | $14,216.00 |

To Withdraw

| | |
|---|---|
| Cash Investments | $0.00 |
| Cash on Hold | $54.28 |
| Cash + Borrowing | $0.00 |

**Margin Details & Buying Power**

**Disclosures & Footnotes**

Brokerage Products: Not FDIC Insured • No Bank Guarantee • May Lose Value

### 3/27 Screenshot @ 15:11
**$17,725.31 Futures Buying Power**



| | |
|---|---|
| Account Value | $95,394.09 |
| Day Change | -$59,604.43 (-60.67%) |

Cash & Cash Investments

| | |
|---|---|
| Total | -$38,980.52 |
| Bank Sweep | $51,752.91 |
| Cash Balance | $0.00 |
| Margin[1] | -$90,733.43 |

Investments

| | |
|---|---|
| Total | $77,614.50 |
| Securities | $0.00 |
| Options | $77,614.50 |

Schwab Futures

| | |
|---|---|
| Futures Account Value | $56,760.11 |
| Futures Total Equity | $56,760.11 |
| Initial Margin Requirement | $0.00 |
| Futures Buying Power | $17,725.31 |

Funds Available

### 3/27 Screenshot @ 16:23
**$8245.23 Mutual Funds Buying Power**



| Account Value | $99,344.01 |
|---|---|
| Day Change | -$59,814.43 (-60.89%) |

**Margin Details**

| | |
|---|---|
| Margin Equity | -$90,733.43 |
| Equity Percent | -100.00% |
| Trade Date Balance | -$38,980.52 |
| Balance Subject to Interest | $0.00 |
| MTD Interest Owed | $54.28 |

**Margin Buying Power**

**Marginable Securities**

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $8,245.23 |
| Short Selling | $0.00 |

**Non-Marginable Securities**

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $0.00 |
| Penny Stocks | $0.00 |

**Fixed Income**

| | |
|---|---|
| Treasuries Maturing in 10+ yrs | $0.00 |
| Government Agencies | $0.00 |
| Municipal Bonds | $0.00 |
| Non-convertible Corporates | $0.00 |

### 3/27 Screenshot @ 20:54
**$1248.34 Mutual Funds Buying Power**

| Account Value | $94,327.12 |
|---|---|
| Day Change | -$59,814.43 (-60.89%) |

**Margin Details**

| | |
|---|---|
| Margin Equity | -$90,733.43 |
| Equity Percent | -100.00% |
| Trade Date Balance | -$38,980.52 |
| Balance Subject to Interest | $0.00 |
| MTD Interest Owed | $54.28 |

**Margin Buying Power**

**Marginable Securities**

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $1,248.34 |
| Short Selling | $0.00 |

**Non-Marginable Securities**

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $0.00 |
| Penny Stocks | $0.00 |

**Fixed Income**

| | |
|---|---|
| Treasuries Maturing in 10+ yrs | $0.00 |
| Government Agencies | $0.00 |
| Municipal Bonds | $0.00 |
| Non-convertible Corporates | $0.00 |

### 3/28 Screenshot @ 17:29
**$1465.13 Mutual Funds Buying Power**

| Account Value | $46,797.20 |
|---|---|
| Day Change | -$4,121.74 (-10.73%) |

**Margin Details**

| | |
|---|---|
| Margin Equity | -$10,979.71 |
| Equity Percent | -100.00% |
| Trade Date Balance | -$10,979.71 |
| Balance Subject to Interest | $0.00 |
| MTD Interest Owed | $54.28 |

**Margin Buying Power**

**Marginable Securities**

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $1,465.13 |
| Short Selling | $0.00 |

**Non-Marginable Securities**

| | |
|---|---|
| Equities | $0.00 |
| Mutual Funds | $0.00 |
| Penny Stocks | $0.00 |

**Fixed Income**

| | |
|---|---|
| Treasuries Maturing in 10+ yrs | $0.00 |
| Government Agencies | $0.00 |
| Municipal Bonds | $0.00 |
| Non-convertible Corporates | $0.00 |
| Convertible Corporates | $0.00 |

**Options**

| | |
|---|---|
| Long (cleared funds) | $0.00 |
| Short (minimum equity required) | $0.00 |

### 3/27 Screenshot @ 16:22
**$8245.23 Futures Buying Power**



| NS | GAIN/LOSS | BALANCES | HISTORY | TILE V |

| Account Value | $99,344.01 |
|---|---|
| Day Change | -$59,814.43 (-60.89%) |

**Cash & Cash Investments**

| | |
|---|---|
| Total | -$38,980.52 |
| Bank Sweep | $51,752.91 |
| Cash Balance | $0.00 |
| Margin[1] | -$90,733.43 |

**Investments**

| | |
|---|---|
| Total | $77,404.50 |
| Securities | $0.00 |
| Options | $77,404.50 |

**Schwab Futures -**

| | |
|---|---|
| Futures Account Value | $60,920.03 |
| Futures Total Equity | $60,920.03 |
| Initial Margin Requirement | $13,640.00 |
| Futures Buying Power | $8,245.23 |

Funds Available

### 3/28 Screenshot @ 17:43
**$1465.13 Futures Buying Power**

| | Brokerage | Futures |
|---|---|---|
| Upbona Requirement | | $0.00 |

**Investments**

| | |
|---|---|
| Securities | $0.00 |
| Options | $45,277.50 |
| Total | $45,277.50 |

**Futures Account  20435612**

| | |
|---|---|
| Futures Account Value | $12,499.41 |
| Futures Total Equity | $12,499.41 |
| Total Futures | $0.00 |
| Futures Gain/Loss | |
| Futures Options | $0.00 |
| Futures Cash | $12,499.41 |

**Requirements & Buying Power**

| | |
|---|---|
| Buying Power | $1,465.13 |
| Futures Requirements | $0.00 |
| Initial Margin | $0.00 |
| Maintenance | $0.00 |

# Predicate Count #10-C

## 18 USC § 1956 (h). *Conspiracy to Commit Money Laundering*

## Defendants TD Ameritrade and Charles Schwab

**A.   TD Ameritrade commanded, counseled, or aided and abetted[54] Schwab's wire fraud and money laundering and is therefore equally culpable and liable.**

438.   TD Ameritrade facilitated specified unlawful activity pertaining to the five transactions pertaining to (1) the removal of the errant $9,999,999.00 deposit continued to promote and facilitate (2) the subsequent theft and conversion of $82,864.25 from Pitlor's Schwab Account ####5612.

439.   Regardless of whether Defendant TD Ameritrade took possession of the laundered funds, the Defendants conspired to facilitate and promote the carrying on of specified unlawful activity, and thereby gives rise to TD Ameritrade's liability for conspiring to commit money laundering in violation of **18 U.S.C. § 1956(h).**

440.   The Schwab-TD Ameritrade enterprise obtained assets in Pitlor's Schwab One Account ####5612, under the custody and control of Charles Schwab, by means of false representations and fraudulent pretenses to execute their scheme.  The Defendants implemented a scheme which utilized (1) digital transmissions affecting interstate commerce, constituting wire fraud in violation of **18 U.S.C. § 1343.**  and (2) a complex array of contrivances to conceal and convert cash value deposited in FDIC insured bank accounts, Schwab's *Bank Sweep Feature,* constituting financial institution fraud in violation of **18 U.S.C. § 1344.**

441.   The theft and money laundering were concealed by various contrivances to misrepresent cash value and spoof Schwab's Gain/Loss accounting.  However, creating the appearance that those laundered funds never existed also required transactions data to be altered or removed so to exclude the stolen funds from the official record altogether.  Pitlor's TD Ameritrade account provided both a conduit to launder funds as well as an avenue through which transaction data could altered, concealed, and for all intents and purposes, eliminated.  The

---

1.   [54] "In order to aid and abet another to commit a crime it is necessary that a defendant in some sort associated himself with the venture, that he participated in it as in something that he wishes to bring about, that he seek by his action to make it succeed." Nye & Nissen v. United States, **336 U.S. 613**, 619 (1949).

evidence of TD Ameritrade's accessing, interfering with, and editing order and balances data pertaining to Pitlor's Schwab account indeed also constitutes violations of **18 U.S.C. § 1030** in addition to their use, production, and trafficking of unauthorized access devices in violation of **18 U.S.C. § 1029**.

442.    The *Bank Sweep Feature*, Futures Account, and erroneous calculation of Futures *Buying Power* and *Cash and Cash Investments Total* were instrumental in facilitating concealed conversion of cash value from Pitlor's account.

443.    Ultimately, the converted funds were concealed in a different account for which Pitlor was a named beneficiary. Pitlor was restricted access to account data, or the cash balances were misrepresented so to conceal the value held therein until the enterprise stripped Pitlor of all ownership interest by transferring ownership of the account

444.    Several plausible means and methods exist which could have been utilized to launder funds from Pitlor's Schwab One Account ####5612. The evidence implies that the complex scheme in fact utilized combinations of the following:

- Schwab Futures Account ####6617
- Bank Sweep Feature of Schwab Account ####5612
- TD Ameritrade's Electronic Services
  - TD Ameritrade Account ####1360 also utilized its Futures Account # TDACX561.
- Other closed accounts held at Schwab

## B.    Changes to TD Ameritrade Account ####1360 & Futures Account XXXXX561 indicate its being utilized

445.    Pitlor's TD Ameritrade Account was supposed to have been closed on 9/29/2017. While access to the website and trading were restricted, Pitlor remained able to access the account via the *ThinkorSwim* platform. This access was halted on 1/23/2020, but Pitlor continues to receive monthly statements.

446.    Since the 9/29/2017 "closure", changes were made to Pitlor's TD Ameritrade Account ####1360, specifically regarding Futures Account XXXXX561, *after* TD Ameritrade claimed to have unilaterally terminated the business relationship with Pitlor in September 2017. Those changes are documented by the excerpts below.

147

a. Excerpt of *ThinkorSwim* Desktop PC Application on 9/24/2017 shows no Futures Account.



b. But, as shown by the following excerpt from the *ThinkorSwim* Desktop PC Application on 8/2/2019, Futures Account TDACX561 is again[55] associated with account ####1360.



447.    The discrepancy regarding the Futures Account also appears in the *ThinkorSwim* Mobile App. Also, the *ThinkorSwim* Mobile App's *"Transfers"* tab was made to be *permanently* "temporarily unavailable" as shown by the following screenshots.

---

[55] As presented with the claims pertaining to the exploitation of Pitlor's TD Ameritrade Futures Account, this account TDACX561 was involved in a fraudulent transaction and is listed a single time in Pitlor's July 2016 Brokerage Statement.

**Screenshot from 2017**

D Ameritrade ThinkorSwim Mobile App



**Screenshots from 12/11/2019**

TD Ameritrade ThinkorSwim Mobile App




448.    The TD Ameritrade Futures Account ####561 was involved in the exploitation of Pitlor's TD Ameritrade Account####1360 in 2016, including fraudulent sweeps transactions and illegitimate Margin Calls. But according to the Monthly Brokerage Statements, Pitlor's futures account was rarely referred to by this account number, for example it only appears listed once in the sweeps transactions in the July 2016 Brokerage Statement.

449.    Moreover, the Futures Account was not segregated from the Brokerage Margin Account, all sweeps transactions are journal transactions, and the tax documents do not include the Futures Account. This comingling of the Margin of the Futures and Brokerage Accounts is precisely that which also facilitated the exploitation of Pitlor's Schwab Futures Account ####6617.

450.    Pitlor's Futures Trading privileges were revoked by TD Ameritrade, without notice or explanation. TD Ameritrade representatives said a determination was made based on risk

assessment, but that phone call in September 2016 was not recorded by Pitlor. Regardless, TD Ameritrade, like Schwab, are each *trusted* to make these determinations and manage accounts in an honest, straightforward manner. Thus, TD Ameritrade's decision to reactivate the Futures Account####561 of Pitlor's supposedly closed account ####1360, as well as other evidence of the account being used as an active account- in Pitlor's name but not for his use or benefit, is relevant to the considerations herein, particularly as closed accounts used in this manner are considered to be unauthorized access devices.

451.    The following letter was received on 4/23/2018, indicating



**TD Ameritrade**

April 23, 2018



|||··|¹|⁰||¹·|··|·|·|··|·||⁰|||·|·|·⁴||||··|⁰||||·|··||·||·|
·····················SNGLP-680
DAVID PITLOR
1711 S 61ST AVE
OMAHA, NE 68106-2109

TDA 8531

Re: An Uncashed Check from Your Account

Dear Valued Client,

We want to let you know about an action we've taken on an uncashed check.

On October 4, 2017, we issued check number 13291799 in the amount of $3.51 from your account ending in 1360. However, our records indicate that this check was never cashed or deposited.

To protect your account, we have voided the check and returned the funds to the account. If you have this check, please do not attempt to cash or deposit it.[1]

If you would like us to issue a new check, just let us know. Log in to your account and go to My Account > Deposits & Transfers > Cash Transfers. Then follow the directions on the page.

If you have any questions, or if we can be of any help, please log in to your account and go to the Message Center to write us. Or you can call Client Services at 800-669-3900. We're available 24 hours a day, seven days a week.

Sincerely,

*Carrie Braxdale*

Carrie Braxdale
Managing Director, Investor Services
TD Ameritrade

[1] Securities and Exchange Commission (SEC) Rule 17Ad-17 requires us to send notification to a client who has not negotiated a check six months (180 days) after it was sent, or who receives regularly scheduled checks and has not negotiated a check when the next scheduled check is sent, whichever comes first. The SEC rule requires us to inform the client that the check has not been negotiated no later than seven months (210 days) after the check was sent to the client.

Market volatility, volume, and system availability may delay account access and trade executions.

TD Ameritrade, Inc., member FINRA/SIPC. TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2016 TD Ameritrade IP Company, Inc.

TDA 8531 L 11/16

## C.    Closed Accounts

452.        On 3/5/2018, the Schwab website indicated that other accounts indeed existed that had been closed. As shown in the following excerpt, a search for documents pertaining to closed or inactive accounts from the last 10 years yielded the following message: *"You do not have any*

*closed or inactive accounts available for viewing online.  Please call… to request documents for your closed accounts"*

| ▼ Date | Document Type | Account | Document Name |
|---|---|---|---|

⚠ You do not have any closed or inactive accounts available for viewing online. Please call us at 800-435-4000 to request documents for your closed accounts.

(0118-7440)

Accounts (https://client.schwab.com/secure/cc/accounts)   Trade (https://client.schwab.com/secure/cc/trade)   Research (https://client.schwab.com/secure/cc/research)
Products (https://client.schwab.com/secure/cc/products)   Guidance (https://client.schwab.com/secure/cc/guidance)   Service (https://client.schwab.com/secure/cc/service)
Summary (https://client.schwab.com/secure/cc/accounts/summary)   Balances (https://client.schwab.com/secure/cc/accounts/balances)
Positions (https://client.schwab.com/secure/cc/accounts/positions)   Portfolio Performance (https://client.schwab.com/secure/cc/accounts/portfolio_analysis)
History (https://client.schwab.com/secure/cc/accounts/historynew)   Statements (https://client.schwab.com/secure/cc/accounts/statementshistory)
Transfers & Payments (https://client.schwab.com/secure/cc/accounts/transfers_payments)

**Brokerage Products: Not FDIC Insured   No Bank Guarantee   May Lose Value**

✦ Back to Top

Account: 2043-5612
Today's Date: 01:55 AM ET, 03/05/2018

Schwab Wealth Investment Advisory, Inc. ("SWIA"), and the FDIC-insured Schwab-affiliated banks ("Affiliated Banks") are separate but affiliated companies and subsidiaries of The Charles Schwab Corporation. Securities products and services are offered by Charles Schwab & Co., Inc. (Member SIPC ⧉ (http://www.sipc.org)) Schwab Intelligent Portfolios™ is offered by SWIA, a registered investment advisor, and Institutional Intelligent Portfolios™, is made available through independent investment advisors and sponsored by SWIA. Deposit products and services are offered by the Affiliated Banks, and lending products and services are offered by Charles Schwab Bank, an Equal Housing Lender.

453.    Also on 3/5/2018, the order history for his account noticeably excludes the transactions that occurred 2/27/2018.  It is as if that account had been closed or replaced with a different account[56].  This could have involved the TD Ameritrade Account, or perhaps other accounts at Schwab.  In either instance, there is no doubt account data was being concealed because of the $9,999,999.00 deposit.

---

[56] The altered format and other misrepresentations pertaining to the February Statement further supports the plausibility of closed or otherwise undisclosed accounts having been utilized to conceal and launder funds.



454.        When Schwab abruptly closed Pitlor's Futures Account, the historical account data was edited to remove all association between accounts ####5612 and ####6617, and it also revealed that Pitlor's account seemed to have been accessed and manipulated by "Schwab Employer Sponsored Service systems", as indicated by the following excerpt from data accessed via the Schwab Website on 4/1/2018.



Source: Screenshot from Schwab website on 4/1/2018

455. The screenshot above is significant because it corresponds to Sunday, 4/1/2018, shortly after the closure of the Futures Account ####6617. Pitlor's Futures Account had been abruptly disassociated with Pitlor's Brokerage Account, causing numerous additional "anomalies".

456. Also, notice how there is a faint message in blue textbox says "Full – Screen Snip" which indicates that the account information has been manipulated by replacing data. A zoomed in excerpt highlighting this anomaly, (which is not present in other specimens of the same account summary page for different days), is shown below:

**-$12,005.09 (-37.33%)**

Account Value                                                              Day Ch.

## D.    Multiple fraudulent artifices involved the *Bank Sweep Feature*

457.                    Pitlor was unable to access details of the *Bank Sweep Feature* for account

**Bank Sweep Activity**

| Transaction Date | Transaction | Description | Withdrawal | Deposit | Balance [X,Z] |
|---|---|---|---|---|---|
| Opening Balance [X,Z] | | | | | 0.00 |
| 03/02/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE [X] | | 29,256.75 | 29,256.75 |
| 03/07/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 12,875.18 | | 16,381.57 |
| 03/08/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 16,341.40 | | 40.17 |
| 03/12/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE [X] | | 17,784.14 | 17,824.31 |
| 03/15/18 | Interest Paid [X,Z] | BANK INTEREST | | 0.77 | 17,825.08 |
| 03/15/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 0.77 | | 17,824.31 |
| 03/19/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE [X] | | 0.77 | 17,825.08 |
| 03/20/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 17,825.08 | | 0.00 |
| 03/22/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE [X] | | 127.04 | 127.04 |
| 03/23/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE [X] | | 14,053.60 | 14,180.64 |
| 03/26/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE [X] | | 14,216.30 | 28,396.94 |
| 03/27/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE [X] | | 23,355.97 | 51,752.91 |
| 03/28/18 | Interest Paid [X,Z] | BANK INTEREST | | 0.64 | 51,753.55 |
| 03/28/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 51,753.55 | | 0.00 |
| Total Activity | | | 98,795.96 | 98,795.96 | |
| Ending Balance [X,Z] | | | | | 0.00 |

Bank Sweep: Interest Rate as of 03/29/18 was 0.12%. Your interest period was 03/01/18 - 03/27/18. [Z]

####5612 while $9,999,999.00 was included in the *Cash on Hold* balance. Details pertaining to the

*Bank Sweep Feature* was "temporarily unavailable" for undisclosed reasons.

### *3/4 Screenshot @ 11:10*
### Schwab Mobile App



155

458.            The Defendants' larceny and money laundering schemes targeted assets held in the FDIC insured accounts that comprise Schwab's *Bank Sweep Feature*.

    a.  Transaction dates were falsified to obfuscate account balances and, generally, to conceal the source, location, control, and ownership of those assets.

    b.  Schwab deviated from its established accounting practices regarding the time and date of Bank Sweep transfers, and inconsistent documentation of those transactions obscured the cash accounting with regard to total Account Value.

459.            Undoubtedly, the *Bank Sweep Feature* was "detached" from Pitlor's Schwab One Brokerage account ####5612, and account data was manipulated to feign the linkage that simply did not exist, as directly evidenced by the 3/6 – Holdings by Investor asset listings displayed below (and records for other days that similarly conceal the value of the *Bank Sweep Feature.*):

    a.  there is no cash balance that corresponds to the Bank Sweep Balance supposed to exist $29,256.75, as displayed by the live screenshot.

    b.  The cash balance in the live data, ($16,384.95) [See Screenshot on following page], is not represented either. A Cash Balance, $12,871.80 exists so to combine with the negative Margin Equity, ($12,875.18), so to manufacture a *Cash and Cash Investments Total* that is consistent with the ($3.38) displayed by the live data.



**oldings By Investor**

1 Brokerage Accounts

As of 3/6/

**Core Accounts**

:count Number: 20435612

:count Type: Individual

| SSET | TICKER | ASSET CLASS | QUANTITY | PRICE ($) | VALUE ($) |
|---|---|---|---|---|---|
| ALL PROSHARES TRUST II $17.5    EXP 03/09/18 | UVXY 03/09/2018 17.50 | OTHER | 10,000.00 | 0.48 | 4,850.00 |
| ASH | | CASH INVESTMENTS | 12,871.80 | 1.00 | 12,871.80 |
| ROSHARES ULTRA VIX    SHORT TERM FUTURES ETF   NEW ULY 2017 | UVXY | OTHER | 1,000.00 | 16.72 | 16,720.00 |
| UT TD AMERITRADE HLDGS $57    EXP 03/09/18 | AMTD 03/09/2018 57.00 | OTHER | 12,500.00 | 0.10 | 1,250.00 |
| UT TD AMERITRADE HLDGS $58    EXP 03/09/18 | AMTD 03/09/2018 58.00 | OTHER | 10,000.00 | 0.28 | 2,750.00 |
| IARGIN | | CASH INVESTMENTS | -12,875.18 | 1.00 | -12,875.18 |
| | | | **Account Total:** | | **$25,586.62** |
| | | | **Investor Total:** | | **$25,586.62** |

### 3/6 Screenshot @ 22:52
### Schwab Mobile App

≡   Individual ▼          🔍   ⋮

ONS    GAIN/LOSS    BALANCES    HISTORY    TILE V

| Account Value | $25,566.62 |
|---|---|
| Day Change | -$3,690.13 (-12.61%) |

Cash & Cash Investments

| Total | -$3.38 |
|---|---|
| Bank Sweep | $29,256.75 |
| Cash Balance | -$16,384.95 |
| Margin[1] | -$12,875.18 |

Investments

| Total | $25,570.00 |
|---|---|
| Securities | $16,720.00 |
| Options | $8,850.00 |

Schwab Futures -

| Futures Account Value | $0.00 |
|---|---|
| Futures Total Equity | $0.00 |
| Initial Margin Requirement | $0.00 |
| Futures Buying Power | |

Funds Available

460.    Impropriety involving the *Bank Sweep Feature* was vital in facilitating the concealed conversion of *Cash on Hold* and the Special Memorandum Account.   Borrowed funds

swept to the *Bank Sweep Feature* thereby documented as "existing" in the official record that in fact were targeted to be converted. In this manner, the *Bank Sweep Transfers* capitalized upon the illegitimate Margin Debt that was concealed by the erroneous account of *Sweeps to Futures.*

461.	As proven by the following screenshot, The *Bank Sweep Features'* records are inconsistent, erroneously dated records containing unexplained anomalies that cannot be trusted to have transacted as documented in the March Statement.

462.	$.77 was documented to have been credited to the account on 3/16/18 according to the Schwab M

**3/18 Screenshot @ 22:08**

**Schwab Mobile App**

| | |
|---|---|
| ← | 🔍 |

**BANK INT 022318-031518  SCHWAB BANK**

Transaction Details

| | |
|---|---|
| Transaction Date | 03/16/18 |
| Action/Type | bank interest |
| Total | $0.77 |

463.	The March Statement reports the transaction to have credited to the *Bank Sweep,* inexplicably transferred to the Brokerage account, and then back to the *Bank Sweep Feature.* But none of these transactions are documented to have occurred on 3/16.

464.	The transaction corresponding to the screenshot above is the 3/15/2018 "Interest Paid." This indicates that the live data lags behind the official record by one day; it also implies that the official record for "yesterday" is able to be entered in "today's" live data[57].

| 03/15/18 | Interest Paid X,Z | BANK INTEREST | | 0.77 | 17,825.08 |
|---|---|---|---|---|---|
| 03/15/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 0.77 | | 17,824.31 |
| 03/19/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE X | | 0.77 | 17,825.08 |

---

[57] The account data for "yesterday" in Pitlor's TD Ameritrade Account was manipulated "today" via "Courtesy Credits" that entered what appear to be negligible adjustments that add a few pennies of value, but analysis leaves no doubt that *Courtesy Credits* in fact corresponded to debits of excess *Margin Equity* that had been concealed via manipulation of transaction sequences, and the few pennies were refunded to create the impression of a small credit to the account. Thus, it is conceivable that Pitlor's Schwab Account data was configured to be processed through his defunct TD Ameritrade Account which was reconfigured to exploit Pitlor for over 18 months.

"Schwab will automatically deposit a Free Credit Balance of one dollar ($1.00) or more in your Account on any Business Day into Deposit Accounts at the first Affiliated Bank... after the close of business on that Business Day."

The term "Free Credit Balance" means the uninvested cash in your Account, minus... (iv) credit balances that are designated as collateral for your obligations, such as a cash balance resulting from a short sale. Proceeds from the sale of securities will not become a Free Credit Balance until the Business Day following settlement date"

**Excerpts from Schwab's Cash Features Disclosure Statement**

## The laundered funds may have remained within the *Bank Sweep* Accounts

465.         Futures Account ####6617 abrupt closure occurred on the same day Pitlor was coerced into switching his cash feature to a money market account. Under false pretenses on 3/28, Schwab representative convinced Pitlor that the money he claimed to be missing would be accessible if he opted for an alternative cash feature, and further that the balances would be displayed in a different manner that would indeed prove Pitlor's claims to be unfounded. The missing funds did not return, however, and the *Bank Sweep Feature* no longer existed thereafter.

466.         The following excerpt from Schwab's Cash Features Disclosure further supports the assertion that the *Bank Sweep Feature* was used to stash value, and TD Ameritrade assisted the with disassociating the *Bank Sweep Feature* with Pitlor's Schwab Account, perhaps with a resurrected "zombie" account ####1360. A transfer could have been triggered by conducting a seventh conversions, the entire Bank Sweep Balance would have been transferred.

"If the balance in your DDA is insufficient to satisfy a debit, we will transfer funds from your MMDA to cover it, plus enough to maintain a minimum balance. If there are insufficient funds in your Deposit Accounts to satisfy the debit, we will withdraw funds from other available sources as described in your Account Agreement...

...Federal banking regulations limit the number of transfers from an MMDA at an Affiliated Bank to six during a monthly statement cycle. Any time this limit is reached, we will transfer all remaining funds in your MMDA to the DDA at the Affiliated Bank and make all deposits for the rest of the month into the DDA. At the beginning of the following month, we will transfer funds from the DDA back to the MMDA, leaving any minimum balance required.

...Schwab may, at its discretion and upon written notice, terminate your use of the Bank Sweep or Bank Sweep for Benefit Plans feature. ....Similarly, if you decide to stop

159

participating in the Bank Sweep or Bank Sweep for Benefit Plans feature....This will result in separating those Deposit Accounts from your Account"

<u>Excerpts from Schwab's Cash Features Disclosure Statement</u>

467.        Schwab altered the <u>February</u> and <u>March Statements</u> to misrepresent and omit transaction details and *Bank Sweep Feature* balances. Thus, it is plausible to suggest those funds hidden in the *Bank Sweep Feature* may have remained there until Pitlor could be permanently disassociated with the account to which it was connected.

468.        Funds concealed within the *Bank Sweep Feature* could have been hijacked by triggering this transfer would have provided the opportunity for misappropriation, particularly by enabling Pitlor's TD Ameritrade account to be indirectly linked to the account to which funds were transferred from Schwab Bank Sweep Feature bank accounts after the six transaction limit had been reached.

## E.        Schwab Futures Account ####6617 was heavily relied on to facilitate both the wire fraud and money laundering

469.        Futures Account ####6617 was associated with Pitlor's Schwab One Brokerage Account ####5612 from 3/5/2018 until its sudden closure[58] on 3/28/2018.

470.        Except for those documents downloaded prior to the records being "cleansed", there would be no evidence to support Pitlor's claim that Futures Account ####6617 was associated with his Schwab Brokerage account ####5612.

471.        Schwab altered its accounting procedures to conceal cash value. Errant calculations of *Cash & Cash Investments Total*, *Account Value*, and *Total Account Value* enabled theft from Brokerage Account via negative *Futures Buying Power*.

472.        Due to the improper configuration and accounting of the Futures Account, funds swept to the Futures Account erroneously registered as losses to the Brokerage Account.

---

[58] On 4/2/2018, Robert T. with Schwab's Client Advocacy Group informed Pitlor that the Futures Account was closed on 3/28/2018. Initially, he said the liquidated funds were being sent via a paper check in the mail, but called back later that day to inform Pitlor that the funds had been "journaled over" to the Brokerage Account. Pitlor's March Brokerage Statement for account ####5612 shows all Sweep to Futures and Sweep to Brokerage transactions as journal entries and, throughout the entirety of the official record, never is there any reference to ####6617.

Furthermore, cash balances, account value, and buying power were inaccurately calculated, described by the following:

- *Cash and Cash Investments Total* **did not include the value of the Futures Account.**

- **The (Brokerage) Account Value as stated by the Schwab Mobile Application errantly includes the value of the Futures Account.**

- **The** *Personal Account Value* **log, which should report daily values for** *Total Accounts Value,* **in fact excluded the** *Futures Account Value.*

473. This is contrary to Schwab's standard accounting protocols as set forth by Schwab's *Disclosures and Footnotes,* as shown by the screenshot below:

**Futures accounts are included in:**

    (1) (Total) Account Value, & 

    (2) Cash & Cash Investments – Total .

**But not included in:**

    (1) (Brokerage) Account Value





i.     For Pitlor's account, the Futures Buying Power was configured to be calculated with respect to the *(Brokerage) Account Value*, and not the *Cash and Cash Investments Total*.

ii.    The *Futures Buying Power* became improperly dependent upon the Gain/Loss of Futures Positions instead of the Margin Maintenance Requirements.

iii.   The Futures Buying Power should be stated as $19,798.63 but instead is stated as $15,620.13. The discrepancy is precisely equal to the stated Futures Account Value ($4,178.50). As this was an intra-day value, the discrepancy does not directly figure into calculation of damages.

474.     Schwab's seemingly contradictory disclosure leaves much to be desired as far as clarity[59]. The following statements are the accurate interpretation of Schwab's accounting procedures.

- The **Futures Account Value** is *supposed to be included* in the calculation of ***Cash and Cash Investments Total***

- The **Total Account Value** is *supposed to be different* from the **Account Value** (which refers only to Brokerage Account Value).

- **The Futures Account Value** is *supposed to be excluded* from the calculation of **(Brokerage) Account Value**.

- The **Futures Account** is *supposed to be included* in **Total Accounts Value**, which refers to Brokerage & Futures Account.

475.     The result is that the Futures Account is not included in the *Cash and Cash Investments*, but cash value is able to be debited by negative *Futures Buying Power*, generating Margin Debt in the brokerage account which then offsets (canceling out) cash value. Value was able to accessed via *Futures Buying Power* without registering as a loss or noticeably affecting the account value until settlement at the end of the day.

---

[59] Schwab's disclosure is a poorly crafted specification featuring confusing nomenclature. Moreover, the disclosure states contradictory terms that must be deciphered, such as the following:
    *"Your Account Value Includes your Schwab Futures account"* (top of text)
    *"Account value does not include Futures Account"* (bottom of text)

476.     The malformed account structure was integrally relied upon to conceal and segregate the $10,000,005.87 *Cash on Hold* on 3/6/2018.  Moreover, these artifices facilitated the continued exploitation and assisted the conversion of $82,864.25 from 3/23/2018 – 3/28/2018.

477.     After the abrupt closure of Futures Account ####6617, Schwab's Mobile Apps still report negative Futures Buying Power that continued to be utilized to extract value from the brokerage account via undocumented debits.



Streetsmart app identifies Futures Account ####6617,
- But, the Futures Account balances correspond to *"Futures Account ####5612"*
- After the removal of Futures Account ####6617, negative *Buying Power* representing a debt remains stated for Futures Account ####5612
- *Futures Gain/Loss is "greyed out"* with a perpetual value of zero.

478.  On 3/27/2018, a Margin Call for $3404.57 is issued to Futures Account ####5612 (despite account ####6617 supposedly being the Future Account):

---

**Futures margin call notice**
1 message

**Charles Schwab Futures** <donotreply-comm@schwab.com>  Tue, Mar 27, 2018 at 8:27 AM
Reply-To: donotreply-comm@schwab.com
To: PITLOR@gmail.com


**FUTURES**

Action needed: Futures account margin call

**March 27, 2018** | your account ending: **612**

# Please meet margin requirement today

The Charles Schwab Futures ("Schwab Futures") account noted above has a margin call, as the equity in the account has fallen below the *maintenance* margin required to hold the open position(s). Maintenance calls are due immediately, and you must now meet the *initial* margin requirement.

Your account equity deficiency is $3,404.57. This amount is based on the equity (cash plus open trade equity) in your Schwab Futures account as of the previous trading day's market close. **Since this amount may change with market conditions and account activity, please confirm the amount on Schwab.com or by calling us.**

<u>Excerpt from 3/27/2018 Futures Margin Call E-mail Notification</u>

---

479.  Additional discrepancies indicate nefarious activity was being concealed pertaining to the value held in the Futures Account.

    a.  the transaction price of futures trades were not stated in the Futures Trade History. (*See* below on left)

    b.  the *Total Value* of Futures Account is stated as "n/a" (*See* below on middle/right)

164

c.  Total Gain/Loss does not register changes in Futures positions' value (despite price change in underlying Futures price, the Gain/Loss remains static at ($275.00)) (middle/right)



480.    The only confirmation of futures transaction prices available to Pitlor were the "Schwab Futures Trade Notices". But these notifications did not correspond to account ####5612 or ####6617. Instead, they stated the account *number* to be "-David Pitlor.", as shown by the excerpt below.

## Schwab Futures Trade Notice - NQM18

1 message

noreply@schwab.com <noreply@schwab.com>                         Mon, Mar 26, 2018 at 1:44 PM
To: PITLOR@gmail.com

 **FUTURES**

The following transaction has been completed on 3/26/2018 2:43:18 PM (ET):

| Account Number: | - DAVID PITLOR |
|---|---|
| Order Number: | 257624725 |

481.        No account statement was ever received or made accessible for this account, despite Pitlor's multiple requests and complaints. When Pitlor's Futures Account was closed, all historical data was altered to remove evidence of its existence as well as all funds that ever swept to or from the Futures Account.

482.        The March Brokerage Statement, which does list the *Sweeps To Futures* and *Sweeps From Futures* transactions, list the transfers as "Journal Entries" but does not identify Futures Account ####6617.

**charles SCHWAB**

| | | |
|---|---|---|
| Schwab One® Accountof<br>**DAVID PITLOR** | Account Number<br>2043-6612 | Statement Period<br>March 1-31, 2018 |

### Transaction Detail - Deposits & Withdrawals

| Transaction Date | Process Date | Activity | Description | Location | Credit/(Debit) |
|---|---|---|---|---|---|
| 03/23/18 | 03/23/18 | Journaled Funds | Sweep to Futures | | (13,768.61) |
| 03/23/18 | 03/23/18 | MoneyLink Txn | Tfr FIRST NATIONAL BAN, DAVID PITLOR | | (75,000.00) |
| 03/26/18 | 03/26/18 | Journaled Funds | Sweep from Futures | | 23,355.97 |
| 03/27/18 | 03/27/18 | Journaled Funds | Sweep to Futures | | (51,698.63) |
| 03/28/18 | 03/28/18 | Journaled Funds | Sweep from Futures | | 42,080.03 |
| 03/29/18 | 03/29/18 | Journaled Funds | Sweep from Futures | | 12,499.41 |
| **Total Deposits & Withdrawals** | | | | | **(62,531.83)** |

The total deposits activity for the statement period was $77,935.41. The total withdrawals activity for the statement period was $140,467.24.

166

| Damages correspond to the Futures Account | |
|---|---|
| $13,768.61 | *Sweep to Futures* (3/23) |
| $51,698.63 | *Sweep to Futures* (3/27) |
| $10,982.00 | Funds Due (3/28) |
| $3,404.57 | **Futures Margin Call excluded from *Sweep to Futures* (3/27)** |
| $2,702.27 | *Disallowed Wash Sale Losses,* all of which shown to be invalid. (March data) |
| $224.80 | Conversion Fees [1 Wire x $25 + 4 x $49.95] (3/6, 3/23, 3/26, 3/27, 3/28) |
| $54.28 | Interest Paid to Schwab (total) |
| $29.54 | *Balance Subject to Interest* not reported [$29.54 = $22.67 + $6.87] (3/22) |
| $2.29 | Discrepancy: $10,982 *Funds Due* and actual negative cash balance $10,979.71  (3/28) |
| $0.77 | Interest (supposed to have) credited the Account (3/15) |
| ($3.51) | TD Ameritrade Account Balance Swapped for $10,000,005.87 (3/6) |
| $82,864.25 | **Total Funds Converted via *Mutual Funds Buying Power*** |
| Note: | The highlighted cells corresponds to funds concealed by final data manipulations captured by screenshots of live data on 4/13 representing unique damages of $309. |

| $309 - Fees and other discrepancies accounted for by final adjustments in April | |
|---|---|
| $224.80 | **Conversion Fees [1 Wire x $25 + 4 x $49.95] (3/6, 3/23, 3/26, 3/27, 3/28)** |
| $54.28 | Interest Paid to Schwab (total) |
| $29.54 | *Balance Subject to Interest* not reported [$29.54 = $22.67 + $6.87] (3/22) |
| $2.29 | Discrepancy: $10,982 *Funds Due* and actual negative cash balance $10,979.71  (3/28) |
| $0.77 | Interest (supposed to have) credited the Account (3/15) |
| ($3.51) | TD Ameritrade Account Balance Swapped for $10,000,005.87 (3/6) |
| $1.00 | Anomalous SMA Value (3/8) |
| ($0.17) | Stray cash discrepancy contained with end-of-month anomalies ($3736.**17**) |
| $309 | **TOTAL Concealed via April Adjustments  [$309 = $734 - $425]** |
| Note: $.83 = $1 (-) $.17.  This is precisely equal to the sum of the cent-valued discrepancies $.83 = $.46 (3/19) +  $.26 (3/22) +  $.06 (3/28) +  $.03 (3/23 - 3/26) + $.02 (3/6) | |

Alternatively:

$13,768.61 + $51,698.63 + $3433.57 + 10,982.00 + 3092.84 + 118 = $82864.25 + $224.95 + $4.45

# Predicate Count #10-D (1 Count)

## 18 U.S.C. 1028(a)(7), - *Identity Theft*

## Defendant Charles Schwab

483.    Under 18 U.S.C. 1028(a)(7), a person is guilty of identity theft when he or she:

> "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law."

484.        Schwab's identity theft in violation of 18 U.S.C. § 1028 is predicated by wire fraud, bank fraud, and use of unauthorized access devices, and is relevant with respect to the laundering of $10,000,005.87 on 3/06/2018, as well as the clandestine conversions of $82,864.25 via *Mutual Funds Buying Power* that occurred on 3/23, 3/26, 3/27, & 3/28. Had the identity theft not occurred, the conversion transactions could not have been executed in the manner that transpired.

485.        The enterprise conspired to withdraw the $9,999,999.00 that was revealed to have been deposited into Pitlor's account whilst maintaining Schwab's ill-contrived excuse that (1) *Cash on hold* is "not real money" and, simultaneously- (2) that no errors occurred, and (3) the $9,999,999.00 appearing as *Cash on Hold* was consistent with Schwab's standard operating procedures for new accounts.

486.        Pitlor's Schwab account was opened on February 21st 2018. The driver's license Pitlor used to open the account expired on February 25th 2018, but Pitlor had already established the Moneylink profile with that ID prior to its expiration. Pitlor was permitted to deposit funds into the account and began trading on 2/27/2018. The Moneylink was finally confirmed to be "verified" on 3/1/2018.

168

487.         The above excerpt was snipped from Schwab's website. It confirms the details pertaining to the Moneylink profile, and it also displays under "Messages":

*"Charles Schwab: Further Follow-Up Requested"*

488.         That message stated the following:

> From: Schwab Client Service                    Message #:
> 8232838
> Account: Individual xxxx-x612
> Received: Wednesday, February 28, 2018 11:33 AM ET
> Subject: Charles Schwab; Further Follow-Up Requested
>
> If we can help with any other questions please click HERE to chat with a Financial Service Professional.
>
> Dear Mr. Pitlor,
>
> Please contact the Risk and Credit Loss Prevention Department at 866-706-5487 in regards to the latest transfer into your account. Currently, we have placed a restriction on your latest transfer and it may limit your ability to trade online. As always, you can also contact us at 800-435-4000 regarding this matter and request to b transferred to the appropriate department.
>
> Sincerely,
>
> Risk and Credit Loss Prevention
> Tel. 866-706-5487
> Charles Schwab & Co., Inc.
> ------ Please do not remove your unique tracking number! ------
> <<#1933856-7294109-8232838#>>

489.         Schwab needed to establish alternate funds transfer capabilities from Pitlor's account ####5612, and valid identification was required.

490.         Rather than admitting that an errant deposit occurred, explaining the situation, and requesting that Pitlor provide current identification, Schwab insisted on deceiving Pitlor. They denied that any additional deposit occurred, but they refused to unfreeze the account.

491.         "Kevin in Dallas", the first representative with whom Pitlor spoke on 2/28, blatantly misrepresented the truth by claiming that First National Bank was the responsible party for the restriction placed on Pitlor's Schwab Account due to additional verification being required for the initial $28,000.00.

492.         No specific request was made for Pitlor to provide a current driver's license and a copy of a voided check until 3/5/2018, despite Pitlor specifically inquiring and seeking resolution with regard to not only the $9,999,999.00, but especially concerning Pitlor's assets, $29,256.75, that were frozen without explanation.

169

493.　　　　　　All funds were frozen until Pitlor provided his current driver's license and a voided check from his First National Bank Account #####533, but Schwab insisted that the documents were required to be provided in order to perform further verification of his "Moneylink[60]" as was standard for new customer accounts. However, there is overwhelming direct and circumstantial evidence that refutes the validity of Schwab's actions.

    a.　Pitlor's Money Link Profile was confirmed as being "verified" on 3/1/2018.

    b.　The initial notice pertaining to "Further Verification Needed" was sent via Schwab's internal messaging system on 2/28/2018 and was specifically referred to the latest transfer into Pitlor's account, $9,999,999.00.

494.　　　　　　voided check was solicited from Pitlor as a decoy. It had no purpose other than to substantiate the charade that Pitlor's First National Bank Account's linkage to his Schwab account was under further scrutiny.

495.　　　　　　**31 U.S. Code § 5318.** *Compliance, exemptions, and summons authority* pertains to records and reports on monetary instruments transactions, and it sets forth the requirement for financial institutions to implement, and for customers (after being given adequate notice) to comply with, reasonable procedures for the following:

> *(A) verifying the identity of any person seeking to open an account to the extent reasonable and practicable;*
>
> *(B) maintaining records of the information used to verify a person's identity, including name, address, and other identifying information;*

**31 U.S. Code § 5318.**

496.　　　　　　Requiring a person to specifically provide a voided check is not consistent with merely verifying someone's identity. Proof of address and identity documents can satisfy the purposes of (B) above pertaining to "maintaining records" of identification information. However, A voided check may be required when a new relationship is established to effect transfers involving an existing bank account, as is commonly required to initiate direct deposits. A voided check may be required to initiate or execute a wire transfer or other means by which to electronically transfer funds. But not in this case. The MoneyLink Profile for Pitlor's First National Bank Account had already been established and verified.

---

[60] Schwab's system of processing deposits and withdrawals into the account via ACH deposit.

497.     As there was no valid reason for the voided check to be provided, indeed it reaffirms the certainty of the conclusion that Schwab acquired Pitlor's state issued identification under false pretenses, and thereby committed identity theft.

498.     Despite its being a rouse to misrepresent their intentions, by requiring Pitlor to provide a copy of a voided check from his First National Bank Account under false pretenses, Schwab thereby also violated 15 U.S. Code § 6821. *Privacy protection for customer information of financial institutions:*

> (a) Prohibition on obtaining customer information by false pretenses. It shall be a violation of this subchapter for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a -financial institution relating to another person—
>
> > (2) by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution;
>
> (b) Prohibition on solicitation of a person to obtain customer information from financial institution under false pretenses. It shall be a violation of this subchapter to request a person to obtain customer information of a financial institution, knowing that the person will obtain, or attempt to obtain, the information from the institution in any manner described in subsection (a).

<div align="right">15 U.S. Code § 6821.</div>

## Predicate Count #11 (2 Counts – February & March)

### 18 U.S.C. § 1341, *Frauds and Swindles* (Mail Fraud)

### Defendant Charles Schwab

**A.     Schwab fraudulently altered the Monthly Brokerage Statements, rendering the official record to be an incomplete accounting of Pitlor's account activity.**

499.     **The two counts pertain to (1) the various manipulations of the February Statement and (2) the concealment of the "Transfers" section from the March Statement.**

500.     .     The format of the Monthly Brokerage Statements were altered to omit specific data fields as well as entire sections of account information.

171

501.    Schwab reformatted the February Statement in its entirety to omit critical data from being reported pertaining to the $9,999,999.00 deposit.  This requiring wholesale manipulation of the data pertaining to Cash Balances, including the *Bank Sweep Feature*.

502.    The March Statement and April Statement were also tampered with to conceal other misrepresentations, but the alterations are more subtle.

503.    The March Statement was altered to omit the section titled *"Transfers"* to conceal the $10,000,005.87 transfer that occurred on 3/6/2018.

504.    The official record of Pitlor's Schwab One account is a fabrication that simply cannot be trusted.

## B.    The February Statement was hastily altered to conceal the $9,999,999.00 deposit.

505.    The entirety of the Pitlor's February Statement is inconsistent with the Schwab Sample Statement and Schwab Account Statement Guide[61].  The flaws are not only obviously erroneous, but flagrantly so, indicative of its having been *hastily*[62] altered to conceal the $9,999,999.00 that was deposited on the *final day* of February 2018.

506.    The February Brokerage Report is presented in portrait rather than the landscape format.  This is not an arbitrary discrepancy, but in fact permitted data fields to be rearranged and represented to portray an alternate version of account activity.

507.    The format does not correlate to the Sample Brokerage Report whereby changes in value are stated in two separate columns, *"This Period"* and *"Year to Date"*.  Instead, the data columns in Pitlor's February Statement are untitled and thus the values reported cannot be confirmed (See red arrows in except below).  Compare to the excerpt from Schwab Sample Statement on following page which displays the proper presentation of this data.

### Excerpt from February Statement (Page 1 of 4)

---

[62] Indeed, these facts support Pitlor's claim that the enterprise was specifically motivated to distract and discredit Pitlor's inquiries pertaining to the $9,999,999.00, and this was achieved by instigating separate conflicts on other fronts by sabotaging his account in March.

Mail To _____

DAVID PITLOR
1711 S 61ST AVE
OMAHA NE          68106-2109

**For Your Information**

Important update:

- This new section of your statement will be regularly updated to include important and helpful account information as soon as it's available.
- Thank you for the opportunity to serve you.

**Account Value Summary**

| | |
|---|---|
| Cash & Sweep Money Market Funds | $ 28,000.00 |
| Total Investments Long | $ 0.00 |
| Total Investments Short | $ 0.00 |
| Net Loan Balance | $ 0.00 |
| Total Account Value | $ 28,000.00 |

**Total Funds Available: Cash + Margin**

| | |
|---|---|
| Available to Withdraw | $ 0.00 |
| Securities Buying Power | $ 0.00 |

**Change in Account Value**

| | |
|---|---|
| Starting Account Value | $ 0.00 |
| Transactions & Income | $ 28,000.00 |
| Income Reinvested | $ 0.00 |
| Change in Value of Investments | $ 0.00 |
| Ending Account Value | $ 28,000.00 |
| Year-to-Date Change in Value Since 2/21/18 | $ 28,000.00 |

**Rate Summary**

| | |
|---|---|
| Bank Sweep: Interest rate as of 02/28 | 0.12% |
| Value Adv Money Fd SWVXX | 1.34% |
| Sch Investor Money Fund | 1.32% |
| Margin Loan Rates Vary by Balance | 6.00% to 8.82% |

508.    The following discrepancies pertain to the above excerpt.

a.  The sections titled *Account Value Summary* and *Total Funds Available – Cash + Margin* (and the majority data fields reported by those sections) were "invented" so to conceal the fact that the *total* cash value of the account is not stated anywhere in the statement.  (blue arrows on left)

b.  The section titled Change in Account Value fails to report entries such as *Credits, Debits,* Transfer of Securities. (green arrow - upper)

c.  As the "Year to Date" data columns were omitted, Schwab improvised and included include *"Year-to-Date Change in Value Since 2/21/2018"* (green arrow - lower) but this clearly deviates from Schwab's established format for displaying such information and is an incomplete accounting of the data supposed to be reported, directly indicative of concealment.

173

d.  According to the Schwab Sample Statement, no account activity or balances are reported on the front page (which only contains a table of contents and general account information, but no balances or values), and

e.  a message stated to be an *"Important Update"* which illogically, nonspecifically introduces a *"new section of the statement [that] that will be regularly updated to include important and helpful account information as soon as it's available."*

509.    The following excerpt from the Schwab Sample Statement shows that same balance data, presented properly:

## Excerpt from Schwab Sample Statement (Page 2 of 21)

charles SCHWAB

Schwab One® Account of
DANA JONES TTEE
JONES CHARITABLE TRUST
U/A DTD 08/22/1973 FBO R JONES

| Change in Account Value | This Period | Year to Date |
|---|---|---|
| Starting Value | $3,295,752.51 | $3,280,045.42 |
| Credits | 37,997.22 | 73,192.51 |
| Debits | (37,974.82) | (57,974.82) |
| Transfer of Securities (In/Out) | 4,480.00 | 10,580.52 |
| Income Reinvested | (347.97) | (895.65) |
| Change in Value of Investments | 45,927.86 | 40,886.82 |
| Ending Value on 06/30/2018^ | $3,345,834.80 | $3,345,834.80 |
| Accrued Income | $5,577.94 | |
| Ending Value with Accrued Income^ | $3,351,412.74 | |
| **Total Change in Account Value** | | |
| Including Deposits and Withdrawals | $50,082.29 1.52% | $65,789.38 2.01% |
| Includes Deposits, Withdrawals, and Accrued Income^ | $55,560.23 | |

## Excerpt from Schwab Sample Statement (Page 4 of 21) - *Cash Transactions Summary -*

| Cash Transactions Summary | This Period | Year to Date |
|---|---|---|
| Starting Cash* | $38,017.38 | $626,024.22 |
| Deposits and Other Cash Credits | 0.00 | 10,000.00 |
| Investments Sold | 37,014.77 | 65,872.89 |
| Dividends and Interest | 982.45 | 5,500.00 |
| Withdrawals and Other Debits | (889.90) | (2,920.00) |
| Investments Purchased | (30,200.47) | (659,482.73) |
| Fees and Charges | (70.15) | (140.30) |
| **Total Cash Transaction Detail** | 6,836.70 | (581,170.14) |
| **Ending Cash*** | $44,854.08 | $44,854.08 |

*Cash (Includes any cash debit balance) held in your account plus the value of any cash invested in a sweep money fund.

174

510. The above excerpt is the "*Cash Transactions Summary*" section as per the Schwab Sample Statement. This section reports the sum of all deposits, withdrawals, purchases, sales, fees, and dividends; Pitlor's February Statement omits the "*Cash Transactions Summary*" section in its entirety.

## C. Schwab altered Pitlor's February Statement to omit data pertaining to the *Bank Sweep Feature*

511. The Bank Sweep Feature was critically utilized in the concealment and laundering of funds from Pitlor's account, including the $10,000,005.87 removed on 3/6/2018, as presented by the **Predicate Count #14 - Bank Fraud.**

512. The "Asset Composition" section shown by the excerpt below is omitted in its entirety from Pitlor's February Statement. Critically, this section presents the *Total Account Value*, including separate data fields for the *Cash and Bank Sweep*. (red arrow)

### Asset Composition - Excerpt from Schwab Sample Statement (Page 2 of 21)

| Asset Composition | Market Value | % of Account Assets | Overview |
|---|---|---|---|
| Cash and Bank Sweep$^{x,z}$ | $64,854.08 | 2% | |
| Money Market Funds | 45,781.70 | 1% | |
| Fixed Income | 1,045,098.93 | 32% | |
| Equities | 1,250,379.40 | 37% | |
| Bond Funds | 512,015.95 | 15% | |
| Equity Funds | 429,334.74 | 13% | |
| Exchange-Traded Funds (ETFs) | 1,320.00 | 0% | 2% Cash, MMFs & Bank Sweep$^{x,z}$ |
| Other Assets | 3,300.00 | 0% | |
| Total Assets Long$^{\triangle}$ | 3,352,084.80 | | 1% MMFs [Non-Sweep] |
| Options (Short) | (6,250.00) | | 32% Fixed Income |
| Total Assets Short | (6,250.00) | | 37% Equities |
| Margin Loan Balance | 0.00 | | 15% Bond Funds |
| Total Account Value$^{\triangle}$ | $3,345,834.80 | 100% | 13% Equity Funds |
| Accrued Income$^{\triangle}$ | $5,577.94 | | 0% ETFs |
| Total Value with Accrued Income$^{\triangle}$ | $3,351,412.74 | | 0% Other Assets |

513. The *Bank Sweep Activity* section has been drastically altered. Note how only the *Withdrawal* and *Deposit* data fields are reported by Pitlor's February Brokerage Statement, while the sample statement also includes a column titled: ***Balance*** (bold added for emphasis).

Excerpt from Pitlor's February Brokerage Statement – Page 3:

175

514.         As shown by the following excerpt, Pitlor's February Statement includes[63] the section *"Bank Sweep Activity"*, but no transactions are reported, and both the *Opening Balance* and *Ending Balance* are stated to be zero.

### Bank Sweep Activity - Excerpt from Pitlor's *February Statement* (Page 3 of 4)

**Bank Sweep Activity**

| | | | | Opening Balance$^{x,z}$: 0.00 |
|---|---|---|---|---|
| Trans Date | Transaction | Description | Withdrawal | Deposit |
| | | Total Activity | 0.00 | 0.00 |
| | | | | Ending Balance$^{x,z}$: 0.00 |

*Bank Sweep: Interest rate as of 02/28/18 was 0.12%.* $^z$

515.         In the above excerpt, only the *Withdrawal* and *Deposit* fields are shown, but according to the Schwab Sample Statement, a third column titled **Balance** is supposed to exist, as shown by the excerpt below (red arrow). Pitlor's February Statement was altered to specifically omit the "Balance" data field by issuing the report in "Portrait" rather than the "Landscape" format[64]. These misrepresentations were critical to the concealment of the $9,999,999.00 deposit to *Cash on Hold*.

### Bank Sweep Activity - Excerpt from *Schwab Sample Statement* (Page 19 of 21)

**Bank Sweep Activity**

| Transaction Date | Transaction | Description | Withdrawal | Deposit | Balance$^{x,z}$ |
|---|---|---|---|---|---|
| Opening Balance$^{x,z}$ | | | | | 0.00 |
| 06/10/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE$^{x,z}$ | | 20,132.68 | 20,132.68 |
| 06/17/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE$^{x}$ | | 192.89 | 20,325.57 |
| 06/17/18 | Interest Paid$^{x,z}$ | BANK INTEREST | | 278.23 | 20,603.80 |
| 06/17/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE$^{x}$ | | 356.25 | 20,960.05 |
| 06/17/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 863.54 | | 20,096.51 |
| 06/17/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 70.15 | | 20,026.36 |
| 06/28/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 26.36 | | 20,000.00 |
| **Total Activity** | | | 960.05 | 20,960.05 | |
| Ending Balance$^{x,z}$ | | | | | 20,000.00 |

Deposit Accounts: Interest rate as of 06/28/18 was 0.01%. Your interest period was 05/15/18–06/17/18.$^z$
Interest Adjust. on 06/17/18 included the amount of $0.05 credited as of 05/27/18 to ensure accurate interest accrual.

---

[63] According to Schwab's stated policies, the Monthly Brokerage Statements only report "qualifying activity." For example, because no "Fixed Income" investments occurred, none of Pitlor's statements include any sections or subsections with the header "Fixed Income." Compare to Schwab's Sample Brokerage Statement.

[64] The Schwab Sample Statement, as well as Pitlor's March and April Statements, are presented in "Landscape" format.

**D.**    **Pitlor's association with account ####5612 is not properly documented by the header data.**

### Excerpt from header of *Schwab's Sample Statement*



Schwab One® Account of
**DANA JONES TTEE**
**JONES CHARITABLE TRUST**
U/A DTD 08/22/1973 FBO R JONES

Account Number
**1111-9999**

Statement Period
**JUNE 1-30, 2018**

516.    On each page of a Schwab's Brokerage Statement, the header identifies the account as "Schwab One Account of" followed by the name of the account holder on the following line. The account number is then stated separately as a separate header entry.

517.    By contrast, the header of the February Brokerage Statement fails to mention Pitlor's name at all. The format has been altered with respect to all information contained in the header, as shown by the following excerpt:

### Excerpt from header of Pitlor's February Brokerage Statement



**Schwab One® Account**
**Account Number: 2043-5612**

**Statement Period: February 21, 2018 to February 28, 2018**
**Page 1 of 4**

**E.**    **The subtle omission of *"Transfers"* section from the March Statement is cleverly concealed.**

518.    The March Statement contains a subtle, but very substantial discrepancies. The ***Transfers*** section is omitted, and the statement has been altered to conceal its absence.

519.    Pitlor's March Statement includes a section titled "*Transaction Detail – Total*". No data is reported, and it is immediately followed by the data field *Total Transaction Detail*[65].

---

[65] Please refer to the page 33 of the March Statement which more adequately depicts the nature of this "orphan data", reported at the top of a page, clearly segregated from the other *Transaction Detail* data reported.

**Excerpt from Pitlor's March Statement – Page 33**



| Schwab One® Accountof | Account Number | Statement Period |
|---|---|---|
| DAVID PITLOR | 2043-5612 | March 1-31, 2018 |

**Transaction Detail - Total**

| Total Transaction Detail | (26,536.17) |
|---|---|

520.         While the data field *Total Transaction Detail* is proper, the section "*Transaction Detail – Total*" is a fabrication. Neither Schwab's Sample Account Statement nor the Statement Guide include that section. As shown by the following excerpt from Schwab's Sample Account Statement, the *Total Transaction Detail* data field immediately follows the section titled "*Transaction Detail – Transfers*".

**Excerpt from *Schwab Sample Statement* – Page 18**

**Transaction Detail — Transfers**

| Settle Date | Trade Date | Transaction | Description | Quantity | Unit Price | Total Amount |
|---|---|---|---|---|---|---|
| 06/28/18 | 06/28/18 | Account Transfer | HOTEL CORP | 100.0000 | 32.0000 | 3,200.00 |
| Total Transfers | | | | | | 3,200.00 |
| | | | Total Transaction Detail | | | 10,036.70 |

521.         Schwab's subtle omission critically excludes from the report the data pertaining to "Transaction Detail – *Transfers*". Clearly, at least one transfer occurred, on 3/6/2018, and Schwab exhausted significant effort to conceal it. Reporting that transfer obviously would have would have scuttled the façade of legitimacy they built into the fraudulent account statement, as well as Schwab's repeated insistence that no $9,999,999.00 deposit occurred and further that no errors occurred.

**F.   Anomalous, non-sensical notes indicate further misrepresentation and concealment pertaining to the March and April Statements.**

522.         An odd message identified as an "Important update" states on page 3 of both the March and April Statements:

178

*"Your Gain/Loss is now on the following page for quicker reference."*

*"Thank you for the opportunity to serve you."*

523.         But according to the Schwab Sample Statement, the *"Gain or (Loss) Summary"* is a naturally included on that *"following page"*, page No. 4.  Considering the scope of the other misrepresentations, specifically the omission of account data, this oddity cannot be set aside as an irrelevant or benign discrepancy.

524.         The non-sensical nature of that "Important Update" indicates deception, presumably relating to data alterations that occurred with respect to the Gain/Loss data.   Indeed, the dates of *Short Sales* were systematically misrepresented, and other errors and inconsistencies exist pertaining to the *Realized Gain (or Loss)*.

### Excerpt from *March Statement* – Page 3



**2043-5612**          **March 1-31, 2018**

## Account Value as of 03/31/2018: $ 23,149.83

alue

**For Your Information**

Important update:

- Your Gain/Loss is now on the following page for quicker reference.

- Thank you for the opportunity to serve you.

7  12/17   3/18

### Predicate Count #12: (6 Counts #12A - #12F)

**18 U.S.C. § 1343.** *Fraud by Wire*

**[Or alternatively, 18 U.S.C. § 1341,** *Frauds and Swindles* **(Mail Fraud)]**

179

**Defendant Charles Schwab**

525.        **Discrepancies concerning key figures reported by the Brokerage Statements confirm the official record to be an expertly crafted fabrication.**

526.        The Brokerage Statements strategically conceal the theft that occurred by depicting an alternate version of account activity that contains subtle inconsistencies and inaccuracies.  Scrutiny of the records confirms that data was altered and strategically misreported.

527.        The six unique values were instrumental in concealing the larceny, and thereby each constitutes a separate count of wire fraud (or alternatively, mail fraud) in violation of 18 U.S.C. § 1343 (or, alternatively, 18 U.S.C. § 1341).

| Brokerage Report Discrepancies[66] | Short Sales Total Proceeds | Transactions Total Purchases | Gain/Loss Cost Basis Discrepancy | Investments Sold[67] |
|---|---|---|---|---|
| March | $52,425.82 | $3092.84 | ($45,236.01) | $5795.11 |
| April | $21,751.53 | - | $16,870.41 | ($5795.11) |

## Count #12-A

(1)        The <u>March Statement</u> understates the *Realized Cost Basis* by $45,236.01, causing Realized Gains to appear overstated, which thereby seems to corroborate the fraudulent, erroneous version of account activity reported.

---

[66] Negative values indicate an "understatement" or "omission."  Positive values pertain to overstated values or, in the case of *Short Sales,* the total amount affected by the errant record keeping.

[67] The discrepancy pertaining to $5795.11 in the <u>March Statement</u> was retroactively manifested due to the inaccurate *Realized Gain or (Loss)* data reported by the <u>April Statement,</u> and thus is considered a single count.

528.    Six Options positions with cumulative *Cost Basis* of $45,236.01 remained stated as assets held in the account worth $1886.00 despite their having expired worthless on 3/29/2018,

529.    The expired positions contribute $1886.00 of non-existent value to *Total Account Value*, precisely corresponding to the value concealed via manipulation of live account balances on Friday, 3/30/2018.

530.    The *Realized Gain **appears*** to therefore be overstated by the same amount $45,236.01, ***appearing*** to coincide with identically overstated *Unrealized Loss.* However, this does not reconcile the erroneous record, and the error is not rectified in the April Statement.

531.    In fact, $45,236.01 corresponds to unreported proceeds and other cash value (from the initial deposit of $28,000) that has been eliminated from the record via various misrepresentations and omissions, accounted for as follows:

| The $45,236.01 *Realized Gain/Loss* and *Cost Basis Discrepancy* disguises missing cash value | |
|---|---|
| $2,481.61 | Value converted on 3/23 - Cumulative total of funds concealed via varius contrivances from 2/27/2018 through 3/23/2018 |
| $32,879.36 | Unreported *Proceeds* of *Short Sale* totaling $16,439.68 erroneously reported as positive *Cost Basis*. ($16,439.68 x 2) |
| ($406.50) | Unreported Closing Costs (*Cost Basis*) of misrepresented *Short Sale* transactions that generated *Proceeds* totaling $16,439.68 |
| $10,982.00 | 3/28/2018 Funds Due corresponding to negative cash balance that resulted from approx $80k converted over previous three days |
| ($104.85) | Discrepancy between live vs. historical *Account Value* on 3/21, edited into record in April (not accounted for by March Statement) |
| ($600.00) | Discrepancy between sum of individual assets' value and stated total for 3/23, edited into record in April (not in March Statement) |
| $4.45 | Cash Discrepancy on 3/27 equal to separate discrepancies $3.51 + $.94 = $4.45 |
| ($0.06) | Discrepancy on 3/28 between *Settled Funds* and *Cash and Cash Investments* on 3/28 |
| $45,236.01 | TOTAL |

## Count #12-B

B.    In the April Statement, the *Cost Basis* is overstated by $16,870.41.

532.    The April Statement reports a total *Cost Basis*, $91,865.17, that simply does not correspond to the sum of the individual transactions' *Cost Basis*, $74,994.76, and is thereby overstated by $16,870.41.

**EQ-12.1: $16,870.41 = $91,865.17 (–) $74,994.76**

## Count #12-C

C.    The March Statement overstates the total of *Investments Purchased* by $3092.84.

181

533.     The sum of realized and unrealized *Cost Basis* ($219,363.24 and $87,928.33, respectively) equals $307,291.57. while the total value *Investments Purchased* is stated to be $310,384.41.

**EQ-12.2: $3092.84 = $310,384.41 (–) $307,291.57**

## Count #12-D

**D.     The <u>March Statement</u> reports inaccurate dates for all *Short Sales,* and proceeds totaling $52,425.83 are thus improperly documented according to the *Realized Gain or (Loss)* accounting.**

534.     The inaccurately reported dates for *Short Sales,* resulted in late-recognition of all *Short Sale* proceeds according to the *Realized Gain or (Loss)* accounting. In March, the total value of those proceeds was $52,425.83.

## Count #12-E

**E.     The <u>April Statement</u> also reports inaccurate dates for all *Short Sales,* thereby improperly accounting for proceeds totaling $21,751.53.**

535.     The inaccurately reported dates for *Short Sales,* resulted in late-recognition of all *Short Sale* proceeds according to the *Realized Gain or (Loss)* accounting. In April, the total value of those proceeds was $21,751.53.

536.     The total proceeds of all *Short Sales* totaled $74,177.36. The total converted via Mutual Fund Buying Power, $82,864.25, plus the total fees $224.80, is precisely derived by the following calculation.

**EQ-12.3: Derivation of $83,089.05**

**$83,089.05 = $74,177.36 + 3,433.57 + $2,702.27 + $3092.84 + $54.28 + $29.54 + $4.45 + $2.29 + $.03 .**

**(-) [$406.50 + $1 + $.06 + $.02]**

# Count #12-F

F.  **Inaccurately dated *Short Sales* concealed proceeds, $5795.11 caused the transactional accounting to be misrepresented by both the <u>March Statement</u> and the <u>April Statement.</u>**

## I.    <u>Short Sales, Realized Gain or (Loss), and Cash Accounting</u>

537.    The fraudulent accounting of the <u>Monthly Brokerage Statements</u> specifically targeted proceeds generated by *Short Sales,* so to conceal the theft from the official record.  The following derivation is crucial in demonstrating a key element of the scheme.

538.    Erroneous transaction dates documented by the *Realized Gain or (Loss)* accounting ledger manufactured a window of time during which funds were unaccounted for and were thus vulnerable to being segregated and concealed.

539.    This example pertains to $5795.11, proceeds generated by a *Short Sale* on 3/23/2018 but documented by the *Realized Gain or (Loss)* accounting to have instead been generated in April.  The erroneous dates span two monthly reporting periods, which uniquely crystalized the discrepancy's impact on the Cash Accounting within the official record.  Nevertheless, inaccurately reporting *Short Sales* by just a single day renders proceeds to be susceptible to exploitation all the same, even if just for a single day in the official record's *Realized Gain or (Loss)* accounting, so long as the cash accounting is concealed during that time span (or, alternatively, by altering the historical data accordingly to correspond to that window).

## II.    <u>Inaccurate, inconsistent accounting of *Short Sale* proceeds</u>

540.    A *Short Sale* position opened on 3/23/2018 and closed in April generated proceeds of $5795.11 on 3/23/2018.  The position was subsequently closed with *Cover Short* purchases on 4/2/2018 & 4/3/2018.

541.    Since the position was opened in March, the proceeds of the *Short Sale,* $5795.11, were appropriately included in the *Investments Sold* as reported by the March Statement.  Moreover, because the position remained as an active investment at the end of March, there was no closing transaction, and thus no *Realized Gain or (Loss)* to report corresponding to

that position. $5795.11 was appropriately excluded from the "Total Proceeds" reported by the *Realized Gain or (Loss)* accounting.

**ash Transactions Summary**

| | This Period | Year to Date |
|---|---|---|
| vestments Sold | 346,432.94 | 346,432.94 |

Excerpt from March Statement Page 5
Excerpt from March Statement Page 14

**Realized Gain or (Loss)** (continued)

| Short Term (continued) | Quantity/Par | Acquired/ Opened | Sold/ Closed | Total Proceeds | Cost Basis | Realized Gain or (Loss) |
|---|---|---|---|---|---|---|
| Total Realized Gain or (Loss) | | | | 340,637.83 | 219,363.24 | 123,976.86 |

542.     The *Transaction Detail* section accurately documents both the sale and purchases. Note the *Trade Date*, 3/23/2018, which- as presented later on the following page, is inaccurately dated by the April Statement's *Realized Gain or (Loss)* section.

**Transaction Detail - Purchases & Sales** (continued)

Options Activity (continued)

| Settle Date | Trade Date | Transaction | Description | Quantity | Unit Price | Total Amount |
|---|---|---|---|---|---|---|
| 03/26/18 | 03/23/18 | Short Sale | CALL SPDR GOLD TR $131.5  EXP 04/27/18: GLD 04/27/2018 131.50 C | (75.0000) | 0.7800 | 5,795.11 |

Excerpt from March Statement Page 26

**Transaction Detail - Purchases & Sales** (continued)

Options Activity (continued)

| Settle Date | Trade Date | Transaction | Description | Quantity | Unit Price | Total Amount |
|---|---|---|---|---|---|---|
| 04/04/18 | 04/03/18 | Cover Short | CALL SPDR GOLD TR $131.5   EXP 04/27/18  GLD 04/27/2018 131.50 C | 10 0000 | 0.2800 | (288.49) |
| 04/04/18 | 04/03/18 | Cover Short | CALL SPDR GOLD TR $131.5   EXP 04/27/18  GLD 04/27/2018 131.50 C | 5.0000 | 0.2800 | (144 25) |
| 04/04/18 | 04/03/18 | Cover Short | CALL SPDR GOLD TR $131.5   EXP 04/27/18  GLD 04/27/2018 131 50 C | 11 0000 | 0.2800 | (317.34) |
| 04/04/18 | 04/03/18 | Cover Short | CALL SPDR GOLD TR $131 5   EXP 04/27/18  GLD | 1.0000 | 0.2800 | (28.83) |
| 04/03/18 | 04/02/18 | Cover Short | CALL SPDR GOLD TR $131 5   EXP 04/27/18: GLD 04/27/2018 131 50 C | 48 0000 | 0.3600 | (1,764 91) |

Excerpts from April Statement Pages 13 & 11

184

543.  Appropriately, the position is documented as an open investment position by the <u>March Statement.</u>  The *Cost Basis* is negative, as is proper for *Short Sales.*

## Investment Detail - Options (continued)

| | Quantity | Market Price | Market Value | % of Account Assets | Unrealized Gain or (Loss) |
|---|---|---|---|---|---|
| Options (continued) | | | Cost Basis | | |
| CALL SPDR GOLD TR | 75.0000 [s] | 0.23000 | (1,725.00) | | 4,070.11 |
| $131.5 EXP 04/27/18 | | | (5,795.11) | | |
| SYMBOL: GLD 04/27/2018 131.50 C | | | | | |

<u>Excerpt from March Statement page 7</u>

544.  However, the *Realized Gain or (Loss)* of the <u>April Statement</u> inaccurately reports the *Short Sales* transactions as day trade transactions[68], clearly erroneous in the following manner:

  a. the "Acquired/Opened" dates report the positions as having been opened in April, and

  b. the "Closed/Sold" dates are inaccurately reported as their settlement dates- one day after the actual "Trade Date" of those closing transactions.

## Realized Gain or (Loss)

| Short Term | Quantity/Par | Acquired/ Opened | Sold/ Closed | Total Proceeds | Cost Basis | Realized Gain or (Loss) |
|---|---|---|---|---|---|---|
| CALL SPDR GOLD TR  - $131.5  EXP 04/27/18: GLD 04/27/2018 131.50 C | 48.0000 [s] | 04/03/18 | 04/03/18 | 3,708.87 | 1,764.91 | 1,943.96 |
| CALL SPDR GOLD TR  $131.5  EXP 04/27/18: GLD 04/27/2018 131.50 C | 1.0000 [s] | 04/04/18 | 04/04/18 | 77.27 | 28.83 | 48.44 |
| CALL SPDR GOLD TR  $131.5  EXP 04/27/18: GLD 04/27/2018 131.50 C | 5.0000 [s] | 04/04/18 | 04/04/18 | 386.34 | 144.25 | 242.09 |
| CALL SPDR GOLD TR  $131.5  EXP 04/27/18: GLD 04/27/2018 131.50 C | 10.0000 [s] | 04/04/18 | 04/04/18 | 772.68 | 288.49 | 484.19 |
| CALL SPDR GOLD TR  $131.5  EXP 04/27/18: GLD 04/27/2018 131.50 C | 11.0000 [s] | 04/04/18 | 04/04/18 | 849.95 | 317.34 | 532.61 |

185

545.    The errors appear in the *Realized Gain or (Loss),* but also causes a discrepancy with respect to the cash accounting between the April Statement and March Statement, and thereby the veracity of the official record is impeached.

### III.    April Statement

546.    According to the erroneous *Realized Gain or (Loss)* transaction dates, the proceeds of that *Short Sale*, $5795.11, were generated in April. Had this been accurate, then the *Investments Sold* (cash accounting) should have recognized those proceeds in the April Statement.

547.    The result is that the *Investments Sold* is understated by $5795.11 with respect to the *Transaction Details'* cash accounting (which do not contain any entry for the *Short Sale* in the *Transaction Details* because it occurred in March and had been appropriately documented as such).

548.    Note the *Total Proceeds* $47,718.11 in the excerpt below, compared to *Investments Sold* $41,923.00 in the following excerpt[69].

**Realized Gain or (Loss)** (continued)

| Short Term (continued) | | Quantity/Par | Acquired/ Opened | Sold/ Closed | Total Proceeds | Cost Basis | Realized Gain or (Loss) |
|---|---|---|---|---|---|---|---|
| CALL DIREXION SHARES E T$17 04/20/18: JNUG 04/20/2018 17.00 C | EXP | 37.0000 | 04/16/18 | 04/20/18 | 0.00 | 372.48 | (372.48) |
| **Total Short Term** | | | | | 47,718.11 | 91,865.17 | (44,147.06) |
| **Total Realized Gain or (Loss)** | | | | | 47,718.11 | 91,865.17 | (44,147.06) |

Schwab has provided accurate realized gain and loss information wherever possible for most investments. Cost basis data may be incomplete or unavailable for some of your holdings. If all data for a given investment is not available, the investment will not be listed here
Option Customers: Realized gain/loss of underlying securities is adjusted to reflect the premiums of assigned or exercised options. Please consult IRS publication 550, Investment Income and Expenses, for additional information on Options.

Excerpt from April Statement Page 9

**Cash Transactions Summary**

| | This Period | Year to Date |
|---|---|---|
| Starting Cash* | $ 1,463.83 | $ 0.00 |
| Deposits and other Cash Credits | 0.00 | 105,935.41 |
| Investments Sold | 41,923.00 | 388,355.94 |

Excerpt From April Statement Page 5

---

[69] Technically, neither of these figures are erroneous with respect to the *Transaction Details,* but the figures are incompatible with the erroneously dated transactions as reported by the *Realized Gain or (Loss)* accounting.

186

549.           While neither of those dollar amounts are technically inaccurate, the inaccurate transaction dates cause the record to be in error.  According to those erroneous "Acquired/Open" dates (as presented by the excerpt on the previous page), the total "Investments Sold" reported by the *Cash Transactions Summary* should have included that $5,795.11 and reported a total $47,718.11.

## IV.   March Statement

550.   .           The erroneously dated transaction reported by the *Realized Gain or (Loss)* accounting causes irreconcilable discrepancies between the March Statement and April Statement.

   a. the *Realized Gain or (Loss)* accounting reports those proceeds as having been generated in April instead of March, *but*

   b. the March Statements' reports $5795.11 of income from *Investments Sold* that, according to the erroneous Realized Gain or (Loss) accounting of the April Statement, were not recognized in March, *but*

   c. neither were those proceeds generated by *Investments Sold* in April, according to the cash accounting of the April Statement.

551.   .           $5795.11 corresponds to other discrepancies[70] in the March Statement in such a precise manner that conclusively confirms Schwab's having designed and implemented the erroneous accounting specifically for the purposes of concealment, as presented by Count #12-G,

## Count #12-G

G.       The *Disallowed Wash Sale Losses*, $2702.27, all of which are illegitimate and improperly accounted for by the transaction records, are concealed within other discrepancies previously identified, $5795.11 & $3092.84.

---

[70] There is another uncanny relationship between the discrepant values.

$$\$5795.11 = \$16870.41 + \$16870.41 - \$28000 + \$54.28$$

187

552.        In the <u>March Statement</u>, the total of *Investments Purchased* is overstated by **$3092.84 (per Count #12-C).** The difference between $3092.84, and the $5795.11 evaluated in **Count #12-F,** is precisely equal to the *Disallowed Wash Sale Losses.*

$$\text{EQ-12.4: } \$2702.27 = \$5795.11 \text{ (-) } \$3092.84$$

553.        The total *Disallowed Wash Sale Losses,* **$2702.27,** are illegitimate, evidenced by the following[71]:

    a. The transaction data confirms the *Disallowed Wash Sale Losses* to be invalid.

        a. The $494.54 corresponding to JNUG transactions in February are clearly bogus because no repurchase of those shares occurred. No wash sale = No possibility of Disallowed Wash Sale Loss.

        b. The other claimed *Disallowed Wash Sale Losses* correspond to day trades that, while technically may constitute wash sales, the losses are not evident. The only plausible scenario whereby these *Disallowed Wash Sale Losses* could have been valid is if they corresponded to transactions missing from the record.

    b. No cost basis adjustments corresponded to the supposed *Disallowed Wash Sale Losses.*

        a. The <u>Schwab Transaction Data Spreadsheet</u>, downloaded from Schwab's electronic services on 4/11/2018, clearly evidences that the *Disallowed Wash Sale Losses* are accounted for in the transactional accounting without any corresponding adjustment to the *Cost Basis.*

        b. By failing to adjust the *Cost Basis,* the reported *Disallowed Wash Sale Losses* are rendered to be "illegitimately disallowed losses".

---

[71] See also: the Disallowed Wash Sale Losses are assessed in further detail along with $494.54 in the Attachment: KEY VALUES.

# Predicate Count #13

## 18 U.S.C. § 1343. *Fraud by Wire* (3 Counts)

## Defendant Charles Schwab

A.         **Damages were concealed in the live data by understating losses.**

554.              The official record is based upon altered historical account values that exclude the Futures Account from the *Total Account Value / Personal Value* of Pitlor's Schwab One Account. In the live data, however, the values concealed were excluded from the daily Gain/Loss figures; the understated losses directly corresponds to the total converted via *Mutual Funds Buying Power.*

555.              The table below states the understated losses the week of 3/26/2018, plus the Margin Calls and other small adjustments which together precisely account for the funds converted via Mutual Funds purchases.

| Illegitimate, Unreported "Disallowed Losses" | Amount | Corresponds to: |
|---|---|---|
| *Day Change* - 3/26/2018 | $23,143.13 | 3/26 - *Sweep from Futures* $23,355.97 |
| *Day Change* - 3/28/2018 | $43,408.18 | 3/28 - *Sweep from Futures* $42,080.00 |
| *Day Change* - 3/29/2018 | $12,868.28 | 3/29 - *Sweep from Futures* $12,499.41 |
| SUBTOTAL 1 | $79,419.59 | Sum of Day Change Discrepancies |
| *Margin Calls* | $3,439.57 | $23 – 3/21/2018 $3,404.57 – 3/27/2018 (Futures), $12 – 4/03/2018 |
| 3/27 – Cash Discrepancy | $4.45 | Discrepancy in end-of-Day Negative Cash Balance $90,733.43 vs. $90,737.88 |
| 3-28 – Cash Balance | .64 | Stray Cash Balance |
| **TOTAL** | **$82864.25** | Mutual Funds Buying Power |

Note: 3/23 and 3/27 are the days that the *Sweeps to Futures* transactions occurred. Including those figures in the above calculation results in double-counted damages. Essentially, the funds were concealed as they were initially segregated, and

misrepresented again by offsetting data inconsistencies and errors to conceal their removal.

556.                  The total conversion fees, $224.80 (4 x 49.95 – Mutual Fund Purchases, 1 x $25 – *Cash on Hold* – 3/6/2018) are not accounted for by the figures presented in the table but were instead concealed by unique damages totaling $309 that occurred on 4/13/2018, which also accounts for the *Balances Subject to Interest*[72] from March.

$$\text{EQ-13.1: } \$309 \sim=\sim \$308.62 = \$224.80 + \$54.28 + \$29.54$$

## B.    Derivations of the understated loss values.

557.                  On 3/26/2018, Brokerage Account was restricted due a "Pattern Day Trader" restriction under the color of **12 CFR § 220.** No securities purchases or sales occurred.

558.                  The loss in the account is calculated by comparing the net value of Investments between the end of day values stated for Friday, 3/23 and Monday, 3/26:

| Account Balances Comparison 3/23/2018 – 3/26/2018 | Friday 3/23/2018 | Monday, 3/26/2018 | Change in Value |
|---|---|---|---|
| Options Investments | $66,366.50 | $46,485.50 | ($19,981.00) |
| Cash and Cash Investments | $51,760.07 | $51,752.91 | ($7.16) |
| Total Account Value | $118,126.57 | $98,238.41 | ($19,888.16) |

559.                  Historical Balances and live data both show a profit, erroneously reporting a *Day Change* of $3,254.97.

| Day Change Discrepancy 3/23/2018 – 3/26/2018 | Amount |
|---|---|
| 3/26 - *Day Change* (Reported) | $3,254.97 |
| Change in Total Account Value (Actual) | ($19,888.16) |
| Illegitimate "Disallowed Loss" | $23,141.13 |

---

[72] The $11.61 *Balance Subject to Interest* on 4/13/2018 correlates to and was accounted for by the Margin Call for $12 that occurred on 4/13/2018.

560.      The following is an excerpt from the 3/26/2018 - Historical Balance Data:



561.      The live data reports the day change of $3,254.97, but as the following screenshots demonstrate, the data is clearly inconsistent and contains numerous additional discrepancies that evidence the decoupling of the gain/loss from the account value due to the erroneous calculation of *Futures Account Value* with respect to *Total Account Value*.



562.      Note the discrepant Brokerage Account values amongst the screenshots (red arrows). No brokerage account transactions occurred during those times; all positions in the

Brokerage account were options positions that did not change value during the timespan documented. The reported value should be constant.

563. The Schwab Mobile app balances (center and right) are marked with an asterisk. The note says: "*This account does not contribute to the Personal Value Chart.*" Pitlor's Personal Value stated to be $0.00 is interpreted as Pitlor having had no ownership interest the accounts for which data is displayed (blue arrow – right screenshot). Also, notice how there is no value reported for the Futures Account (center and right).

**C.   Repeating the same analysis for the other days yields the results as shown by the table below. Screenshots of the raw data are presented on the**

| Day Change Discrepancy 3/27/2018 – 3/28/2018 | 3/26/2018 | 3/27/2018 | 3/28/2018 | | 3/29/2018 |
|---|---|---|---|---|---|
| End of Day Value (Live Data) | $98,238.41 | 94,327.12 | $46,797.20 | | $21,381.83 |
| *Day Change* | $3254.97 | ($59,814.43) | ($4,121.74) | | ($12,547.09) |
| Implied Starting value | 94983.44 | $154,141.55 | $50,918.94 | | $33,928.92 |
| Actual Starting Value | 118,126.57 | $98,238.41 | 94327.12 | | $46,797.20 |
| Change in Total Account Value (Actual) | ($19,888.16) | ($3907.29) | ($47,529.92) | | ($25,415.37) |
| Discrepancy in Total Change of Value (Actual – Stated Day Change) | ($23,143.13) | $55903.14 | $43,408.18 | | $12,868.28 |
| **Illegitimate "Disallowed Loss"** | **$23,143.13** | **N/A\*** | **$43,408.18** | | **$12,868.28** |

**following pages.**

*The value $55,903.14 is in fact equal to the difference in account value between the live and historical data on 3/27.

| 3/27 @ 20:53 | 3/30 @ 03:28 | 3/28 @ 17:29 |
|---|---|---|
| Schwab Mobile App | Schwab Mobile App | Schwab Mobile App |

  

## Predicate #14

### 18 U.S.C. § 1344. *Bank Fraud* (2 Counts)

### [Or alternatively, 18 U.S.C. § 1343, *Fraud by Wire*]

### Defendants: TD Ameritrade and Charles Schwab
### Generally

564.     The Defendants' scheme relied upon to illegitimate debt balances to conceal funds laundered from sweeps transactions from both the Futures Account and *Bank Sweep Feature*.

565.     The funds targeted were held in the FDIC insured deposit accounts that comprise the *Bank Sweep Feature* of Pitlor's Schwab Account. In fact, misrepresentations and deception pertaining to the *Bank Sweep Feature* was a key element throughout the pattern of exploitation.

566.     The Defendants' enterprise engaged in wire fraud, money laundering, identity theft, and utilized unauthorized access to gain access to, take illegitimate control over, and to conceal the illegitimate, clandestine conversion of cash value.

## Count #14-A

(1)      **$51,753.55, the balance of the Bank Sweep Feature reported to have swept to Brokerage Account ####5612 on 3/28/2018, was specifically targeted to be concealed and converted.**

567.      The following analysis demonstrates the mechanics of the contrivances that were also utilized to launder the $9,999,999.00 that was revealed to have been deposited into Pitlor's account on 2/28/2018, as described by Count-B.

568.      .      On 3/27, The *Bank Sweep Feature* balance was **$51,752.91**, equal to $51,698.63 plus **$54.28** *Cash on Hold.*

**EQ-14.1: $51,752.91 = $51,698.63 + $54.28**

569.      On 3/28, The total transferred from the *Bank Sweep Feature* to the Brokerage Account was $51,753.55, equal to $51,752.91 plus a $.64 Interest Credited to the balance.

**EQ-14.2: $51,753.55 = $51,752.91 + $.64**

570.      On 3/28, A total of $93,833.58 is documented by <u>March Statement</u> to have been credited to the Cash Balance of the Brokerage Account on 3/28/2018, comprised of two sweeps transfers, $42,080.03 from the Futures Account and $51,753.55 from the Bank Sweep Feature:

**EQ-14.3: $93,833.58 = $51,753.55 + $42,080.03**

571.      Pitlor was restricted from using borrowed funds (Margin Loans) to finance investment purchases. On 3/27/2018, the investment purchases totaled $39,039.25.  The *Trade Date Balance* to begin the day 3/28/2018 should have been no less than $54,794.33.

**EQ-14.4: $54,794.33 = $93,833.58 (–) $39,039.25.**

572.      However, the *Trade Date Balance* was instead stated to be just $3095.06 on 3/28, thus funds are missing totaling $51,699.27, the precise value supposed to have swept from the *Bank Sweep Feature*, less $54.28, the *MTD Interest Owed*, which was already earmarked to be collected by Schwab.

**EQ-14.5: \$51,699.27 = \$54,794.33 (–) \$3095.06 = \$51,753.55 - \$54.28**

Excerpt from 3/28 Screenshot @ 09:43
Schwab Mobile App

| | |
|---|---|
| Account Value | \$62,923.63 |
| Day Change | +\$10,883.53 (28.33%) |
| | |
| Margin Details | |
| | |
| Margin Equity | \$3,095.06 |
| Equity Percent | 100.00% |
| Trade Date Balance | \$3,095.06 |
| Balance Subject to Interest | \$0.00 |
| MTD Interest Owed | \$54.28 |

573.     The Defendants scheme was expertly crafted such that the previous calculation cannot be proven with certainty with the historical data alone.  The 3/28 *Trade Date Balance*, \$3095.06, is critical to the analysis, but is not documented by the official record or historical balance data.

3/27 - Screenshot @ 20:53
Schwab Mobile App



| Account Value | Day Change | Cash & Cash Investments | Market Value |
|---|---|---|---|
| $38,419.53 | -$59,818.88 | -$38,984.97 | $77,404.50 |

**Balance Details**

— Cash & Cash Investments

| | |
|---|---|
| Bank Sweep Feature - Rates | $51,752.91 |
| Cash Balance | -$90,737.88 |
| Cash & Cash Investments Total | -$38,984.97 |

— Funds Available

— To Trade

| | |
|---|---|
| Cash & Cash Investments | $0.00 |
| Settled Funds | $0.00 |
| Cash + Borrowing | $0.00 |

Excerpt from 3/27 – Historical Balances

574.    The following analysis conclusively invalidates[73] the negative cash balance and Margin debt ($90,733.43) as documented by both the live and historical data (from previous page).

575.    The *Investment Purchased* and sweep transactions' data presented in the table below is directly sourced from the March Statement.  The *Cash Balances,* as well as the *Cash and Cash Investments Total*, are the values reported by the historical balances data for 3/26 and 3/27.

| 3/27-3/29: CASH TRANSACTIONS | 26-Mar | 27-Mar |
|---|---|---|
| Investments Purchased | $0.00 | ($39,039.25) |
| Investment Proceeds | $0.00 | $0.00 |
| Sweep From Futures (IN) | $23,355.97 | $0.00 |
| Sweep To Futures (Out) | $0.00 | ($51,698.63) |
| Bank Sweep Transfer (OUT) | $14.180.64 | $23,355.97 |
| Bank Sweep Feature Balance | $28,396.94 | $51,752.91 |

---

[73] The 3/27 end-of-day screenshots resoundingly impeaches the historical data upon which the official record is based.  Compare the live *Account Value* as displayed by the excerpt below, $94,327.12, to the historical data on the following page, which reports a total account value $38,419.53.

| | | |
|---|---|---|
| Cash Balance (Brokerage Account) | $23,355.97 | ($90,737.88) |
| Futures Account Value | n/a[74] | $55,903.14 |
| Cash Balance and Cash Investments Total | $51,752.91 | ($38,984.94) |

576.      .              The negative *Cash Balance*, ($90,737.88), and the negative *Cash and Cash Investments Total*, is incalculable **unless the following deviations** from Schwab's established accounting procedures **are accepted to be legitimate**:

a. The *Bank Sweep Transfer Out* on 3/27 was assessed as a Margin Debt against the account, and

b. The *Bank Sweep Feature Balance* from 3/26/2018, $28,396.94, is regarded as a debt, consistent with the conclusions that the previous transfers to the *Bank Sweep Feature* were also assessed a debt balance to the brokerage account

c. The value of the Futures Account does not contribute to *Cash and Cash Investments Total.*

**EQ-14.6: ($90,737.88) = ($23,355.97) + ($28,396.94) + ($51,698.63) + ($39,039.25) + $51,752.91**

- ($23,355.97):     Bank Sweep Transfer Out (3/27)
- ($28,396.94):     Bank Sweep Feature Balance (3/26)
- ($51,698.63):     Sweep To Futures (3/27)
- ($39,039.25):     Investment Purchases
- $51,752.91:     Bank Sweep Feature Balance (3/27)

**$90,737.88:   Negative Cash Balance (3/27)**

577.              Even taking into account the aforementioned exceptions, and regardless of Pitlor's "interpretation of information viewed online"[75] with respect to the account data or Schwab's accounting practices, the calculation is mathematically illogical and must be rejected as invalid because it requires:

---

[74] The Futures Account began the day on 3/26/2018 with $0.00. While futures trades occurred, no gains or losses were realized. The positions opened on 3/26 were closed on 3/27. Also, Schwab's erroneous accounting made it such that the Futures Account value was not included in the Cash and Cash Investments Total, and thus $51,752.91, and since no funds had yet swept to the Futures Account, the value of the unrealized gains or losses on 3/26 are irrelevant with respect to this analysis, which calculates the accurate account value for 3/27. The Futures positions on 3/26/2018, however, are analyzed with respect to discrepancies pertaining to the Futures Sweep *infra.*

[75] In response to Pitlor's complaint to FINRA which specifically identified $90,737.88 to be a clearly erroneous value, Schwab's response was that Pitlor had "misinterpreted information viewed online".

- the Bank Sweep Feature balance from 3/26, $28,396.94 to be accounted for as a negative value, ($28,396.94) so to contribute to the *Margin Debt* balance.
- the transfer to *Bank Sweep Feature* on 3/27, $23,355.97, also contribute to the total *Margin Debt*, ($23,355.97), **but**
- the sum of those values, ($51,752.91), is in fact represented as the value of *Bank Sweep Feature,* which indeed contributes to the balances as a positive value, which obviously leads to an inequality

**(INEQUALITY) EQ-14.7: ($23,355.97) + ($28,396.94) ≠ $51,752.91**

**EQ-14.7: $23,355.97 + $28,396.94 = $51,752.91**

578.       The Defendants scheme is an exceptionally complex puzzle to unravel, aggravated by the fact the Futures Account had been excluded from the *Cash and Cash Investments Total.* The Defendants took advantage of the complexity of Schwab's cash accounting. For example, the following:

a. *Bank Sweep Transfers* do not create Margin Debt, because that would simply cancel out that value, as demonstrated by **EQ-14.7**. Bank Sweep Transfers deduct or add value from the *Cash Balance* of the Brokerage Account, but do not change the value of *Cash and Cash Investments Total.*

b. *Sweeps to Futures* from the Brokerage Account function similarly. There are no instances of such transactions in Pitlor's account data, because both Futures Sweeps first transferred through the *Bank Sweep Feature*.

c. When *Sweeps To Futures*, (which occur during the overnight hours) are financed by funds that exist in the *Bank Sweep Feature* (settled in the evening- presumably at or around the same time Mutual Fund settlement occurs), indeed *Margin Debt* is created, which is offset at settlement.



579.         As depicted by the above figure, the *Cash and Cash Investments Total* does not change, regardless of how funds transfer amongst the Brokerage Account, Bank Sweep Feature, Futures Account.

580.         By excluding the Futures Account from the calculation of *Cash and Cash Investments Total,* the cash balances are vulnerable to exploitation, particularly when *Sweeps to Futures* first transfer through the *Bank Sweep Feature,* creating a legitimate debt balance equal to the value that is not included in the *Cash and Cash Investments Total.*

581.         The elegance and sophistication of the Defendants scheme is exemplified by the two following derivations below, particularly which are ultimately equivalent statements and demonstrates how the $12 *Margin Call* correlates to the $11.61 *Balance Subject to Interest* through variation amongst the accounting of the smaller discrepancies.

| Bank Fraud concealed the funds converted via Mutual Funds Buying Power | |
|---|---|
| $51,698.63 | *Sweep to Futures* transferred via *Bank Sweep Feature* (3/27) |
| $28,396.94 | *Bank Sweep Feature* balance (3/26) |
| $2,702.27 | *Disallowed Wash Sale Losses* (March) |
| $54.28 | Interest Fee paid to Schwab (March) |
| $12.00 | Margin Call - (April*) [$12 = $11.61 + $.26 + $.13 = $7.16 + $3.51 + $.94 + $.26 + $.13] |
| $0.77 | Interest Credited to account via *Bank Sweep Feature* - contributes to total damages (3/16) |
| ($0.64) | Interest Credited and shown to exist in Brokerage Account - counts as reduction to total damages (3/28) |
| **$82,864.25** | **Total Funds Converted via *Mutual Funds Buying Power*** |

\* With the exception of the $12 Margin Call on 4/3/2018, the entirety of the funds converted via *Mutual Funds Buying Power* corresponds to discrepancies in the March 2018 data.
Also, the $309 additional damages from 4/13 (not included above) concealed the conversion fees - $224.80, and $54.28 (not appearing to be a discrepancy but indeed contributes to damages) & $29.54 (unreported *Balance Subject* to Interest on 3/22). $224.80 + $54.28 + $29.54 = $308.62 (Note that: $309 (-) $308.62 = $.38 is $.01 difference from **$12** (-) $11.61 = $.39)

| Bank Fraud concealed the funds converted via Mutual Funds Buying Power | |
|---|---|
| $51,698.63 | *Sweep to Futures* transferred via *Bank Sweep Feature* (3/27) |
| $28,396.94 | *Bank Sweep Feature* balance (3/26) |
| $2,702.27 | *Disallowed Wash Sale Losses* (March) |
| $54.28 | Interest Fee paid to Schwab (March) |
| $4.45 | *Margin Equity* discrepancy [Live vs. Historical data] (3/27) [$4.45 = $3.51 + $.94 = $3.51 + $1 (-) $.06]* |
| $6.87 | *Cash on Hold* converted along with $9,999,999.00 (3/6) |
| $0.77 | Interest Credited to account via *Bank Sweep Feature* (3/16) - contributes to total damages |
| $0.06 | Unjustified discrepancy between *Settled Cash* and *Cash Investments Total* (3/28)* |
| ($0.02) | Refunded at liquidation (as separate sum via separate check) - relates to $3.51 + $3.38 (-) $6.87= $.02 |
| **$82,864.25** | **Total Funds Converted via *Mutual Funds Buying Power*** |

Note that the $4.45 is the sum of values that includes ($.06), then $.06 appears as a separate discrepancy the following day, which serves to cancel out that previous discrepancy. This example illustrates how the scheme also operated similarly to precisely match larger sums.

## B. Alternative derivation of the Total Funds Converted via Mutual Funds Buying Power

582.     As pertains to the Bank Fraud, both $28,396.94 are $29,256.75 are key sums in the following derivation of the funds converted via *Mutual Fund Buying Power*. $29,256.75 was the account balance after 2 days of trading. While *Margin Equity* totaling $1048.69 was concealed during that time, and further $494.54 of illegitimate Disallowed Wash Sale Losses were reported.

**EQ-14.8: $82,864.25 + $54.28 = $23489.95 + $28396.94 + $29256.75 + $1768 + $6.89**

- ▪ $82,864.25: The total Funds converted from Pitlor's Schwab Account via Mutual Funds Buying Power

- $54.28: Total Margin Interest charge collected by Schwab.

- $29,256.25: The value held in the Bank Sweep Feature at the time $10,000,005.87 was converted on 3/6/2018, removed from Pitlor's *Cash on Hold*

- $28,396.94: (1) The value held in the Bank Sweep Feature on 3/26/2018, and (2) the value demonstrated to be missing from the account on 3/27/2018 and (3) strongly correlates to $28,396.00 stated as *Borrowed Funds Available to Withdraw* in the live end-of-day balances on 3/23/2018, subsequently edited out of the historical balances to conceal the segregation of those funds.

- $23,489.95: The total value concealed via manipulation of the Trade Date Balance, and the erroneous accounting pertaining to the Sweep To Futures transaction the morning of 3/23/2018.

  - **$23,489.95[76] = $13768.61 + $9720.68 + $.66**
    - $13,768.61: Sweep to Futures erroneously stated as loss to Brokerage Account Value

    - $9720.68: Total cash value concealed by *Trade Date Balance* having been changed from $412.03 to ($9308.65) after the opening bell.
      **$9720.68 = $412.03 + $9308.65**

- $1768: The undisclosed, unjustified end-of-month adjustment corresponding to the account value stated in the live data at the end of March compared to the total value reported by March Statement.

- $6.89: The sum of $3.38 and $3.51, or $6.87 + .02
  - $3.38: The negative cash balance that anomalously existed at the end of the day after the conversion of $10,000,005.87 on 3/06/2018.
  - $3.51: The balance that remained in Pitlor's TD Ameritrade Account.

## Count #14-B

C.        **On 3/6/2018, the $10,000,005.87 *Cash on Hold* balance was laundered through the *Bank Sweep Feature* via offsetting negative *Futures Buying Power*.**

---

[76] Alternatively, $23,489.85 = $14,181.30 + $9308.65. Schwab's disclosures are unclear as to whether the proper trade date balance for 3/23/2018 should have been $14,181.30, or, because of the Sweep to Futures for $13,768.61, perhaps it was properly stated as $412.03. Either way, the discrepancy totaling $23,489.95 is precisely calculated.

583.        Initially, the $9,999,999.00 deposit was concealed by depositing that free credit balance into the *Bank Sweep Feature*. Those funds had first been Those total funds laundered and represented theft of $6.87 along with the $9,999,999.00 that was also laundered.

584.        As presented in the attachment previously in **Predicate Count #11**, The February Statement was physically altered to prevent the balances from being reported, specifically the transactions pertaining to the *Bank Sweep Feature*, none of which are documented by the official record as having occurred until March.

585.        The data pertaining to the *Bank Sweep Feature* was altered and concealed to prevent transactions and balances from being reported (in part by presenting the report in "portrait" rather than "landscape" format, the latter being consistent with Schwab's reporting as per their Premium Statement Guide and Sample Brokerage Report).

586.        The $9,999,999.00 deposit had been swept to the *Bank Sweep Feature* on 2/28/2018, utilizing the same accounting contrivances as described with the derivation of missing $51,753.55 presented previously. Then, those funds were able to be cancelled out of the brokerage account balances via the negative buying power in the Futures Account.

## Predicate #15 (2 Counts)

### 18 U.S.C. § 1343 - Fraud by Wire

### (Alternatively, 18 U.S.C. § 1348 - Securities Fraud)

**Defendants: TD Ameritrade and Charles Schwab**

(1)        **The two counts correspond to the two *Short Sales* that transacted on 3/23/2018 that were instead reported to be *Investment Purchases*. Proceeds totaling $16,439.68 were instead recorded as an expenditure.**

| | | | | | | |
|---|---|---|---|---|---|---|
| 03/26/18 | 03/23/18 | Bought | CALL PROSHARES TRUST II $20.5  EXP 03/29/18: UVXY 03/29/2018 20.50 C | 60.0000 | 0.7400 | (4,484.88) |
| 03/26/18 | 03/23/18 | Bought | CALL PROSHARES TRUST II $21  EXP 03/29/18: UVXY 03/29/2018 21.00 C | 150.0000 | 0.7900 | (11,954.80) |

Excerpt from March Statement Page 29

587.            TD Ameritrade is named as a Defendant due to the extensive evidence of their having gained access to, interfered with, and manipulated data pertaining to account history, transaction data, and balances, as documented by the crash logs of Schwab's Mobile App.

588.            Two Short Sale transactions were misrepresented in the official record and were reported to instead be asset purchases.  Proceeds totaling $16,439.68 were instead reported as asset purchases- expenditures, and thereby concealed cash value totaling $32,472.86.

**EQ-15.1: $16,439.68 = $4,484.88 + $11,954.80**

589.            The total damages in fact corresponds to twice this amount, less the closing cost that represents the true *Cost Basis* for these transactions.

**EQ-15.2: $32,472.86 = $16,439.68 + $ 16,439.68 (-) $406.50**

590.            The *Cost Basis* discrepancy in the <u>April Statement,</u> $16,870.41 (***See* Count #12-B**) precisely corresponds to the following.

**EQ-15.3: $16,870.41 = $16,439.68 + $406.50 + $24.23**

- **$16,439.68: Proceeds erroneously reported as *Cost Basis***
- **$406.50: Unreported actual Closing Costs of for those misreported positions**
- **$24.23: Transfer Fee**

## B. The closing costs for the *Short Sales,* $406.50, represent unaccounted *Cost Basis.*

591.            As the *Cover Short* purchases are excluded from the official record, so too are the associated costs and commissions.  The total closing costs **$406.50,** calculated as follows, affirm Pitlor's memory of closing out positions.  Despite these transactions having occurred more than two years ago, they are nonetheless distinctly etched into his memory because closing out those positions was unnecessary; those positions were set to expire worthless.  But, Pitlor desired to

close out all open positions and withdraw profits totaling $75,000.00 without any outstanding liabilities that would askew the account balances. The closing costs[77] are calculated as follows:

    a. $270.00 - Transaction price:

        a. UVXY 20.50 C - $.02 x 60  = $120

        b. UVXY 21.00 C - $.01 x 150 = $150

    b. $136.50 - Options commission: $.65/contract x 210 contracts

$$\text{EQ-15.4: } \$406.50 = \$270 + \$136.50$$

## C.       $24.23 corresponds to a $25 transfer fee offset by the $.77 interest credit

592.       The $25 transfer fee[78] (corresponding to the clandestine conversion of $2,481.61 via a Mutual Funds purchase on 3/23/2018) was partially offset by the $.77 interest credit paid to the account at the start of the week, thus resulting in a net additional "disallowed loss" of $24.23.

$$\text{EQ-15.5: } \$24.23 = \$25.00\ (-)\ \$.77$$

- **$25.00: Transfer Fee**
- **($.77): Interest Paid to Account**

593.       Confirmation that the $25 transfer fee had been concealed on 3/23/2018 is furnished by the screenshot from Schwab's website accessed just after midnight the morning of Friday, 3/23/2018, which reports a Cash Balance with $25 dollars concealed from the balance reported by the Schwab Mobile App, which is as $14,181.30 in the excerpt below, but as $14,205.64 in the data from the Schwab website.

**3/22 Screenshot @ 15:21**
**Schwab Mobile App**

stated

Cash & Money Market

| Cash & Money Market | $14,181.30(1) |
| --- | --- |
| Cash & Money Market Total | $14,181.30 |

Schwab Futures

| Futures Account Value | $0.00 |
| --- | --- |

---

[77] The historical pricing data for UVXY on 3/23/2018 corroborates Pitlor's accounting.

[78] This fee was charged for the conversion of $10,000,005.87 from account ####5612 on 3/6/2018. Schwab charges $25 for wire transfer and account transfers, the latter of which is believed to have transpired.



594.    The errors *"We are currently unable to display historical balances"* and the *"Personal Value = $0.00"* and *"Day Change = N/A"* are indeed noteworthy, as well as the fact that Brokerage Account ####5612 is explicitly stated to be comingled with the Futures Account[79].

595.    The *Cash and Cash Investments* stated to be $14,205.64. As described previously the Futures Account did not contribute to the *Cash and Cash Investments Total*. Therefore, the open Futures positions had no impact on the *Cash and Cash Investments Total*, which is reported by the Schwab Mobile App as $14,181.30, a difference of $24.34.

**EQ-15.6: $24.34 = $14,205.64 -$14,181.30**

596.    The difference between $24.34 and $24.23 (the latter value calculated by **EQ-15.3 & EQ-15.5**) is precisely accounted for by other discrepancies, namely the $.13 difference between ($3.38) and ($3.51), and the $.02 difference between $6.87 and $6.89. Pitlor is prepared

---

[79] A Futures Account must be segregated in a separate Margin Account. Comingling in this manner is unlawful, and in this case is additional evidence that Futures Account ####6617 was "detached" from Pitlor's account in a particular manner that allowed it to access funds from Brokerage Account ####5612. This is described in great detail *infra* in the section Facilitation of Money Laundering.

to offer additional analysis and explanations that prove that the $.11 difference precisely corresponds to the following relationships.

**EQ-15.7(a)(b)(c)(d):**

(a) $.11 = \mathbf{\$.06}^{80}$ + $.03 + $.02 = $.13 - .02 = $3.51 (-) $3.38 (-)$.02

(b) $6.89 - $6.87 = $.02

(c) ($6.87) = $9,999,999.00 (-) $10,000,005.87

(d) $22.67 + $3.38 = $26.05 = $25 + $1 $^{81}$+ $\mathbf{\$.03}$ + $\mathbf{\$.02}$

## D.    The unaccounted *Cost Basis, $406.50,* is in fact accounted for be concealing that value as a *Disallowed Wash Sale Loss.*

597.    The entirety of the total Disallowed Wash Sale Losses[82], $2702.27, are invalid.

    a. The <u>Schwab Spreadsheet Data</u> confirms that the *Adjusted Cost Basis* is identical to the *Unadjusted Cost Basis,* and thus the *Disallowed Wash Sale Losses* function so to conceal damages.

    b. The Monthly Statements omit the *Adjusted Cost Basis* data altogether, and in fact conceal the $2,702.27 as the difference between other erroneous figures, $3092.84 and $5795.11.

598.    Notwithstanding their invalidity, the *Disallowed Wash Sale Losses* are indeed reported by the **1099-B Tax Filing**, and thus conceals illegitimate, undocumented losses represented as unaccounted cost basis, identified as the following:

**EQ-15.8: $2702.27 = $406.50 + $494.54 + $1768 + $24.23 + $9.00**

- **$406.50** - identified in the previous analysis, representing the transaction cost and fees associated with unreported *Cover Short* transactions.

---

[80] $.06 refers to a stray cash balance that appears as a discrepancy in the cash balances for 3/28/2018.

[81] $1 refers to a stray SMA balance that existed on 3/8/2018, after the conversion of $10,000,005.87 *Cash on Hold.*

[82] While the $494.54 Disallowed Wash Sale Loss- and its illegitimacy, are clearly documented with respect to the JNUG positions closed on 2/28/2018, the remaining $2,207.73 corresponds to GLD options transactions without any *Cost Basis* adjustments. The latter was arbitrarily applied to those positions to conceal the fraudulent activity described by the analysis herein.

- **$494.54** - corresponding to JNUG transactions in February 2018.
- **$1768** - The end-of-month adjustments conceal $1886 of total damages, $1768 of which corresponds to the change in the account value with respect to the total reported by to the March Statement, and the Disallowed Wash Sale Losses correspond to the March 2018 transaction data.
- **$24.23:** As derived by preceding analysis
- **$9.00** – An additional $9 corresponds to the following array of small discrepancies:
  - $9.00 = $6.87 + $2.29 (-).13 (-).03, and/or[83]
  - $9.00 = $4.45 + 3.38 + 1.3 (-).13

**EQ-15.9: As presented below, $82,864.25 is precisely derived using the key sums from the preceding analyses:**

| | Description of Discrepancy |
|---|---|
| **$16,439.68** | Proceeds of *Short Sales* not reported |
| **$16,439.68** | Proceeds of *Short Sales* instead reported as *Cost Basis* |
| **($406.50)** | Cost Basis of closing transactions for *Short Sales* deducts from total damages |
| **$5,795.11** | Errant transactional accounting of *Investment Sold by March and April Statements* |
| **$28,396.94** | Concealed via various contrivances 3/27/2018 |
| **$14,223.46** | Concealed Margin Equity on 3/23/2018 |
| **$1,886.00** | Manipulation of end-of-month account value on 3/30/2018 |
| **$104.85** | Discrepancy between live vs. historical account value for 3/21/2018 |
| **($11.61)** | Unreported *Balance Subject to Interest* – April |
| **($6.87)** | *represents "refund" of Cash on Hold* converted with $9,999,999.00 on 3/6/2018 |
| **$3.51** | TD Ameritrade account balance. Initially, this value was credited to the account as it was swapped with the $10,000,005.87 *Cash on Hold.* While the $6.87 was made to seem as if it had never been stolen, the $3.51 discrepancy remains. |
| **$82,864.25** | **Total funds converted via *Mutual Funds Buying Power*** |

---

[83] The nature of the damages often tended to occur in doubles that offset against each other. Just as there are two precise derivations of $9.00, indeed there are several derivations for the other "adjustment" amounts, $1768, $2702.27, $3092.84, and $1048.69, as described *infra*.

## Predicate Count #16 (7 Counts #16A - #16G)

### 18 U.S.C. § 1343 - *Fraud by Wire*
### Defendants: TD Ameritrade and Charles Schwab

## Generally

599.     TD Ameritrade is also named as a Defendant for these counts due to the extensive evidence of their having gained access to, interfered with, and manipulated data pertaining to account history, transaction data, and balances, as documented by the crash logs of Schwab's Mobile App.

600.     The following counts correspond to unique fraudulent contrivances, but not necessarily unique damages. The derivations are useful in illustrating the complexity and precision of the Defendants' scheme that can only be the result of meticulous premeditated intent. The derived values are also relevant with respect to various calculations of total funds converted via Mutual Funds purchases.

601.     The key values utilized in the following derivations are presented with evidence and analysis with the **Attachment: KEY VALUES.**

## Count #16-A

(1)     **$23,489.95 was concealed via manipulation of the *Trade Date Balance* and erroneous accounting of *Sweep to Futures* transfer as a loss to Brokerage Account ####5612.**

602.     At the start of day 3/23/2018, Cash value totaling **$23,489.95** was concealed on 3/23/2018 via fraudulent artifices pertaining to (1) sweeps to the Futures Account, **$13,768.61** being erroneously assessed as a loss to Brokerage Account ####5612 (2) manipulation of the Trade Date Balance from $412.03 to ($9308.65), thereby concealing **$9720.65.**

**EQ-16.1:**          $\$23,489.95^{84} = \$13768.61 + \$9720.68 + \$.66$

- **$13,768.61**:During the premarket hours the 3/23/2018, the errant *Day Change* (loss) of $13,768.61 was stated due to the erroneous accounting of the *Sweep to Futures* transfer (the Futures Account Value is *not* supposed to be included in the (Brokerage) Account Value)

- **$9720.68**: After the opening bell on 3/23, The *Trade Date Balance* at the start of 3/23/2018 was changed from **$412.03** to a negative value, **($9,308.65).** This maneuver concealed **$9720.68.**

**EQ-16.2:**          $\$9720.68 = \$412.03 + \$9308.65$

- **$.66**: Discrepancy between Margin Equity $14,054.26 on 3/22/2018, and the $14,053.60 transferred to the *Bank Sweep Feature* on 3/23/2018.

**EQ-16.3:**          $\$.66 = \$14,054.26 (-) \$14,053.60$

## Count #16-B

**B.**          **On 3/23/2018, Margin Equity totaling $14,223.46 was concealed via alteration of the historical account balances.**

603.          At the end of the day on 3/23/2018, the *Margin Equity* is stated to be $14,223.46. A similar value, $14,216.00 is stated as the SMA balance. The historical account data restates the *Margin Equity* as $14,216.30, altered to conceal the fact that $14,223.46 was in fact a unique sum and disguised that missing value by making it seem as if it never existed.

604.          The assets listed by the *3/23 - Brokerage Holdings by Investor* confirm that $14,223.46 has been excluded from the record.

**EQ-16.4:**    $\$14,223.46 = \$13768.61 + \$412.03 + \$29.54 + \$7.16 + \$6.89 + (\$.77)$

- **$13,768.61**:During the premarket hours the 3/23/2018, the errant *Day Change* (loss) of $13,768.61 was stated due to the erroneous accounting of the *Sweep to Futures* transfer (the Futures Account Value is *not* supposed to be included in the (Brokerage) Account Value)

---

[84] Alternatively, $23,489.85 = $14,181.30 + $9308.65. Schwab's disclosures are unclear as to whether the proper trade date balance for 3/23/2018 should have been $14,181.30, or, because of the Sweep to Futures for $13,768.61, perhaps it was properly stated as $412.03. Either way, the discrepancy totaling $23,489.95 is precisely calculated.

- **$412.03**:  The original *Trade Date Balance* on 3/23/2018.

- **$7.16**, the discrepancy between the two stated values for *Margin Equity*, indeed $14,223.46 and $14,216.30. Also, a discrepancy of $7.16 exists between the end of day *Cash and Cash Investments* stated by the live data, $51,760.07, and the value reported by the 3/26/2018 *Cash and Cash Investments Total*, $51,752.91.   That discrepancy refutes any prospective claim by Schwab that the historical balances were merely changed with respect to the closure of the Futures Account.

- **$29.54**, the *Balance Subject to Interest* corresponding to the negative cash balance of $(22.67) on 3/19, plus $6.87 Cash on Hold, was not reported by the official record (March Statement).

- **$6.89**: The sum of $3.38 and $3.51, or $6.87 + .02
    - $3.38: The negative cash balance that anomalously existed at the end of the day after the conversion of $10,000,005.87 on 3/06/2018.
    - $3.51: The balance that remained in Pitlor's TD Ameritrade Account.

# Count #16-C

C.        **The altered historical balance data on 3/23/2018 was altered to caused the account value to be understated by $23,141.13 compared to the value reported by the live data.**

**EQ-16.5:**            **$23,141.13 = $118,126.57 (–) $94,983.44**

- **$118,126.57:** The *Total Accounts Value* according to the live end-of-day balances for 3/23/2018.

- **$94,983.44**: The *Account Value* according to the altered historical data and other records of historical account values, such as the *Personal Value* log.

210

## Count #16-D

D.        The *Sweep to Futures* transfer reported by the <u>March Statement</u>, **$51,698.63, is understated by $3,404.57, the value of the Futures Margin Call received on 3/27/2018.  The actual amount *Swept to Futures* was $55,103.20.**

605.        The Futures Sweep as reported by the <u>March Statement</u> $51,698.63 on 3/27 exceeded the required *Maintenance Margin* of the Futures positions by **$16,898.63**.

<div align="center">

**EQ-16.6:        $16,898.63 = $51,698.63 - $34,800.00**

</div>

- $51,698.63: Sweep to Futures transferred during early morning hours of 3/27/2018, as reported by the <u>March Statement.</u>

- $34,800.00: The Maintenance Margin Requirement for the mini-Nasdaq futures contracts (NQM18), was $5800.  Pitlor sold 6 contracts short, thus requiring 6 x $5800 = $34,800 minimum cash value to be held in the Futures account (cash + value of the futures position) in order to satisfy this requirement.

606.        Accounting for the Margin Call for $3,404.57, the actual value of the Futures Sweep was $55,103.20.

<div align="center">

**EQ-16.7:   $55103.20 = $51698.63 + $3404.57**

</div>



<div align="center">

211

</div>

607.        According to the above data, a Futures Margin Maintenance Call should have been issued for $20,303.20 to Futures Account ####6617.  The Margin Call likely did occur, but because Pitlor had been secretly disassociated with account ####6617, only the $3404.57 deficit was issued as a Margin Call to the brokerage account.

608.        The Futures Margin Call was issued the morning of 3/27/2018 for **$3,404.57** to account ####5612, the Brokerage Account, instead of Futures Account ####6617.

609.        The value of that Futures Margin Maintenance Call that was never received, $20,303.20, is calculated as per the following:

**EQ-16.8:**        **$20,303.20 = $16,898.63 + $3404.57**

- **$16,898.63: As calculated above, this is the amount transferred in excess of the Maintenance Margin Requirement according to the Sweep to Futures reported by the official record, $51,698.63**
- **$3,404.57: Futures Margin Call issued to Brokerage Account ####5612.**

610.        Thus, the accurate *Sweep to Futures* transfer that should have been reported by the March Statement is $55,103.20.

**EQ-16.9:**        **$55,103.20 = $34,800.00 + $20,303.20**

611.        This can also be interpreted as the Futures Margin Maintenance Call having been understated by $16,898.63, as the true amount required to be swept in addition to the *Initial Margin Requirement* was $20,303.20.

612.        The following equations confirms the above analysis.

**EQ-16.10:**        **$3343.13 =$55,103.20 - $51,760.07**

- **$55,103.20:** Actual value of *Sweep to Futures* on 3/27.
- **$51,760.07:** *Cash and Cash Investments Total* reported by live data on 3/23/2018.

**EQ-16.11:**        **$3404.57 = $3343.13 + $54.28 + $7.16**

212

- **$54.28:** Month to Date Interest Owed as of 3/26/2018, related to discrepancy pertaining to $74,594.84 *Balance Subject to Interest* (a key value presented with analysis for 3/23/2018)

- **$7.16:** The discrepancy between the end of day *Cash and Cash Investments* stated by the live data, $51,760.07, and the value reported by the 3/26/2018 *Cash and Cash Investments Total*, $51,752.91.

613.    The *Cash and Cash Investments Total* stated for 3/26/20178 was $51,752.91, and because no transactions occurred on 3/26/2018 to impact that total, that $7.16 is confirmed to have been unaccounted for. was rendered to be unaccounted. Indeed, a *Balance Subject to Interest* of $11.61, assessed in the final days of the account being active in April (unreported by the April Statement). addressed and concealed that additional discrepancy, plus another unaccounted discrepancy, $4.45, that exists in the end-of-day balances for 3/27/2018.

$$\text{EQ-16.12:} \quad \$11.61 = \$7.16 + \$4.45$$

- $7.16 = as described above, originally derived in EQ-1C

- $4.45 = discrepancy in end-of-day balances for 3/27/2018, also equal to the following, which is addressed further *infra*.

$$\text{EQ-16.13:} \quad \$4.45 = \$3.51 + \$.94$$

## Count #16-E

E.    **Illegitimate Funds Due $10982.00 corresponding to negative cash balance of $10,979.71.**

614.    The difference between the negative cash balance and the *Funds Due* represents an additional discrepancy of $2.29

$$\text{EQ-16.14:} \quad \$10,982.00 = \$10979.71 + \$2.29$$

213

## Count #16-F

F.      **Discrepancies precisely equate to $2481.61, the value converted via Mutual Funds Buying Power on 3/23/2018.**

### EQ-16.15:      $1886 + $600 + .06 - $4.45

- **$1886:** the reported *Market Value* of expired options reported as active investments by the March Statement, thereby concealing this value which, as documented by live screenshots, indeed was not included in the Total Account Value.
    - Also, $1886 corresponds to value concealed by adjustments to account balances at the end of the month, explained further below with **EQ-1H(3)** through **EQ-1H(5)**

- **$600:** discrepancy in total account value on 3/23/2018 reported by the historical data,$94,983.44, versus the value reported by 3/23 - *Brokerage Holdings by Investor*, $93,363.44 unique for its existing within the altered historical data reported by the

### EQ-16.16: $600 = $94,983.44 (–) $98,363.44

- **$.06:** $.06 discrepancy that existed on 3/28/2018 between *Settled Funds* and *Funds Available to Trade*.

- **($4.45):** $4.45 being subtracted from the total reflects its not being accounted for by the March data, but is instead accounted for by a $11.61 *Balance Subject to Interest,* a discrepancy in the April data in the final days of the account being active, as calculated by EQ-1F(6).

615.      Alternatively, the derivation above can be stated as the following:

### EQ-16.17: $2481.61 = $1768 + $600 + $104.85 + $3.51 + $3.51 + $3.51 (–) $.77 (–) $1.00[85]

- **$1768:** value missing from the account that was temporarily replaced to "paint the tape" and register as value included in the March Statement.
    - Then, the account value was reset back to an even lower value which represented additional unique damages of $118.

---

[85] The partial sum of $8.76 can be equivalently stated in many different ways, a few of which are presented below (Bold denotes changes from "as stated above"):

| | | | | | | |
|---|---|---|---|---|---|---|
| **As stated above**: | $8.76 = $3.51 + | $3.51 + $3.51 (-) $.77 | + 0 | (-) $1 | | |
| Alternative #1 | $8.76 = $3.51 + | $3.51 + $3.51 + | **$.64** | (-) **1.41** (-) $1 | | |
| Alternative #2 | $8.76 = $3.51 + | $3.51 + **$3.38** (-) | **$.64** | + 0 | (-) $1 | |
| Alternative #3 | $8.76 = $3.51 + | **$6.87** + **$.02** (-) | **$.64** | + 0 | (-) $1 | |
| Alternative #4 | $8.76 = **$4.45** + | **$2.29** + **$0** | + **$.64** | + **1.41** + **$.03** | | |

- **$600**: description presented above with **EQ-1H**

- **$104.85** Discrepancy between live vs. historical end-of-day *Account Values* for 3/21/2018

  **EQ-16.18: $104.85 = $27,327.29 (–) $27,222.54**

- **$1**, An anomalous $1 SMA balance existed at the end of 3/8/2018, which remained until the next transactions in his account on 3/19/2018.  All end-of-day SMA balances are demonstrated to represent funds that were subsequently concealed and included in the total converted via Mutual Funds Buying Power.

  **EQ-16.19:    $1768 = $23,149.83 (–) $21,381.83**

  **EQ-16.20    $1886 = $21,149.83 (–) $21,263.83**

  **EQ-16.21    $118 = $1886 - $1768**

- **$118** Unique damages pertaining to end of month after prior adjustments that concealed $1768 from the March Statement.
  - $21,381.83: Stated Account Value prior to adjustment on 3/30/2018.
  - $23,149.83: Total Account Value reported by March Statement, temporarily reflected as such in the live data, until changed by further adjustment.
  - $21,263.83: Stated Account Value after the temporary adjustment to $23,149.83, reflecting additional unique damages of $118.

# Count #16-G

**Futures Buying Power was utilized to debit Pitlor's account even after its supposed closure.**

616.    Even after Pitlor's Futures Account was supposedly closed in March 2018, negative Futures Buying Power was utilized to conceal funds.  This pattern continued in April up until the final closure of the Brokerage Account.  This implies that another Futures Account (or other Margin Account) was linked to Pitlor's Brokerage Account such to be able to siphon off cash value.  Indeed, this supports the notion that the TD Ameritrade Account had been attached for nefarious purposes.

617.    On 3/30, negative futures buying power is documented corresponding to those end-of-month adjustments, assessing illegitimate debt of $3618, which then changes to $3736 after falsifying the account value for purposes of its being documented by the official record.

618.    On 4/3/2018, the Futures Buying Power is anomalously stated to be ($6,639.00), despite the lack of Futures Account.

619.    On 4/13/2018, the following screenshot again capture a net deduct from the account of $309, invisible to the *Cash and Cash Investments* accounting until the credits and debits are offset at the end-of-day settlement.

($734) Futures Buying Power + 425 SMA ≈ ($309) Net Debit





## Count #16-H

### G. Pitlor's $75,000.00 withdrawal was an amount specifically targeted for theft.

620.         Pitlor's $75,000 withdrawal on 3/23/2018 became the primary target of the scheme; this value was "matched" by smaller constituent sums that were concealed and converted, as demonstrated by the following derivation of $82,864.25.

**EQ-16.22: $82,864.25 = $75000 + $3404.57 + $3404.57 + $1048.69 + $3.38 + $4.45 (-) $1.41**

- **$4.45,** as explained *supra,* is the sum of $3.51 and $.94.

- **$3.38**[86]**,** the negative Cash and Cash Investments Total on 3/6/2018

- **$1.41** is the Interest reported to have paid to the account during the month of March.

- **$1048.69,** the understated *Margin Equity* on 2/27/2018, was caused by the scheme that initially targeted Pitlor's Schwab Account, virtually indistinguishable from the *Margin Equity & Disallowed Wash Sale* artifices that were relied upon to conduct and conceal the exploitation of Pitlor's TD Ameritrade Account. After the debacle of the errant $9,999,999.00 deposit, the TD Ameritrade Schwab enterprise employed a unique scheme that relied upon deprivation of Pitlor's rights under the color of 12 CFR § 220 to conceal the vast majority of the funds that were subsequently stolen and laundered.

621.         The following calculation indicates that, $74,594.84, the anomalous *Balance Subject to Interest* associated with the $75,000.00 withdrawal on 3/23/2018 was indeed relevant to the exploitation that occurred.

**EQ-16.23: $82,864.25 = $74,594.84. + 3092.84 + 3404.57 + 1768 + 4.45 + 2.29 + $.77 (-) $3.51**

- **$74,594.84** is the *Balance Subject to Interest* edited[87] into the historical data for 3/23/2018.

---

[86] $3.38 is particularly relevant because no Margin Call was issued, and it was combined with $3.51 (which was initially credited but then removed from the account) to conceal the theft of $6.87 that occurred during the conversion of $10,000,005.87 = $9,999,999.00 + $6.87.

$$\$3.51 + \$3.38 = \$6.87 + \$.02$$

[87] The live account balances do not show any *Balance Subject to Interest* at the end of the day on 3/23/2018, but the historical balance data does report a *Balance Subject to Interest* of $74,642.25. The March Statement reports a *Balance Subject to Interest* of $74,594.84.

217

- **$3092.84** is the overstated cost of *Investments Purchased* in the March Statement

- **$3,404.57,** the amount of the Futures Margin Call (erroneously[88] issued to the ***Brokerage*** account ####5612) but not reported in the March Statement.

- **$1768**: value missing from the account that was temporarily replaced to "paint the tape" and register as value included in the March Statement. Then, the account value was reset back to an even lower value which represented additional unique damages of $118. The total $1768 + $118 = $1886, and as described in the previous derivation, expired options contracts are reported by the March Statement as contributing $1886 of non-existent *Market Value* included in the *Total Account Value*.

# Predicate #17 (3 Counts)

## 18 U.S.C. § 1343, *Fraud by Wire*

## Defendant Charles Schwab

## Schwab Spreadsheet Transaction Data

## Generally

622.    Analysis of the Schwab Spreadsheet Transaction Data provides additional quantitative validation of Pitlor's claims of damages and implies the existence of accounts[89] linked to Schwab Account ####5612 that (1) are not documented by the official record and (3) correspond to  transaction data that does not relate the Pitlor's account activity.

623.    The qualitative merit of these claims are further reinforced by the quantitative merit of the evidence and calculations that precisely derives the total larceny evidenced by the conversion of $82,864.25 via Mutual Funds Buying Power, and the $224.80 Fees assessed for those transactions.

## Count #17-A

---

[88] The comingling of the margin of the Futures and Brokerage Accounts was a deliberate maneuver; this contrivance facilitated the aberrational accounting of account value, cash assets, and buying power that was subsequently exploited.

[89] These other accounts may have been Futures Account ####6617, or TD Ameritrade Account ####1360 and its Futures Account, but most all played a role to a certain extent .

**A.**   **Illegitimate *Disallowed Wash Sale Losses* concealed damages totaling $2,702.27**

624.    All of the *Disallowed Wash Sale Losses* are invalid because, aside from the merits of the transactions to which they apply (which are all either invalid or highly suspect), there are no corresponding *Cost Basis* Adjustments.

625.    Therefore, $2702.27 in fact represents concealed damages- or proceeds that have been stolen, or legitimate cost basis that was misrepresented or unreported.  In any case, the misrepresentation conceals an illegitimately "disallowed loss."

# Count #17-B

**B.    The <u>Schwab Transaction Spreadsheet</u> data was manipulated to conceal profits totaling $76,431.65.**

626.    In addition to the illegitimate *Disallowed Wash Sale Losses,* a more substantial pattern of discrepancies exists.  There are two columns populated with data that do not correspond to the figures reported by the official record titled *"Transaction Cost"* and *"Total Transaction Gain/Loss."* Those figures do not correspond[90] to the actual *Cost Basis* or *Realized Gains or (Losses)* but are quite relevant to the fraudulent misrepresentations and concealment of cash value, explained as follows:

   a.  The *"Transaction Cost"* is vastly inflated, $663,061.85 vs actual *Unadjusted Cost Basis* of only $264,559.25.

   b.  The *"Transaction Gain/Loss"* figures sums to a total loss ($63,351.09) vs. actual *Gain* of $78,740.85 corresponding to *Proceeds* of $340,637.83.

---

[90] Presumably, Schwab had comingled the account structures in such a manner so to become the counter-party to the positions in Pitlor's account.  Those Transaction Gain/Loss and Cost figures may be an accurate "scorecard" in some respects.  Indeed, there are some figures like $1048.69 that populate those errant data fields which directly correspond to funds concealed from Pitlor.  The precise nature of these numbers is within the knowledge of the Defendants and for the most part, beyond the scope of this complaint.  The importance is that these figures exist, and further the actual gains from those transactions which do not include those anomalous entries total $76,431.65, which as proven by this analysis, directly corresponds to the damages.

627. Many transactions contain no entries in those anomalous data fields, consistent with their being excluded from *that* version of the transactional accounting. The actual total *Realized Gains* corresponding to those transactions was $76,431.65.

628. $76,431.65 is derived by values corresponding to the larceny concealed by the March account data, derived as follows:

| Funds Concealed via Manipulation of Schwab Spreadsheet Transaction Data (March) | |
|---|---|
| $29,256.75 | Account Value as of 3/1/2018 (*Bank Sweep* balance - excluding the $9,999,999.00 deposit) |
| $16,439.68 | *Short Sale* proceeds reported as *Investments Purchased* (UVXY Options Contracts - 3/23) |
| $16,439.68 | Overstated Cost of Investments Purchased (b/c Short Sale proceeds reported as Investments Purchased) |
| $10,979.71 | Negative Cash Balance (3/28) |
| $3,433.57 | Total value debited by Margin Calls (March/April) |
| ($118.00) | Unique damages not represented by spreadsheet data- end of March adjustments (corresponds to fees) |
| $0.26 | [$1 + $.03 - $.77] Discrepancy between *Settled Funds* and *Cash Investments Total* (3/22) |
| **$76,431.65** | **GAINS FOR TRANSACTIONS EXCLUDED FROM SCHWAB SPREADSHEET TRANSACTION DATA (March)** |

629. The above derivation is also critical in demonstrating how $29,256.75 did not need to be accounted for as concealed proceeds, negative cash balances, or margin calls because it existed in the *Bank Sweep Balance* prior to any funds being removed, $28,000 of which is attributable to Pitlor's initial deposit. $29,256.75 was concealed wholly by misrepresentations and inaccuracies pertaining to the sweeps transactions (combined with other discrepancies.)

630. Also, $29,256.75 was the starting value for the account in March (excluding the $9,999,999.00 deposited on 2/28), and the ending value reported by the February statement was only $28,000.00. While this standing alone may not represent an error, it appears to have been exploited nonetheless. The difference between those values, $1,256.75, closely correlates to $1,248.34, a value separately segregated and converted via Mutual Funds Buying Power on 3/27.

**EQ17.1: $1256.75 = $29,256.75 - $28,000.00**

**Compare to $1,248.34 (a value segregated as *Mutual Funds Buying Power* on 3/27)**

## Count #17-C

C. In addition to the **$76,431.65**, there are additional damages totaling **$6,657.40** corresponding to an array of anomalies corresponding to the March data.

631.      Together these sum to a total of, $83,089.05, which is the precise sum of all funds converted via *Mutual Funds Buying Power*, $82,864.25, plus the transaction fees for the money laundering transactions, $224.80.

$$\text{EQ17.2: } \$83,089.05 = \$76,431.65 + \$6657.40 = \$82,864.25 + \$224.80$$

| Total Value of Discrepancies Not Represented by Schwab Spreadsheet Transaction Data (March) | |
|---|---|
| $3,092.84 | Overstated cost of *Investments Purchased* (March Statement) |
| $2,702.27 | Illegitimate *Disallowed Wash Sale Losses* (March Statement and Schwab Transaction Spreadsheet) |
| $600.00 | Discrepnacy historical balances vs. *Assets by Investor of* Schwab Performance Report (3/23) |
| $118.00 | Unique damages - end of March adjustments (corresponds to fees) |
| $104.85 | Discrepancy between end-of-day Historical vs. Live Balances (3/20) |
| $22.67 | Negative Cash Balance - end-of-day 3/19 |
| $6.87 | Cash on Hold converted on 3/6 along with $9,999,999.00 ($10,000,005.87 = $9,999,999 + $6.87) |
| **$4.45** | Discrepancy between Historical vs. Live Balances (3/27) **[$4.45 + $.06 -$ 1.00 = $3.51 ]** |
| $3.38 | Negative Cash Balance - end-of-day 3/6 |
| $2.29 | Discrepancy between negative cash balance and *Funds Due* (3/28) |
| $0.77 | Interest Credited to Account (3/16) |
| $0.03 | Combination of various discrepancies (3/23) & difference of SMA vs. Margin Equity (3/26) |
| ($0.02) | Returned to Pitbor at Liquidation (offsets difference corresponding to $3.51 + $3.38 (-) $6.87= $.02 |
| ($1.00) | Anomalous SMA Value (3/8) |
| **$6,657.40** | **Total of Discrepancies Not Represented by Schwab Spreadsheet Transaction Data (March)** |

632.      It logically follows that $6,657.40, the sum of the discrepancies March data in excess of the $76,431.65 concealed by the Schwab Spreadsheet Transaction Data, were thus required to be accounted for in April.

633.      Indeed, an anomalous *Funds Due* on 4/3/2018 nearly exactly matches that targeted value.



634.    The difference is accounted for by other discrepancies which relate to the 3/6/2018 conversion of the $9,999,999.00 + $6.87 *Cash on Hold* and the concealment of $3.51.

$$\text{EQ-17.3: } \$6639 = \$6657.40 \; (-) \; (\$11.61 + \$6.87 \; \text{-.06 -.02})$$
$$\text{EQ-17.4: } \$11.61 = \$7.16 + \$4.45$$
$$\text{EQ-17.5: } \$4.45 = \$3.51 + \$1 \; (\text{-}) \; \$.06$$
$$\text{EQ-17.6: } \$6.87 = \$3.51 + \$3.38 \; (\text{-}) \; \$.02$$

635.    The derivation below consolidates the values presented in the previous two tables (which calculated $76,431.65 and & $6,657.40, respectively). A series of substitutions cancel out the small discrepancies equal to and lesser than $1 in the same fashion that transpired in the live data, which resulted in a $.06 stray cash balance remained on 3/28/2018 (the day of Pitlor's final transactions in March), in addition to $.02 which was returned to Pitlor upon the account's final liquidation (and also represents the interest credited to the account in April).

| DAMAGES TOTALING $83,089.05 | |
|---|---|
| $29,256.75 | Bank Sweep Value (3/6) |
| $16,439.68 | Short Sale (UVXY Options Contracts - 3/23) |
| $16,439.68 | Short Sale (UVXY Options Contracts - 3/23) |
| $10,979.71 | Negative Cash Balance (3/28) |
| $3,433.57 | Total value debited by Margin Calls (March/April) |
| $3,092.84 | Overstated cost of *Investments Purchased* (March |
| $2,702.27 | Illegitimate Disallowed Wash Sale Losses |
| $600.00 | Account Value (3/23) |
| $104.85 | Account Value (3/20) |
| $22.67 | Negative Cash Balance (3/19) |
| $6.87 | Cash on Hold converted (3/6) |
| $4.45 | Account Value (3/27) |
| $3.38 | Negative Cash Balance (3/6) |
| $2.29 | Negative cash balance vs. *Funds Due* (3/28) |
| $0.06 | Stray Cash Balance Discrepancy (3/28) |
| ($0.02) | $3.51 + $3.38 (-) $6.87= $.02 |
| $83,089.05 | TOTAL DAMAGES |

636.    The Schwab Transaction Spreadsheet Data further explains the significance of the $.17 and its relation to $3.51 and $3.38, both of the latter which relate to the conversion of $10,000,005.87 on 3/6/2018.

637.    A $.17 discrepancy demonstrates that $3.38 was concealed by essentially transforming it into $3.51, which as demonstrated by the various analyses throughout this complaint, was initially credited to the account but in fact represents unique damages, indicating its effectively having been removed from the account twice.

$$EQ\text{-}17.4: \$.17 = \$.13 + \$06 \text{ (-) } \$.02.$$

$$EQ\text{-}17.5: \$82,864.25 = \$76,431.65 + \$3736.17 + \$2,702.27 + \$.02 \text{ (-) } [\$3.51 + \$2.29 + \$.06]$$

$$EQ\text{-}17.6: \$82,864.25 = \$76,431.65 + \$3736.00 + \$2702.27 \text{ (-) } [\$3.38 + \$2.29]$$

223

*Excerpts from 3/31/2018 Screenshots*
Negative Futures Buying Power $3736.17 (left) vs. Funds Due $3736 (right)



**SCHWAB SPREADSHEET DATA (MARCH TRANSACTIONS ISOLATED)**

| | Proceeds | Cost Basis | Gain/Loss ($) | Unadjusted Cost Basis | Wash Sale? | Disallowed Loss | Transaction Closed Date | Transaction Cost Basis | Total Transaction Gain/Loss ($) |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL OF ALL TRANSACTIONS LISTED | $340,637.83 | $264,599.25 | $78,740.85 | $264,599.25 | $0.00 | $2,702.27 | | $663,061.85 | ($63,351.09) |
| TRANSACTIONS WITH "TRANSACTION CLOSED DATES" | $52,425.83 | $54,479.80 | $153.76 | $54,479.80 | $0.00 | $2,207.73 | | $82,789.29 | ($2,321.50) |
| TRANSACTIONS WITHOUT "TOTAL TRANSACTION GAIN/LOSS" DATA | $181,574.84 | $105,143.19 | $76,431.65 | $105,143.19 | $0.00 | $0.00 | | $0.00 | $0.00 |
| TRANSACTIONS WITH A "TOTAL TRANSACTION GAIN/LOSS" DATA | $159,062.99 | $159,456.06 | $2,309.20 | $159,456.06 | $0.00 | $2,702.27 | $1,165,914.00 | $663,061.85 | ($63,351.09) |

| Symbol | Closed Date | Opened Date | Quantity | Proceeds | Cost Basis | Gain/Loss ($) | Unadjusted Cost Basis | Wash Sale? | Disallowed Loss | Transaction Closed Date | Transaction Cost Basis | Total Transaction Gain/Loss ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TVIX | 2/27/2018 | 2/27/2018 | 1000 | $7,361.18 | $7,024.95 | $336.23 | $7,024.95 | No | | | $21,034.85 | $1,048.69 |
| TVIX | 2/27/2018 | 2/27/2018 | 1000 | $7,361.18 | $7,004.95 | $356.23 | $7,004.95 | No | | | $21,034.85 | $1,048.69 |
| TVIX | 2/27/2018 | 2/27/2018 | 1000 | $7,361.18 | $7,004.95 | $356.23 | $7,004.95 | No | | | $21,034.85 | $1,048.69 |
| JNUG | 2/28/2018 | 2/27/2018 | 200 | $2,624.49 | $2,590.99 | $33.50 | $2,590.99 | No | | | $28,376.16 | $361.98 |
| JNUG | 2/28/2018 | 2/27/2018 | 100 | $1,312.24 | $1,295.99 | $16.25 | $1,295.99 | No | | | $28,376.16 | $361.98 |
| JNUG | 2/28/2018 | 2/27/2018 | 490 | $6,439.01 | $6,933.55 | $0.00 | $6,933.55 | Yes | $494.54 | | $30,377.86 | ($153.92) |
| JNUG | 2/28/2018 | 2/27/2018 | 810 | $10,644.09 | $10,489.46 | $154.63 | $10,489.46 | No | | | $30,377.86 | ($153.92) |
| JNUG | 2/28/2018 | 2/27/2018 | 1000 | $13,140.84 | $12,954.85 | $185.99 | $12,954.85 | No | | | $30,377.86 | ($153.92) |
| JNUG | 2/28/2018 | 2/27/2018 | 190 | $2,493.26 | $2,652.25 | ($158.99) | $2,652.25 | No | | | $28,376.16 | $361.98 |
| JNUG | 2/28/2018 | 2/27/2018 | 400 | $5,248.98 | $5,180.98 | $68.00 | $5,180.98 | No | | | $28,376.16 | $361.98 |
| JNUG | 2/28/2018 | 2/27/2018 | 100 | $1,312.24 | $1,295.50 | $16.74 | $1,295.50 | No | | | $28,376.16 | $361.98 |
| JNUG | 2/28/2018 | 2/27/2018 | 300 | $3,936.73 | $4,188.52 | ($251.79) | $4,188.52 | No | | | $28,376.16 | $361.98 |
| JNUG | 2/28/2018 | 2/27/2018 | 200 | $2,624.49 | $2,591.01 | $33.48 | $2,591.01 | No | | | $28,376.16 | $361.98 |
| JNUG | 2/28/2018 | 2/27/2018 | 700 | $9,185.71 | $9,075.46 | $110.25 | $9,075.46 | No | | | $28,376.16 | $361.98 |
| AMTD 03/09/2018 57.00 P | 3/7/2018 | 3/6/2018 | 2 | $18.54 | $51.41 | ($32.87) | $51.41 | No | | | | |
| UVXY | 3/7/2018 | 3/6/2018 | 500 | $8,862.35 | $8,192.47 | $669.88 | $8,192.47 | No | | | | |
| UVXY | 3/7/2018 | 3/6/2018 | 500 | $8,921.79 | $8,192.48 | $729.31 | $8,192.48 | No | | | | |
| UVXY 03/09/2018 17.50 C | 3/7/2018 | 3/6/2018 | 50 | $4,211.66 | $2,835.76 | $1,375.90 | $2,835.76 | No | | | | |
| AMTD 03/09/2018 57.00 P | 3/7/2018 | 3/6/2018 | 55 | $509.74 | $1,413.79 | ($904.05) | $1,413.79 | No | | | | |
| AMTD 03/09/2018 57.00 P | 3/7/2018 | 3/6/2018 | 18 | $184.82 | $462.70 | ($277.88) | $462.70 | No | | | | |
| UVXY 03/09/2018 17.50 C | 3/9/2018 | 3/6/2018 | 1 | $0.00 | $56.70 | ($56.70) | $56.70 | No | | | $2,835.75 | ($2,835.75) |
| SLV 03/09/2018 16.00 C | 3/9/2018 | 3/7/2018 | 27 | $0.00 | $72.73 | ($72.73) | $72.73 | No | | | $471.46 | ($471.46) |
| UVXY 03/09/2018 17.50 C | 3/9/2018 | 3/6/2018 | 49 | $0.00 | $2,779.05 | ($2,779.05) | $2,779.05 | No | | | $2,835.75 | ($2,835.75) |
| AMTD 03/09/2018 58.00 P | 3/9/2018 | 3/6/2018 | 73 | $0.00 | $2,972.20 | ($2,972.20) | $2,972.20 | No | | | $3,990.51 | ($3,990.51) |
| AMTD 03/09/2018 58.00 P | 3/9/2018 | 3/6/2018 | 27 | $0.00 | $1,018.31 | ($1,018.31) | $1,018.31 | No | | | $3,990.51 | ($3,990.51) |
| SLV 03/09/2018 16.00 C | 3/9/2018 | 3/7/2018 | 26 | $0.00 | $70.06 | ($70.06) | $70.06 | No | | | $471.46 | ($471.46) |
| AMTD 03/09/2018 57.00 P | 3/9/2018 | 3/6/2018 | 50 | $0.00 | $1,285.26 | ($1,285.26) | $1,285.26 | No | | | | |
| SLV 03/09/2018 16.00 C | 3/9/2018 | 3/7/2018 | 50 | $0.00 | $134.70 | ($134.70) | $134.70 | No | | | $471.46 | ($471.46) |
| SLV 03/09/2018 16.00 C | 3/9/2018 | 3/7/2018 | 22 | $0.00 | $59.27 | ($59.27) | $59.27 | No | | | $471.46 | ($471.46) |
| SLV 03/09/2018 16.00 C | 3/9/2018 | 3/7/2018 | 50 | $0.00 | $134.70 | ($134.70) | $134.70 | No | | | $471.46 | ($471.46) |
| GLD 03/16/2018 126.50 C | 3/16/2018 | 3/7/2018 | 50 | $0.00 | $3,238.24 | ($3,238.24) | $3,238.24 | No | | | | |
| JNUG 03/23/2018 14.00 C | 3/21/2018 | 3/21/2018 | 40 | $1,048.40 | $711.58 | $336.82 | $711.58 | No | | | | |
| GLD 03/29/2018 126.00 C | 3/21/2018 | 3/19/2018 | 4 | $288.33 | $138.86 | $149.47 | $138.86 | No | | | | |
| GLD 03/29/2018 126.00 C | 3/21/2018 | 3/19/2018 | 16 | $1,153.36 | $555.44 | $597.92 | $555.44 | No | | | | |
| GLD 03/23/2018 125.00 C | 3/21/2018 | 3/19/2018 | 50 | $3,611.68 | $2,435.75 | $1,175.93 | $2,435.75 | No | | | | |
| JNUG 04/06/2018 15.00 C | 3/21/2018 | 3/21/2018 | 30 | $1,145.05 | $951.82 | $193.23 | $951.82 | No | | | | |
| GLD 03/23/2018 125.00 C | 3/21/2018 | 3/19/2018 | 35 | $2,666.69 | $1,705.03 | $961.66 | $1,705.03 | No | | | | |
| UVXY 03/23/2018 15.50 C | 3/22/2018 | 3/21/2018 | 13 | $3,500.05 | $609.45 | $2,890.60 | $609.45 | No | | | $2,121.00 | $12,148.45 |
| UVXY 03/23/2018 15.50 C | 3/22/2018 | 3/21/2018 | 1 | $269.24 | $37.77 | $231.47 | $37.77 | No | | | $2,121.00 | $12,148.45 |
| AMTD 03/29/2018 59.50 P | 3/22/2018 | 3/21/2018 | 5 | $584.18 | $204.32 | $379.86 | $204.32 | No | | | | |
| UVXY 03/23/2018 15.50 C | 3/22/2018 | 3/21/2018 | 2 | $538.47 | $75.58 | $462.89 | $75.58 | No | | | $2,121.00 | $12,148.45 |
| UVXY 03/23/2018 15.50 C | 3/22/2018 | 3/21/2018 | 16 | $4,307.76 | $604.63 | $3,703.13 | $604.63 | No | | | $2,121.00 | $12,148.45 |
| UVXY 03/23/2018 15.50 C | 3/22/2018 | 3/19/2018 | 65 | $9,377.21 | $4,533.22 | $4,843.99 | $4,533.22 | No | | | $5,002.02 | $5,817.84 |
| UVXY 03/23/2018 15.50 C | 3/22/2018 | 3/21/2018 | 21 | $5,653.93 | $793.57 | $4,860.36 | $793.57 | No | | | $2,121.00 | $12,148.45 |
| UVXY 03/23/2018 15.50 C | 3/22/2018 | 3/21/2018 | 10 | $1,442.65 | $468.80 | $973.85 | $468.80 | No | | | $5,002.02 | $5,817.84 |
| AMTD 03/29/2018 59.50 P | 3/22/2018 | 3/21/2018 | 5 | $584.19 | $204.32 | $379.87 | $204.32 | No | | | | |
| UVXY 03/23/2018 16.00 C | 3/22/2018 | 3/19/2018 | 20 | $4,981.61 | $994.30 | $3,987.31 | $994.30 | No | | | | |
| UVXY 03/23/2018 16.00 C | 3/22/2018 | 3/19/2018 | 60 | $7,154.95 | $2,982.91 | $4,172.04 | $2,982.91 | No | | | | |
| GLD 03/23/2018 126.50 C | 3/22/2018 | 3/22/2018 | 1 | $21.21 | $27.81 | ($6.60) | $27.81 | No | | 3/21/2018 | $973.25 | ($231.49) |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GLD 03/23/2018 126.50 C | 3/22/2018 | 3/22/2018 | 33 | $699.34 | $917.64 | ($218.30) | $917.64 | No | | | 3/21/2018 | $973.25 | ($231.49) |
| GLD 03/23/2018 126.50 C | 3/22/2018 | 3/22/2018 | 1 | $21.21 | $27.80 | ($6.59) | $27.80 | No | | | 3/21/2018 | $973.25 | ($231.49) |
| AMTD 03/23/2018 60.50 P | 3/22/2018 | 3/21/2018 | 31 | $3,385.45 | $1,109.47 | $2,275.98 | $1,109.47 | No | | | | | ($231.49) |
| AMTD 03/23/2018 60.50 P | 3/22/2018 | 3/21/2018 | 4 | $436.82 | $143.16 | $293.66 | $143.16 | No | | | | | |
| AMTD 03/23/2018 60.50 P | 3/22/2018 | 3/21/2018 | 5 | $546.05 | $178.95 | $367.10 | $178.95 | No | | | | | |
| GLD 03/29/2018 126.00 C | 3/23/2018 | 3/19/2018 | 28 | $5,579.49 | $972.02 | $4,607.47 | $972.02 | No | | | | | |
| JNUG 03/23/2018 14.00 C | 3/23/2018 | 3/22/2018 | 100 | $6,928.33 | $1,471.51 | $5,456.82 | $1,471.51 | No | | | | | |
| GLD 03/23/2018 128.00 C | 3/23/2018 | 3/23/2018 | 150 | $645.18 | $2,204.80 | ($1,559.62) | $2,204.80 | No | | | | | |
| GLD 03/29/2018 126.00 C | 3/23/2018 | 3/19/2018 | 52 | $10,361.94 | $1,805.19 | $8,556.75 | $1,805.19 | No | | | | | |
| UVXY 03/23/2018 17.00 C | 3/23/2018 | 3/21/2018 | 18 | $5,385.55 | $608.33 | $4,777.22 | $608.33 | No | | | | $980.09 | $7,696.63 |
| UVXY 03/23/2018 17.00 C | 3/23/2018 | 3/21/2018 | 7 | $2,094.38 | $236.57 | $1,857.81 | $236.57 | No | | | | | |
| UVXY 03/23/2018 17.00 C | 3/23/2018 | 3/21/2018 | 11 | $3,291.17 | $371.76 | $2,919.41 | $371.76 | No | | | | $980.09 | $7,696.63 |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 10 | $762.32 | $76.76 | $685.56 | $76.76 | No | | | | | |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 10 | $762.32 | $76.75 | $685.57 | $76.75 | No | | | | | |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 15 | $1,143.48 | $115.13 | $1,028.35 | $115.13 | No | | | | | |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 40 | $3,049.31 | $307.02 | $2,742.29 | $307.02 | No | | | | | |
| GLD 03/23/2018 125.00 C | 3/23/2018 | 3/19/2018 | 15 | $4,034.97 | $730.73 | $3,304.24 | $730.73 | No | | | | | |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 110 | $9,051.62 | $844.31 | $8,207.31 | $844.31 | No | | | | | |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 90 | $7,494.97 | $690.79 | $6,804.18 | $690.79 | No | | | | | |
| JNUG 03/23/2018 15.00 C | 3/23/2018 | 3/23/2018 | 218 | $0.00 | $2,110.71 | ($2,110.71) | $2,110.71 | No | | | | $4,909.31 | ($4,909.31) |
| JNUG 03/23/2018 15.00 C | 3/23/2018 | 3/23/2018 | 82 | $0.00 | $793.92 | ($793.92) | $793.92 | No | | | | $4,909.31 | ($4,909.31) |
| JNUG 03/23/2018 15.00 C | 3/23/2018 | 3/23/2018 | 97 | $0.00 | $648.18 | ($648.18) | $648.18 | No | | | | $4,909.31 | ($4,909.31) |
| SLV 03/23/2018 16.00 C | 3/23/2018 | 3/21/2018 | 100 | $0.00 | $371.51 | ($371.51) | $371.51 | No | | | | $1,543.02 | ($1,543.02) |
| SLV 03/23/2018 16.00 C | 3/23/2018 | 3/7/2018 | 47 | $0.00 | $550.62 | ($550.62) | $550.62 | No | | | | $1,543.02 | ($1,543.02) |
| SLV 03/23/2018 16.00 C | 3/23/2018 | 3/7/2018 | 30 | $0.00 | $351.46 | ($351.46) | $351.46 | No | | | | $1,543.02 | ($1,543.02) |
| SLV 03/23/2018 16.00 C | 3/23/2018 | 3/7/2018 | 23 | $0.00 | $269.43 | ($269.43) | $269.43 | No | | | | $1,543.02 | ($1,543.02) |
| JNUG 03/23/2018 14.50 C | 3/23/2018 | 3/23/2018 | 150 | $4,395.10 | $4,754.80 | ($359.70) | $4,754.80 | No | | | | | |
| UVXY 03/23/2018 17.00 C | 3/23/2018 | 3/21/2018 | 1 | $299.21 | $33.80 | $265.41 | $33.80 | No | | | | | |
| UVXY 03/23/2018 17.00 C | 3/23/2018 | 3/21/2018 | 1 | $299.21 | $33.80 | $265.41 | $33.80 | No | | | | | |
| UVXY 03/23/2018 17.50 C | 3/23/2018 | 3/21/2018 | 60 | $13,154.82 | $1,124.88 | $12,029.94 | $1,124.88 | No | | | | | |
| JNUG 03/23/2018 15.00 C | 3/23/2018 | 3/23/2018 | 157 | $0.00 | $1,049.10 | ($1,049.10) | $1,049.10 | No | | | | $4,909.31 | ($4,909.31) |
| JNUG 03/23/2018 15.00 C | 3/23/2018 | 3/22/2018 | 26 | $0.00 | $173.75 | ($173.75) | $173.75 | No | | | | $4,909.31 | ($4,909.31) |
| JNUG 03/23/2018 15.00 C | 3/23/2018 | 3/23/2018 | 20 | $0.00 | $133.65 | ($133.65) | $133.65 | No | | | | $4,909.31 | ($4,909.31) |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 10 | $762.32 | $76.76 | $685.56 | $76.76 | No | | | | | |
| GLD 04/27/2018 135.00 C | 3/23/2018 | 3/22/2018 | 5 | $146.51 | $68.41 | $78.10 | $68.41 | No | | | | | |
| GLD 04/27/2018 135.00 C | 3/23/2018 | 3/22/2018 | 5 | $146.51 | $68.41 | $78.10 | $68.41 | No | | | | | |
| GLD 04/27/2018 135.00 C | 3/23/2018 | 3/22/2018 | 8 | $234.40 | $109.46 | $124.94 | $109.46 | No | | | | | |
| GLD 04/27/2018 135.00 C | 3/23/2018 | 3/22/2018 | 4 | $117.20 | $54.73 | $62.47 | $54.73 | No | | | | | |
| GLD 04/27/2018 135.00 C | 3/23/2018 | 3/22/2018 | 86 | $2,519.85 | $1,176.66 | $1,343.19 | $1,176.66 | No | | | | | |
| UVXY 03/23/2018 16.00 C | 3/23/2018 | 3/19/2018 | 20 | $5,384.15 | $994.30 | $4,389.85 | $994.30 | No | | | | $1,916.22 | $9,121.28 |
| UVXY 03/23/2018 16.00 C | 3/23/2018 | 3/21/2018 | 21 | $5,653.35 | $921.92 | $4,731.43 | $921.92 | No | | | | $1,916.22 | $9,121.28 |
| GLD 04/27/2018 135.00 C | 3/23/2018 | 3/22/2018 | 5 | $146.51 | $68.41 | $78.10 | $68.41 | No | | | | | |
| GLD 03/23/2018 126.00 C | 3/23/2018 | 3/22/2018 | 100 | $16,928.10 | $2,971.51 | $13,956.59 | $2,971.51 | No | | | | | |
| GLD 04/27/2018 135.00 C | 3/23/2018 | 3/22/2018 | 7 | $205.11 | $95.77 | $109.34 | $95.77 | No | | | | | |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 181 | $13,798.15 | $1,389.27 | $12,408.88 | $1,389.27 | No | | | | | |
| GLD 03/29/2018 127.00 C | 3/23/2018 | 3/23/2018 | 30 | $905.06 | $1,224.92 | ($319.86) | $1,224.92 | No | | 3/22/2018 | | | |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 10 | $762.32 | $76.75 | $685.57 | $76.75 | No | | | | | |
| GLD 03/23/2018 127.00 C | 3/23/2018 | 3/22/2018 | 24 | $1,829.59 | $184.21 | $1,645.38 | $184.21 | No | | | | | |
| UVXY 03/23/2018 16.50 C | 3/23/2018 | 3/23/2018 | 45 | $1,315.07 | $8,359.90 | ($7,044.83) | $8,359.90 | No | | 3/22/2018 | | | |
| GLD 04/27/2018 135.00 C | 3/23/2018 | 3/22/2018 | 5 | $146.51 | $68.41 | $78.10 | $68.41 | No | | | | | |
| GLD 04/27/2018 135.00 C | 3/23/2018 | 3/22/2018 | 25 | $757.48 | $342.05 | $415.43 | $342.05 | No | | | | | |
| GLD 03/29/2018 128.00 C | 3/23/2018 | 3/23/2018 | 1 | $18.40 | $18.76 | $0.00 | $18.76 | Yes | $0.36 | 3/22/2018 | $938.24 | $169.56 |
| GLD 03/29/2018 128.00 C | 3/23/2018 | 3/23/2018 | 49 | $1,089.40 | $919.48 | $169.92 | $919.48 | No | | 3/22/2018 | $938.24 | $169.56 |
| UVXY 03/23/2018 18.50 C | 3/26/2018 | 3/26/2018 | 15 | $1,112.87 | $492.11 | $620.76 | $492.11 | No | | 3/23/2018 | | | |
| UVXY 03/23/2018 18.50 C | 3/26/2018 | 3/26/2018 | 7 | $519.34 | $229.65 | $289.69 | $229.65 | No | | 3/23/2018 | | | |
| UVXY 03/23/2018 18.50 C | 3/26/2018 | 3/26/2018 | 1 | $74.19 | $32.79 | $41.40 | $32.79 | No | | 3/23/2018 | | | |
| UVXY 03/23/2018 18.50 C | 3/26/2018 | 3/26/2018 | 1 | $74.19 | $32.79 | $41.40 | $32.79 | No | | 3/23/2018 | | | |
| UVXY 03/23/2018 18.50 C | 3/26/2018 | 3/26/2018 | 11 | $816.10 | $360.88 | $455.22 | $360.88 | No | | 3/23/2018 | | | |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 15 | $675.04 | $865.43 | $0.00 | $865.43 | Yes | $190.39 | 3/23/2018 | $9,519.78 | ($2,199.70) |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 66 | $2,924.91 | $2,911.29 | $13.62 | $2,911.29 | No | | | 3/23/2018 | $3,071.51 | $1,378.16 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 1 | $44.32 | $38.39 | $5.93 | $38.39 | No | | | 3/23/2018 | $3,071.51 | $1,378.16 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 15 | $664.75 | $651.12 | $13.63 | $651.12 | No | | | 3/23/2018 | $3,071.51 | $1,378.16 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 20 | $886.34 | $921.73 | ($35.39) | $921.73 | No | | | 3/23/2018 | $653.82 | $232.52 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 1 | $44.32 | $45.08 | ($0.76) | $45.08 | No | | | 3/23/2018 | $31.68 | $12.64 |
| UVXY 03/23/2018 19.00 C | 3/26/2018 | 3/26/2018 | 46 | $3,414.56 | $5,552.94 | ($2,138.38) | $5,552.94 | No | | | 3/23/2018 | $11,830.18 | ($4,555.49) |
| UVXY 03/23/2018 18.00 C | 3/26/2018 | 3/26/2018 | 100 | $10,628.24 | $5,671.51 | $4,956.73 | $5,671.51 | No | | | 3/23/2018 | | |
| UVXY 03/23/2018 19.00 C | 3/26/2018 | 3/26/2018 | 2 | $148.46 | $241.43 | ($92.97) | $241.43 | No | | | 3/23/2018 | $11,830.18 | ($4,555.49) |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 18 | $815.69 | $552.86 | $262.83 | $552.86 | No | | | 3/23/2018 | $3,071.51 | $1,378.16 |
| UVXY 03/23/2018 19.00 C | 3/26/2018 | 3/26/2018 | 50 | $3,711.67 | $6,035.81 | ($2,324.14) | $6,035.81 | No | | | 3/23/2018 | $11,830.18 | ($4,555.49) |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 10 | $443.16 | $470.86 | ($27.70) | $470.86 | No | | | 3/23/2018 | $336.91 | $106.25 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 19 | $842.02 | $875.63 | ($33.61) | $875.63 | No | | | 3/23/2018 | $1,634.53 | $581.31 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 31 | $1,373.82 | $1,013.41 | $360.41 | $1,013.41 | No | | | 3/23/2018 | $1,634.53 | $581.31 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 85 | $3,766.93 | $2,863.68 | $903.25 | $2,863.68 | No | | | 3/23/2018 | | |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 150 | $6,645.04 | $8,654.35 | $0.00 | $8,654.35 | Yes | $2,009.31 | | 3/23/2018 | $9,519.78 | ($2,199.70) |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 1 | $39.40 | $47.07 | $0.00 | $47.07 | Yes | $7.67 | | 3/23/2018 | $33.67 | $5.73 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 11 | $487.49 | $517.94 | ($30.45) | $517.94 | No | | | 3/23/2018 | $370.59 | $116.90 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 2 | $88.63 | $94.17 | ($5.54) | $94.17 | No | | | 3/23/2018 | $67.38 | $21.25 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 3 | $132.95 | $138.24 | ($5.29) | $138.24 | No | | | 3/23/2018 | $98.05 | $34.90 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 11 | $487.49 | $517.94 | ($30.45) | $517.94 | No | | | 3/23/2018 | $370.59 | $116.90 |
| GLD 03/23/2018 127.50 C | 3/26/2018 | 3/26/2018 | 6 | $265.90 | $282.52 | ($16.62) | $282.52 | No | | | 3/23/2018 | $202.15 | $63.75 |
| AMTD 03/29/2018 59.50 P | 3/28/2018 | 3/21/2018 | 15 | $3,509.98 | $612.96 | $2,897.02 | $612.96 | No | | | | | |
| GLD 03/29/2018 128.00 C | 3/28/2018 | 3/28/2018 | 99 | $7,156.04 | $2,842.79 | $4,313.25 | $2,842.79 | No | | | 3/27/2018 | $2,871.51 | $4,356.81 |
| GLD 03/29/2018 128.00 C | 3/28/2018 | 3/28/2018 | 1 | $72.28 | $29.08 | $43.20 | $29.08 | No | | | 3/27/2018 | $2,871.51 | $4,356.81 |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 35 | $0.00 | $513.88 | ($513.88) | $513.88 | No | | | | $6,599.37 | ($6,599.37) |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 12 | $0.00 | $176.19 | ($176.19) | $176.19 | No | | | | $6,599.37 | ($6,599.37) |
| GLD 03/29/2018 128.00 C | 3/29/2018 | 3/27/2018 | 300 | $0.00 | $8,604.63 | ($8,604.63) | $8,604.63 | No | | | | | |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 37 | $0.00 | $543.24 | ($543.24) | $543.24 | No | | | | $6,599.37 | ($6,599.37) |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 40 | $0.00 | $587.29 | ($587.29) | $587.29 | No | | | | $6,599.37 | ($6,599.37) |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 32 | $0.00 | $469.82 | ($469.82) | $469.82 | No | | | | $6,599.37 | ($6,599.37) |
| GLD 03/29/2018 127.00 C | 3/29/2018 | 3/22/2018 | 68 | $0.00 | $2,836.64 | ($2,836.64) | $2,836.64 | No | | | | $8,009.26 | ($8,009.26) |
| GLD 03/29/2018 127.00 C | 3/29/2018 | 3/28/2018 | 500 | $0.00 | $3,837.75 | ($3,837.75) | $3,837.75 | No | | | | $8,009.26 | ($8,009.26) |
| UVXY 03/29/2018 20.50 C | 3/29/2018 | 3/23/2018 | 60 | $0.00 | $4,484.88 | ($4,484.88) | $4,484.88 | No | | | | | |
| JNUG 03/29/2018 14.50 C | 3/29/2018 | 3/22/2018 | 26 | $0.00 | $828.27 | ($828.27) | $828.27 | No | | | | $5,583.07 | ($5,583.07) |
| JNUG 03/29/2018 14.50 C | 3/29/2018 | 3/22/2018 | 150 | $0.00 | $4,754.80 | ($4,754.80) | $4,754.80 | No | | | | $5,583.07 | ($5,583.07) |
| GLD 03/29/2018 127.00 C | 3/29/2018 | 3/22/2018 | 32 | $0.00 | $1,334.87 | ($1,334.87) | $1,334.87 | No | | | | $8,009.26 | ($8,009.26) |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 12 | $0.00 | $167.95 | ($167.95) | $167.95 | No | | | | $6,599.37 | ($6,599.37) |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 3 | $0.00 | $41.97 | ($41.97) | $41.97 | No | | | | $6,599.37 | ($6,599.37) |
| UVXY 03/29/2018 21.00 C | 3/29/2018 | 3/23/2018 | 150 | $0.00 | $11,954.80 | ($11,954.80) | $11,954.80 | No | | | | | |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 64 | $0.00 | $939.63 | ($939.63) | $939.63 | No | | | | $6,599.37 | ($6,599.37) |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 135 | $0.00 | $1,984.81 | ($1,984.81) | $1,984.81 | No | | | | $6,599.37 | ($6,599.37) |
| GLD 03/29/2018 129.00 C | 3/29/2018 | 3/27/2018 | 30 | $0.00 | $440.47 | ($440.47) | $440.47 | No | | | | $6,599.37 | ($6,599.37) |

## Predicate Count #18

### 18 U.S.C § 1029.
### *Fraud and related activity in connection with access devices*

### Defendants: TD Ameritrade and Charles Schwab

**(1)** **The Defendants' enterprise abused the permissions granted to the Schwab and TD Ameritrade applications to facilitate clandestine access to Pitlor's accounts, and his electronic devices, via unauthorized access devices, including TD Ameritrade Account ####1360 which, as a closed account, is an unauthorized access device., in violation of 18 U.S.C. § 1029.**

638.    The crash reports generated by the Defendants' mobile applications confirm that, regardless of whether or not TD Ameritrade was a party to the conversion transactions, TD Ameritrade's Electronic Services were utilized and materially contributed to the concealment of cash value as well as the conversion transactions pertaining to Pitlor's Schwab Accounts.

639.    The scheme required the cooperation and collaboration between the Defendants so to facilitate TD Ameritrade's tortious interference with Pitlor's Schwab Account, including the wire fraud and money laundering. Their use of unauthorized access devices is well documented and multi-faceted, constituting a pattern of violations of **18 U.S.C. § 1029,** evidenced by the following:

a. "Null Sessions" were utilized to access Pitlor's accounts, and his devices, without valid login credentials. TD Ameritrade's interaction with Schwab's Electronic Services, via intrusions on Pitlor's devices and accounts, was facilitated by null sessions whereby no authenticated login occurred.

b. Production of access devices and manipulation of telecommunication instruments to facilitate those intrusions is well documented by TD Ameritrade's extensive debugging activities on Pitlor's devices, so to enable null sessions.

c. Pitlor's TD Ameritrade Account ####1360 was utilized in the scheme and, for its being a closed account, is also an unauthorized access device according to **18 U.S.C. § 1029.**

640.    TD Ameritrade's intrusion on Pitlor's devices specifically pertaining to the Schwab Account occurred on 3/1, 3/21, 3/22, 4/3. Other unauthenticated logins and fraudulent access devices

228

were used, produced, or trafficked to further the goals and purposes of the enterprise on 4/24, 5/23, 5/25, and 6/1.

641.    On 2/28/2018, the Schwab Mobile Application crashed due to errors identified as Null Pointer Exceptions and Null Object References. Essentially, the application was looking for data that was supposed to exist, but was "null" (empty).



642.    The errors specifically pertained to newly created Schwab Account activity and the Fragment Manager (right screenshot – green arrow).

643.    Whereas an "Activity" is an application component that is typically given a window to draw a user interface, a fragment is a finer-grained application component that allows the application and its user interface to be broken up into separate modules, fragments. Fragments are "mini-activities" that are reusable, independent, portions of the application and the screen that can be drawn independently of each other, each receiving its own events having its own state, application lifecycle, and back stack.

644.    "Background Fragments" can be used to do work that persists across activities. They can be retained when the configuration changes and persist even when activities are destroyed or re-created.

645.    The stack traces of the crashlogs generated by the Schwab Mobile app, and then later by TD Ameritrade's *ThinkorSwim* app, each document the proliferation of errors pertaining to fragments. Those errors give rise to the opportunity to debug and edit the "faulty" data that is capable of interacting with background data and processes.

**The 2/28/2018 System log documents a Warning pertaining to a "Null Session" associated with Process ID (1621)**

A null session was utilized along with verbose commands. Note the debug and verbsose switches that accompany the majority of these log entries.

 

646.    Seconds later, Process ID (1621) is involved in additional suspicious debugging activities:

- (left): Debugging activity pertaining to executable commands instructs keys to be intercepted. (! Means executable command).
- (left): The log entries pertain to the "*Input Manager – JNI*", which stands for "Java Native Interface." JNI allows programmers to make their applications and data to be compatible and accessible across multiple platforms, precisely as would be expected for Schwab account data to be processed through TD Ameritrade's platforms, and vice-versa.
- (right): Then, a fraction of a second later there is an array of warnings that there exists an "*Active Mobile Network without subscriber!*
- (right – green arrow) A warning is received due to an a image file being in an invalid format, suggesting that the file contained information that was not an image, but instead contained other data concealed via steganography.



647.         Seconds minutes after Process ID (1621) is logged with the warning of there existing an "active mobile network without subscriber!", a "timestamps broadcast receiver" is changed via a third party client identifying it to be sourced from Amazon.

a. (left) The log entries pertaining to Amazon identifies an unspecified "thirdpartyclient" and involving Advertising Video On-Demand (AVOD).

b. (left) The log entry denotes a change to the timestamp broadcasts receiver[91], further referring to a "Lambortish" clock, which refers to a means of timekeeping and tracking events with respect to the order that those events occurs.

c. Then, seconds later, a photo is accessed from "amazon.clouddrive"



648.        The next morning on 3/1/2018 at 7:01. the Schwab Mobile App crashed again, and among the running applications are TD Ameritrade's *ThinkorSwim* application, along with another identified as "Maintenance" for the *ThinkorSwim App*, along with sandboxed processes,

---

[91] Altering temporal information were relied upon by both Defendants' schemes, particularly in Pitlor's TD Ameritrade Account ####1360 where erroneous timestamps plagued the Transaction History's Cash Accounting for 18 months. Pitlor brought this to TD Ameritrade's attention, and they refused to acknowledge the existence of the obvious pattern of discrepancies.

privileged processes, settings receivers, the Knox secure folder, all of which are suspicious with respect to the specific log entries and events that follow.





649.         Moments later at 7:04 am, Pitlor was temporarily unable to sign-in to the account because a new User ID had been created. One hour later, another crash log confirms process

233

(1621) to be associated with TD Ameritrade and Samsung's secure file partitioning system, KNOX.



650.        Process (1621), that which was specifically referenced above with regard to null sessions, TD Ameritrade, and altered timestamps receivers by way of Amazon, is confirmed to be associated with Schwab Account Activity.

651.        Again, an entry pertaining to "ChangeTimestampsBroadcastsReceiver" is logged, this time sandwiched between entries pertaining to "AccountDetailsTabActivity" pertaining to Pitlor's Schwab Account.



652.        The majority of TD Ameritrade's log entries pertaining to process (1621) on 3/1/2018 are debugging and verbose entries. It is reasonable to presume that the debugging log entries pertaining to other processes are similarly related, such as Process ID (659) which is configuring the network settings for "Wifip2pService", including debugging of the DNS Proxy Server. By setting up a DNS proxy, an entity's physical location can be spoofed to make it appear that content is being accessed from an authorized location.

653.        Moreover, as shown below, the crash logs clearly document TD Ameritrade's interaction with Pitlor's device to involve frequent verbose and debug log entries pertaining to:

235

- **(left):**  (1) Accessing and resuming TaskRecords (2) modifying the "DVFS – Dynamic Frequency Managing Service, which changes the way the processor operates and allocates resources and

- **(right):**  (1) instructing a user change pertaining to the secure KNOX folder- but instructing there be no notification posted regarding that change. (2) Instructing that "Shared devices show user statefalse" to conceal the shared status of the device, as it was achieved via an unauthorized access device, immediately preceding (3) verbose log entry from devexperts.tdmobile.

 

654.         .        More examples of TD Ameritrade's debugging and verbose log entries pertaining to the crash of Schwab's Mobile App. on 3/1/2018, evidencing the elaborate programming and application development specifically tailored to infiltrate Pitlor's device and to perform

clandestine data manipulations and inter-process communications between the Defendants' platforms:

- **(left)**: (1) Verbose entry - editing information into Null Channels [ic = null refers to null input channel.] Input method manager "Editor" being used with root access, indicating unauthorized access.

- **(Middle)**: (1) concealing activity pertaining to KNOX (2) disposing of input channel

- **(Right)**: (1) writing data using "AudioFlinger" (2) accessing and debugging unexpected occurrence pertaining to "GameManagerService" pertaining to devexperts.tdameritrade.



655.    The morning of 3/6/2018, null pointer exceptions pertain to login activity, indicating unauthorized access to Pitlor's account achieved without login credentials, including:

    a.    Logon to equity awards, the Schwab portal specifically geared toward fund transfers, exercising options, and other conversions including Mutual Funds. At no time on

3/6/2018 did Pitlor access the Schwab Equity awards, and every login to his account was achieved with authorized login credentials.

b.  Numerous additional entries pertaining to null logins (i.e. signing in without authorized credentials),  including using the "pin entry widget" which, again, Pitlor never used.



656.    On 3/21, Schwab's Mobile Application crashed, and log entries pertaining to Process ID (1623) documents the clandestine inter-process communications between TD Ameritrade and

Schwab's Application included access, manipulation, and transmission of data pertaining to account history and balances.





Process 1623 : Instructions pertaining to Schwab "Retail Broker Balance Details Activities" "on pause" and "on stop" indicating certain commands to be followed upon the process being paused/stopped



One second later on Process 1623, prior to login (Which occurs a few thousands of a second thereafter) the TD Ameritrade app "moveTasktoFront". Upon login, the "on_paused" activity is called and resumed, thereby directly evidencing the Defendants collusion concerning tasks involving Schwab Account balances.



240

657.    Further evidence on 3/21 supports the conclusion that TD Ameritrade was involved with the processing and manipulation of Pitlor's Schwab Account data:

- **Left:** @ 15:32, TD Ameritrade's "devexperts" disguised as "maintenance", executed actions pertaining to privileged processes on Process ID (1623),

- **Middle:** Debugging Commands the Schwab App Destroy the input channel. That input channel involved TD Ameritrade, as may be plausibly concluded with respect to the screenshots presented on the previous page also pertaining to Process ID (1623).

- **Right:** (1) A "surface null session" is started on Schwab.mobile without login credentials. (2) The Custom Frequency Manager Service pertaining to the DVFS, utilized to tune the CPU processor and set its operating parameters, was debugged similarly to TD Ameritrade's actions on 3/1 performed with respect to Process ID (1621).



658.        During the evening of 4/3/2018, an additional instance of unauthorized login to Pitlor's account is documented by the *Stack trace* generated by the crash of Schwab Mobile App.

<div align="center">

**4/3 Screenshot @ 21:19**
**Stack Trace**

</div>



## B. Data usage by TD Ameritrade's *ThinkorSwim* application corroborates claims of TD Ameritrade's tortious interference, and the clandestine agreement between the Defendants

659.    The following screenshots show the data usage by the TD Ameritrade app in March and April of 2018. Pitlor's did use the TD Ameritrade to view prices for securities and track the markets, but the data usage rates are through the roof. Almost 90MB in March, and 400 MB in April, including 14.52 MB of background activity. In both months, the data usage is substantial, but in April the data usage rate was 4.5X higher, indicating the accumulated Schwab account data having been processed and transmitted several times over.

660.    TD Ameritrade was very busy accessing and processing data on Pitlor's device during the time the Schwab Account was active. Indeed, this supports the claim that TD Ameritrade was directly involved with the processing, editing, and manipulation of data in Pitlor's Schwab Account.



a.

**C. TD Ameritrade and Schwab's agreement extended beyond the time span of Pitlor's accounts, as evidenced by TD Ameritrade's intrusions onto Pitlor's devices in May and June 2018 to "Restore All States".**

661.    The following screenshot is particularly revealing:

a.    the Android Debug Bridge is directly documented as having been activated

b.    The KNOX secure folder is immediately accessed via the debugger, implying a violation of 18 U.S.C. 1029 because no login credentials were used.

c.    A "Secure Folder Task" is resumed.



## D.     The Defendants' enterprise included Amazon and Facebook

662.          Screenshots capture significant detail pertaining to Schwab and TD Ameritrade's intrusions on Pitlor's devices, including their incorporating the electronic services of both Facebook and Amazon.

663.          While Amazon and Facebook apps were indeed installed on Pitlor's devices during the relevant timeframes, Pitlor was not an active Facebook or Amazon user.  Certainly, he did not sign into either Facebook or Amazon on 2/28/2018,  3/1/2018, or 4/24/2018, nor did he use the Facebook messenger to send any pictures in May 2018.   The following screenshots of crash logs plausibly indicate that:

  a.   On 2/28/2018: TD Ameritrade leveraged its relationship with Facebook and proceeded to abuse the electronic services to initiate the clandestine digital linkage to Schwab's processes operating on Pitlor's device, thus facilitating the tortious interference that transpired thereafter.

  b.   On 3/1/2018: The manipulated timestamps were facilitated via Amazon's web services, so to segregate the errant timekeeping contrivances from the brokerages' digital infrastructure.

  c.   On 4/24/2018: Facebook's systems were again utilized to facilitate TD Ameritrade's clandestine access and other activities pertaining to their unlawful intrusions.

Facebook's involvement with Process 1621 on 2/28/2018:

Moments earlier, Process 1621 was used to deliberately crash the Schwab App,

the first such crash of many that followed, and as shown on the following page, 1621 was also responsible for

'changing the timestamp broadcast receiver'



- (Left and Middle)A process (1621) associated with Facebook appears in the event log.  First the instruction to kill (terminate) the process, then the confirmation.
- Similarly, processes associated with the Samsung account and cloud storage (osp.app.signin & scloud) were also stopped by process (1621).
- Pitlor was not an active user of Facebook and did not have the app open at that time[92]
- Right: Process (1621) acts as the application crash proxy ("AppCrashProxy") which results in an error in the Schwab mobile app, as documented by the next entry in the log

---

[92] Pitlor has screenshots of the crashlog listing all open applications at the time of this particular crash, and Facebook was not on the list of open applications.









664.    "Orca" is Facebook's messenger app.  TD Ameritrade and Facebook's legitimate association-in-fact enterprise includes provision of TD Ameritrade's brokerage services through Facebook's platform.

247

**E.    Pitlor's TD Ameritrade account balances were frozen so to continue to report the same $3.51 balance that existed since the account's supposed "closure", as evidenced by the restoration of normal timekeeping upon TD Ameritrade's final intrusion (to Pitlor's knowledge) via deliberate application crash on June 1, 2018.**

665.    The two screenshots below contain the following evidence of manipulation:
- 1508245866142 is the Unix Timestamp referring to October 17th 2017. (left)
- The daemon[93] used to freeze the state of Pitlor's account (persistence), most substantially the account balance data, was written off  (left)
- Kernel timezone is confirmed to be updated (right)
- Extensive use of debugging entries "D/" and the errors "E/" existing in the log indicate settings and data were altered, not as part of an application's programmed processes and features, but instead documented above to be aberrations, custom modifications.

 

---

[93] The daemon was used to deviate from standard procedures, and instead report a persistent value corresponding to a chosen point in time.

The words "daemon" and "demon" both come from the same root, but "daemon" is an older form and its meaning is somewhat different. A daemon is an attendant spirit that influences one's character or personality. Daemons are not minions of evil or good; they're creatures of independent thought and will. – Linux Administration Handbook Chapter 29. Source: https://admin.com/samples/Daemons.pdf

666.    The two screenshots that follow affirm that the errors were caused by TD Ameritrade's *ThinkorSwim* app. The "Illegal State Exceptions" pertain to the fragment manager, zygote processes, and inter-process communications.



667.    In addition to the numerical relationships that confirm the significance of $3.51 in the various calculations, the crash reports generated by the Schwab Mobile App and TD Ameritrade's *Thinkorswim* app generated a plethora of direct evidence of the Defendants' nefarious collaboration.

668.    Selected samples are presented to efficiently demonstrate the plausibility of Pitlor's claims. The evidence organized according to the following categories.

669.   On 4/24/2018, just days prior to the abrupt restriction of Pitlor's access to his Schwab account[94], TD Ameritrade's app crashed on Pitlor's phone, and the crash logs indicate TD Ameritrade's acting to eliminate evidence of the nefarious cooperation with its supposed competitor.

670.   On 5/23, 5/25, and 6/1/2018, a series of subsequent crashes of the TD Ameritrade's *ThinkorSwim* Mobile App involved "null pointer exceptions" and "illegal state exceptions" including specific errors pertaining to the processing and editing of order data. Further, adjustments were made regarding data access privileges and timestamps which had been manipulated on 2/28/2018 and 3/1/2018.

671.   After the Court's ruling in 8:17-cv-00359 granted dismissal of Pitlor's action against TD Ameritrade on 4/20/2018, the enterprise was emboldened by the decision. The funds, which were likely stashed in Schwab Futures Account ####6617 (or perhaps had been moved back to Pitlor's account ####5612), were transferred to TD Ameritrade.

672.   The enterprise deliberately instigated conflict between Pitlor and Schwab via obnoxious, flagrantly violative conduct. By aggravating the dispute between Schwab and Pitlor, focus was shifted to the Schwab account and that dispute. When Schwab secured a favorable result in District Court, then the funds were transferred back at the end of May. The letter on the following page, indicating activity in the TD Ameritrade Account, documents action by TD Ameritrade that establishes this to be plausible, beyond just mere speculation.

---

[94] Schwab had specified in writing that the account would be closed on 5/02/2018. Pitlor specifically requested access to account data to extend beyond this date, but the Managing Director of Schwab's Corporate Legal Counsel adamantly insisted that there was no possibility of any such accommodation being made. Then, Schwab abruptly restricted access of 4/27/2018.



**TD Ameritrade**

April 23, 2018



················SNGLP-680
DAVID PITLOR
1711 S 61ST AVE
OMAHA, NE 68106-2109

TDA 8531

Re: An Uncashed Check from Your Account

Dear Valued Client,

We want to let you know about an action we've taken on an uncashed check.

On October 4, 2017, we issued check number 13291799 in the amount of $3.51 from your account ending in 1360. However, our records indicate that this check was never cashed or deposited.

To protect your account, we have voided the check and returned the funds to the account. If you have this check, please do not attempt to cash or deposit it.[1]

If you would like us to issue a new check, just let us know. Log in to your account and go to My Account > Deposits & Transfers > Cash Transfers. Then follow the directions on the page.

If you have any questions, or if we can be of any help, please log in to your account and go to the Message Center to write us. Or you can call Client Services at 800-669-3900. We're available 24 hours a day, seven days a week.

Sincerely,

*Carrie Braxdale*

Carrie Braxdale
Managing Director, Investor Services
TD Ameritrade

---

[1] Securities and Exchange Commission (SEC) Rule 17Ad-17 requires us to send notification to a client who has not negotiated a check six months (180 days) after it was sent, or who receives regularly scheduled checks and has not negotiated a check when the next scheduled check is sent, whichever comes first. The SEC rule requires us to inform the client that the check has not been negotiated no later than seven months (210 days) after the check was sent to the client.

Market volatility, volume, and system availability may delay account access and trade executions.

TD Ameritrade, Inc., member FINRA/SIPC. TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2016 TD Ameritrade IP Company, Inc.

TDA 8531 L 11/16

673.    Then, On 4/24, TD Ameritrade's crashed on Pitlor's phone for the first time. The crash pertained to errors, debugging, and warnings pertaining to, among other things, the Secure Linux[95].

---

[95] SILinux: Secure linux seperates security policy from implementation.

b.  Zygote It is logged with the Error switch ("E/").  Zygote is the init-process for Android, it simplifies runtime loading for applications by preloading -at boot them and sharing with apps that are started later.  The nature of the error causing the crash was categorized as an "Illegal State Exception" which, in lay terms, is precisely what the phrase imples: "something where it is not allowed or not able to be."

c.  The SeLinux log entry is in fact logged with a "Warning" ("W/"), albeit partially obscured by the glare of the photo[96], which indicates high probability of causing errors.

d.  The adjacent log entries pertain to "whitelisting" and "blacklisting" processes and access to data partitions, which pertains to permissions and privileges, precisely that which is being warned by the SeLinux, indicating vulnerability or other abnormality.  Indeed, it is precisely these settings that were required to be changed to enable the inter-process communications that transpired and to restrict Pitlor from accessing or otherwise interfering with the clandestine activities.

674.    Previously, it was the Schwab App that crashed, and those crash logs were populated with TD Ameritrade related log entries, including debugging and verbose entries, as well.  Several examples are presented in the next several pages.  The screenshot below contains the debugging, error, and warning log messages pertaining to the Whitelisting, Blacklisting, Secure Linux, and Zygote Processes as described by the previous page.

---

SELinux supports the concept of a "remote policy server" (configurable via /etc/selinux/semanage.conf) as an alternative source for policy configuration.

SELinux will usually support those same permissions, but also includes controls for mknod, binding to network sockets, implicit use of POSIX capabilities, loading and unloading kernel modules, various means of accessing shared memory, etc

[96] Only the 4/24/2018 crash logs are photos with poor quality due to glare.  All others are standard screenshots.



## The Relevance of "-978464720"

675.    The crash logs from the TD Ameritrade App on 5/23/2018 indicate that TD Ameritrade had been in TD Ameritrade's possession of or otherwise control funds directly relating to the $9,999,999.00 and the exploitation of Pitlor's Schwab Account, thereby further corroborating the

alleged conspiracy. The number "-978464720" was secretly accessed and the source of the data was destroyed on 5/23.

676.      The evidence from the crash logs supports the conclusion that the funds laundered from Pitlor's Schwab account were concealed within Pitlor's supposedly closed TD Ameritrade accounts on 4/24/2018, and then ultimately repatriated back to Schwab approximately one month later. It may or may not have transpired in the precise manner as alleged below, but compelling evidence and corroborating analysis leave little doubt that (1) TD Ameritrade either controlled $9,784,647.20 on at least 5/23/2018 and arranged for a debit or transfer to occur, or (2) was taking action to conceal their previous involvement with that sum. In either instance, TD Ameritrade expended considerable effort to conceal that numerical value, a negative value, that would represent a debit, (9,784,647.20).

677.      TD Ameritrade forced a series of crashes of the *ThinkorSwim* application on Pitlor's device on 5/23/2018 with a "Null Pointer Exception" then again on 5/25/2018 with an "illegal state exception".

   a.  A *null pointer exception* refers to blank data field being referenced that is not supposed to be empty.

   b.  An *illegal state exception* refers to data that impossibly exists in a state that is not allowed (i.e. text existing in a numerical data field, for example, or changes to account data that render the historical data to be inaccurate or inconsistent).

678.      The errors specifically pertained to "OrderEditorParamsHolder.java", implying transaction activity was being manipulated. The error logs are littered with debugging entries, warnings, and other anomalous exceptions. Under no circumstances would such errors occurs or such extensive debugging activities populate the logs under normal circumstances whereby the application was only being used to access stock market data.

 

679.        As shown by the screenshots below:

**Left Screenshot**

- data described as "Redoable" is accessed from 4/24/2018[97]. (5adf5c00 is the hexadecimal date for April 24th 2018).

- Next, permission is first attained by debugging the manifest to grant permission to write to external storage, then an event log with detail and value is inserted as indicated by the log entry: "InsertEventLogWithDetailandValue" which is associated with a process "Flash Annotate[98] Permission Utilities"

- The integer value inserted is -978464720, which would correspond to the value ($9,784,647.20) in decimal format.

---

[97] The first of the series of 5 documented crashes of TD Ameritrade's app occurred on 4/24/2018, just days prior to Schwab's abruptly and permanently restricting Pitlor's account access.

[98] "Flashing" refers to deleting and overwriting data.

## Right Screenshot

- After the value is loaded as a Frame Buffer Object, the log which contained those buffer values was debugged to promptly delete the source of the data.



1. On the left:
   a. Data described as "Redoable" is accessed from 4/24/2018[99]. (5adf5c00 is the hexadecimal date for April 24th 2018).
   b. Next, permission is first attained by debugging the manifest to grant permission to write to external storage, then an event log with detail and value is inserted.
   c. "InsertEventLogWithDetailandValue" is a process associated with "Flash Annotate Permission Utilities"
   d. The integer value inserted is -978464720, which would correspond to the value ($9,784,647.20) in decimal format.

---

[99] The first of the series of crashes of TD Ameritrade's app occurred on 4/24/2018, just days prior to Schwab's abruptly and permanently restricting Pitlor's account access. (The other documented crashes occurred on 5/23, 5/25, and 6/1 )

2. On the right:

   e. After the value is loaded as a Frame Buffer Object, the log which contained those buffer values are promptly deleted.

680.    Essentially, data from April 24th was accessed and overwritten with other data, and a specific value was entered. That value which was entered, (9,784,647.20), is the remaining balance of the $10,000,005.87 *Cash on Hold* balance that was initially segregated via the *Bank Sweep Feature* and laundered on 3/6/2018, as demonstrated by the following analysis that precisely accounts for that specific amount.

$$\$215,358.67 = \$10,000,005.87 + (\$9,784.647.20)$$

681.    The difference between those values, $215,358.67, directly correlates to Pitlor's maximum *Total Account Value*. Purchases and withdrawals converted funds from cash to other assets. When the funds were withdrawn, legitimately lost via unprofitable investments, or stolen by the enterprise, those funds did not return. The funds in Pitlor's account were comingled in such a manner that the enterprise was a counterparty to Pitlor's trades; thereby the theft from Pitlor's account and pattern of racketeering activities constitute violations of RICO A or B. Pitlor's losses were the enterprise's gains, but those gains were realized in a different account in which Pitlor had no interest, and so it logically follows that the remaining, undisturbed funds of the originally converted $10,000,005.87 could be derived as follows:

$$\$215,358.67 + \$3,404.57 = \$94,983.44 + \$74,594.84 + \$49,200.71 + 4.45 + 2.29 + .77\ (-)\ [\$23 + \$.26]$$

- $94,983.44: end-of-day account value for 3/23/2018 according to Historical Data
- $49,200.71[100]: The value concealed from the account on 3/23/2018, the value understated by $94,983.44.
- $74,594.84: The amount of the withdrawal that "was not present" and thus had to be borrowed, consistent with the interpretation that the entirety of the funds in Pitlor's account were configured so to be "borrowed" against that $10,000,005.87.

---

[100] See Predicate Count #7-E for the derivation of $49,200.71 as the total value concealed by historical balance data for 3/23/2018.

**F.**      **The Defendants' scheme relied upon Process Isolation and Privilege Reduction to subjugate Pitlor to egregiously unfair abuses which caused him significant harm.**

"Process isolation and privilege reduction are techniques that are often a cornerstone in secure system design. The complexities of these techniques complicate the system for both developers and attackers, which increase the cost of development for both parties. When an attacker is crafting his attack, he must take the time to fully understand the complexities involved. With a system like Android, exploiting a single vulnerability may not be enough to get full access to the system. Instead, the attacker may have to exploit several vulnerabilities to achieve the objective. **To summarize, successfully attacking a complex system requires a complex exploit."**[101]

682.      The Defendants conspiratorial agreement featured reoccurring themes of "process isolation" and "privilege reduction", both in the context described above pertaining to Android data security architecture, as well as in a more general sense.

683.      In terms of the claims of the Defendants' digital trespassing and violations of **18 U.S.C. § 1029,** Pitlor's "privilege reduction" can also be described in terms of the Defendants' privilege escalation and their comingling of processes and resources.

    a.  The Defendants integrated their processes, which are supposed to be isolated, to vastly augment the fraudulent potential of their racketeering enterprise. This enabled fraudulent segregation and transfer (i.e. isolation) of transaction and accounting procedures.

    b.  The enterprise's "privledge escalation" concerned Schwab's access to TDAmeritrade's data processing systems (and vice-versa). The TD Ameritrade is  was retooled in a manner that effectively exploited Pitlor's brokerage account (at TD Ameritrade) for well over 18 months, featuring  retroactive editing of account balances as well as manipulations pertaining to transaction sequences and, more generally, timekeeping.

684.      The following screenshot was taken over the weekend after Pitlor's Futures Account was supposedly closed without notice or formal acknowledgement thereafter. The screenshot evidences both "privilege escalation" and "process isolation".

---

[101] Regretfully, Pitlor misplaced the reference to this passage, but it was contained in a digital book pertaining to exploits, hacking, and security as pertained to the Android system.

a. To avoid computational errors in the official record, the data had to be isolated so be removed or excluded from the official record. Certainly, accessing the "Schwab Employer Sponsored Service Systems" would grant privileges that would ordinarily not be available. In this case, Pitlor was not able to access these systems, but the evidence clearly indicates that Pitlor's account had indeed utilized whatever enhanced privlidges offered by

b. Simultaneously, an error message indicates that Pitlor would be unable to access any account data, whether online or via the phone, pertaining to some "functionality" regarding his account. Indeed, this restricted Pitlor from accessing all data pertaining to the Futures Account, historical balance data, and more.

 Some functionality including account settings, BillPay, money movement and portfolio reporting is currently unavailable online and via our automated phone systems. In addition, some account information including balance, positions and transactions may be delayed or unavailable. We apologize for any inconvenience. Please call 800-435-4000 for assistance.

## All Brokerage Accounts

Go to new Summary

| Total Accounts Value * | Total Cash & Cash Investments | Total Market Value | Day Change ** |
|---|---|---|---|
| $21,263.83 | $1,463.83 | $19,800.00 | -$12,665.09 (-37.33%) |

### Brokerage Accounts

| Name | Account | Cash & Cash Investments | Account Value | Day Change ** | Next Steps |
|---|---|---|---|---|---|
| Individual | 2043-5612 | $1,463.83 | $21,263.83 | -$12,665 09 (-37 33%) | 15 |
| Totals | | $1,463.83 | $21,263.83 | -$12,665.09 (-37.33%) | All Positions |

 Schwab Employer Sponsored Service systems are not available at this time. try back later — code 002

Schwab Website Screenshot 4/1/2018 @ 01:49

259

## KEY VALUES: $494.54 & $2702.27

## Disallowed Wash Sale Losses

1. A *Disallowed Wash Sale Loss* for **$494.54** is reported for the transactions of JNUG sold on 2/28/2018, as shown below in the screenshot of Schwab's Realized Gain / Loss data. However, no loss for $494.54 occurred.

2. On 2/27/2018, the first day of trading, All JNUG shares were purchased prior to any sales of those shares occurred. No JNUG shares were repurchased after being sold, period.[1] There is no possibility for any loss to be disallowed, and thus no justification for altering the *Cost Basis*. As a result, **$494.54** is able to be removed from the account without being registered as a loss.

3. Because no wash sale occurred, the removal of $494.54 from the account is required to maintain consistency between the transactional accounting and he *Realized Gain (or Loss)*.

Transactions  **Realized Gain / Loss**

View Unrealized Gain/Loss

Trades made today will not appear until tomorrow.
Cost Basis Calculator    Rules & Assumptions

Select Date Range.    From:    To:
Year to date    01/01/2018    03/03/2018    Search

**Reporting Period: 01/01/2018 to 03/03/2018**

| Proceeds | Cost Basis | Total Gain/Loss | Long Term Gain/Loss | Short Term Gain/Loss |
|---|---|---|---|---|
| $81,045.62 | $80,283.41 | +$1,256.75 (1.57%) | $0.00 (N/A) | +$1,256.75 (1.57%) |

| | | | | | | | Gain/Loss ($ I %) | |
|---|---|---|---|---|---|---|---|---|
| Symbol | ▴ Name (Full I Short) | Closed Date | Quantity | Proceeds | Cost Basis Transaction CB | Total Transaction Total | Long Term | Short Term Transaction ST |
| ■ JNUG | DAILY JR GOLD MINERS IND. | 02/28/2018 | 2,300 | $30,223 04 | $30,377 86 | +$340.82 | | +$340 82 |
| | | | | | | | | Disallowed Loss: $404 54 |
| JNUG | DAILY JR GOLD MINERS IND . | 02/28/2018 | 2,190 | $28,738 14 | $28,870 70 $28,376 16 | -$132.56 +$361 98 | | -$132.56 +$361 98 |
| TVIX | VELOCITY SHS DAILY 2X SH | 02/27/2018 | 3,000 | $22,083 54 | $21,034.85 | +$1,048.69 | | +$1,048 69 |

⌂ Total includes missing cost basis values for one or more lots

🔲 The total Realized Gain/Loss for this account includes values for Short Positions held in the account. For more information on summary totals when there are Short Positions, please see the Help Section

Ⓔ Data for this holding has been edited

N/A Not Available

■ Wash Sale activity has adjusted this cost. For additional information, click here

**Source: JNUG Realized Gain/Loss data as reported by Schwab Website**

### JNUG Illegitimate Wash Sale Disallowed Loss

| | |
|---|---|
| Actual Cost Basis | $58,754.02 |
| Actual Total Proceeds | $58,962.08 |
| **Actual Total Gain** | **$208.06** |
| **Wash Sale Disallowed Loss** | **$494.54** |
| **Implied Actual Total Loss** | **-$286.48** |
| **Adjusted Cost Basis** | **$59,248.56** |

4.         In the 1099-B tax filing submitted to the IRS by Schwab on Pitlor's behalf reports the adjusted *Cost Basis*, identically to the March Statement.

**Short-Term Realized Gain or (Loss) (continued)**

This section is for covered securities and corresponds to transactions reported on your 1099B as "cost basis is reported to the IRS." Report on Form 8949, Part I, with Box A checked.

| Description OR Option Symbol | CUSIP Number | Quantity/Par | Date Acquired | Date Sold | Total Proceeds | (-)Cost Basis | (+)Wash Sale Loss Disallowed | (=)Realized Gain or (Loss) |
|---|---|---|---|---|---|---|---|---|
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 100.00 | 02/27/18 | 02/28/18 | $ 1,312.24 | $ 1,295.50 | $ -- | 16.74 |
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 100.00 | 02/27/18 | 02/28/18 | $ 1,312.24 | $ 1,295.99 | $ -- | 16.25 |
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 190.00 | 02/27/18 | 02/28/18 | $ 2,493.26 | $ 2,652.25 | $ -- | (158.99) |
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 200.00 | 02/27/18 | 02/28/18 | $ 2,624.49 | $ 2,590.99 | $ -- | 33.50 |
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 200.00 | 02/27/19 | 02/26/18 | $ 2,624.49 | $ 2,591.01 | $ -- | 33.48 |
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 490.00 | 02/27/18 | 02/28/18 | $ 6,439.01 | $ 6,933.55 | $ 494.54 | 0.00 |
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 700.00 | 02/27/18 | 02/28/18 | $ 9,185.71 | $ 9,075.46 | $ -- | 110.25 |
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 700.00 | 02/27/18 | 02/28/18 | $ 9,185.71 | $ 9,369.50 | $ -- | (183.79) |
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 810.00 | 02/27/18 | 02/28/18 | $ 10,644.09 | $ 10,489.46 | $ -- | 154.63 |
| DIREXION DAILY JUNIOR GOLD MINERS INDEX BULL | 25460E851 | 1,000.00 | 02/27/18 | 02/28/18 | $ 13,140.84 | $ 12,954.85 | $ -- | 186.99 |
| Security Subtotal | | | | | $ 58,962.08 | $ 59,248.56 | $ 494.54 | 208.06 |

### Excerpt from 2018 Schwab 1099-B Tax Filing

5.         The first purchase for 490 shares appears in the middle of the list, indicating tampering with the sequence of the transactions. Similar abnormalities pertaining to illegitimate *Disallowed Wash Sale Losses* are pervasive throughout the Pitlor's TD Ameritrade account records whereby inconsistent representation of lot shares and inaccurate transaction sequences directly related to the illegitimate *Disallowed Wash Sale Losses* which concealed significant losses that accumulated in modest slices over time. (*See TD Ameritrade Disallowed Wash Sale Losses*).

6.         In the Schwab Account, the Defendants largely abandoned the scheme after the botched implementation of the scheme resulted in an unanticipated Margin violation which automatically

triggered a transfer from an account with an undisclosed relationship with Pitlor's account ####5612. **$9,999,999.00** was deposited into Pitlor's *Cash on Hold.*

7.    The entirety of the Disallowed Wash Sale Losses are invalid as confirmed by the Schwab Spreadsheet Transaction Data whereby there is no difference between the Adjusted Cost Basis and the Unadjusted Cost Basis, despite *Disallowed Wash Sale Losses* having been reported totaling $2702.27. As described above, the adjusted prices were reported as the unadjusted transaction prices in the brokerage statements.

8. Also, the 1099-B tax filing represents the transactions in different lots than compared to the March Statement as well as the transaction data displayed by Schwab's website in the days after the trades. This supports Pitlor's claims that a hidden account, or multiple hidden accounts or partitions were utilized to facilitate the misrepresentation of account activity by the official record.

**Realized Gain or (Loss)**

| Short Term | Quantity/Par | Acquired/ Opened | Sold/ Closed | Total Proceeds | Cost Basis | Realized Gain or (Loss) |
|---|---|---|---|---|---|---|
| VELOCITY SHS DAILY 2X  SHORT TERM ETN : TVIX | 3,000.0000 | 02/27/18 | 02/27/18 | 22,083.54 | 21,034.85 | 1,048.69 |
| DAILY JR GOLD MINERS  INDEX BULL 3X SHS NEW  FEB 2017: JNUG | 2,190.0000 | 02/27/18 | 02/28/18 | 28,738.14 | 28,870.70 | (132.56) |
| DAILY JR GOLD MINERS  INDEX BULL 3X SHS NEW  FEB 2017: JNUG | 2,300.0000 | 02/27/18 | 02/28/18 | 30,223.94 | 30,377.86 | 340.62 |

Excerpt from March Statement page 8

## Additional Disallowed Wash Sale Discrepancies

9.    The *Disallowed Wash Sale Loss* calculations are awry and indicate that the sequence of the transactions has been altered.

**Proceeds from Broker Transactions — 2018 (continued)**    **Form 1099-B**

Department of the Treasury-Internal Revenue Service    Copy B for Recipient (OMB No. 1545-0715)

SHORT-TERM TRANSACTIONS FOR WHICH BASIS IS REPORTED TO THE IRS - Report on Form 8949, Part I, with **Box A** checked.

| 1a-Description of property (Example 100 sh. XYZ Co.) CUSIP Number / Symbol | | | | 1b-Date acquired 1c-Date sold or disposed | 1d-Proceeds 6-Reported to IRS: Gross Proceeds (except where Indicated) | | 1e-Cost or other basis | 1f-Accrued Market Discount 1g-Wash Sale Loss Disallowed | | Realized Gain or (Loss) | 4-Federal Income tax withheld |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1s CALL SPDR GOLD TR  GLD 03/23/2018 127.50 C | $127.5 | EXP | BC | 03/26/18 03/26/18 | $ 39.40 | $ | 47.07 | -- $ 7.67 | $ | 0.00 | $ 0.00 |
| 15s CALL SPDR GOLD TR  GLD 03/23/2018 127.50 C | $127.5 | EX | BC | 03/26/18 03/26/18 | $ 675.04 | $ | 865.43 | -- $ 190.39 | $ | 0.00 | $ 0.00 |
| 18s CALL SPDR GOLD TR  GLD 03/23/2018 127.50 C | $127.5 | EX | BC | 03/26/18 03/26/18 | $ 815.69 | $ | 552.86 | -- | $ | 262.83 | $ 0.00 |
| 64s CALL SPDR GOLD TR  GLD 03/23/2018 127.50 C | $127.5 | EX | BC | 03/26/18 03/26/18 | $ 2,836.28 | $ | 2,988.48 | -- | $ | (152.20) | $ 0.00 |
| 150s CALL SPDR GOLD TR  GLD 03/23/2018 127.50 C | $127.5 | E | BC | 03/26/18 03/26/18 | $ 6,645.04 | $ | 8,654.35 | -- $ 2,009.31 | $ | 0.00 | $ 0.00 |
| 217s CALL SPDR GOLD TR  GLD 03/23/2018 127.50 C | $127.5 | E | BC | 03/26/18 03/26/18 | $ 9,616.75 | $ | 8,353.52 | -- | $ | 1,263.23 | $ 0.00 |
| **Security Subtotal** | | | | | $ 20,628.20 | $ | 21,461.71 | -- $ 2,207.37 | $ | 1,373.86 | $ 0.00 |

**Excerpt from 2018 Schwab 1099-B Tax Filing**

10.    The lot designations between the *Proceeds from Broker Transactions* (above) and the *Realize Gain or (Loss)* do not correlate.

**Short-Term Realized Gain or (Loss) (continued)**

This section is for covered securities and corresponds to transactions reported on your 1099B as  "cost basis is reported to the IRS." Report on Form 8949, Part I, with Box A checked.

| Description OR Option Symbol | CUSIP Number | Quantity/Par | Date Acquired | Date Sold | Total Proceeds | (-)Cost Basis | (+)Wash Sale Loss Disallowed | (=)Realized Gain or (Loss) |
|---|---|---|---|---|---|---|---|---|
| GLD 03/23/2018 127.50 C | | 1.00s | 03/26/18 | 03/26/18 | $ 39.40 | $ 47.07 | $ 7.67 | $ 0.00 |
| GLD 03/23/2018 127.50 C | | 1.00s | 03/26/18 | 03/26/18 | $ 44.32 | 45.08 | -- $ | (0.76) |
| GLD 03/23/2018 127.50 C | | 2.00s | 03/26/18 | 03/26/18 | $ 88.63 | 94.17 | -- $ | (5.54) |
| GLD 03/23/2018 127.50 C | | 3.00s | 03/26/18 | 03/26/18 | $ 132.95 | 138.24 | -- $ | (5.29) |
| GLD 03/23/2018 127.50 C | | 6.00s | 03/26/18 | 03/26/18 | $ 265.90 | 282.52 | -- $ | (16.62) |
| GLD 03/23/2018 127.50 C | | 10.00s | 03/26/18 | 03/26/18 | $ 443.16 | 470.86 | -- $ | (27.70) |
| GLD 03/23/2018 127.50 C | | 11.00s | 03/26/18 | 03/26/18 | $ 487.49 | 517.94 | -- $ | (30.45) |
| GLD 03/23/2018 127.50 C | | 11.00s | 03/26/18 | 03/26/18 | $ 487.49 | 517.94 | -- $ | (30.45) |
| GLD 03/23/2018 127.50 C | | 15.00s | 03/26/18 | 03/26/18 | $ 675.04 | 865.43 $ | 190.39 $ | 0.00 |
| GLD 03/23/2018 127.50 C | | 18.00s | 03/26/18 | 03/26/18 | $ 815.69 | 552.86 | -- $ | 262.83 |
| GLD 03/23/2018 127.50 C | | 20.00s | 03/26/18 | 03/26/18 | $ 886.34 | 921.73 | -- $ | (35.39) |
| GLD 03/23/2018 127.50 C | | 50.00s | 03/26/18 | 03/26/18 | $ 2,215.84 | 1,889.04 | -- $ | 326.80 |
| GLD 03/23/2018 127.50 C | | 82.00s | 03/26/18 | 03/26/18 | $ 3,633.98 | 3,600.80 | -- $ | 33.18 |
| GLD 03/23/2018 127.50 C | | 85.00s | 03/26/18 | 03/26/18 | $ 3,766.93 | 2,863.68 | -- $ | 903.25 |
| GLD 03/23/2018 127.50 C | | 150.00s | 03/26/18 | 03/26/18 | $ 6,645.04 | 8,654.35 $ | 2,009.31 $ | 0.00 |
| **Security Subtotal** | | | | | $ 20,628.20 $ | 21,461.71 $ | 2,207.37 $ | 1,373.86 |

11.    Compare to the <u>March Statement</u>, which portrays its own unique version of the account activity pertaining to those same transactions. Altogether, the records have been scrambled so to obfuscate the truth of what had actually transpired.

**Transaction Detail - Purchases & Sales** (continued)

**Options Activity** (continued)

| Settle Date | Trade Date | Transaction | Description | Quantity | Unit Price | Total Amount |
|---|---|---|---|---|---|---|
| 03/26/18 | 03/23/18 | Short Sale | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | (150.0000) | 0.4500 | 6,645.04 |
| 03/26/18 | 03/23/18 | Short Sale | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | (15.0000) | 0.4600 | 675.04 |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 165.0000 | 0.5700 | (9,519.78) |
| Settle Date | Trade Date | Transaction | Description | Quantity | Unit Price | Total Amount |
| 03/26/18 | 03/23/18 | Short Sale | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | (1.0000) | 0.4500 | 39.40 |
| 03/26/18 | 03/23/18 | Short Sale | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | (281.0000) | 0.4500 | 12,453.03 |
| 03/26/18 | 03/23/18 | Short Sale | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | (18.0000) | 0.4600 | 815.69 |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 1.0000 | 0.3300 | (33.67) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 85.0000 | 0.3300 | (2,863.68) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 50.0000 | 0.3200 | (1,634.53) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 11.0000 | 0.3300 | (370.59) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 6.0000 | 0.3300 | (202.15) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 3.0000 | 0.3200 | (98.05) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 11.0000 | 0.3300 | (370.59) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 2.0000 | 0.3300 | (67.38) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 10.0000 | 0.3300 | (336.91) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 20.0000 | 0.3200 | (653.82) |
| Settle Date | Trade Date | Transaction | Description | Quantity | Unit Price | Total Amount |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 1.0000 | 0.3100 | (31.68) |
| 03/26/18 | 03/23/18 | Cover Short | CALL SPDR GOLD TR<br>$127.5    EXP 03/23/18: GLD 03/23/2018 127.50 C | 100.0000 | 0.3000 | (3,071.51) |

12.    Ultimately, this is evidence in support of Pitlor's claim that there are transactions missing from the records, or otherwise misrepresented, and the data has been massaged to corroborate a fraudulent version of account activity. Breaking down the trade lots into smaller quantities (more total transactions) fills what otherwise would be vacant data entries. Then, Schwab cherry picked and massaged data to reflect the most unfavorable iterations of the available data.

13.     Pitlor frequently received a troubling notification upon sign-in to the mobile app, and suspicion was significanty aggravated by Schwab's repeated refusals to acknowledge, let-alone to explain the following:

**3/26/2018 Screenshot @ 23:32**



## KEY VALUE: $1048.69

### 2/27/2018 and 2/28/2018 Transactions for Pitlor's Schwab One Account ####5612
### Screenshots from Schwab Mobile App taken on 3/5/2018 at 08:34 CT.



The first transaction was Pitlor's $28,000.00 deposit (left screenshot at bottom). The transactions that occurred on 2/27/2018 are then listed in sequence, moving up through the list and then to the bottom of the middle screenshot, and so on. The latest transactions are the two sales of the JNUG shares that occure on 2/28/2018. These screenshots leave no doubt that (1) the TVIX purchases were the first trades and (2) no free ride violation occurred with respect to the TVIX trades and (3) No Wash Sales Occured

14.     $1048.69 was concealed via understated *Margin Equity* on 2/27/2018 due to Schwab's erroneous transactional accounting. The understated *Margin Equity* is attributable to Pitlor's trades being reordered into an inaccurate transaction sequence.

a.  The accurate sequence of transactions, confirmed by the above screenshot, is as follows:

1. TVIX Purchases –2. JNUG Set 1 Purchase –3. TVIX Sale –4. JNUG Set 2 Purchases -- ||--5. JNUG SALES—
|--------2/27-----------------------------------------------------------------------------------------------||-----2/28---------

b.  The erroneous sequence transpired as follows:

2. JNUG Set 1 Purchase –4. JNUG Set #2 Purchases –1. TVIX Purchases --2. TVIX SALES -||--5. JNUG SALES
|------2/27-----------------------------------------------------------------------------------------------||-----2/28------

15.     A fictitious cash deficit is manufactured equal to the profits generated by the TVIX transactions. According to the inaccurate sequence of transactions, the JNUG purchases are processed as having occurred prior to the TVIX transactions, and the profits of the TVIX trades would not have been available to contribute to the *Margin Equity* of the JNUG purchases.

16.     This fictitious deficit propagates through to the TVIX transactions, and the illegitimate debt is repaid upon arrival of those missing funds. While the value of those missing funds was not eligible to contribute to the Margin Equity, but there is no record of any debt because it never existed in real time.

17.     By reporting an erroneous transaction sequence, the Margin Equity was understated by $1048.69, precisely equal to the profits realized by the TVIX trades, confirmed by the understated *Margin Equity* as reported by the **2/27 & 2/28 - Historical Balance Data,** presented on the following page.

18.     The scheme was improperly executed due to the perpetrators' failure to regard the unique margin requirements of TVIX, which must be purchased with 100% Cash. The TVIX purchases were the first in the account, but the manipulated transaction sequence spoofed Schwab's accounting systems and registered the round-trip purchase and sale without the required cash existing in the account.

19.     Schwab claimed that Pitlor was responsible for the *Free Ride* violation and imposed a *Settled Cash Up Front* restriction, which was confirmed by various Schwab representatives during recorded phone calls and in writing by Schwab's Client Advocacy Team in Stacy F.'s 3/30/2018 correspondence.

20.     Schwab's historical account documents and Monthly Brokerage Statements do not "attempt" to accurately represent the sequence of transaction execution. Instead, the transactions are organized according to other parameters. Schwab's disclosures do not specify how transactions are supposed to be sequentially ordered except that:

> *"The Report and Gain/Loss Tab use Trade Date to determine the account holdings while the SPS uses the Settlement Date, for regulatory purposes."*

21.     The inconsistency regarding reported share lots and transaction groupings throughout the record, in tandem with the reordered transaction sequences, rendering it impossible to ascertain the order of the transactions as they occurred according to the data reported by official record, but there is no doubt the Margin Equity was understated in a manner precisely as described above, as confirmed by the 2/27 & 2/28 – Historical Balance Data.

## Excerpt from 2-27-2018 Historical Balance Data

**Historical Balances** ¹ for 02/27/2018   Return to Current Balances

Change Date . 📷 mm/dd/yyyy    Go

The historical balance data reflect the ending values of the date selected.

| Account Value ⁰ | Day Change | | Cash & Cash Investments | Market Value |
|---|---|---|---|---|
| $29,113.67 | +$29,113.67 | | -$29,705.33 | $58,819.00 |

### Balance Details

| | | | | |
|---|---|---|---|---|
| **— Cash & Cash Investments** | | | **— Funds Available** | |
| Cash Balance ● - Rates ⬀ | -$29,705.33 | | — To Trade | |
| **Cash & Cash Investments Total** | **-$29,705.33** | | Cash & Cash Investments | $0.00 |
| | | | Settled Funds ● | $0.00 |
| **— Investments** | | | Cash + Borrowing | $0.00 |
| — Securities | $58,819.00 | | SMA ● | $0.00 |
| — Market Value | $58,819.00 | | — To Withdraw | |
| Non-Margin | $0.00 | | Cash & Cash Investments | $0.00 |
| Margin | $58,819.00 | | Borrowing | $0.00 |
| | Positions Detail | | Cash + Borrowing | $0.00 |
| | | | Cash on Hold ● | $28,000.00 |
| **Investments Total** | **$58,819.00** | | | |
| | | | **— Margin Details & Buying Power** | |
| **— Option Details** | | | Balance Subject to Interest ● | $0.00 |
| Option Requirement | $0.00 | | Month to Date Interest Owed | $0.00 |
| | | | Margin Equity | $28,064.98 |
| | | | Equity Percent | 47% |
| | | | Margin Buying Power | Margin Rates ⬀ |

### Notes:

(1) Margin Equity is stated to be $28,064.98, which is $1048.69 less than the stated *Account Value*, $29,113.67. Pitlor received a Margin Loan for $29,712.20, and thus his Cash and Cash Investments Total reflects no cash assets, less an additional $6.87 debt.

(2) The *Account Value*, $29,113.67, is flagged with a superscript "0" indicating that the value was edited, presumably to conceal the understated *Margin Equity*. Similar artifices were utilized to alter Pitlor's TD Ameritrade account data with respect to understated *Margin Equity*.

## KEY VALUE: $575

### Discrepancy due to inconsistent asset prices

22.    The screenshot on the left accurately states both the value of the positions and their Gain/Loss with respect to the cost of the purchases. The *Investments – Total* value is $26,145.00 **[$16,720.00 (ETF shares) + $9,425.00 (Options) = $26,145.00].** The screenshot on the right supposedly corresponds to the same data, but the *Options Investments* value is understated as $8,850.00, a $575 discrepancy.



**3/6 Screenshot @ 23:39**
**Schwab Mobile App**

**3/6 Screenshot @ 23:39**
**Schwab Mobile App**

All the positions shown were purchased on 3/6, and no sales occurred. and therefore the *Gain/Loss* (left) should be equal to the *Day Change* (right). The $575 difference is due to the discrepancy in stated value of the options positions.

23.    The Historical Account Value reports the lessor valuation of those *Options Investments*, as shown below.

## Historical Account Value

Account 2043-5612

| ▼ Date | Account Value |
|---|---|
| Tuesday, March 6, 2018 | $25,566.62 |

Excerpt from Historical Account Value Log

## KEY VALUES: $10,000,005.87 & ($9,970,749.12)

24.    The Futures Buying Power corroborates Pitlor's claim that $10,000,005.87 negative cash balance was generated in Brokerage account ####5612.  The Schwab *Streetsmart* app (middle) identifies the Futures Account data as also corresponding to ####5612, despite its identifying the Futures Account as ####6617 in the header area.



I.    The Schwab Mobile App's display (left screenshot) has been altered to prevent the display of the Futures Buying Power; that data field was whited out to conceal that value.

II.    However, it was not prevented from being displayed by the Schwab Streetsmart App (middle screenshot), but the Streetsmart App "greyed out" so to conceal the "Total Futures [value]" data field.

III.    Details pertaining to the *Bank Sweep Feature* (right) were also inaccessible during the time the $9,999,999.00 deposit existed as Cash on Hold.

IV.    ($9,970,749.12) corresponds to a debit of $10,000,005.87 against the value of Pitlor's account.

**EQ-1.5(b) [Negative Futures Buying Power]: ($9,970,749.12) = $29,256.75 (-) $10,000,005.87**

## KEY VALUE: $3.38

25.     Despite the enforcement of the *Settled Cash Up Front* restriction that existed in Pitlor's account, a negative *Cash and Cash Investments* total, ($3.38) existed at the end of the day 3/6/2018.

26.     The *Settled Cash Up Front* restriction restricts borrowed funds from being used for investments. But there are two viable explanations whereby funds were withdrawn, creating a cash deficit not relating to investment purchases.

   a.  $25 transfer fee that was assessed against Pitlor's account for the conversion of $10,000,005.87 that occurred earlier that day.

   b.  The entirety of the *Cash on Hold* balance was converted, including $6.87 of Pitlor's cash balance in addition to the $9,999,999.00[2] deposit.

### 3/6 Screenshot @ 23:30
### Schwab Mobile App



| | |
|---|---|
| **Account Value** | **$25,566.62** |
| Day Change | -$3,690.13 (-12.61%) |

Cash & Cash Investments

| | |
|---|---|
| Total | -$3.38 |
| Bank Sweep | $29,256.75 |
| Cash Balance | -$16,384.95 |
| Margin[1] | -$12,875.18 |

Investments

| | |
|---|---|
| Total | $25,570.00 |
| Securities | $16,720.00 |
| Options | $8,850.00 |

Schwab Futures

| | |
|---|---|
| Futures Account Value | $0.00 |
| Futures Total Equity | $0.00 |
| Initial Margin Requirement | $0.00 |
| Futures Buying Power | |

Funds Available

---

[2] Notice how the Futures Buying Power remains "whited out" to conceal the conversion of $10,000,005.87 *Cash on Hold.*

## KEY VALUE: $6.87

27.    The following screenshot from 3/7/2018 displays *Borrowed Funds* and *Margin Equity* of $515.00[3] and $515.01, respectively. These funds were "borrowed" against the equity of the positions in Pitlor's account, and then loaned back to Pitlor as *Margin Equity*. The variation between those values, and the SMA $517.00, is indicative of the erroneous accounting and manipulation facilitated by the *Settled Cash Up Front* restriction.

28.    As those value does not uniquely figure into the calculation of damages, it is presumed to relate to the other discrepancies, $494.54 (Disallowed Wash Sale Losses) and $1048.69 (Understated Margin Equity) described *supra*.

<div align="center">

Excerpt from 3/7/2018 Screenshot 12:23 PM ET
Schwab Website

</div>



29. Critically, the *Borrowed Funds* precisely corresponds to the *Settled Funds:*

**EQ-A.1 $515.00 (Borrowed) = $504.75 (Settled) + $3.38 (3/6 - Neg. Cash) + $6.87 (Cash on Hold)**

30.    $.06 and ($.02), which correspond to other discrepancies, served many purposes, including to attain the equality presented by **EQ-A.2**.

**EQ-A.2: $494.54 = $504.75 (–) $3.38  (–)  $6.87 +.06 (–)  $.02**

## KEY VALUE: $1 SMA

| Excerpt from 3/8/2018 Screenshot 05:40 ET Schwab Website | 3/18 Screenshot @ 22:13 Schwab *Streetsmart* App |
|---|---|

**Funds Available**

**To Trade**

| | |
|---|---|
| Cash & Cash Investments | $33.30 |
| Settled Funds ● | $33.30 |
| Cash + Borrowing | $33.30 |
| SMA ● | $1.00 |

**To Withdraw**

| | |
|---|---|
| Cash & Cash Investments | $33.30 |
| Borrowing | $0.00 |
| Cash + Borrowing | $33.30 |
| Cash on Hold ● | $6.87 |

Individual ▼

GAIN/LOSS   BALANCES   HISTORY   TILE V

| | |
|---|---|
| Futures Account Value | $0.00 |
| Futures Total Equity | $0.00 |
| Initial Margin Requirement | $0.00 |
| Futures Buying Power | $17,818.21 |

Funds Available

To Trade

| | |
|---|---|
| Cash Investments | $17,818.21 |
| Settled Funds | $17,818.21 |
| Cash + Borrowing | $35,652.16 |
| SMA | $1.00 |

To Withdraw

| | |
|---|---|
| Cash Investments | $17,818.21 |
| Cash on Hold | $6.87 |
| Cash + Borrowing | $17,818.21 |

Margin Details & Buying Power

Disclosures & Footnotes

Brokerage Products: Not FDIC Insured · No Bank Guarantee · May Lose Value

31. The anomalous $1 SMA first appeared in the end-of-day account balances for 3/7/2018, after the conversion of $10,000,005.87 on 3/6/2018 (as reflected by the pre-market account balances from 3/8/2018 shown by screenshot above (left).

32. The $1 SMA is a perplexing value; its origin is unknown, and the Defendants possess and control the information that could explain its existence. Moreover, that $1 SMA value can be modeled as (1) being credited to the account, (2) representative of unique damages, or (3) omitted (seemingly) from the derivations of damages altogether.

33. The variation itself is due to multiple individual factors:

   a. many cent-valued and small-dollar discrepancies exist, and they were combined together via different iterations that changed throughout the course of Pitlor's account, and

   b. those other discrepancies often also exhibit those same properties, due to the nature and complexity of the scheme,

   c. Cent-Valued discrepancies are always able to be modeled as "$1 (−) X". For example:

      i. $4.45 = $3.51 + $.94, and

      ii. $4.45 = $3.51 + $1 (−) $.06

# KEY VALUE: $.77

34.      $.77 was documented to have been credited to the account on 3/16/18 according to the Schwab Mobile App's records, but the March Statement reports conflicting data.



35.      The March Statement reports the transaction to have credited to the *Bank Sweep,* inexplicably transferred to the Brokerage account, and then back to the *Bank Sweep Feature.* But none of these transactions are documented to have occurred on 3/16.

36.      The transaction corresponding to the screenshot above corresponds to the "Interest Paid" on 3/15/2018 at shown by the excerpt below.   This indicates that the live data lags behind the official record by one day; it also implies that the official record for "yesterday" is able to be represented in "today's" live data[4].

| 03/15/18 | Interest Paid[x,z] | BANK INTEREST | | 0.77 | 17,825.08 |
| 03/15/18 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 0.77 | | 17,824.31 |
| 03/19/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE  [x] | | 0.77 | 17,825.08 |

Excerpt from March Statement Page 33: Bank Sweep Activity

---

[4] The account data for "yesterday" in Pitlor's TD Ameritrade Account was manipulated "today" via "Courtesy Credits" that entered what appear to be negligible adjustments that add a few pennies of value, but analysis leaves no doubt that *Courtesy Credits* in fact corresponded to debits of excess *Margin Equity* that had been concealed via manipulation of transaction sequences, and the few pennies were refunded to create the impression of a small credit to the account.  Thus, it is conceivable that Pitlor's Schwab Account data was configured to be processed through his defunct TD Ameritrade Account which was reconfigured to exploit Pitlor for over 18 months.

## <u>KEY VALUE: $50</u>

37.　　Options that expired on 3/16/2018 are stated as possessing value of $50 (left screenshot).

38.　　This causes a $50 discrepancy between live Account Value (right screenshot) and the Historical Personal Values (below screenshots) reported for 3/19/2018.

39.　　The *Day Change* (right screenshot) value is also off by $50, less the $.77 interest payment credited to the account on 3/16/2018. This anomaly is accurately described as Friday's losses in that position being "replayed." The $50 of value reported to have been held in that position likely did not exist and represented funds that had been debited from the account[5].



---

[5] This specific fraudulent contrivance is believed to be precisely the nature of the fraud that incessantly targeted Pitlor's TD Ameritrade Account. But, without screenshots to document the precise live account values, proof that the losses were double counted similarly to as shown above is more complicated task involving analysis of the erroneous *Disallowed Wash Sale Losses* and *Cost Basis Adjustments*.

| Friday, March 16, 2018 | $18,025.08 |
| --- | --- |

## Historical Personal Value

| Date | Personal Value |
| --- | --- |
| Sunday, March 18, 2018 | $18,025.08 |

Excerpts from Historical Personal Value

## KEY VALUES: $22.67 & $29.54

### 3/20 Screenshot @ 06:08 (PST) Schwab Mobile App



### 3/21 Screenshot @ 08:57 (PST) Schwab Mobile App



### 3/22 Screenshot @ 15:29 Schwab Mobile App



40. Prior to any transactions occurring, a screenshot taken the morning of 3/21/2018 confirms the accurate *Trade Date Balance* to be a negative value, ($22.67).

41. $29.54 is equal to the sum of the negative cash balance from 3/20, $22.67, and the *Cash on Hold* $6.87 (corresponding to *MTD Interest Owed*).

**EQ-A.3: Balance Subject to Interest ($29.54) = ($22.67) + ($6.87)**

42.    The existence of a negative *Cash Balance* confirms that Schwab was either (1) not enforcing the *Settled Cash Up Front* restriction properly, or (2) the negative *Cash Balance* was caused by something other than an investment purchase (in which case would also contradict the trade data reported by the March Brokerage Statement). As explained *infra* regarding the *Key Value* $.33, in fact both are true.

## KEY VALUE: $.33



3/20 Screenshot @ 06:07 (PST)
Schwab Mobile App

3/21 Screenshot Excerpt @ 03:58 (PST)
Schwab Mobile App

Note how the *Total Futures* is greyed out.

43.    The negative cash balance ($22.67) triggers a *Money Due* notice and a *Margin Call*, both for $23.00 on Wednesday, 3/21/2018. The *Balance Subject to Interest*, $29.54, was not reported in the March Statement, but it was initially reporesented as negative Futures Buying Power ($29.87).

**EQ-A.4:   $.33 = $23 (–) $22.67 [Margin Call (–) Negative Cash balance]**
**EQ-A.4(a):  $.33 = 29.87 (–)  $29.54 [Neg. Futures Buying Power (–) Balance Subject to Interest]**

44.    A discrepancy of $.33 was required to be concealed discrepancy exists because the scheme conceals whole dollar amounts via the *Special Memorandum Account* ("SMA") and as *Funds Due.*

45.    $.33 also relates to the concealment of $3.51 was in fact swapped for the *Cash on Hold* of $10,000,005.87 on Tuesday, 3/06/2018, because it reveals the additional discrepancy, $.13, that together with $.33 was represented as a unique discrepancy $.46.

$$EQA.4(b): \$46 = \$.33 + \$.13$$

## KEY VALUE: $.46

46.    A $.46 discrepancy exists between Settled Funds and Cash Investments 3/21/2018. $.46 in fact represents the constituent sums of $.33 and $.13, which is explained further on the following page.



## KEY VALUE: $.13

47.    On 3/21, the cash available for withdrawal is $127.17, but the transfer to the *Bank Sweep* Feature is on $127.04, thus representing a $.13 discrepancy in the account data.

### 3/22 Screenshot @ 15:07
### Schwab Mobile App



| | |
|---|---|
| Options | $54,829.50 |

Schwab Futures

| | |
|---|---|
| Futures Account Value | $0.00 |
| Futures Total Equity | $0.00 |
| Initial Margin Requirement | $0.00 |
| Futures Buying Power | $14,174.17 |

Funds Available

To Trade

| | |
|---|---|
| Cash Investments | $14,174.43 |
| Settled Funds | $14,174.17 |
| Cash + Borrowing | $28,362.08 |
| SMA | $14,054.00 |

To Withdraw

| | |
|---|---|
| Cash Investments | $120.17 |
| Cash on Hold | $6.87 |
| Cash + Borrowing | $14,174.17 |

Margin Details & Buying Power

Disclosures & Footnotes

### Bank Sweep Activity

| Transaction Date | Transaction | Description | Withdrawal | Deposit | Balance $^{x,z}$ |
|---|---|---|---|---|---|
| 03/22/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE ^ | | 127.04 | 127.04 |

Excerpt from March Statement page 33: Bank Sweep Activity

**EQ-A.5(a) TD Ameritrade Balance**     $.13 = \$3.51 + (\$3.38)$

**EQ-A.5(b) Bank Sweep Feature:**     $.13 = \$127.17 \,(-)\, \$127.04$

**EQ-A.5(c) Interest Credit Anomalies**     $(\$.13) = (\$.77) + \$.64$

**EQ-A.5(d) 3/28 Anomaly**     $\$1.30 = \$1.43\,(-)\,\$.13 = \$.77 + \$.64 + \$.02\,(-)\,\$.13$

**EQ-A.5(e) (representation error)**     $1.3 = 13/10 = 13 * (1/10)$

## KEY VALUE: $104.85



3/21 Screenshot @ 15:09
Schwab Mobile App

Note how the ($22.67) *Negative Cash Balance* from 3/19/2018 is still listed as the *Cash Balance* despite the various transactions that transpired.

While this purports to be the related to the enforcement of the *Settled Cash Up Front* restriction, in fact the reconfigured account structure was abused to segregate the Cash Account for the purposes of exploitation.

48.      The historical account data reports an account value for 3/21/2018 that is $104.85 less than the *Account Value* displayed live, which states the account value to be $27,327.39, a difference of $104.85.

49.      The Historical Account Value Record states the end-of-day total *Account Value* to be $27,222.64.

Wednesday, March 21, 2018                                                    $27,222.54

EQ-A.6: $104.85 = $27,327.39 (–) $27,222.54

## KEY VALUE: $.66

50.        The transfer to the *Bank Sweep Feature* on 3/23 was for $14,053.60, but the end of day Margin Equity on 3/22 was $14,054.26. This is a discrepancy of **$.66**.

$$\text{EQ-A.7: } \$.66 = \$14,054.26 \ (-) \ \$14,053.60$$



### 3/22 Screenshot @ 15:42
### Schwab Mobile App

| | |
|---|---|
| Account Value | $70,240.30 |
| Day Change | +$43,017.76 (158.02%) |

Margin Details

| | |
|---|---|
| Margin Equity | $14,054.26 |
| Equity Percent | 100.00% |
| Trade Date Balance | $14,181.30 |
| Balance Subject to Interest | $29.54 |
| MTD Interest Owed | $6.87 |

**Bank Sweep Activity**

| Transaction Date | Transaction | Description | Withdrawal | Deposit | Balance XZ |
|---|---|---|---|---|---|
| 03/22/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE X | | 127.04 | 127.04 |
| 03/23/18 | Auto Transfer | BANK CREDIT FROM BROKERAGE X | | 14,053.60 | 14,180.64 |

Excerpt from March Statement page 33: Bank Sweep Activity

51.        The $.66 discrepancy represents the consolidation of several previous cent-valued discrepancies, $.13, $.77, $.64, and $.02.

$$\text{EQ-A.8(a) } \$.66 = \$.77 + \$.02 \ (-) \ \$.13 + .02$$

52.        Alternatively, $.66 is also calculated by the sum of other discrepancies, including $.06 which appears in the 3/28 data several days later, and another anomaly from 3/22, **$.26**.

$$\text{EQ-A.8(b) } \$.66 = \$.46 + \$.26 \ (-).06$$

53.        $.66 also closely corresponds to $.64 through the ($.02) discrepancy generated by the concealment of $6.87, $3.51, and $3.38.

$$\text{EQ-A.9} \quad \$.64 = \$.66 \ (-) \ (\$.02)$$

$$\text{EQ-A.10} \quad (\$.02) = \$6.87 \ (-) \ (\$3.51 + \$3.38)$$

54.    Further, $.66 relates to $1.43, the total Interest Credited to the account. Anomalies are associated with each of those interest credits, $.77, $.64, & $.02

EQ-A.11    $1.43 = $.77 + $.66 = $1.41 + $.02

## KEY VALUES: $.26, $14,054.00, $14,181.30, $127.04

55.    On 3/22, the $.26 difference between *Cash Investments* and *Settled Funds*, $14,174.43 and $14,174.17, respectively, was precisely equal to the difference of *Margin Equity* and SMA, $14,054.26 and $14,054.00, respectively (red arrows below).

EQ-A.12: $.26 = $14,173.43 (–) $ 14,173.17 = $14,054.26 (–) $14,054.00



56.    Because the SMA is represented in whole dollar amounts, the additional $.26 has to "go somewhere", and thus $.26 cents was placed in *Cash Investments* while $14,054.00 resides placed in the SMA account. (red arrows)

57.    The $.26 discrepancy confirms the existence of *Settled Funds* totaling $14,054.00 that were generated by *Borrowed Funds* generated to precisely mirror the SMA account value which, by its very definition, are *Funds Available to Borrow*.

58.        Evaluating the $28,362.08 with respect to the relevant values reveals that $.26 is not included in the *Cash + Borrowing* because the SMA balance that was targeted was a whole dollar amount.

$.26 not included in the following equation

**EQ-A.12(a): (Cash + Borrowing) $28,362.08 = $14,174.17 + $127.04 + $6.87 + 14054.00**

59.        In fact, the following equation confirms that $127.04, the existing *Bank Sweep Feature* balance, contributes separately to Borrowed Funds, despite its already supposedly being represented by the $14,181.30.


**EQ-A.13: $14,181.30:  $14,174.17 + $.26 + $6.87 = $14,054.26 + 127.04**


60.        $14,181.30 is also stated to be the *Trade Date Balance* (right screenshot – green), which corresponds to additional errors because the actual *Trade Date Balance* was $131.89.

61.        There is no escaping the conclusion that the totality of the errors results in an utter mess of complexity.  Such is the essence of the Defendants scheme, and Pitlor is eager for the opportunity to provide any further clarification that may assist efficient interpretation of the evidence.

62. .        The same artifices were utilized to conceal Margin Equity $14,223.46 vs. $14,216.30 the following day, and indeed they are similar sums to the values involved in the above analysis.

## KEY VALUE: $25

63.        $25 was concealed from the balances displayed by the Schwab Mobile App on 3/22/2018, which stated Pitlor's *Cash and Cash Investments* to be $14,181.30.  The website data reports the total *Cash and Cash Investment – Total* to be $14,205.65.  The equation below also reflects the $.66 discrepancy.

$$\text{EQ-A.14: } \$14,205.64 = \$14181.30 + \$25.00 \, (-) \, \$.66 \text{ (EQ-A.7)}$$

### 3/22 - Account Data @ 23:20 from Schwab.com website platform



### 3/22 Screenshot @ 15:22
### Schwab Mobile App



## KEY VALUE: $13,768.61

64.    On 3/23/2018, the *Sweep To Futures* for *$13,768.61* was erroneously accounted for as a loss.

**Transaction Detail - Deposits & Withdrawals**

| Transaction Date | Process Date | Activity | Description | Location | Credit/(Debit) |
|---|---|---|---|---|---|
| 03/23/18 | 03/23/18 | Journaled Funds | Sweep to Futures | | (13,768.61) |

**Excerpt From March Brokerage Statement Page 32**

65.    The *Sweep to Futures* erroneously registered as a loss because (1) the *Sweep to Futures* deducted from the (Brokerage) Account Value, and (2) the value of the Futures Account was excluded from *Cash and Cash Investments Total*, and thereby did not contribute to the *Total Accounts Value (see screenshots on following page),* both of which errantly deviate from Schwab's established accounting practices.

66.    While indiscernible according to the official record, the results of the erroneous accounting are documented by the screenshots below. The *Sweep to Futures* erroneously debited against the *Total Account Value* (left) and counts as a loss to the *Brokerage Account Value* (right). The *Cash and Cash Investments Total* erroneously excludes the *Futures Account Value* *Futures Total Value:* "N/A" (left).

| 3/23 Screenshot @ 03:38 | 3/23 Screenshot @ 08:24 |
|---|---|
| Schwab *Streetsmart* App | Schwab Mobile App |





## KEY VALUES: $412.03   $9308.65

67. Manipulation of *Trade Date Balances* coincides with unjustified negative *Margin Equity* balance which thereby concealed $412.03 + $9308.65 = $9720.68.

68. The *Trade Date Balance* in the premarket hours of 3/23/2018 is stated to be $412.03.

69. After the opening bell at 08:54, the *Trade Date Balance* again changes to a negative value ($9,308.65).



| 3/23 Screenshot @ 08:24 Schwab Mobile App | | 3/23 Screenshot @ 08:54 Schwab Mobile App | |
| --- | --- | --- | --- |
| Account Value | $66,488.16 | Account Value | $156,544.48 |
| Day Change | -$13,768.61 (-20.11%) | Day Change | +$76,287.71 (111.43%) |
| **Margin Details** | | **Margin Details** | |
| Margin Equity | -$13,768 61 | Margin Equity | -$23,489.29 |
| Equity Percent | -100.00% | Equity Percent | -100.00% |
| Trade Date Balance | $412.03 | Trade Date Balance | -$9,308.65 |
| Balance Subject to Interest | $0.00 | Balance Subject to Interest | $0.00 |
| MTD Interest Owed | $6.87 | MTD Interest Owed | $6.87 |
| **Margin Buying Power** | | **Margin Buying Power** | |
| **Marginable Securities** | | **Marginable Securities** | |
| Equities | $24,417.54 | Equities | $0.00 |
| Mutual Funds | $12,201.90 | Mutual Funds | $2,481.61 |
| Short Selling | $24,417.54 | Short Selling | $0.00 |
| **Non Marginable Securities** | | **Non-Marginable Securities** | |
| Equities | $12,201.90 | Equities | $0.00 |
| Mutual Funds | $404.77 | Mutual Funds | $0.00 |
| Penny Stocks | $12,201.90 | Penny Stocks | $0.00 |
| **Fixed Income** | | **Fixed Income** | |
| Treasuries Maturing in 10+ yrs | $122,019.00 | Treasuries Maturing in 10+ yrs | $0.00 |
| Government Agencies | $61,009.50 | Government Agencies | $0.00 |
| Municipal Bonds | $48,807.50 | Municipal Bonds | $0.00 |
| Non-convertible Corporates | $40,673.00 | Non-convertible Corporates | $0.00 |

## KEY VALUE: $23,489.95

70. The sum of the erroneously assessed losses, the net value concealed by the manipulation of the *Trade Date Balance,* and the $.66 discrepancy from the previous day, is equal to $23,489.95, which factors into the derivation of the total funds converted via *Mutual Funds Buying Power* and other critical values.

**EQ-A.15: $23,489.95 = $13,768.61 + $412.03 + $9,308.65 + $.66**

## KEY VALUE: $14223.46

71.    $14,223.46 was concealed by being matched with a nearly matching sum $14,216.30 that was replaced as the *Margin Equity* value by manipulating the balance data for 3/23.

**Figure: 3/23/2018 Cash & Margin Balances**

| 3/23/2018 Account Balances | Live Balance Details | Historical Balance Data |
|---|---|---|
| Cash Balance | $14,223.46 | $14,216.30 |
| Margin Equity | $14,223.46 | $14,216.30 |
| SMA | $14,216.00 | $14,216.00 |

72.    The $14223.46 *Cash Balance* stated by the 3/23 – Live Balance Details is a separate sum from the SMA value $14,216.00, and the Margin Equity $14,216.30 as reported by the 3/23 – Historical Balance data

73.    The following excerpt lists the assets in the account according to Schwab's historical data for Saturday, 3/24/2018, which *should* corroborate the end-of-day balances stated for Friday, 3/23/2018,

As of: 3/24/18

**Core Accounts**

Account Number: 20435612
Account Type: Individual

| ASSET | | TICKER | ASSET CLASS | QUANTITY | PRICE ($) | VALUE ($) |
|---|---|---|---|---|---|---|
| CALL DIREXION SHARES E T$14.5 | EXP 03/29/18 | JNUG 03/29/2018 14.50 | OTHER | 17,600.00 | 0.58 | 10,208.00 |
| CALL DIREXION SHARES E T$15 | EXP 04/06/18 | JNUG 04/06/2018 15.00 | OTHER | 5,000.00 | 0.69 | 3,475.00 |
| CALL DIREXION SHARES E T$17 | EXP 04/13/18 | JNUG 04/13/2018 17.00 | OTHER | 3,000.00 | 0.42 | 1,260.00 |
| CALL ISHR SILVER TR  $16 | EXP 04/06/18 | SLV 04/06/2018 16.00 C | OTHER | 43,100.00 | 0.09 | 3,663.50 |
| CALL ISHR SILVER TR  $16 | EXP 04/20/18 | SLV 04/20/2018 16.00 C | OTHER | 20,000.00 | 0.15 | 3,100.00 |
| CALL PROSHARES TRUST II $20.5 | EXP 03/29/18 | UVXY 03/29/2018 20.50 | OTHER | 6,000.00 | 1.44 | 8,610.00 |
| CALL PROSHARES TRUST II $21 | EXP 03/29/18 | UVXY 03/29/2018 21.00 | OTHER | 15,000.00 | 1.23 | 18,375.00 |
| CALL SPDR GOLD TR  $127 | EXP 03/29/18 | GLD 03/29/2018 127.00 | OTHER | 10,000.00 | 1.23 | 12,300.00 |
| CALL SPDR GOLD TR  $130 | EXP 04/27/18 | GLD 04/27/2018 130.00 | OTHER | 7,500.00 | 1.13 | 8,475.00 |
| CALL SPDR GOLD TR  $135 | EXP 04/27/18 | GLD 04/27/2018 135.00 | OTHER | 15,000.00 | 0.38 | 5,700.00 |
| CASH | | | CASH INVESTMENTS | 14,180.64 | 1.00 | 14,180.64 |
| MARGIN | | | CASH INVESTMENTS | 11,194.23 | 1.00 | 11,194.23 |
| PUT TD AMERITRADE HLDGS $59.5 | EXP 03/29/18 | AMTD 03/29/2018 59.50 | OTHER | 1,500.00 | 3.00 | 4,500.00 |
| SHORT | | | CASH INVESTMENTS | 3,022.07 | 1.00 | 3,022.07 |
| CALL SPDR GOLD TR  $128 | EXP 03/29/18 | GLD 03/29/2018 128.00 | | -10,000.00 | 0.77 | -7,700.00 |
| CALL SPDR GOLD TR  $131.5 | EXP 04/27/18 | GLD 04/27/2018 131.50 | | -7,500.00 | 0.80 | -6,000.00 |
| | | | | Account Total: | | $94,363.44 |
| | | | | Investor Total: | | $94,363.44 |

74.    The *Cash* entry, $14,180.64, precisely corresponds to the value held in the *Bank Sweep Feature*. $14,216.30, the sum of the *Margin* and *Short* entries, $11,194.23 & $3,022.07, precisely corresponds to the altered *Historical Balances* for 3/23/2018.

75.    As the individualized listing of account assets shows, there is no iteration of the *Cash, Margin,* and *Short* entries stated as *Cash Investments* that sums to $14,223.46.

76.    Nor is $14,223.46 the sum of the Margin Equity stated by the altered record, $14,216.30, and the Cash on Hold, $6.87, and neither does any iteration of the stray cent values from the previous day (or days) account for the discrepancy.

77.    The targeted SMA value, $14,216.00 nearly matches the concealed value $14,223.46. The Margin Equity figures were calibrated so the stated Margin Equity, when combined with the $6.87 *Cash on Hold,* could disguised the $14,223.46 by replacing it. $14,216.30 + $6.87 (Cash on Hold) = $14,223.17.   Thereby, $14,223.46, a legitimately separate value that should have uniquely contributed to the account value, is able to essentially vanish.

## KEY VALUE: $600

78.    There is a **$600** discrepancy exists between the *Account Total* $94,363.44 reported by the Schwab Performance Report's *Holdings by Investor* compared to the *3/23 – Historical Balances* stating the total account value to be $94,983.44. While this is generally unrelated to the immediate analyses, it nonetheless is a key discrepancy standing alone that is vital to several derivations of the precise total damages.

**EQ-A.16:  $600 = $94,983.44 (–) $94,363.44**

## KEY VALUE: $28,396.00 & $.03

79.    When combined with $14,174.17 concealed via clandestine utilization of *Funds Available to Borrowed Funds* from the previous day, this total, $28,397.63 = $14223.46 + $14,054.00 + 120.17, is a $1.63 difference from the *Borrowed Funds* $28,396.00 (identified on attached page 3/23 – Live Balances).

**EQ-A.17: $28,397.63 = $14,223.46 + $14,054.00 + $120.17**

**EQ-A.19: $1.63 = $28,397.63 (–) $28,396.00**

80.    $28,396.00 emulates $28,396.94, a critically important sum that figures into the derivation of total damages.  Altogether, this leaves $.69 difference

**EQ-A.18: $.69 = \$28,397.63 (–) \$28,396.94$ [\$28,396.94 = 3/26 Bank Sweep Feature Balance]**

81.      In fact, \$.69 is comprised of the \$.66 discrepancy previously derived, and a unique discrepancy, \$.03.

82.      That \$.03 discrepancy has extremely special significance for its being unaccounted for. It is in fact an "error" in the record that accounted for in purely hypothetical terms, accounted for only by these small fluctuations between otherwise completely unrelated discrepancies, but indeed is relevant to several derivations of damages, depending on how and if the other cent-valued and small dollar discrepancies are evaluated.

**EQ-A.20: $.03 = \$.69 (–) \$.66$ (EQ-A.7)**

## KEY VALUE: $2.29

83.      Also, \$1.63, the difference between \$28,397.63 and the *Borrowed Funds* \$28,396.00 **(EQ-A.18),** plus \$.66, is equal to \$2.29, and thus introduces this key value that is more directly represented by the discrepancy between the negative cash balance \$10,979.71 and the Funds Due \$10,982.00 on 3/28/2018.

**EQ-A.21: $2.29 = \$1.63 + \$.66$**

## KEY VALUES $7.16   $6.87

84. **In addition to \$14,216.30, an additional \$7.16 of funds illegitimately was concealed and removed from the account.**

85.      **\$7.16**, the difference between \$14,216.30 and \$14.223.46, is a separate discrepancy. The \$.03 from above, the \$.26 difference between *Settled Funds* and *Funds Available To Trade* on 3/22, and the \$6.87 *Cash on Hold*, indeed do total to \$7.16. Because \$6.87 was taken on 3/6/2018, that value was "matched" with this discrepancy, thereby addressing the concealment.

**EQ-A.22(a): $7.16 = \$51,760.07 (–) \$52,752.91$**

**EQ-A.22(b): $7.16 = \$6.87$ (Cash on Hold) $+ \$.26$ (EQ-A.12) $+ .03$ (EQ-A.20)**

86.        $7.16 is also the difference between $51,760.07 and $51,752.91, the end-of-day Cash & Cash Investments Total reported by the 3/23/2018 live balances and $51,752.91, the reported total for 3/26/2018.

**EQ-A.22(c): $7.16 = $51,760.07  (−) $52,752.91**

87.    Ultimately, the conclusion must be reached that the transactions responsible for generating the **$14,223.46** have been omitted from, or perhaps simply delayed and held back from the record. Indeed, this conclusion is firmly supported by the following evidence.

  a.  Inaccurate dates of short sale transactions imply the existence of missing transactions.

  b.  Transactions are shown to have been misrepresented so that proceeds of *Short Sales* were disguised as *Cost Basis.*

  c.  A series of *Short Sale* and *Short cover* transactions which occurred on 3/23/2018 were erroneously reported to have transacted on 3/26/2018.  The problem is that the options contracts expired on 3/26/2018.  There is simply no way for proceeds to be generated on Monday, 3/26/2018 for a security that ceased existing on Friday, 3/23/2018.

## KEY VALUES: $74,642.25   $23,143.13

88.       Comparison between the 3/23 - 'Live' Balance Details and the 3/23 - Historical Balance Details (records are presented on next pages) reveals significant discrepancies amongst the account balances.

89.       The 3/23 - 'Live' Balance Details were downloaded from Schwab's website the afternoon of 3/23/2018, after the withdrawal of $75,000.00 was processed, leaving a *Total Account Value* of $118,126.57.

90.       The 3/23 - Historical Balance Details as well as the Historical Account Values state a 3/23/2018 end-of-day (Brokerage) Account value of $94,983.44.  Both records were generated after Pitlor's account records were altered to remove any reference of the futures account's existence, and thus the (Brokerage) Account value was equivalent to the *Total Account Value.*

| 3/23/2018 "Balance Details" Comparison | "3/23 'Live' Balance Details" | "3/23 Historical Balance Details" | Difference Between Live vs. Historical |
|---|---|---|---|
| Account Value | $118,126.57 | $94,983.44 | $23,143.13 |
| Investments | $66,366.50 | $66,586.50 | ($220.00) |
| Balance Subject to Interest | $0.00 | $74,642.25 | ($74,642.25) |
| Month-to-Date Interest Owed | $6.87 | $54.28 | ($47.41) |
| Cash and Cash Investments | $51,760.07 | $28,342.36 | $23,417.71 |
| Futures Account Value | $23,355.97 | No Futures Account Data Displayed | $23,355.97 |

91.       The Historical Personal Value for 3/23/2018, a record of the *Total Accounts Value*, clearly omits the value of the Futures Account.

### Historical Personal Value

Date                                                                                     Personal Value

Friday, March 23, 2018                                                        $94,983.44

Excerpt from Historical Personal Value



| Accounts | Trade | Research | Products | Guidance | Service | Chat | Help | Search | | Log Out | Trading |

Summary  Balances  Positions  Portfolio Performance  History  Statements  Transfers & Payments                    StreetSma

| Individual | 2043-5612 ⌄ | | Page last updated: 04:16 PM ET, 03/23/2018  ⟳ Refresh  ⬇ Export  🖶 Print |

| Total Accounts Value [1] | Day Change [2] | Total Cash & Cash Investments [3] | Market Value |
| --- | --- | --- | --- |
| $118,126.57 | +$26,310.96 (+38.43%) | $51,760.07 | $66,366.50 |

## My Balances

Historical Balances Table

|  | Futures Buying Power | Futures Total Equity |
| --- | --- | --- |
| | $51,752.61 | $23,355.97 |
| | Cash on Hold | Futures Account Value |
| | $6.87 | $23,355.97 |

Feb 28  Mar 2  Mar 4  Mar 6  Mar 8  Mar 10  Mar 12  Mar 14  Mar 16  Mar 19  Mar 20  Mar 22

## Balance Details

### — Cash & Cash Investments

| Bank Sweep [4] - Rates | $14,180.64 |
| --- | --- |
| | Details |
| Cash Balance | $14,223.46 |
| **Cash & Cash Investments Total** | **$51,760.07** |

### — Investments

| — Securities | $0.00 |
| --- | --- |
| Market Value | $0.00 |
| — Options [5] | $66,366.50 |
| — Market Value Long | $80,066.50 |
| Non-Margin | $0.00 |
| Margin | $80,066.50 |
| + Market Value Short | -$13,700.00 |
| | Positions Detail |
| **Investments Total** | **$66,366.50** |

### — Option Details

| Option Requirement | $0.00 |
| --- | --- |

### — Charles Schwab Futures [6]
DAVID PITLOR 6725-6617

| Futures Account Value | $23,355.97 |
| --- | --- |
| Futures Initial Margin Requirement | $0.00 |
| Futures Buying Power | $51,752.61 |
| Futures Total Equity | $23,355.97 |

### — Funds Available

| — To Trade | |
| --- | --- |
| Cash & Cash Investments | $28,396.64 |
| Settled Funds | $51,752.61 |
| Cash + Borrowing | $103,505.22 |
| SMA | $14,216.00 |
| — To Withdraw | |
| Cash & Cash Investments | $0.00 |
| Borrowing | $28,396.00 |
| Cash + Borrowing | $51,751.97 |
| Cash on Hold | $6.87 |

### — Margin Details & Buying Power [7]

| Balance Subject to Interest | $0.00 |
| --- | --- |
| Month to Date Interest Owed | $6.87 |
| Margin Equity | $14,223.46 |
| Equity Percent | 100% |
| Margin Buying Power | Margin Rates |

(0118-738S)



Accounts    Trade    Research    Messages    Products    Guidance    Us    Service    Chat    Help    Search    Log Out    Trading

Summary    **Balances**    Positions    Portfolio Performance    History    Statements    Transfers & Payments    StreetSmart

Individual        2043-5612 ∨                                    Page last updated: 11:01 AM ET, 04/07/2018    ⟳ Refresh    🖶 Print

**Historical Balances** [1] **for 03/23/2018**    Return to Current Balances    Change Date: 📅 mm/dd/yyyy    Go

The historical balance data reflect the ending values of the date selected.

| Account Value [0] | Day Change | Cash & Cash Investments | Market Value |
|---|---|---|---|
| $94,983.44 | +$26,523.80 | $28,396.94 | $66,586.50 |

## Balance Details

| — Cash & Cash Investments | | — Funds Available | |
|---|---|---|---|
| Bank Sweep Feature - Rates 🖩 | $14,180.64 | — To Trade | |
| Cash Balance ❓ | $14,216.30 | Cash & Cash Investments | $28,342.66 |
| **Cash & Cash Investments Total** | **$28,396.94** | Settled Funds ❓ | $28,342.36 |
| | | Cash + Borrowing | $56,793.28 |
| — Investments | | SMA ❓ | $14,216.00 |
| — Securities | $0.00 | — To Withdraw | |
| Market Value | $0.00 | Cash & Cash Investments | $28,342.66 |
| | | Borrowing | $0.00 |
| — Options | $66,586.50 | Cash + Borrowing | $28,342.66 |
| — Market Value Long | $80,286.50 | Cash on Hold ❓ | $54.28 |
| Non-Margin | $0.00 | | |
| Margin | $80,286.50 | — Margin Details & Buying Power | |
| — Market Value Short | -$13,700.00 | Balance Subject to Interest ❓ | $74,642.25 |
| Non-Margin | $0.00 | Month to Date Interest Owed | $54.28 |
| Margin | -$13,700.00 | Margin Equity | $14,216.30 |
| | Positions Detail | Equity Percent | 100% |
| **Investments Total** | **$66,586.50** | Margin Buying Power | Margin Rates 🖩 |

| — Option Details | |
|---|---|
| Option Requirement | $0.00 |

(0118-738S)

Accounts   Trade   Research   Products   Guidance   Service
Summary   Balances   Positions   Portfolio Performance   History   Statements   Transfers & Payments        ↑ Back to Top

**Brokerage Products: Not FDIC Insured • No Bank Guarantee • May Lose Value**        Account: 2043-5612
Today's Date: 11:01 AM ET, 04/07/2018

Charles Schwab & Co., Inc., and Charles Schwab Bank are separate but affiliated companies and subsidiaries of The Charles Schwab Corporation. Brokerage products are offered by Charles Schwab & Co., Inc. (Member SIPC 🖩) ("Schwab"). Schwab Intelligent Portfolios® is offered by Schwab, a dually registered broker dealer and investment advisor, and Institutional Intelligent Portfolios® is a technology and service platform provided to Advisor by Schwab Performance Technologies ("SPT") and used by Advisor to provide its clients with an automated investment management service. Deposit and lending products and services are offered by Charles Schwab Bank, Member FDIC and an Equal Housing Lender ("Schwab Bank").

Bank sweep accounts are generally held at Charles Schwab Bank. Funds deposited at Schwab Bank are insured by the Federal Deposit Insurance Corporation (FDIC) up to $250,000 when aggregated with all other deposits held by you in the same capacity at Schwab Bank. Funds on deposit at Schwab Bank are not deposits or obligations of Charles Schwab & Co., Inc. and may not be covered by the Securities Investor Protection Corporation (SIPC 🖩) NOTE: Funds deposited at an FDIC insured institution are insured, in aggregate, up to $250,000 per depositor, per insured institution based upon account type by the Federal Deposit Insurance Corporation (FDIC).

© 2018 Charles Schwab & Co., Inc. All rights reserved. Member SIPC. Unauthorized access is prohibited. Usage will be monitored.

Agreements   Compensation and Advice Disclosures   Fees & Commissions   Privacy   🔒 SchwabSafe   USA Patriot Act   SIPC®   FDIC Insurance   Site Map   Site Help   Support Session





## Direct Evidence of Manipulated Account Values on 3/26/2018

92.    Anomalous discrepancies in the account balances occurring the afternoon of 3/26/2018 during the extended market hours directly evidences the manipulation of account balances that are not attributable to any legitimate account activity or otherwise documented in the records.

93.    On the "Summary" tab of the Schwab Mobile app, the *Personal Value* was consistently stated as zero and *Day Change* was "N/A". This anomaly is not limited to 3/26/2018 but is pervasive throughout the life of the Futures Account and its association with Brokerage Account ####5612.

94.    At 15:17, the value of the brokerage and futures account is stated to be $81,265.21, but with also as having earned a profit of $3,254.97 for the day. Less than an hour later, at 16:03, the account value is stated to be $107,725.21 but with the same profit. No transactions occurred during that time, nor was there any significant change to the value of the Futures positions.

**3/26/2018 Screenshot at 15:19**



**3/26/2018 Screenshot at 16:03**



95.    The following screenshot shows how, less than two hours after the account value was stated to be over $107k, the *Total Account Value* reverts to the range of the previously stated value, approximately $80k.

3/26/2018 Screenshot at 15:19



* This account value does not contribute to the Personal Value chart  For details, see "What is Personal Value?"

## Disclosures & Footnotes

**Brokerage Products: Not FDIC Insured · No Bank Guarantee · May Lose Value**

## KEY VALUES: $16,922.62 & ($90,737.88)

96.     The Futures Account is not included in the *Cash and Cash Investments Total,* facilitating the removal of funds via utilization of Mutual Fund Buying Power. The Cash Balance concealed, $16,922.62, closely corresponds to other key values, $16,870.41 and $16,439.68.

<u>3/27/2018 Screenshot at 20:53</u>



Excerpts from Historical Balance Details (as reported on 4/7/2018)



Excerpt from Historical Account Value (as reported on 4/7/2018)

| | |
|---|---|
| Tuesday, March 27, 2018 | $38,419.53 |
| Monday, March 26, 2018 | $98,238.41 |

97.     While the *Account Value* in the live screenshot is stated accurately with respect to the displayed balances[6], the *Cash and Cash Investments Total* is inaccurate for its not including the value of the Futures Account.

98.     Also, *Sweep to Futures* transfer, $51,698.63, is represented as a loss in the live data, erroneously, precisely the same as what had transpired on 3/23 whereby $13,761.68 was reported as a loss.

---

[6] While the *Total Account Value* does accurately compute with respect to the account values as displayed, the missing cash value as identified in the analysis of the previous days is not represented because $51,698.63 was removed on 3/26, in addition to $2,481.61 converted on 3/23 via Mutual Fund purchases (or otherwise disposing of those funds via utilization of Mutual Fund Buying Power).

99.      *Cash and Cash Investments Total* is supposed[7] to include the value of the Futures Account, but it is clearly omitted from the total.  This fraudulent contrivance was a critical factor in facilitating the concealment of the exploitation as it occurred.

100.      Yet, the account value remains precisely calculable to the penny by separately adding together the erroneous value of the *Cash and Cash Investments Total* to the accurately stated value of Options Investments and the Futures Account.

### Verification of *Account Value* depicted in Screenshot

| | |
|---|---|
| *Cash and Cash Investments Total* | ($38,980.52) |
| Options Investments | $77,404.50 |
| Futures Account Value | $55,903.14 |
| **Total Account Value** | **$94,327.12** |

**EQ-A.23: $94,327.12 = $77,404.50 + $55,903.14 (–) $38,980.52**

101.      Clearly, the value of the Futures Account has been erroneously excluded from the *Cash and Cash Investments – Total.*  The accurately calculated value for *Cash and Cash Investments - Total* is reached by calculating the difference between *Total Account Value* and *Total Investments.*

### Calculation of Accurate *Cash and Cash Investments Total*

| | |
|---|---|
| Total Account Value | $94,327.12 |
| Total Investments | $77,404.50 |
| **Cash and Cash Investments Total** | **$16,922.62** |

**EQ-A.24(a): $16,922.62 = $94,327.12  (–) $77,404.50**

102.      The proper value for *Cash and Cash Investments – Total* is confirmed by the following alternative calculation which adds the *Futures Account Value* and *Bank Sweep Feature* and the net *Margin* equity value, which yields the identical value, $16,922.62.

| | |
|---|---|
| Futures Account Value | $55,903.14 |

---

[7] According to Schwab's contractual terms and conditions and other disclosures, the *Cash and Cash Investments Total* does include the value of the Futures Account.  However, multiple Schwab representatives repeatedly misrepresented this fact in attempting to convince Pitlor that there were no errors in the account balances as displayed, and that Schwab's systems were operating "as designed."

| | | | |
|---|---|---|---|
| | Bank Sweep Feature | $51,752.91 | Alternative |
| | Margin Equity | ($90,733.43) | Calculation |
| confirms | **Cash and Cash Investments Total** | **$16,922.62** | value of *Cash* |

*and Cash Investments Total*

**EQ-A.24(b): $16,922.62 = $55,903.14 + $51,752.91 (–) $90,733.43**

## KEY VALUES: $55,907.59 & $4.45

103.        The *Cash and Cash Investments Total* conceals $16,922.62 of cash value, but the historical account data presents a negative *Cash and Cash Investments Total*, ($38,984.97). Thus, the total value concealed by the erroneous exclusion of the Futures Account, plus an additional $4.45.

**EQ-A.25(a):   $55,907.59 = $16,922.62 (–)  ($38,984.97)**

**EQ-A.25(b):        $4.45 = $55,907.59 (–)  $55,903.14**

104.        The discrepancy is exploited by the fact the Futures Account data was retroactively edited out of the historical data, thereby facilitating misrepresentation of the historical *Account Value*, which is reported to be $38,419.53, clearly omitting the value of the Futures Account, but also introducing a separate discrepancy, $4.45.

**EQ-A.25(c):   $4.45 = $38,423.98 (–)  $38,419.53**

105.        $4.45 corresponds to the concealment of $3.51, which was disguised by combining it with other discrepancies.

**EQ-A.26(a):   $4.45 = $3.51 + .94**

**EQ-A.26(b):   $.94 = $28,396.94 (–) $28,396.00 = $1 (–) $.06**

$$\text{EQ-A.26(c):} \quad \$4.45 = \$3.51 + \$1 \ (-) \ \$.06,$$

106.    The missing Futures Account value $55,907.59 is directly corresponds to the  funds that exist in the *Bank Sweep Feature*, indicating those funds to have been targeted and constituting Bank Fraud.

$$\text{EQ-A.27(a): } \$51,752.31 = \$55,907.59 \ (-) \ (\$3,404.57 + \$600 + \$104.85 + \$29.54 + \$7.16 + \$6.87 + \$2.29)$$

$$\text{EQ-A.28(b) Bank Sweep Feature Balance (3/27): } \$51,752.91 = \$51,752.31 + \$.66 \ (-) \ \$.06$$

$$\text{EQ-A.29(c) Bank Sweep to Brokerage (3/28): } \quad \$51,753.55 = \$51,752.31 + \$1.3 \ (-) \ \$.06$$

## KEY VALUE: $34,867.11

107.    The following screenshots taken the afternoon of 3/27/2018 demonstrate that, according to the Schwab Mobile App (left), funds were segregated as *Borrowed Funds* that were available to



3/27 Screenshot @ 14:39
Schwab Mobile App

3/27 Screenshot @ 14:39
Schwab *Streetsmart* App

withdraw, but not to trade, and further that ***no Settled Funds exist.*** Yet, simultaneously, the Schwab *Streetsmart App* (right) displays a similar value as *Settled Funds*- stated as *Funds Available to Trade.*

108.    In both screenshots, the *Cash and Cash Investments* available is $0, for *Funds Available to Trade* and *Funds Available to Withdraw.* However, the Schwab *Streetsmart App* displays *Settled Funds Available to Trade* as $34,238.74, while the Schwab Mobile App displays $0. This indicates that Schwab manipulated the balances so to conceal the existence of those *Settled Funds,* and implies further misrepresentation with respect to the data displayed by the respective apps.

109.    The screenshots constitute proof that, while Pitlor was restricted from trading, anomalies exist pertaining. Borrowed funds are stated to be zero; Cash Investments are stated to be zero, yet Cash + Borrowing has a non-zero value.

110.    This is explained by the *Funds Available to Borrowed* being converted into *Settled Cash* in a clandestine fashion, and that value having been segregated so to be inaccessible to Pitlor. Then, the display of the account balances were manipulated to conceal this having occurred. Moreover, the existence of those *Settled Funds* was concealed from the Schwab Mobile app.

**EQ-A.30: $34,867.11 =  $32,879.36 + $1886 + $104.85 + $2.29 + $.06 (–)$4.45 (–) $1**

111.    This is explained by *Borrowed Funds* being converted into *Settled Cash* in a clandestine fashion, and that value having been segregated so to be inaccessible to Pitlor. Also, Schwab Mobile app[8] conceals the existence of those *Settled Funds*, which are reported to be $0.

---

[8] During several conversations with Schwab representatives, Pitlor was asked whether he was viewing information via the Schwab Mobile App or Schwab Streetsmart App. Pitlor identified his preference to use the Schwab Mobile App, and asked why such an inquiry was relevant. The representatives refused to elaborate further regarding their interest.

## KEY VALUES: $10,979.71 & $10,982.00

112.    On 3/28/2018, the Value of the Futures Account is not calculated in the Total Account Value, and an illegitimate negative cash balance exists due to the $81,399.12 that had been converted via Mutual Funds purchases over the course of the preceding three trading days.

**3/28 Screenshot @ 17:43**
**Schwab *Streetsmart* App**



**3/28 Screenshot @ 17:29**
**Schwab Mobile App**



**3/28 Screenshot @ 17:30**
**Schwab Mobile App**



113.    With respect to the Total Value of Options Investments: $45,277.50, and the Futures Account Value, $12,499.41, the total Account Value should be $57,776.91.

**EQ-A.31 - Accurate Account Value: $57,776.91 = $45,277.50 + $12,499.41**

114.    But, because of the negative cash balance, ($10,979.71), the *Total Account Value* is instead stated to be $46,797.20.

**EQ-A.32 - Negative Cash Balance: ($10,979.71) = $46,797.20 (–) $57,776.91**

115.     Stacy F., a *Resolution Manager* with Schwab's *Client Advocacy Team*, claimed to have removed the *Settled Cash Up Front* restriction while on the phone with Pitlor the afternoon of 3/28. However, this does not justify or explain the negative cash balance, which ultimately relates to the cash deficit and missing funds from the previous day.

116.     The erroneous nature of the accounting is further demonstrated by the fact that, even presuming that negative cash balance to be valid, the historical balance for 3/28, $33,928.92, does not agree with that *Total Account Value* displayed by the live data, $46.797.20.

117.     The missing value, $12,868.28, closely corresponds with the value of the Futures Account, but also bundles in several previously unconcealed discrepancies.

$$\text{EQ-A.33 Missing Value}: \$12,868.28 = \$12,499.41 + \$368.87$$

$$\text{EQ-A.33(a) } \$368.87 = \$412.03 + \$7.16 + \$4.45 \ (-) \ \$54.28 \ (-) \ (\$.66 \ (-) \ \$.13 \ (-) \ .06 + \$.02)$$

## Historical Personal Value

| Date | Personal Value |
|---|---|
| Thursday, March 29, 2018 | $23,149.83 |
| Wednesday, March 28, 2018 | $33,928.92 |

118.     The total account value should be the sum of the investments and Futures Account Value, equal to $57,776.91. However, the <u>Historical Personal Value</u> reports a value of only $33,928.92, a difference of $23,874.99

$$\text{EQ-A.34 Missing Value (without neg. cash balance)}: \$23,874.99 = \$57,776.91 \ (-) \ \$33,928.92$$

119.     $23,874.99 relates to a critical value misrepresented on 3/23/2018, $23,489.95, similarly to as derived above in EQ-A.33(a).

$$\text{EQ-A.34(a)}: \$23,874.99 = \$23,489.95 + \$368.87 + \$22.67 + \$.26 \ (-) \ \$4.45 \ (-) \ \$2.29$$

120.     $2.29 appears in the preceding equation which. It was also previously derived by **EQ-A.21** pertaining to the combination of discrepancies that did not specifically correspond to any

single discrepancy in the data. However, the difference between the *Funds Due*, $10,982.00 and the negative *Cash Balance*, $10,979.71, indeed identifies $2.29 to be a uniquely discrepant value and thereby corroborates the previous analyses which derived $2.29.

$$\text{EQ-A.35} = \$2.29 = \$10,982.00 \, (-) \, \$10,979.71$$

121.     No Margin Call was received for the negative cash balance, nor does the accounting make logical sense with respect to the more than $90k that was supposed to have transferred into the account on 3/28/2018 from a Sweep from Futures, $42,080.03 from the Futures Account, and $51,753.55 from the *Bank Sweep Feature*. Indeed the deficit is attributable to the $90,737.88 negative *Cash Balance* from 3/27, which is demonstrated to have been illegitimate.

122.     Ultimately, the various accounting contrivances concealed the *Bank Sweep Feature* balance, $51,753.55, as presented in further detail by the Bank Fraud claim.

123.     The following relationship demonstrates the correlation between the negative cash balance, Funds Due, and various other documented discrepancies that are critical to the precise calculation of total damages.

$$\text{EQ-A.35(a)} \; \$10,982.00 = \$3,404.57 + \$2,702.27 + \$3,092.84 + \$1768 + \$6.89 + \$4.45 + \$2.29 + \$.77 - \$.06 - \$.02$$

$$\text{EQ-A.35(b)} \; \$10,979.71 = \$3092.84 + \$2702.27 + \$1768 + \$1048.69 + \$600 + \$575 + \$494.54 + \$309 + \$118 + \$104.85 + \$54.28 + \$50 + \$29.54 + \$22.67 + \$3.51 + \$3.38 + \$1.41 + \$1 + \$.66 + \$.06 + \$.03 - \$.02$$

Print

Accounts >Portfolio Performance

Rate of Return    **Schwab Portfolio Checkup**    Quarterly Portfolio Profile

Portfolio Setup    **Portfolio Analysis**

| Portfolio | Total Market Value | Target Asset Allocation |
|---|---|---|
| d ⌄  View Holdings | $ 0.64 | **Aggressive** |

Asset Allocation ⚠    Sector Diversification ✓    Equity Concentration ✓    Fixed Income ✓    Quality ✓

⚠ Your current portfolio is out of balance with your Target Asset Allocation.

For more information click here



| Asset Class | | |
|---|---|---|
| ■ Large Cap Equity | Current Allocation | Target Asset Allocation: Aggressive |
| ■ Small Cap Equity | | |
| ■ International Equity | | |
| ■ Fixed Income | | |
| ■ Cash Investments | | |
| ■ Other | | |

The **bolded asset categories** below with an alert indicate a difference larger than **5%** between your current allocation and your target asset allocation.

| Asset Class | Current Allocation | Target Asset Allocation | Difference |
|---|---|---|---|
| | View table in % \| View table in $ | | |
| **Large Cap Equity** ⚠ | $ 0.00 | $ 0.32 | $ 0.32 |
| **Small Cap Equity** ⚠ | $ 0.00 | $ 0.13 | $ 0.13 |
| **International Equity** ⚠ | $ 0.00 | $ 0.16 | $ 0.16 |
| Fixed Income | $ 0.00 | $ 0.00 | $ 0.00 |
| **Cash Investments** ⚠ | $ 0.64 | $ 0.03 | ($ 0.61) |
| Other | $ 0.00 | $ 0.00 | $ 0.00 |
| **Total** | **$ 0.64** | **$ 0.64** | |

Create Report

Allocations to Schwab asset classes (i.e. Large Cap, Small Cap, Intl Stocks, Bonds, Cash, and Other) for all mutual funds and ETFs are based on rescaled long-only allocation percentages. Long rescaled allocations ignore short positions so that there are no negative positions in any asset class, and are rescaled so that the sum of all asset classes (0314-1537)

**Brokerage Products: Not FDIC Insured • No Bank Guarantee • May Lose Value**

Account: XXXX-X612
Today's Date: 08:43 PM ET, 03/28/2018

Schwab Wealth Investment Advisory, Inc. ("SWIA"), and the FDIC-insured Schwab-affiliated banks ("Affiliated Banks") are separate but affiliated companies and subsidiaries of The Charles Schwab Corporation. Securities products and services are offered by Charles Schwab & Co., Inc. (Member SIPC ⬛) Schwab Intelligent Portfolios™ is offered by SWIA, a registered investment advisor, and Institutional Intelligent Portfolios™, is made available through independent investment advisors and sponsored by SWIA. Deposit products and services are offered by the Affiliated Banks, and lending products and services are offered by Charles Schwab Bank, an Equal Housing Lender.

Bank Sweep deposits are held at one or more FDIC-insured banks that are affiliated with Charles Schwab & Co., Inc. ("Affiliated Banks"). Securities products and services (including unswept or intra-day cash, net credit or debit balances, and money market funds) offered by Charles Schwab & Co., Inc. (member SIPC ⬛) are not deposits or obligations of the Affiliated Banks, are subject to investment risk, are not FDIC insured, may lose value, and are not Affiliated Bank-guaranteed. Charles Schwab & Co., Inc. and the Affiliated Banks are separate entities and are all

## KEY VALUE: $1.30

124.    The screenshots below confirm that the $1,465.13 *Mutual Funds Buying Power* conversion on 3/28 targeted the $1,463.83 *Cash and Cash Investments Total* stated on 3/29. While the values are nearly identical, an additional $1.30 was converted, and that value is an essential linkage amongst the various other discrepancies (particularly those that are multiples of $.13[9])

$$\text{EQ-A.36: } \$1.30 = \$1,465.13 \; (-) \; \$1,463.83$$

| 3/28 Screenshot @ 17:29 | 3/29 Screenshot @ 03:28 |
|---|---|
| Schwab *Streetsmart* App | Schwab *Streetsmart* App |





$$\text{EQ-A.37(a): } \quad \$1 + \$.26 \; (-) \; \$.03 \; = \$2.29 - \$1 - \$.06$$

$$\text{EQ-A.37(b): } \quad \$3.51 = \$2.29 + \$1.3 \; (-) \; \$.06 \; (-) \; \$.02$$

$$\text{EQ-A.37(c): } \quad \$1.30 = \$1.41 + .02 \; (-) \; \$.13$$

$$\text{EQ-A.37(d): } \quad \$1.30 = .66 + \$.46 + \$.26 \; (-) \; \$.06 \; (-) \; \$.02$$

$$\text{EQ-A.37(e): } \quad \$1.30 = \$1 + \$.26 + \$.06 \; (-) \; \$.02$$

$$\text{EQ-A.37(f): } \quad \$1.30 = \$1 + \$.46 \; (-) \; \$.13 \; (-) \; \$.03$$

$$\text{EQ-A.37(g): } \quad \$1.30 = \$1 + \$.17 + \$.13$$

$$\text{EQ-A.37(h) } \quad \$1.30 = \$4.45 + \$.26 \; (-) \; \$3.38 \; (-) \; \$.03$$

$$\text{EQ-A.37(i): } \quad \$1.30 = \$4.45 + \$.66 \; (-) \; \$3.51 \; (-) \; \$.26$$

---

[9] Though beyond the immediate scope of this complaint at this time, there is significance to the fact that the small dollar and cent-valued discrepancies were choreographed to coincide with multiples of $.13 (**i.e. BASE 13**). $.26, $3.38, $3.51, $1.43, $4.45 (-) $.03, $2.29 - $.06 - $.02,

## KEY VALUES: $1,768, $1,886, $118, $.17

125.    Manipulation of account balances during the final days of March 2018 achieved the concealment of $1886 as Disallowed Losses, which includes unique additional damages of $118.



126.    During the early morning hours of Friday, 3/30/2018[10], the *Account Value* changed from $21,381.83 (left), to $23,149.83 (middle) (a change of $1768), then on 3/31/2018 the value reverted back to $21,263.83 (right) [a change of $1886]. Also, note the negative *Futures Buying Power*.

$$\text{EQ-A.39(a): } \$1768 = \$23,149.83 \; (-) \; \$21,381.83$$

---

[10] The markets were closed in observance of the Easter holiday on 3/30/2018; the final trading day of the month was 3/29/2018.

$$\text{EQ-A.39(b): } \$1886; = \$23,149.83 \; (-) \; \$21,263.83$$

127.     The middle screenshot above corresponds to the account value reported by the <u>March</u> <u>Statement</u>, $23,149.83, but as screenshot on right shows, the account value was only temporarily adjusted to accommodate the arithmatic. In fact, the values is readjusted downward resulting in additional unrealized losses, unique damages of $118.

$$\text{EQ-A.38(c): } \$118: = \$1886 \; (-) \; \$1768$$

128.     The <u>March Statement</u> reports options positions which had expired worthless as possessing *Market Value* of $1886. This value directly corresponds to the manipulation of *Account Value* in the live data at the end of March 2018. These unreported "adjustments" were engineered to precisely accommodate Schwab's fraudulently reconstructed version of account activity as reported by the **March Statement**.

129.     The difference in value of the *Options Investments* between the middle and right screenshots, $21,686 vs. $19,800, is precisely $1886- the *Market Value* erroneously stated for those expired options.

$$\text{EQ-A.38(d): } \$1886 = \$21,686.00 - \$19,800.00$$

$$\text{EQ-A.38(e): } \$1768 = \$1048.69 + \$600 + \$104.85 + \$6.87 + \$3.51 + \$3.38 + \$1.3 + \$.06 - \$.64 \; (-) \; \$.02$$

## KEY VALUES: $3,618 & $3,736

130.        As shown by the 3/30 screenshots, the account value changed from $21,381.83 to $21,263.83, representing damages of $118. The screenshots below prove that additional unique damages of $118 occurred because the "Money Due" amount changed from $3618 to $3,736.

3/30/2018 Screenshot @ 03:38
Schwab Mobile App

3/31/2018 Screenshot @ 06:56
Schwab Mobile App





**EQ-A.39: $118 = $3736 (−) 3618**

131.        The $118 difference between the *Money Due* amounts affirms it to also relate to the end-of-month adjustments.

132.        No Margin Calls or other official documentation of those debts exists, except for Pitlor's screenshots.

**EQ-A.40: $3618 = $1048.69 + $600 + $575 + $494.54 + $309 + $224.80 + $118 + $104.85....**
**+ $54.28 + $50 + $29.54 + $7.16 + $3.51 + .06 − $1.43**

## KEY VALUE: $.17

### 3/30/2018 Screenshot @ 03:28
### Schwab Mobile App



### 3/31/2018 Screenshot @ 06:35
### Schwab Mobile App



133.    As shown by the above screenshots, the actual *Futures Buying Power* associated with the *Funds Due* of $3,618.00 and $3,736.00 that appear at the end of March contain an additional $.17.

134.    That $.17 in fact corresponds to the combination of other cent valued discrepancies. The variation with respect to the cent-valued discrepancies and the $1 SMA in fact lead to many other unique calculations of $.17 in addition to the following, most direct examples:

$$\text{EQ-A40.1: } \$.17 = \$.13 + \$.06 \; (-) \; \$.02$$
$$\text{EQ-A40.2: } \$.17 = \$.26 \; (-) \; \$.06 \; (-) \; \$.03$$

# KEY VALUE: $6639

Excerpt from 4/3 Screenshot @10:37
Schwab Mobile App



## KEY VALUES: $309 & $11.61

135.     The screenshots below demonstrate how the account balances were manipulated.

136.     The negative futures buying power ($734.00) and SMA value $425.00 net to a total negative value of ($309)

$$EQ\text{-}A.41: (\$309.00) = (\$734.00) + \$425.00$$

### 4/13/2018 Screenshot @ 11:54
### Schwab *Streetsmart* App



| Cash & Cash Investments | |
| --- | --- |
| Total | $381.57 |
| Cash Balance | $0.00 |
| Margin[1] | $381.57 |

| Investments | |
| --- | --- |
| Total | $884.50 |
| Securities | $0.00 |
| Options | $884.50 |

| Schwab Futures - | |
| --- | --- |
| Futures Account Value | $0.00 |
| Futures Total Equity | $0.00 |
| Initial Margin Requirement | $0.00 |
| Futures Buying Power | -$734.00 |

| Funds Available | |
| --- | --- |
| To Trade | |
| Cash Investments | $0.00 |
| Settled Funds | $0.00 |
| Cash + Borrowing | $0.00 |
| SMA | $425.00 |
| To Withdraw | |
| Cash Investments | $0.00 |
| Cash on Hold | $0.00 |
| Cash + Borrowing | $0.00 |

### 4/13/2018 Screenshot @ 11:55
### Schwab *Streetsmart* App

| Account Value | $1,266.07 |
| --- | --- |
| Day Change | -$1,506.80 (-54.34%) |

| Margin Details | |
| --- | --- |
| Margin Equity | $381.57 |
| Equity Percent | 100.00% |
| Trade Date Balance | $381.57 |
| Balance Subject to Interest | $11.61 |
| MTD Interest Owed | $0.00 |

| Margin Buying Power | |
| --- | --- |
| Marginable Securities | |
| Equities | $0.00 |
| Mutual Funds | $0.00 |
| Short Selling | $0.00 |
| Non-Marginable Securities | |
| Equities | $0.00 |
| Mutual Funds | $0.00 |
| Penny Stocks | $0.00 |
| Fixed Income | |
| Treasuries Maturing in 10+ yrs | $0.00 |
| Government Agencies | $0.00 |
| Municipal Bonds | $0.00 |
| Non-convertible Corporates | $0.00 |
| Convertible Corporates | $0.00 |
| Options | |
| Long (cleared funds) | $0.00 |
| Short (minimum equity required) | $0.00 |

137.     The Cash Balance, $381.57 represented as *Margin Equity,* does not compute with respect to the above figures, indicating that the Futures Buying Power and SMA are decoupled from the Margin Equity of the account, but must still "access" such to impact Account Value.

138.     Also note the Balance Subject to Interest, $11.61, which correlates to the $12 Futures Margin Call from 4/13/2018. The various data manipulations served to obfuscate the account data into a more complex puzzle while also balancing the discrepancies so to be indecipherable according to the official records and historical data alone.

$$EQ\text{-}A.42: \$11.61 = \$7.16 + \$4.45$$

# KEY VALUES: $3.51 & $.02

*Every value used in the derivations and calculations below corresponds to a **unique,** documented discrepancy in the account data, either in the live data or in the official record. Please refer to the index sheet for the precise reference. Previous derivations are referenced as applicable.*

*(Note: new equations are labeled **"EQ-B..."** whereas previously derived equations are **"Ref. EQ-..."**)*

139.    $3.51 was initially credited to the account, but it was then taken back, and then stolen. The net result was not a credit but unique damages totaling $3.51. However, the various data manipulations that achieved that result were not as straight-forward.

140.    The data conclusively confirms that significant effort was put forth to conceal $3.51, an amount that has no relation to the transaction data. $3.51 was hidden by combining it with other discrepancies and including it with the unreported *Balances Subject to Interest* (i.e. borrowed funds), $29.54 (via $6.87), and $11.61 (via $4,45)

141.    $3.51 was concealed along with $3.38 to masquerade as the *Cash on Hold, $6.87,* which resulted in an additional discrepancy of $.02:

**Ref. EQ-A.43: $6.89 = $3.38 + $3.51 = $6.87 + $.02.**

142.    While it is sometimes accounted for by offsetting other values (i.e. $.64 vs. $.66, or $1.41 vs. $1.43), $.02 must be precisely accounted for in every derivation of damages, similarly to $3.51. Indeed, $3.51 and $.02 relate to the concealment of that $6.87 that was converted along with the $9,999,999.00 *Cash on Hold* on 3/6/2018.

143.    The *Balance subject to Interest* of $29.54[11] displayed in the live account data from 3/20 – 3/22, supposing to correspond to a negative cash balance of $22.67 from 3/19, was not reported by the <u>March Statement</u> and thus concealed the following:

   a. negative cash balance ($22.67),

   b. $6.87 (which was included with the $10M+ funds laundered on 3/6/2018), and

144.    While the $29.54 was effective at concealing the $6.87, the $.02 discrepancy remained unaccounted for as was required to be offset separately. This was eventually accomplished by

---

[11] See EQ-A.3: $29.54

issuing an interest credit in April that, as confirmed by the official record, was based on erroneous data that did not correspond to Pitlor's account balances.

$$\text{EQ-B.1(a): } \$29.54 = \$22.67 + \$6.87$$
$$\text{EQ-B.1(b): } \$29.54 = \$22.67 + \$3.51 + \$3.38 \, (-) \, \$.02$$

145.    $3.51 was then concealed again as **$4.45** because it was stolen *twice* because, once to cancel the initial credit, and then again so to represent unique damages of $3.51.

$$\text{Ref. EQ-A.26(a): } \$4.45 = \$3.51 + .94$$
$$\text{Ref. EQ-A.26(b): } \$.94 = \$28{,}396.94 \, (-) \, \$28{,}396.00 = \$1 \, (-) \, \$.06$$
$$\text{Ref. EQ-A.26(c): } \$4.45 = \$3.51 + \$1 \, (-) \, \$.06),$$

146.    $4.45 was then combined along with the separate discrepancy, $7.16, to yield a $11.61, which shows up as a *Balance Subject to Interest* in April in the final days prior to the account's liquidation and subsequent closure.  Akin to the $29.54 derived previously in **EQ0.3**, the $11.61 *Balance Subject to Interest* was also omitted from the official record, as it was not reported by the April Statement.

$$\text{Ref. EQ-A.42: } \$11.61 = \$4.45 + \$7.16,$$

147.    The $.13 net credit [represented by $3.51 + ($3.38) = $.13] is also reflected by discrepancies pertaining to the interest credited to Pitlor's account, were choreographed to cancel out that difference.

**Ref. EQ-A.4(b): $46 = $.33 + $.13**

| | |
|---|---|
| **Ref. EQ-A.5(a) TD Ameritrade Balance** | **$.13 = $3.51 + ($3.38)** |
| **Ref. EQ-A.5(b) Bank Sweep Feature:** | **$.13 = $127.17 (–) $127.04** |
| **Ref. EQ-A.5(c) Interest Credit Anomalies** | **($.13) = ($.77) + $.64** |

**Ref. EQ-A.5(d) 3/28 Anomaly    $1.30  =  $1.43 (–) $.13  =  $.77 + $.64 + $.02 (–) $.13**

    a.    Several discrepancies corresponding to the $.77 interest payment on 3/15 resulted in its being stolen, and confirmed by the analysis.

    b.    While $.64 was indeed included in the $51,753.55 missing from the account on 3/28/2018 (supposed transfer from *Bank Sweep Feature*), it is also documented as a

stray cash balance on 3/28/2018, indicating its having been separately credited back to the Brokerage Account.

c.  A $.13 discrepancy also exists between Cash Available to Withdraw, $127.17, and the funds Swept to the *Bank Sweep Feature*, $127.04, on 3/22/2018.

**Ref. EQ-A.5(a)(b): $.13 = $3.51 (-) $3.38 =$.77 (-) $.64**

d.  As demonstrated by the analysis corresponding the $.13 discrepancy, indeed it did exist as a separate discrepancy

**EQ-A.5(b) Bank Sweep Feature:**                          **$.13 = $127.17 (–) $127.04**

148.     In addition to the derivations *infra* which primarily involve the small dollar and cent valued discrepancies, $3.51 is a constituent sum that precisely computes larger discrepancies.  Note that every constituent sum in all of the as previously derived:

**EQ-A.35(a) $10,982.00** = $3,404.57 + $2,702.27 + $3,092.84 + $1768 + $6.89 + **$4.45**…
+ $2.29 + $.77 -$.06 - $.02

**EQ-A.35(b) $10,979.71** = $3092.84 + $2702.27 + $1768 + $1048.69 + $600 + $575…
+ $494.54 $309 + $118 + $104.85 + $54.28 + $50 + $29.54 + $22.67…
+ **$3.51** + $3.38 + $1.41 + $1 + $.66 + $.06 + $.03 - $.02

**EQ-A.38(e): $1768** = $1048.69 + $600 +$104.85 + $6.87 + **$3.51** + $3.38 + $1.3 + $.06 -$.64 (–) $.02

**EQ-A.40: $3618** = $1048.69 + $600 + $575 + $494.54 + $309 + $224.80 + $118 + $104.85….
+ $54.28 + $50 + $29.54 + $7.16 + **$3.51** + .06 - $1.43

149.     Because the $3.51 discrepancy was (1) designed to be concealed by the *Cash on Hold* $6.87, which is represented in the entirety of the March Data as a *Balance Subject to Interest* (either as $6.87 or $54.28), and further (2) because it also was carried through and eventually offset in the April data, indeed it is included in virtually every derivation of discrepant values that are a combination of other discrepancies, of which there are many examples.

150.     Similar patterns of manipulations are evident with respect to the other sums that were concealed from the official record, such as:

i. $23,355.97, which is documented to have been credited to Schwab Brokerage Account ####5612 via a *Sweep from Futures* transaction, but it can also be shown to have been contributing to the damages twice, or

ii. $28,396.94, which corresponds to the *Bank Sweep Feature Balance* on 3/26/2018; alternative derivations of damages show it to have in fact been stolen twice.

iii. Both of the above are "true", but the derivations of **unique** damages confirms that proper analysis must be certain to avoid double-counting.

iv. Such complexity is a feature of the Defendants scheme, and Pitlor looks forward to the opportunity to more thoroughly explain how these relationships operate with "similar" sums with respect to the larger scheme.

v. The following is just one such example that demonstrates the "lack of uniqueness" amongst the key values, specifically pertaining to $5795.11 and $16,870.41, the erroneous values reported byas well as the smaller adjustment values.  :

> *Every value corresponds to unique discrepancies in the account data, or the sum of discrepancies.  $16,870.41 and $5795.11 correspond to discernable errors identified via analysis of the official record alone.*

EQ-B.2:     $23,489.95 = $16870.41 + $5795.11 + $600 + $118 + $104.85 + $1.41 + $.17

Ref. EQ-A.37(c):     $1.41 - $.13 = $1.3 (−) $.02

EQ-B.3:     $29,256.75 = $23,489.95 + $5795.11 + $1 + $.26 (−) $.03

EQ-B.3(a):     $1 + $.26 (−) $.03 = $2.29 - $1 - $.06

EQ-B.4:     **$3.51** = $2.29 + $1.3 (−) $.06 (−) $.02

151.     That $.03, which corresponds to the consolidation of other discrepancies, is a separate anomaly from $7.16, both of which relate to the 3/23 account data.  Indeed, the pieces of the puzzle all fit together.

EQ-B.5: $7.16 = $3.51 + $3.51 + $.17 (−)  $.03

EQ-B5.1: $.17 = $.13 + $.06 (−)  $.02

## OATH

I hereby swear under the penalty of perjury that the contents of this filing are true and accurate.

On this 6th day of July, 2020,

_____David Pitlor_____

2001 S. 60th St.

Omaha, NE 68106

(531-375-1392

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2020, I filed the foregoing with the Clerk of the District of Nebraska at the Roman L. Hruska Federal Courthouse in Omaha, Nebraska.

s/David Pitlor

David Pitlor